## No. 22-16826

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# NINTH CIRCUIT

TGP COMMUNICATIONS, LLC, d/b/a THE GATEWAY PUNDIT,
AND JORDAN CONRADSON,

*Plaintiffs-Appellants,*

v.

JACK SELLERS, THOMAS GALVIN, BILL GATES, CLINT HICKMAN, STEVE GALLARDO,
STEPHEN RICHER, REY VALENZUELA, SCOTT JARRETT, MEGAN GILBERTSON, AND
MARCUS MILAM,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Arizona
No. 2:22-cv-01925-JJT
The Honorable John J. Tuchi

# MOTION FOR AN INJUNCTION PENDING APPEAL
### [Emergency Motion Under Circuit Rule 27-3]

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118
Tel:   702-420-2001
ecf@randazza.com

David S. Gingras
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
david@gingraslaw.com

Attorneys for Appellants

**INTRODUCTION**

Pursuant to Fed. R. App. P. (8)(a)(2) and Circuit Rule 27-3, Plaintiffs-Appellants submit this emergency motion for an injunction pending appeal and request that the Court enjoin Defendants-Appellees from excluding Appellants from newsgathering or attending press conferences on an equal basis to any other press outlets they have admitted to such conferences or events.

Absent immediate relief, Appellants' ability to report on matters of national significance, namely the 2022 national election, will be irreparably harmed. The election in Maricopa County, Arizona is a hot news situation, and *any* impediment to Plaintiffs' ability to cover this news irreparably harms the First Amendment.

**FACTUAL BACKGROUND**

**I.   Appellants The Gateway Pundit and Conradson**

TGP Communications d/b/a The Gateway Pundit ("TGP") is a widely circulated news source. (*See* Dist. Ct. Dkt. No. 7-3). Appellants cover Maricopa elections extensively. (*See* Dist. Ct. Dkt. No. 13). In fact, their reporting exposed Maricopa County Supervisor Steve Chucri as an "election denier" in 2021, and led to his resignation. (*See* Dist. Ct. Dkt. Nos. 13-2, 13-3, 13-4, 13-5, and 13-6; Hearing Transcript, attached as **Exhibit 1**, at 36:2-37:5).

## II.     Maricopa's Press Pass Regulation

Maricopa County established a new procedure to exclude disfavored reporters. It requires "an official Press Pass for members of the press to enter its facilities and/or cover events related to the 2022 General Election." (*See* Dist. Ct. Dkt. No. 1-2). It decides whether to issue a pass based, in relevant part, upon the following criteria:

> e.  Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?
>
> > i.  Both avoid real or perceived conflicts of interest;
> >
> > ii.  Both are free of associations that would compromise journalistic integrity or damage credibility;

(*See* Dist. Ct. Dkt. No. 1-2).

## III.     Appellees' Denial of Appellants' Press Pass

On September 27, 2022, TGP and one of its reporters, Jordan Conradson, applied for press credentials to view the vote tabulation process and to attend press conferences. However, Appellees excluded Appellants from covering the election. The stated reason was as follows:

- #4[sic]: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.

(*See* Dist. Ct. Dkt. No. 1-5.)

Conradson appealed in person. (*See* **Exhibit 1** at 51:3-6). His appeal was ignored. He then appealed through a letter from counsel – also ignored. (*See* Dist. Ct. Dkt. No. 1-6.)

On November 8, Maricopa's election turned from a simple "report on the outcome" to a controversy of national importance. Along with this escalation in journalistic urgency, Maricopa escalated its hostility toward Appellants. On November 10, 2022, Maricopa County ejected Appellants completely from County property, not even allowing them to be on the curtilage of County property, and following Conradson with a drone. (*See* **Exhibit 1** at 37:2-5).

Other members of the press had the "correct" viewpoint and content, so they were allowed inside the cordon. (Dist. Ct. Dkt. No. 7-2 at ¶¶ 4-5, 10; Dist. Ct. Dkt. No. 7-3 at ¶¶ 4-5, 10). Appellants were unable to participate in press conferences or view the ballot-counting process.

Appellees excluded Appellants out of specific animus against them. On September 27, 2022, Appellee Stephen Richer, the Maricopa County Recorder, retweeted a Twitter post reading "County elections getting all fancy. Really gonna miss The Gateway Pundit rolling in and trying to listen in on legitimate reporter conversations/intimidate public officials." (Dist. Ct. Dkt. No. 25-1). The day

Appellants requested a press pass, and three days before Appellees formally denied this request, Appellees had already judged Appellants to be unworthy of one.[1]

## IV.  Relevant Procedural History

Appellants sued on Nov. 12, 2022, and it was not docketed until Nov. 14, 2022. (*See* Dist. Ct. Dkt. No. 1). Plaintiffs moved for an emergency, *ex parte* relief seeking to prohibit Defendants from further interference in Plaintiffs' abilities to report on the ongoing election in Maricopa County. (*See* Dist. Ct. Dkt. No. 7).

On Nov. 17, 2022, the District Court held a full evidentiary hearing. (*See* Dist. Ct. Dkt. No. 17). The District Court denied Appellants' request for an injunction on Nov. 23, 2022. (*See* Dist. Ct. Dkt. No. 27).

## ARGUMENT

This Court should restore Appellants' right to gather news, no matter whether Maricopa County likes their viewpoint or their politics or not. The regulations are unconstitutional, both facially and as applied.

## I.  Seeking the Requested Relief Below Would be Impracticable

Fed. R. App. P. 8(a) requires seeking relief in the district court unless "moving first in the district court would be impracticable." Here, there is no time to seek such

---

[1]  The District Court acknowledged this evidence, but said it did not show animus had anything to do with the denial. (Dist. Ct. Dkt. No. 27 at 14). Such a conclusion in the face of clear, unambiguous evidence of animus, is clearly erroneous.

relief. Appellants must be afforded relief *right now* or forever lose their ability to report on an issue of national importance. Plaintiffs will not receive a decision on an emergency motion with sufficient speed if they first file in the court below.

The District Court heard Appellants' motion on Nov. 17, 2022. It took nearly a week to deny it – on the afternoon before Thanksgiving. The District Court ignored significant evidence and testimony presented during the hearing, strongly suggesting that the Court had largely reached its decision prior to the hearing. If the District Court truly needed almost a week to issue its denial, it could have promptly issued a minute order denying the motion, with a detailed written order to follow. While Appellants do not suggest the District Court's timing in issuing its order evidences anything untoward, Appellants cannot file this in the District Court, wait until Friday afternoon at 4:59 PM for the Court to deny it again, only to then seek relief here. Speed is vital, as this is an hour-by-hour developing news issue. As this Court observed in *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020):

> Before us, amici the Reporters Committee for Freedom of the Press and twenty-seven media organizations press the point that "news" is not even "news" if it is not timely, that is, immediate and contemporaneous. *See* Janet Kolodzy, *Convergence Journalism* 59 (2006) ("It is, after all, called the 'news' business and not the 'olds' business."); Fred Fedler et al., *Reporting for the Media* 123 (8th ed. 2005) (identifying timeliness as a central characteristic of news). Thus, that "old" news is not worthy of, and does not receive, much public attention has been widely recognized. Moreover, as amici argue, the need for immediacy of reporting news "is even more vital in the digital age," where timeliness is measured in terms of minutes or seconds.

*Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020). Even a 24-hour delay at the District Court will irreparably harm Appellants.

## II. Legal Standard

A party seeking a preliminary injunction or temporary restraining order must meet one of two tests: traditional or alternative. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). Under the traditional test, a plaintiff must show: (1) he will probably prevail on the merits; (2) he will suffer irreparable injury if injunctive relief is not granted; (3) the defendant will not be equitably harmed more than the plaintiff is helped by the injunction; and (4) granting the injunction is in the public interest. *See id*. Alternatively, a court may issue a preliminary injunction if the plaintiff shows either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *See FDIC v. Garner*, 125 F.3d 1272, 1277 (9th Cir. 1997); *Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir. 1993). "The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Injunctive relief is proper if either test is met. These are not separate tests, but "merely extremes of a single continuum." *Topanga Press, Inc. v. City of Los Angles*, 989 F.2d 1524, 1528 (9th Cir. 1993). If the balance of hardships strongly favors the

plaintiff, he does not need as strong of a showing of success on the merits, and vice versa. *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999).

Where a constitutional right is at stake, no further showing of irreparable injury is required. *See Associate General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). In fact, the first prong of the "traditional" test is generally outcome determinative in First Amendment cases, as a chill to First Amendment rights is irreparable harm, a governmental entity can have no legitimate interest in enforcing an unconstitutional regulation, and the public is not helped by enforcing such a regulation. *See Thoms v. Maricopa Cty. Cmty. Coll. Dist.*, 2021 U.S. Dist. LEXIS 214822, *35-39 (D. Ariz. Nov. 5, 2021).

## III. Appellants Demonstrated a Likelihood of Success

For purposes of this Motion, Appellants argue their First Amendment rights were violated in that Appellees' regulations governing press passes are unconstitutionally vague, and Appellees engaged in viewpoint-based discrimination in denying Appellants a press pass.

### A. Newsgathering is Broadly Protected

The media serves an essential role as "surrogates for the public" when it reports on government affairs. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).

In *Consumers Union v. Periodical Correspondents'Ass'n.*, 365 F. Supp. 18, 22-23 (D.D.C. 1973),[2] it was unconstitutional for the government to discriminate against Consumer Reports on grounds that it was "owned and operated" by a "self-proclaimed advocate of consumer interests." The court further stated: "A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine." *Consumers Union*, 365 F. Supp. at 25.

The government may not exclude a publication because of their viewpoint or their readership. *See Quad-City Cmty News Serv. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) ("any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional"). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media, or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill v. Knight*, 569 F.2d 124, 129 (1977) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972).

---

[2]    Rev'd on other grounds, 515 F.2d 1341 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976).

The government, in this case, tries to save its decision by offering Appellants the opportunity to watch streaming video of press conferences. This does not cleanse their actions. The court in *Consumers Union* stated:

> While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, … the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied …, constitutes a direct limitation upon the content of news.

*Consumers Union*, 365 F. Supp. at 25-26 (citations omitted)

"[A]ll representatives of news organizations must not only be given equal access, but within reasonable limits, access with equal convenience to official news sources." *Westinghouse Broad. Co. Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976). In a similar case, the government sought to segregate media into different areas. *That* was not permissible. *See United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1374 (S.D. Fla. 2002) "[T]o the extent that entry into the 'general-circulation media' press room provides media representatives with additional access to information, Plaintiffs' First Amendment rights are being violated." *Id.*

## B. Appellees' Restrictions are Unconstitutionally Vague

A policy is impermissibly vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Because of the potential for arbitrary

suppression of free speech, "the Constitution requires a 'greater degree of specificity' in cases involving First Amendment rights." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011).

Appellees revoked Appellants' right to cover press conferences and denied them new credentials without due process,[3] by using unconstitutionally vague criteria – that journalists "avoid real or perceived conflicts of interest," and that journalists be "free of associations that would compromise journalistic integrity or damage credibility." (*See* Dist. Ct. Dkt. No. 7-1, Denial Email).

As to conflicts of interests, it is unclear what is prohibited. The government relies upon the SPJ (Society for Professional Journalists) Code of Ethics upon regulations upheld by the Seventh Circuit in *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610-11 (7th Cir. 2021). The District Court said these were "reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the [government's] message by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to

---

[3]    The record is clear that Appellants *had* a right to newsgather co-equal with other government-approved press, but that was taken from them when Maricopa instituted its new policy – which according to the record in this case, does not appear to have been enforced against anyone except the Appellants. (*See also* Dist. Ct. Dkt. No. 7 at 11-12).

craft newsworthy stories." (Dist. Ct. Dkt. No. 27 at 13).[4] The District Court failed to appreciate that the Seventh Circuit was upholding the application of these standards to exclude *a think tank* from a pool of journalists. *Evers*, 994 F.3d at 606. This *could* make sense, but to say that the Seventh Circuit was endorsing viewpoint-based discrimination against disfavored journalism outlets ignores the actual holding and facts of that case. If it did read as the District Court interpreted it, this Circuit should reject such a holding.

Even if the government could decide what a "conflict of interest" really is, it is impossible to determine how a journalist may avoid the government deciding that it *perceives* a conflict of interest. Is appearing to favor one political party a conflict of interest? If that is the case, and the rule were applied evenly, all press conferences would be given to empty rooms. This vagueness leads to arbitrary and viewpoint-based enforcement, which happened here. (*See* Dist. Ct. Dkt. No. 25-1; **Exhibit 1** at 35:21-36:1 [Conradson testifying he received a press pass from the Arizona Senate]; Dist. Ct. Dkt. No. 27 at 8-9 [District Court approving of Arizona Senate Media Rules containing same definition of "conflict of interest" as Appellees used]).

---

[4]    With respect to these three criteria that the District Court approved of, the record shows that the first two (news dissemination and longevity) are clearly met. (Dist. Ct. Dkt. No. 7-3 at ¶ 1). The third however, is Constitutionally infirm. What is "newsworthy" is not for the government nor a court to decide. The government and the District Court appointed themselves as "media critics" – which is not a proper function for any branch of government.

The District Court referred to the SPJ Code of Ethics to determine whether the term "conflict of interest" was unconstitutionally vague. (Dist. Ct. Dkt. No. 27 at 8). In doing so, it noted that this code did not create a set of legally enforceable rules. (*Id*. at n.2). Yet it then used the SPJ's standards as guideposts for determining the constitutionality of Appellees' regulations. (*Id*. at 8-9). Meanwhile, Appellants' expert gave full testimony on how such a standard is no standard at all and that the SPJ itself is biased against "new media." (**Exhibit 1** at 13:1-14:11).

Appellees claim a broader definition of the term "conflict of interest" in its regulations than even the SPJ. The government claims that the SPJ standard should include a journalist who reports "on issues for which, and candidates for whom, he also advocates," as justification for denying Conradson a press pass. (Dist. Ct. Dkt. No. 27 at 8; **Exhibit 1** at 70:7-23).[5] The District Court found that Appellees' broad definition was "not an outlier" because the Arizona Senate's Media Rules had a similarly broad scope. (Dist. Ct. Dkt. No. 27 at 8-9). However, the District Court then went on to ignore that, under even this broad standard, the Arizona Senate gave

---

[5]    Even if this standard were constitutional, there is nothing in the record that shows that the Appellants ever violated such a standard. This is just made up out of thin air. The government showed Conradson volunteering for a Phoenix mayoral candidate in a prior election. (Dist. Ct. Dkt. No. 17 at 6; Dist. Ct. Dkt. No. 17-2 at 1-4). Is the government saying that once one volunteers on a campaign, one is banned from being a journalist?

him a press pass. (**Exhibit 1** at 35:21-36:1).[6] A different outcome under the same standard is compelling evidence of the standard being unconstitutionally vague, and is evidence of Appellees exercising unfettered discretion.

Entertaining this broad interpretation of "conflict of interest" at all was an abuse of discretion. Under such a standard, any reporting relating to an industry to which a media outlet's *advertiser* belongs would be a conflict of interest. For example, if the *Arizona Republic* ran an ad for Katie Hobbs, it would be disqualified under this standard (if it were applied in a viewpoint neutral manner). This reveals the "standard's" true nature; a blank check for viewpoint-based censorship.

As to Appellees' "free of associations" requirement, it is likewise unclear what conduct is prohibited. What sort of associations would "compromise journalistic integrity or damage credibility?" There was testimony explaining this – that a lobbyist should not also be a journalist. (**Exhibit 1** at 15:15-16:5). But, the District Court seemed to interpret this as allowing the government to ban TGP and Conradson from press conferences because Conradson does not hide the fact that he

---

[6]  This does not mean that the Arizona Senate's rules are constitutional. Just because one governmental entity applies an unconstitutional standard does not mean that a different entity may rely on this fact to defend the constitutionality of its own restriction. It shows the District Court was wildly inconsistent in crediting Appellee's evidence, which consisted entirely of hearsay in media articles, and Appellants' direct evidence of viewpoint discrimination.

is a Republican. To violate the Free Press clause, the government chose to use the Free Association clause as its weapon. This cannot stand.

### C.     Defendants Engaged in Viewpoint Discrimination

The government may not condition exercise of First Amendment rights on "obtaining a license or permit from a government official in that official's boundless discretion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). Content-based and viewpoint-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). A restriction is viewpoint-based where "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Univ. of Va.*, 515 U.S. 819, 829 (1995).

In this case, the government created a limited public forum for the press to gather the news. However, the government limited access to that forum using a vague standard, which they employed using unfettered discretion. In a public forum, "there is broad agreement that ... investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006)); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012). "For this reason, even in cases involving nonpublic or limited public forums, a policy …

that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Child Evangelism*, 457 F.3d at 387.

Appellees' regulations have no reasonably specific criteria or objective factors. They claim to rely on the SPJ, but at the District Court it was shown that they were not actually using the SPJ's standards, but rather using their language and interpreting it to give them the discretion to ban anyone at all. (Dist. Ct. Dkt. No. 27 at 8; **Exhibit 1** at 70:7-23).

During the hearing, Appellees argued that they had "the right to set up criteria for ethical reporting." (**Exhibit 1** at 83:15-25). The District Court correctly noted that this proposition was "controversial" and "problematic" and Appellants' expert witness strongly disagreed with it. (Dist. Ct. Dkt. No. 27 at 13). The District Court then transformed this unconstitutional assertion of authority into something benign, claiming that forbidding journalists from accessing a limited public forum was not a restriction on newsgathering, but rather "further[ed] the County's legitimate interest in disseminating accurate information to the public." (*Id.* at 14). This is a distinction without a difference, as limiting access to the exclusive forum where official information regarding the 2022 election was provided is a restriction on newsgathering. Furthermore, it is absurd to accept that the government may selectively exclude media for the sake of ensuring the reporting of what the

government deems to be "accurate" information. The government is a poor arbiter of truth,[7] especially when it has a vested interest in stifling the dissemination of unflattering, yet accurate, information. In fact, such dissemination of unflattering information by TGP is likely part of this animus toward them.[8] History is replete with examples of governments lying to their constituents. That is why the First Amendment protects freedom of the press. To accept such censorious motives as a legitimate government interest is a clearly erroneous application of law.

## IV.  Remaining Injunction Factors

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). The freedom of the press also exists to serve the public. *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1135 (D. Alaska 2021) ("the foundational principle of the press clause of the First Amendment is that the media serves the public in offering both governmental transparency and information to the citizenry"). Conversely, there is a public harm in only allowing "viewpoint

---

[7]  Appellees' witness claimed that they are "interested in serving journalists who are interested in selling the truth …" (**Exhibit 1** at 66:18-24).

[8]  TGP was the sole reporter of statements showing an Arizona elections official being an "election denier," which directly led to his resignation. (*See* Dist. Ct. Dkt. Nos. 13-2, 13-3, 13-4, 13-5, and 13-6; **Exhibit 1** at 36:2-37:5). Appellees then promulgated new press pass requirements that, as the Maricopa County Recorder admitted on social media, were designed to keep TGP out of press conferences shortly before the 2022 election. (Dist. Ct. Dkt. No. 25-1). The retaliatory motive and animus could not be clearer.

approved" press to cover the government, and the way the government has acted will undermine confidence that the election is being tallied cleanly.

"When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) (citing Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence"). And when the government restricts a publication because of its viewpoint, the government is trying to blind the critical press while allowing in the friendly press.

The District Court found that Appellants' alleged delay in filing suit weighed against any claim of irreparable harm. (Dkt. No. 27 at 16). However, Appellants were not sitting on their hands during that gap – but were trying to resolve this without litigation both with in person appeals and written appeals. (Dist. Ct. Dkt. No. 7-1; **Exhibit 1** at 45:6-14 & 51:3-6). Further, there was no story of national importance until November 8. And the escalation of hostility and final rejection of administrative appeals did not occur until November 10. This "delay" rationale seems to be a pretext, not clear analysis of the facts.

Appellees also argued that the livestreams they broadcast of these press conferences are just as good as being there in-person, but the District Court correctly noted this is false. (Dist. Ct. Dkt. No. 15). It ignored just how poor a substitute the livestreams were, however, as not all of these conferences are livestreamed, and journalists viewing a livestream have no opportunity to ask officials questions. (**Exhibit 1** at 46:4-20, 54:3-8, 68:14-23).

In explaining why Conradson was denied a press pass, Appellees' witness, Fields Moseley, stated that "[h]e doesn't seek the truth and his articles have led to direct threats to Board of Elections officials and employees." (**Exhibit 1** at 72:13-17). This histrionic claim is at best, a fantasy. Their only evidence of these alleged "threats" was inadmissible hearsay *Reuters* reporting "stating that TGP was cited in highly threatening communications directed at County election employees." (Dist. Ct. Dkt. No. 27 at 4) (citing Dist. Ct. Dkt. No. 17-2 at Exhibit 17 and Dist. Ct. Dkt. No. 17-3 at Exhibit 18). The Court, for reasons unexplained, chose to credit these articles in weighing the public interest, characterizing them as "evidence suggesting–though not definitively proving–that [TGP's] articles have been associated with threats against County employees." (Dist. Ct. Dkt. No. 17). There was no finding that TGP's articles actually had this effect on anyone, that anyone had actually received these alleged threats, how many threats there were, or any other thing that could be called "evidence." (**Exhibit 1** at 74:5-75:1).

**CONCLUSION**

The government claims that its restrictions are not content or viewpoint based, but they then have somehow made a determination that the Appellants' reporting is not of sufficient "quality" – which the same exact thing, just called by a different name. The government also seems to claim that any harm done is of no consequence because the Appellants can watch YouTube streams of press conferences and, even with a pass, there is no guarantee Conradson would even be allowed into the room (because they could be full before he arrived) and even if he got into the room, there is no legal obligation for anyone to allow him to ask questions.

If all this is true, then why is the government permitted to revoke long-standing access to press conferences and then issue press credentials to people with arbitrary levels of "journalistic integrity" who may never be called on at all during a press conference? Those two things are completely inconsistent with each other.

The government rarely admits to viewpoint or content based discrimination. Here, it has done so, but it seems to think that if it calls it something else, then it just magically becomes something else. It does not. But, if this decision would stand, it will be cited by government agencies across the land who decide that they simply do not like one media outlet or another – and that based on these unconstitutionally vague notions, they can be barred from access to press conferences or other forms of news gathering. The District Court and the government have created a "press

licensing" system that is perfectly primed to be abused. If one does not like The Gateway Pundit, that is everyone's right. However, we must picture the tool that the government uses today in the hands of someone we despise, or at least politically disagree with. When we do that, we can easily see into the future – and how this will be abused. Either the District Court decision or the Free Press clause can stand – but not both.

The Court should immediately issue an injunction pending appeal preventing Appellees from interfering with Appellants' access to Appellees' public forum and gathering news regarding the 2022 Maricopa County election.

Date: November 30, 2022.   RANDAZZA LEGAL GROUP, PLLC

         /s/ Marc J. Randazza
         Marc J. Randazza

         David S. Gingras
         GINGRAS LAW OFFICE, PLLC

         *Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 27 because this brief contains 4,802 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: November 30, 2022.                    RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

David S. Gingras
GINGRAS LAW OFFICE, PLLC
*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: November 30, 2022.    RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

David S. Gingras
GINGRAS LAW OFFICE, PLLC

*Attorneys for Appellants*

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 16. Circuit Rule 27-3 Certificate for Emergency Motion

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form16instructions.pdf*

**9th Cir. Case Number(s)** | 22-16826

**Case Name** | TGP Communications, LLC, et al. v. Jack Sellers, et al.

I certify the following:

The relief I request in the emergency motion that accompanies this certificate is:

An injunction pending appeal requesting that the Court enjoin Defendants-Appellees from excluding Appellants from newsgathering or attending press conferences on an equal basis to any other press outlets they have admitted to such conferences or events

Relief is needed no later than *(date)*: Dec 2, 2022

The following will happen if relief is not granted within the requested time:

Plaintiffs-Appellants are suffering and will continue to suffer irreparable harm because their First Amendment press freedoms remain infringed upon by the Defendants-Appellees.

This is a 'hot news' situation, and relief is urgent – even a delay of hours is troublesome, but days would be extremely prejudicial to the appellants, journalists seeking to cover events of national importance.

I could not have filed this motion earlier because:

This appeal was docketed on November 29, 2022.

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 16** 1 *Rev. 11/21/2019*

I requested this relief in the district court or other lower court: ◉ Yes ○ No

 If not, why not:

> The requested injunction is the subject of this appeal.

I notified 9th Circuit court staff via voicemail or email about the filing of this motion: ◉ Yes ○ No

 If not, why not:

I have notified all counsel and any unrepresented party of the filing of this motion:

 On *(date)*: Nov 29, 2022

 By *(method)*: E-mail

 Position of other parties: Appellees oppose the requested relief.

 Name and best contact information for each counsel/party notified:

> Counsel for Appellees:
> Maricopa County Attorney's Office
> Thomas P. Liddy, liddyt@mcao.maricoa.gov
> Charles Tullinger, trullinc@mcao.maricopa.gov
> Joseph Branco, brancoj@mcao.maricopa.gov
> Joseph LaRue, laruej@mcao.maricopa.gov
> 225 West Madison Street, Phoenix, Arizona 85003
> Telephone: (602) 506-8541

I declare under penalty of perjury that the foregoing is true.

**Signature** /s/ Marc J. Randazza   **Date** Nov 30, 2022

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 16** 2 *Rev. 11/21/2019*