UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| TGP COMMUNICATIONS, LLC, a Missouri limited liability company, DBA The Gateway Pundit; JORDAN CONRADSON, an individual,<br><br>        Plaintiffs-Appellants,<br><br> v.<br><br>JACK SELLERS, et al.,<br><br>        Defendants-Appellees. | No.   22-16826<br><br>D.C. No. 2:22-cv-01925-JJT<br>District of Arizona,<br>Phoenix<br><br>ORDER |

On November 8, 2022, the United States held its mid-term elections. Nearly a month later, Maricopa County continues to count those cast ballots. As a result, press attention remains fixed on Arizona, the election results and the ballot counting. To balance the demand for access with logistical and security requirements, Maricopa County began requiring members of the press to obtain a press pass to enter its facilities to cover election-related events. Jordan Conradson, a reporter for The Gateway Pundit, the trade name of TGP Communications, LLC (together, "Plaintiffs" or "Appellants"), sought a press pass to attend press briefings about the election. Maricopa County and individual Appellees denied Conradson a press pass because, in their view, he is not a reputable journalist under their press-pass guidelines and had reported false information about Arizona elections.

Plaintiffs sought a temporary restraining order, arguing that the press-pass criteria were unconstitutional. They sought, among other forms of relief, access to the County press briefings. After an evidentiary hearing, the district court denied injunctive relief. We consider Appellants' motion for an injunction pending appeal concerning the County's denial of Conradson's press pass.

We have jurisdiction over appeals of denials of preliminary injunctions pursuant to 28 U.S.C. § 1292(a)(1), but we generally lack jurisdiction over appeals of denials of temporary restraining orders. *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989). Although Plaintiffs sought a temporary restraining order below, we conclude that we have appellate jurisdiction under § 1292(a)(1) because the district court's order was effectively a denial of preliminary injunctive relief. *See Graham v. Teledyne-Cont'l Motors*, 805 F.2d 1386, 1388 (9th Cir. 1986). Because Appellants have established that they are likely to suffer irreparable harm in the absence of preliminary relief and are likely to succeed on the merits of their as-applied First Amendment challenge to the denial of a press pass, we grant the motion.

I

This appeal arises from a denial of injunctive relief regarding Maricopa County's policy of requiring press members to obtain a press pass to attend press briefings concerning the election at County facilities. Reporters can apply online for

a press pass that "will allow a member of the press to attend news conferences or enter the Elections Department's office to conduct interviews, take photos, and/or video." The County evaluates whether an individual is a "member of the press" based on these criteria:

> a. Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?
>
> b. Does the parent news organization meet the following criteria?
>
>> i. It has published news continuously for at least 18 months, and;
>>
>> ii. It has a periodical publication component or an established television or radio presence.
>
> c. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?
>
> d. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?
>
> e. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?
>
>> i. Both avoid real or perceived conflicts of interest;
>>
>> ii. Both are free of associations that would compromise journalistic integrity or damage credibility;
>>
>> iii. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and
>>
>> iv. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

> This list is not exhaustive. The time, manner, and place limitations or needs of any one event may require consideration of additional factors.

On September 26, 2022, Plaintiffs applied for a press pass, which the County denied. Its denial decision stated that Plaintiffs "(a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility." And the County found that Conradson is "not a bona fide correspondent of repute in [his] profession."

After the national election, Conradson again sought access to press briefings regarding the ongoing ballot counting in Maricopa County but was denied such access. On November 12, 2022, Plaintiffs sued, alleging violations of the First Amendment. They sought a temporary restraining order requiring the County "to immediately authorize Conradson's press credentials or to allow him to attend press conferences." The district court held an evidentiary hearing, at which counsel for all parties appeared in person. The court took testimony, received evidence, and heard argument. The district court denied Plaintiffs' request for injunctive relief. *TGP Commc'ns LLC v. Sellers*, No. CV-22-01925, 2022 WL 17177700, at *1 (D. Ariz. Nov. 23, 2022).

Plaintiffs appealed and moved to expedite the appeal. On November 30, Appellants filed this emergency motion for an injunction pending appeal, requesting that we "enjoin Defendants-Appellees from excluding Appellants from

newsgathering or attending press conferences on an equal basis to any other press outlets they have admitted to such conferences or events." That same day, a motions panel expedited the appeal to be heard on the merits. We are now asked to decide Appellants' motion for injunctive relief pending appeal.

II

Although we review the denial "of a preliminary injunction for an abuse of discretion" and "factual findings for clear error," we also review "the underlying legal conclusions de novo." *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021). If "the district court relied on an erroneous legal premise," then it abused its discretion, and we may reverse. *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015).

At the preliminary injunction stage, our "review of the district court's findings" is "restricted to the limited record available to the district court when it granted or denied the motion." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 753 (9th Cir. 1982).

III

The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction. *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). And courts use the same standard for issuing a temporary restraining order as that for

issuing a preliminary injunction. *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). As relevant here, Appellants must show: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)).

A

We first must determine whether we have appellate jurisdiction. An order denying a temporary restraining order (TRO) is generally not appealable under 28 U.S.C. § 1292(a)(1), which limits our jurisdiction to review denials of preliminary injunctions. *Religious Tech. Ctr.*, 869 F.2d at 1308. An order denying a temporary restraining order after a full adversary hearing, however, is appealable where the order effectively denies injunctive relief. *See Env't Def. Fund, Inc. v. Andrus*, 625 F.2d 861, 862 (9th Cir. 1980). The district court held an adversary hearing in which both sides could examine witnesses and proffer evidence. And in its order, the district court noted it was denying injunctive relief. Under these circumstances, the district court's order was effectively the denial of a preliminary injunction. The order is thus appealable under § 1252(a)(1). *See Religious Tech.*

*Ctr.*, 869 F.2d at 1308.

We also agree that requiring Appellants to seek relief in the district court would be impracticable under Fed. R. App. P. 8(a) under the particular circumstances presented here, which include the ongoing nature of the 2022 Arizona election ballot count and the concomitant need to timely report on these events. *See, e.g.*, *Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020). We thus review the merits of Appellants' motion for injunctive relief.

In deciding whether to grant an injunction pending appeal, we "balance[] the plaintiff's likelihood of success against the relative hardship to the parties." *Se. Alaska Conservation Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1100 (9th Cir. 2006) (cleaned up). We analyze those factors below.

B

At least at this preliminary stage, Appellants have shown a likelihood of success on the merits. Appellants raise both facial and as-applied challenges to the County's press-pass criteria. In their complaint, Appellants claim that the press-pass criteria are facially unconstitutional under the First Amendment, and they seek broad relief invalidating those criteria. Appellants also contend that the County applied these standards unconstitutionally against them personally in denying Conradson a press pass based on his viewpoint. Because their present motion for an injunction pending appeal requests more narrow relief—an injunction "preventing Appellees

7

from interfering with Appellants' access to Appellees' public forum and gathering news regarding" the election—we need not address their facial challenge: we conclude, at this preliminary juncture, that Appellants are likely to succeed on their First Amendment as-applied challenge, and order Appellees to issue Conradson temporary press credentials, effective during this appeal.[1]

Appellants claim that, as applied, the denial of a press pass to Conradson was impermissibly content- and viewpoint-based. The First Amendment does not provide a right of free and unconditional access to all government properties or events. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Further, "[t]he existence of a right of access to public property and the standard by which limitations [placed] upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983).

In traditional public forums—such as parks, streets, and other spaces traditionally held open for public speech—"the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (citing *Pleasant*

---

[1] Plaintiffs also raise an equal protection challenge which we likewise need not address.

*Grove City v. Summum*, 555 U.S. 460, 469 (2009)). And even in limited public forums where the government opens a traditionally private place for speech on limited topics, such as opening the County facilities for press conferences as the County did here, the First Amendment's protections against content-based and viewpoint-based restrictions are robust. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (proscribing viewpoint discrimination "even when the limited public forum is one of its own creation").

Content-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). And the First Amendment provides even stronger protection against viewpoint discrimination, which "is an egregious form of content discrimination and occurs when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction on speech." *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 800 (9th Cir. 2011) (cleaned up). A restriction on speech is unconstitutional if it is "an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ.*, 460 U.S. at 46. In evaluating claims of viewpoint discrimination, "[w]e thus look to the government's purpose as the threshold consideration." *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994).

The County denied Plaintiffs' September application for a press pass because of its conclusion that Plaintiffs "(a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility," and because it determined that Conradson is "not a bona fide correspondent of repute in [his] profession." But despite these stated reasons, the evidence put before the district court—including that presented by the County itself—strongly suggests that a predominant reason for the County denying Plaintiffs a press pass was Conradson's political views.

The County, for example, noted that "Conradson participates in political party events and associates with people and groups that demonstrate an inability to avoid real or perceived conflicts of interest." Relying on a reporter's attendance at political party events is weak grounds—and a poor measuring stick—for determining a journalistic conflict of interest. No other evidence placed before the district court— nor the arguments made to us on appeal—supports the assertion that Conradson fails to "avoid real or perceived conflicts of interest," and is not "free of associations that would compromise journalistic integrity or damage credibility."[2]

---

[2] The County also failed to establish that, at the time of the denial in September, Conradson had violated the press-pass restrictions by having any journalistic ethics problem. In the district court proceedings, the County noted that after being denied a press pass, "Conradson appeared at press conference on October 13, 2022, with a hidden camera. On November 10, 2022, he showed up at [the Maricopa County Tabulation and Election Center] under the guise of being there to pick up his

Moreover, the evidence before the district court strongly suggests that the County considered Conradson's political leanings. The County's own witness, Roy Moseley, stated at the evidentiary hearing that, beyond not avoiding conflicts of interest, Conradson's press pass was denied because "[h]e doesn't seek the truth and his articles have led to direct threats to Board of Election officials and employees." Permitting "truth" to be determined by the County violates our foundational notions of a free press. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 538 (1980) ("To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.").[3]

The County's own evidence only underscores that the press-pass denial, as applied to Conradson, was not viewpoint neutral; the County's evidence indeed highlights its reliance on Conradson's political views. Before the district court, the County argued:

---

credentials." He allegedly became disruptive, and the County had to remove him from the facility. Such conduct is troubling. None of these subsequent acts, however, could have influenced the County's previous denial of the press pass. And a restriction on an individual's First Amendment rights may not be justified with *post hoc* explanations. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2432 n.8 (2022).

[3] There is no evidence that Conradson ever threatened County employees. Certainly, such evidence would be relevant to the issuance of a press pass as a justification wholly independent of Conradson's viewpoint. But—in the absence of any evidence that Conradson himself called for violence—the fact that third parties who may have read Conradson's articles engaged in threatening behavior is not such relevant evidence.

> As part of the application process, Mr. Conradson submitted three links to work examples. Those three articles . . . do little more than proselytize The Gateway Pundit's views. Each article germinates from a news report or press release (such as the County's announcement of Press Pass criteria). Mr. Conradson then expresses an opinion about the news report or press release and supports that opinion by referencing like-minded social media posts, prior articles by The Gateway Pundit, and allying websites that express the same viewpoints. Moreover, each article uses inflammatory and/or accusatory language, such as "Fake News Media," "globalist elitist establishment," and "highly flawed 2022 Primary Elections." And while Mr. Conradson is certainly entitled to express his opinions, his poorly sourced, researched, and reported work lacks the journalistic integrity and credibility required by the Press Pass criteria.

The district court rightly found this evidence to be a "fraught consideration." *TGP Commc'ns LLC*, 2022 WL 17177700, at *8. Yet the district court held that the County was furthering its legitimate interest in disseminating accurate information to the public in a manner "reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." *Id*. at *7.

In so concluding, the district court relied heavily on the Seventh Circuit's analysis of similar press pass restrictions in *John K. MacIver Institute for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 610–15 (7th Cir. 2021). *See TGP Commc'ns LLC*, 2022 WL 17177700, at *4–8. In *MacIver*, however, the court noted that there was no evidence that the government had "manipulate[d] the[] neutral criteria in a manner that discriminate[d]" against the applicant. 994 F.3d at 611. The *MacIver*

court further found that the applicant's "other naked assertions of bias" were "unsupported by references to the record." *Id.* That is not the case here.

The evidence supports, at least at this preliminary stage of the review, the conclusion that a predominant reason for the County denying Conradson a press pass was the viewpoint expressed in his writings. It is the County's politically-tinged assessment of Conradson's prior reporting that appears to have led it to deny him a press pass.[4] That type of viewpoint-based discrimination is exactly what the First Amendment protects against. Because it appears at this preliminary stage that the County engaged in viewpoint discrimination, it is likely that the County's denial of a press pass will not survive review when considering Conradson's as-applied challenge. *Mansky*, 138 S. Ct. at 1885. Appellants have thus shown a likelihood of success on the merits.

2

As analyzed above, Appellants have shown a likelihood of success on the merits of their as applied First Amendment claim at this preliminary stage. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Despite this likely constitutional violation, the district court noted

---

[4] Appellants note, and Appellees have not disputed, that the County has not denied any other requests for a press pass on any basis similar to the reasons articulated here.

Conradson could watch live streams of press conferences, even if he could not attend in person, and delayed 41 days from the denial to seek injunctive relief. Neither the availability of live streams nor Conradson's delay sufficiently allay the irreparable harm from a likely constitutional violation.

a

The district court found that watching the press conference live streams, rather than attend in person, was a "de minimis" harm because County officials would be under no obligation to "interact with" Conradson, even if they were granted access. We disagree. The constitutional harm of viewpoint discrimination, expressed here by the County's exclusion of Plaintiffs from its limited forum, cannot be rendered de minimis or otherwise mitigated by requiring Plaintiffs to avail themselves of a less desirable, even if somewhat effective, alternative.

As the U.S. District Court for the District of Columbia has persuasively explained, "[w]hile it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news . . . the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation." *Consumers Union v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 25–26 (D.D.C. 1973) (citation omitted), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975). For this reason, "[a]ccess to news, if unreasonably or arbitrarily denied . . ., constitutes a direct limitation upon

the content of news." *Id.*; *see also Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1131 (D. Ala. 2021) ("[T]he First Amendment 'provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of the government,' [so] Plaintiffs' attendance at the Governor's press conferences certainly is protected."). Viewpoint discrimination as to in-person access to such conferences is not a de minimis injury.

b

The district court noted that Conradson's 41-day delay in appealing the denial of his application for a press pass pointed against a finding of irreparable harm. While a plaintiff's delay may cut against a finding of irreparable harm, the delay must be substantial. *See, e.g.*, *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Even if Conradson could have sought injunctive relief sooner, in the context of the events here—where the press briefings are still ongoing—his arguable delay is not dispositive. As we have discussed above, other factors favor a finding of irreparable harm. *See Arc of California v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014). In any event, we are "loath to withhold relief solely on that ground." *Id.* (citing *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).

Even though the injunctive relief analysis usually turns on findings of likelihood of success on the merits and irreparable harm, the two other factors we consider in determining whether to grant an injunction also favor granting relief here. Permitting Conradson to attend press briefings pending resolution on the merits would not prejudice Appellees because no one would be obliged to speak with him.[5] *Alaska Landmine*, 514 F. Supp. 3d at 1135. Finally, the public interest is served by ensuring that the County's administration of press-pass credentials complies with the First Amendment. *See Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

**GRANTED.**

BY AND AT THE DIRECTION OF THE COURT

MOLLY C. DWYER
CLERK OF COURT

By: Allison Fung
Deputy Clerk
Ninth Circuit Rule 27-7

---

[5] Our grant of an injunction pending appeal, which requires Appellees to grant Conradson temporary press credentials until the merits of Plaintiffs' appeal are decided, does not preclude Maricopa County from revoking Conradson's press credentials in the future—or declining to grant those credentials—so long as the County does so consistent with Conradson's First Amendment rights.