# No. 22-16826

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# NINTH CIRCUIT

TGP COMMUNICATIONS, LLC, D/B/A THE GATEWAY PUNDIT,
AND JORDAN CONRADSON,

*Plaintiffs-Appellants,*

v.

JACK SELLERS, THOMAS GALVIN, BILL GATES, CLINT HICKMAN, STEVE
GALLARDO, STEPHEN RICHER, REY VALENZUELA, SCOTT JARRETT, MEGAN
GILBERTSON, AND MARCUS MILAM,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Arizona
No. 2:22-cv-01925-JJT
The Honorable John J. Tuchi

# APPELLANTS' OPENING BRIEF

Marc J. Randazza
Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118
Tel:  702-420-2001
ecf@randazza.com

David S. Gingras
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
david@gingraslaw.com

Attorneys for Appellants

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants TGP Communications, LLC d/b/a The Gateway Pundit and Jordan Conradson hereby provides the following information:

There are no parent corporations or publicly held corporations that own 10% or more of the stock of Appellant TGP Communications, LLC. Appellant Jordan Conradson is a natural person.

Date: December 8, 2022.

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

*Attorneys for Appellants*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................ 2

STATEMENT OF THE CASE ................................................... 3

    I.   APPELLANTS THE GATEWAY PUNDIT AND CONRADSON ...................... 3

    II.  MARICOPA'S PRESS PASS REGULATION ................................. 5

    III. APPELLEES' DENIAL OF APPELLANTS' PRESS PASS ............................ 8

    IV. RELEVANT PROCEDURAL HISTORY ..................................... 14

SUMMARY OF THE ARGUMENT .................................... 15

STANDARD OF REVIEW .................................................. 17

ARGUMENT ...................................................................... 18

    I.   LEGAL STANDARD ........................................................... 19

    II.  PLAINTIFFS DEMONSTRATED A LIKELIHOOD OF SUCCESS ................. 22

        A.  *Newsgathering is First Amendment Protected* ........................... 22

        B.  *Appellees' Restrictions are Unconstitutionally Vague* ............... 26

        C.  *Appellees Engaged in Viewpoint Discrimination* ....................... 35

        D.  *Appellants Were Deprived of Due Process* .................................. 42

        E.  *Appellants Were Deprived of Equal Protection* ........................... 45

    III. APPELLANTS DEMONSTRATED IRREPARABLE HARM ........................ 47

    IV. THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH IN APPELLANTS' FAVOR ........................................................ 51

CONCLUSION ................................................................... 53

# TABLE OF AUTHORITIES

## CASES

*Alaska Landmine, LLC v. Dunleavy,*
   514 F. Supp. 3d 1123 (D. Alaska 2021) ........................ 24, 28, 42, 43, 47

*Am. Broad. Cos. v. Cuomo,*
   570 F.2d 1080 (2d Cir. 1977) .............................................................. 24

*Associate General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401 (9th Cir. 1991) .................................. 20

*Branzburg v. Hayes,*
   408 U.S. 665 (1972) ...................................................................... 22, 24

*Briseño v. Henderson,*
   998 F.3d 1014 (9th Cir. 2021) .............................................................. 17

*Cable News Network, Inc. v. Am. Broad. Cos.,*
   518 F. Supp. 1238 (N.D. Ga. 1981) ...................................................... 22

*Carey v. Piphus,*
   435 U.S. 247 (1978) .............................................................................. 45

*Chicago v. Tribune Co.,*
   307 Ill. 595 (1923) ................................................................................ 18

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006) ........................................ 36, 37

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) .............................................................................. 38

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ................................................................................ 20

*CNN v. Trump,*
  No. CV-18-02610-TJK, 2022 U.S. Dist. LEXIS 212609
  (D.D.C. Nov. 16, 2018) ........................................................ 42

*Consumers Union v. Periodical Correspondents' Assoc.,*
  365 F. Supp. 18 (D.D.C. 1973) ........................... 23, 24, 25, 28

*Cooter & Gell v. Hartmarx Corp.,*
  496 U.S. 384 (1990) ............................................................ 18

*Cox Broad. Corp. v. Cohn,*
  420 U.S. 469 (1975) ............................................................ 23

*Crumpton v. Gates,*
  947 F.2d 1418 (9th Cir. 1991) ........................................... 43

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................................... 47

*Exxon Corp. v. Federal Trade Com.,*
  589 F.2d 582 (D.C. Cir. 1978) ..................................... 24, 28

*FDIC v. Garner,*
  125 F.3d 1272 (9th Cir. 1997) ........................................... 20

*Forsyth Cty. v. Nationalist Movement,*
  505 U.S. 123 (1992) ........................................................... 35

*Fyock v. Sunnyvale,*
  779 F.3d 991 (9th Cir. 2015) ............................................. 17

*G.K. Ltd. Travel v. City of Lake Oswego,*
  436 F.3d 1064 (9th Cir. 2006) ........................................... 38

*Gaudiya Vaishnava Soc. v. San Francisco,*
  952 F.2d 1059 (9th Cir. 1991) ........................................... 37

*Getty Images News Servs. Corp. v. Dep't of Def.,*
  193 F. Supp. 2d 112 (D.D.C. Mar. 7, 2002) ........................ 43

*Grosjean v. American Press Co.*,
  297 U.S. 233 (1936) ....................................................... 18, 53

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) .............................................. 21

*Hill v. Colorado*,
  530 U.S. 703 (2000) ....................................................... 26

*Ingenco Holdings, LLC v. Ace Am. Ins. Co.*,
  921 F.3d 803 (9th Cir. 2019) .............................................. 17

*John K. MacIver Institute for Pub. Policy, Inc. v. Evers*,
  994 F.3d 602 (7th Cir. 2021) ......................... 6, 23, 27, 28, 33

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) .............................................. 36

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) .............................................. 47

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) .............................................. 21

*Martinez v. Clark County*,
  846 F. Supp. 2d 1131 (D. Nev. 2012) .................................... 45

*Matthews v. Eldridge*,
  424 U.S. 319 (1976) ....................................................... 42

*Metro Pub. Ltd. v. San Jose Mercury News*,
  987 F.2d 637 (9th Cir. 1993) .............................................. 20

*Nat'l Org. for Marriage v. McKee*,
  649 F.3d 34 (1st Cir. 2011) ............................................... 26

*New York Times Co. v. United States*,
  403 U.S. 713 (1971) ....................................................... 40

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
762 F.2d 1374 (9th Cir. 1985) .............................................................. 50

*OSU Student Alliance v. Ray,*
699 F.3d 1053 (9th Cir. 2012) .............................................................. 46

*Pleasant Grove City v. Summum,*
555 U.S. 460 (2009) .............................................................................. 35

*Police Dep't of Chicago v. Mosley,*
408 U.S. 92 (1972) ................................................................................ 46

*Quad-City Cmty News Serv. v. Jebens,*
334 F. Supp. 8 (S.D. Iowa 1971) ......................................................... 24

*Reed v. Town of Gilbert, Ariz.,*
576 U.S. 155 (2015) .............................................................................. 35

*Religious Tech. Ctr. v. Scott,*
869 F.2d 1306 (9th Cir. 1989) ............................................................... 2

*Richmond Newspapers v. Virginia,*
448 U.S. 555 (1980) .............................................................................. 23

*Rosenberger v. Rector & Univ. of Va.,*
515 U.S. 819 (1995) .............................................................................. 35

*Seattle Affiliate of the October 22nd Coalition to Stop Police Brutality, Repression & the Criminalization of a Generation v. City of Seattle,*
550 F.3d 788 (9th Cir. 2008) ................................................................ 38

*Security Farms v. International Bhd. Of Teamsters,*
124 F.3d 999 (9th Cir. 1997) ................................................................ 18

*Sherrill v. Knight,*
569 F.2d 124 (D.C. Cir. 1977) ........................................... 23, 24, 42, 43

*Southwest Voter Registration Educ. Project v. Shelley,*
344 F.3d 914 (9th Cir. 2003) ........................................................... 3, 17

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ............................................................ 19

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......................................................................... 48

*TGP Commc'ns, LLC v. Sellers*,
No. 22-16826, 2022 U.S. App. LEXIS 33641 (9th Cir. 2022) ....... *passim*

*Thoms v. Maricopa Cty. Cmty. Coll. Dist.*,
No. CV-21-01781-PHX-SPL, 2021 U.S. Dist. LEXIS 214822
(D. Ariz. Nov. 5, 2021) ..................................................................... 21

*Topanga Press, Inc. v. City of Los Angles*,
989 F.2d 1524 (9th Cir. 1993). ......................................................... 20

*United States v. Alvarez*,
567 U.S. 709 (2012) .......................................................................... 34

*United States v. Sherman*,
581 F.2d 1358 (9th Cir. 1978) ........................................................... 22

*United States v. Working*,
287 F.3d 801 (9th Cir. 2002) ............................................................ 17

*United Teachers of Dade v. Stierheim*,
213 F. Supp. 2d 1368 (S.D. Fla. 2002) .............................................. 25

*Walczak v. EPL Prolong, Inc.*,
198 F.3d 725 (9th Cir. 1999) ............................................................ 20

*Washington v. U.S. Dep't of State*,
996 F.3d 552 (9th Cir. 2021) ............................................................ 17

*Westinghouse Broad. Co. Inc. v. Dukakis*,
409 F. Supp. 895 (D. Mass. 1976) ..................................................... 25

*World Wide Rush, LLC v. City of L.A.*,
No. CV 07-238 ABC (JWJx), 2007 U.S. Dist. LEXIS 105249
(C.D. Cal. July 23, 2007) ............................................................ 38, 39

**STATUTES**

28 U.S.C. § 1292 ................................................................... 1, 2


**RULES**

Fed. R. App. P. 4 ...................................................................... 2


**CONSTITUTIONAL PROVISIONS**

U.S. Const. *amend. XIV, § 1* ................................................. 45


**OTHER AUTHORITIES**

Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992) .................................... 47

# INTRODUCTION

This Court is familiar with the factual and legal issues in this case. In deciding Appellants' motion for an injunction pending appeal (Dkt. No. 5), it explained why Appellants should have prevailed at the District Court. The Court's summary is clear and accurate:

> On November 8, 2022, the United States held its mid-term elections. Nearly a month later, Maricopa County continues to count those cast ballots. As a result, press attention remains fixed on Arizona, the election results and the ballot counting. To balance the demand for access with logistical and security requirements, Maricopa County began requiring members of the press to obtain a press pass to enter its facilities to cover election-related events. Jordan Conradson, a reporter for The Gateway Pundit … sought a press pass to attend press briefings about the election. Maricopa County and individual Appellees denied Conradson a press pass because, in their view, he is not a reputable journalist under their press-pass guidelines and had reported false information about Arizona elections.

*TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, *1-2 (9th Cir. 2022). Appellees restricted Appellants' First Amendment protected newsgathering based on Appellants' viewpoint and their reporting. This is constitutionally impermissible.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal because it relates to an interlocutory order refusing an injunction. *See* 28 U.S.C. §1292(a)(1).

"[A] denial of a TRO may be appealed if the circumstances render the denial 'tantamount to the denial of a preliminary injunction.'" *Religious Tech. Ctr. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989).

On November 11, 2022, Appellants sought a temporary restraining order. Dist. Ct. Dkt. No. 2 (corrected in 3-ER-377). After the motion was briefed, the District Court held a full evidentiary hearing on November 17, 2022. 2-ER-141; 2-ER-123. On November 23, 2022, the District Court denied Appellants' motion. 1-ER-2. Appellants timely filed a Notice of Appeal on November 28, 2022. 3-ER-443. *See* Fed. R. App. P. 4(a)(1)(A).

As this Court found in granting Appellants' Motion for an Injunction Pending Appeal (Dkt. No. 5-1), "[a]lthough Plaintiffs sought a temporary restraining order below, we conclude that we have appellate jurisdiction under §1292(a)(1) because the district court's order was effectively a denial of preliminary injunctive relief." *Sellers*, 2022 U.S. App. LEXIS 33641 at *3.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether Appellants demonstrated a likelihood of success on their claims for violation of their First and Fourteenth Amendment rights based on Appellees' denial of a press pass. This issue was first raised in

Dkt. 2 (3-ER-377) and was ruled on in Dkt. 27 (1-ER-2). The standard of review is abuse of discretion. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

2.     Whether Appellants demonstrated that they would suffer irreparable harm in the absence of an injunction allowing Appellants to appear at Maricopa County press conferences on the same basis as other journalists. This issue was first raised in Dkt. 2 (3-ER-377) and was ruled on in Dkt. 27 (1-ER-2). The standard of review is abuse of discretion. *Shelley*, 344 F.3d at 918.

3.     Whether the balance of equities and public interest favor an injunction allowing Appellants to appear at Maricopa County press conferences on the same basis as other journalists. This issue was first raised in Dkt. 2 (3-ER-377) and was ruled on in Dkt. 27 (1-ER-2). The standard of review is abuse of discretion. *Shelley*, 344 F.3d at 918.

## STATEMENT OF THE CASE

## I.    Appellants The Gateway Pundit and Conradson

TGP Communications d/b/a The Gateway Pundit ("TGP") is a news and opinion publication with a very large national audience. 3-ER-403 at ¶1. Founded by publisher Jim Hoft in 2004, The Gateway Pundit has

grown into one of the largest and most highly read political blogs in the nation. *Id*; 2-ER-80:2-10. The Gateway Pundit is ranked as one of the top 150 websites in the US, with an average of 2.5 million daily readers. 3-ER-403 at ¶1. Jordan Conradson is a reporter for TGP, covering Arizona politics for more than 18 months. 2-ER-80:7-13.

TGP has more readers than the largest newspaper in Arizona – the Arizona Republic, which claimed to have 9 million unique visitors to its website per *month*.[1] Meanwhile TGP has 3.5 million per *day*. 2-ER-80:6-9. CNN claims about 4.8 million per day.[2]

TGP and Conradson have covered Maricopa elections extensively. 3-ER-293–369. In fact, their reporting exposed County Supervisor Steve Chucri as an "election denier" in 2021, thus leading to his resignation. 3-ER-303; 3-ER-309; 3-ER-314; 3-ER-320; 3-ER-325; 2-ER-59:2-25.

---

[1] Phil Boas, *For 130 years, The Arizona Republic has grown and matured with our Western state*, ARIZONA REPUBLIC (May 17, 2020) available at https://www.azcentral.com/story/opinion/op-ed/philboas/2020/05/17/arizona-republic-history-mirrors-state-130-year-anniversary/5194412002/ (last accessed Dec. 2, 2022)

[2] "CNN Digital Dominates All Competitors" CNN.COM available at https://cnnpressroom.blogs.cnn.com/2022/01/26/cnn-digital-ratings-top-competitors-largest-digital-news-outlet-2021/ (last accessed Dec. 2, 2022) (CNN claiming 144 million visitors per month, divided by 30, is approx. 4.8 million).

Thereafter, Maricopa County's relationship with Appellants became adversarial. 2-ER-59:25–60:2.

## II.  Maricopa's Press Pass Regulation

In September 2022, Maricopa County established a new procedure to screen journalists who wished to have access to County press conferences and facilities. "Maricopa County will require an official Press Pass for members of the press to enter its facilities and/or cover events related to the 2022 General Election." 3-ER-426. The Maricopa County website announces that members of the press will be evaluated based upon the following criteria:

a.  Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?

b.  Does the parent news organization meet the following criteria?

  i.  It has published news continuously for at least 18 months, and;

  ii.  It has a periodical publication component or an established television or radio presence.

c.  Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?

d.  Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or

promotion work for any individual, political party, corporation, or organization?

e.  Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

    **i.  Both avoid real or perceived conflicts of interest;**

    **ii.  Both are free of associations that would compromise journalistic integrity or damage credibility;**

    iii.  Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and

    iv.  Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

This list is not exhaustive. The time, manner, and place limitations or needs of any one event may require consideration of additional factors.

3-ER-426–427 (emphasis added – the bolded terms are at issue for Appellants). After the Complaint was filed, Appellees claimed that these requirements were taken from press pass regulations approved of by the Seventh Circuit in *John K. MacIver Institute for Pub. Policy, Inc. v. Evers*, 994 F.3d 602 (7th Cir. 2021). 2-ER-144–145.

In attempting to explain what the terms "conflict of interest" and "associations that would compromise journalistic integrity or damage credibility" meant, Appellees' witness, Roy Moseley, testified that "we are

really interested in serving journalists who are interested in selling the truth or at least pursuing the truth and that's always our goal." 2-ER-89:18-24. Appellees also cited the Society of Professional Journalists ("SPJ") Code of Ethics as evidence that these terms were well understood. 2-ER-146–147. However, Appellants provided expert testimony from Professor Gregg Leslie[3] that even the SPJ itself does not claim that its standards should be used to determine who, as a matter of law, is entitled to be called a "journalist," and that the government should not base criteria for determining who is allowed into press events on these standards. 2-ER-36:16–37:11; 2-ER-44:14-20. Leslie also testified that there were competing professional journalist organizations with different standards. 2-ER-35:5-25.

And, what's worse, Moseley testified that Appellees' definition of "conflict of interest" was actually broader than the SPJ's definition,

---

[3] Professor Leslie is a Professor of Practice at ASU Sandra Day O'Connor College of Law and Executive Director of the College's First Amendment Clinic. 2-ER-135. He has also been the Legal Defense Director for the Reporters Committee for Freedom of the Press since 2000. *Id*. And, while the Court did not formally admit Leslie as an expert witness due to the procedural posture of the case (2-ER-32:20–33:1), Appellees' counsel referred to him as an expert witness during the TRO hearing. 2-ER-106:15-21.

claiming it included a journalist who reports "on issues for which, and candidates for whom, he also advocates." 2-ER-93:7-23.

After these new regulations were promulgated, Conradson published an article about them on TGP, criticizing Maricopa County as acting like 1984's "Ministry of Truth." 2-ER-165–166. Maricopa County took offense at this opinion. 2-ER-151; 2-ER-118:2–119:7.

## III. Appellees' Denial of Appellants' Press Pass

On September 27, 2022, Appellants applied for credentials to view vote tabulation in Maricopa County and to participate in press conferences. 3-ER-399 at ¶3; 3-ER-403 at ¶3. Appellees excluded Appellants. The stated reason was as follows:

> Thank you for applying for a Maricopa County Press Pass. This email is to notify you that you have been denied a press credential based on the following criteria which is listed on Maricopa.gov:
>
> • #4[sic]: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.

3-ER-438. Appellees made this determination despite Conradson receiving a press pass from the Arizona Senate, whose Media Rules are substantially similar (though clearer) to Appellees' new rules. 2-ER-

58:21–59:1. Appellees did not state any other reasons for denying a press pass.[4] The denial provided no evidence substantiating the conclusions about Conradson and provided no explanation as to how he failed to avoid conflicts of interests and had "compromising" associations. 3-ER-438. The email stated that "[i]f you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered," but provided no further information as to the appeals process. *Id.* There is no record evidence that Appellees denied any other applicants for a press pass for these reasons. *Sellers*, 2022 U.S. App. LEXIS 33641 at *14 n.4.

Appellants continued to report on matters of public concern in Maricopa County, but they simultaneously attempted to convince Maricopa to change its mind. Conradson went there in person to appeal. 2-ER-74:3-6. His appeal was ignored. He then sought appeal through a letter from counsel – also ignored. 3-ER-440–441.

---

[4] Appellees offered post hoc reasons, including reporting that occurred after the decision. 2-ER-152–153; 2-ER-249–273. Appellees also claimed (falsely and with no support) that Conradson was disruptive and had to be removed from the facility after the decision was made. 2-ER-147–148, 151, 153. However, Conradson denies this, and will present video evidence that shows that this is not true.

On November 10, 2022, Maricopa County took this rejection even further, not even allowing Appellants to remain on the curtilage of the Maricopa County Elections Office, and ejected them completely from the property, not even allowing them to be outside the gate to cover the events inside in any manner. 3-ER-399–400 at ¶5; 3-ER-404 at ¶5. Upon being ejected, the government used a drone to follow them to further intimidate them from continuing to make any meaningful effort at newsgathering. *Id.*; 2-ER-60:2-5.

Other members of the press who worked for media outlets that were deemed sufficiently acceptable to the government were allowed to attend and remain within the cordon set up around the Maricopa County building. 3-ER-399–401 at ¶¶4-5, 10; 3-ER-403–405 at ¶¶4-5, 10. Accordingly, Appellants were unable to participate in that press conference and future press conferences, and they were unable to view the ballot-counting process which is essential to their reporting – not even from afar.

Appellees excluded Appellants out of specific, politically-motivated animus against them. On September 27, 2022, Appellee Stephen Richer, the Maricopa County Recorder, retweeted a Twitter post reading "County

elections getting all fancy. Really gonna miss The Gateway Pundit rolling in and trying to listen in on legitimate reporter conversations/intimidate public officials." 2-ER-22; Dist. Ct. Dkt. No. 25-1. The day Appellants requested a press pass, and three days before Appellees formally denied this request, Appellees had already judged Appellants to be unworthy of one.[5]

In attempting to articulate their reasons for denying Appellants a press pass, Appellees argued in their briefing that "Mr. Conradson participates in political party events and associates with people and groups that demonstrate an inability to avoid real or perceived conflicts of interest," citing evidence showing Conradson attending long-past political events and campaigns. 2-ER-146–151. During the TRO hearing, Moseley testified that "Mr. Conradson doesn't present as an ethical journalist who practices with integrity or professionalism. He doesn't contact us to seek the truth or to seek our response to what an accusation might be," and that Conradson exhibits the characteristics of someone

---

[5] The District Court acknowledged this evidence but said it did not show animus had anything to do with the denial. 1-ER-15. Such a conclusion in the face of clear, unambiguous evidence of animus is clearly erroneous.

who is "advocating for one conclusion or somebody or some thing to get passed." 2-ER-93:1-18. Moseley also testified that Conradson ran afoul of the press standards because of his "political leanings," *i.e.*, identifying as a Republican. 2-ER-61:17-21; 2-ER-93:19-23. Appellees provided no evidence of any other purported conflicts of interest or compromising associations. This Court has already recognized that the record evidence "strongly suggests that a predominant reason for the County denying Plaintiffs a press pass was Conradson's political views," and that "the County considered Conradson's political leanings" in denying Appellants a press pass. *Sellers*, 2022 U.S. App. LEXIS 33641 at *11-12. *This* Court was right.

These stated justifications are constitutionally suspect enough, but Appellees' briefing at the District Court made it even more apparent that their problem with Appellants is the alleged quality, content, and viewpoint of their reporting. In explaining why the pass was denied Appellees stated:

> Mr. Conradson then expresses an opinion about the news report or press release and supports that opinion by referencing like-minded social media posts, prior articles by The Gateway Pundit, and allying websites that express the same viewpoints. Moreover, each article uses inflammatory and/or accusatory language, such as "Fake News Media,"

"globalist elitist establishment," and "highly flawed 2022 Primary Elections."

2-ER-146. Appellees even admitted that Conradson's article criticizing the new press pass regulations was part of the reason they denied him a pass:

> [H]is article about the creation of the Press Pass criteria, the three articles he submitted, as well as his associations, clearly indicate that he was properly denied a Press Pass for the reasons cited in the denial email.

2-ER-151.

The throughline of Appellees' argument is that TGP is not "legitimate news" because they disagree with TGP's reporting. But, by any constitutional metric, TGP is just as much a journalistic outfit as any other media entity given a pass. Conradson has, even as a young journalist, landed an interview with Kari Lake. 2-ER-58:16-17. He did not interview her opponent. He tried, but she would not speak to him. 2-ER-58:15. He was the first to report on the Chucri election denial story, using primary sources. 2-ER-59:15. TGP is widely read and long-established, eliminating any claim that it is not a bona fide news publication. 3-ER-403 at ¶1; 2-ER-80:2-10.

## IV. Relevant Procedural History

Appellants filed the action against Defendants on Nov. 12, 2022, and it was docketed on Nov. 14, 2022. 3-ER-410. Appellants' Complaint alleges that Appellees violated their First Amendment rights by unlawfully depriving them of previously-granted access to election-related government buildings in Maricopa County, Arizona, and from any further viewing or participating in press conferences held by Maricopa County government officials. All Appellees are sued in their official capacities only. *See id.* Along with their Complaint, Appellants moved for an emergency, *ex parte* temporary restraining order seeking to prohibit Appellees from further interference in Appellants' abilities to report on the ongoing election in Maricopa County. 3-ER-377.

On November 14, 2022, the District Court ordered briefing by Appellees and set an evidentiary hearing. 3-ER-375. Appellees appeared and filed responsive briefing on November 16, 2022. 2-ER-141. On November 17, 2022, the District Court held an evidentiary hearing, at which counsel for the parties appeared in person, presented evidence and testimony, and orally argued Appellants' motion. 2-ER-125. The District

Court issued its Order denying Appellants' motion for a temporary restraining order on November 23, 2022. 1-ER-2.

## SUMMARY OF THE ARGUMENT

Appellants are a well-established and widely read news and opinion publication and one of its reporters. Prior to September 2022, they broke a story that led to the resignation of a Maricopa County official. Appellees then promulgated new regulations for the issuance of media press passes that would allow reporters to attend County press conferences, with the specific intent that these regulations would let the County bar TGP from attending them. Appellees denied Appellants a press pass when they requested one. In their notice of this denial, Appellees provided no evidence, instead only citing their new regulations and claiming that Conradson did not "avoid real or perceived conflicts of interest" and that he was "not free of associations that would compromise journalistic integrity or damage credibility." This notice stated that Conradson could appeal the denial by sending an email but provided no other information about the appeals process. Appellees have not provided any evidence regarding other details about the appeals process, either.

In its briefing and during the hearing on the TRO motion, Appellees made it clear that they were engaging in viewpoint-based discrimination in denying Appellants a press pass. Their only evidence of Conradson's alleged conflicts of interest or compromising associations was his attendance at prior political events. Their other, post hoc explanations for their denial were based on events that occurred after the denial, and thus could not have been part of Appellees' determination. Appellees thus violated Appellants' First Amendment rights.

Similarly, Appellees violated Appellants' Fourteenth Amendment rights. First, there was no procedural due process afforded to Appellants in denying them a press pass; there is no evidence of the adequacy of this process, and the record is bereft of any details regarding who decides such appeals, how long they take, or what standards are used in deciding them. Second, Appellants' equal protection rights were violated because Appellees singled them out and discriminated against them based on their political viewpoints. Appellees have not applied these new regulations in a similar manner to any other press outlet; on the existing record, Appellants are the *only* journalists the government has deemed to have disqualifying conflicts of interest or compromising associations,

despite the government using definitions for these terms broad enough to encompass and disqualify every professional journalist in the country.

## STANDARD OF REVIEW

An order granting or denying a request for preliminary injunctive relief is reviewed for abuse of discretion. *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003). "A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, 921 F.3d 803, 808 (9th Cir. 2019) (cleaned up); *see United States v. Working*, 287 F.3d 801, 807 (9th Cir. 2002) (explaining that a district court abuses its discretion when a ruling is guided by erroneous legal conclusions); *see also Briseño v. Henderson*, 998 F.3d 1014, 1022 (9th Cir. 2021) (a district court "abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact"). The court reviews "factual findings for clear error" and "the underlying legal conclusions de novo." *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560 (9th Cir. 2021). If "the district court relied on an erroneous legal premise," then it abused its discretion. *Fyock v. Sunnyvale*, 779 F.3d 991, 995 (9th Cir. 2015). The abuse of

discretion standard requires reversal of a decision that does not "'fall[]
within a broad range of permissible conclusions.'" *Security Farms v.
International Bhd. Of Teamsters*, 124 F.3d 999, 1016 (9th Cir. 1997)
(quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400 (1990)).

## ARGUMENT

Maricopa County requires a permit or a license to gather news.
Licensing of journalists has never been permissible in America. Such
schemes fell out of favor even before the Revolution. "Licensing of the
press was never effective in the American colonies. The last attempt to
enforce this common law right of the crown in the American colonies
failed in 1725." *Chicago v. Tribune Co.*, 307 Ill. 595, 599 (1923). Whether
because the colonists would not accept press licensing or by the
imposition of our Constitution after the Revolution, there is not, nor
should there ever be, press licensing in America. If there were and the
Courts did not step in, it "would make it easy for dictators to control their
subjects." *Grosjean v. American Press Co.*, 297 U.S. 233, 240 (1936)
(discussing press licensing through taxation). Maricopa County appears
to believe that it has found a loophole – while it may not restrain
opposition media from *publishing* by using a licensing scheme, it has

decided that it will impede opposition media's attempts to serve as a watchdog on government by licensing *newsgathering*.

This Honorable Court should uphold Appellants' right to gather the news, no matter whether the Maricopa County government likes their viewpoint or their politics or not. The regulations are unconstitutional, both facially and as applied.

## I.    Legal Standard

A party seeking a preliminary injunction or temporary restraining order must meet one of two tests: traditional or alternative. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). Under the traditional test, a plaintiff must show: (1) he will probably prevail on the merits; (2) he will suffer irreparable injury if injunctive relief is not granted; (3) the defendant will not be equitably harmed more than the plaintiff is helped by the injunction; and (4) granting the injunction is in the public interest. *See id*. Alternatively, a court may issue a preliminary injunction if the plaintiff shows either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *See FDIC v. Garner*, 125 F.3d 1272,

1277 (9th Cir. 1997); *Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir. 1993). "The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Under these standards injunctive relief is appropriate when either of these two tests are met. These are not two separate tests, but "merely extremes of a single continuum." *Topanga Press, Inc. v. City of Los Angles*, 989 F.2d 1524, 1528 (9th Cir. 1993). This means that if the balance of hardships strongly favors the plaintiff, he does not need to make as strong a showing of success on the merits, and vice versa. *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999).

When there is a violation of a constitutional right, no further showing of irreparable injury is required. *See Associate General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). In fact, the first prong of the "traditional" test is generally outcome determinative in First Amendment cases, as a chill to one's First Amendment rights is irreparable harm, a governmental entity can have no legitimate interest in enforcing an unconstitutional regulation, and the public is not helped by enforcing such a regulation.

*See Thoms v. Maricopa Cty. Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL, 2021 U.S. Dist. LEXIS 214822, *35-39 (D. Ariz. Nov. 5, 2021).

This Court has also stated that mandatory injunctions are subject to a higher standard than prohibitory injunctions. *Hernandez v. Sessions*, 872 F.3d 976, 998-99 (9th Cir. 2017). A mandatory injunction is appropriate where "'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id*. (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). However, this Court called this distinction into question in *Hernandez v. Sessions*, 872 F.3d 976, 997-98 (9th Cir. 2017), noting that the Sixth and Seventh Circuits have rejected it, scholars have criticized this approach, and even other Circuits that use it have questioned whether the distinction is meaningful. The Court in *Hernandez* did not depart from this standard because "the answer to the challenges raised by the government [were] remarkably simple," *id*. at 998, but that is not the case here. This is an excellent opportunity for the Court to revisit this disapproved distinction.

## II.  Plaintiffs Demonstrated a Likelihood of Success

Appellees violated Appellants' First and Fourteenth Amendment rights in four ways: (1) The regulations governing press passes are unconstitutionally vague; (2) Appellees engaged in viewpoint-based discrimination in denying Appellants a press pass; (3) Appellees did not afford Appellants due process in denying them a press pass; and (4) Appellees discriminated against Appellants in violation of their right to equal protection.

### A.  Newsgathering is First Amendment Protected

The First Amendment protects newsgathering. *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see also Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated"); *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) ("[T]he rights guaranteed and protected by the First Amendment include a right of access to news or information concerning the operations and activities of government").

The media serves as "surrogates for the public" when it reports on government affairs. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573

(1980); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations"). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).

In *Consumers Union v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 22-23 (D.D.C. 1973), rev'd on other grounds, 515 F.2d 1341 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976), the court held it was unconstitutional for the government to discriminate against Consumer Reports on grounds that it was "owned and operated" by a "self-proclaimed advocate of consumer interests." The court further stated: "A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine." *Consumers Union*, 365 F. Supp. at 25.[6]

---

[6]  This holding appears to be in conflict with *MacIver*, 994 F.3d 602. In *MacIver*, the government was permitted to exclude a "think tank" from

The government may not exclude a publication because of their viewpoint or because their readership consists mainly of people who vote differently than they do. *See Quad-City Cmty News Serv. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) (stating "any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional"). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media, or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Knight*, 569 F.2d at 129 (citing *Branzburg,* 408 U.S. at 681 & 707).

---

press conferences. *Id.* at 611. The D.C. Circuit, however, has cited *Consumers Union* with approval. *See Exxon Corp. v. Federal Trade Com.*, 589 F.2d 582, 590 (D.C. Cir. 1978); *Sherrill v. Knight*, 569 F.2d 124, 129 n.17 (D.C. Cir. 1977). The District of Alaska cites to it as well. *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1131 n.53 (D. Alaska 2021). When evaluating the facial challenge to the regulations, this Court should entertain the opportunity to take the position that the rules set out in *MacIver* are "dangerous and self-defeating," as the *Consumers Union* case and its progeny seem to support.

The government, in this case, tries to save its decision by offering Appellants the opportunity to watch streaming video of press conferences. However, this does not purge their actions of their unconstitutional sins. The court in *Consumers Union* stated:

> While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, … the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied …, constitutes a direct limitation upon the content of news.

365 F. Supp. at 26 (citations omitted)

"[A]ll representatives of news organizations must not only be given equal access, but within reasonable limits, access with equal convenience to official news sources." *Westinghouse Broad. Co. Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976). In a similar case, the government sought to segregate media into different areas. But, even that was not permissible. *See United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1374 (S.D. Fla. 2002) ("[T]o the extent that entry into the 'general-circulation media' press room provides media representatives with additional access to information, Plaintiffs' First Amendment rights are being violated"); *see also Sellers*, 2022 U.S. App. LEXIS 33641 at *15-16.

## B. Appellees' Restrictions are Unconstitutionally Vague

A policy is impermissibly vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Because of the potential for arbitrary suppression of free speech, "the Constitution requires a 'greater degree of specificity' in cases involving First Amendment rights." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011).

Appellees revoked Appellants' long-standing right to cover press conferences and (or) denied them new credentials without due process,[7] by using unconstitutionally vague criteria – that journalists "avoid real or perceived conflicts of interest," and that journalists be "free of associations that would compromise journalistic integrity or damage credibility." 3-ER-397. These are facially unconstitutional (in addition to

---

[7] The record is clear that Appellants *had* a right to newsgather co-equal with other government-approved press, but that was taken from them when Maricopa instituted its new policy – which according to the record in this case, does not appear to have been enforced against anyone except Appellants.

being unconstitutional as applied) because they are completely muddy as to what is prohibited.

As to conflicts of interests, there is no explanation of what a "perceived conflict" is. Perceived by whom? In attempting to explain how this term is "clearly" understood, the District Court credited the fact that the SPJ Code of Ethics was considered by the Seventh Circuit in *MacIver*, 994 F.3d at 610-11. The District Court said these were "reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the [government's] message by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories." 1-ER-14.[8] The District Court failed to appreciate that the Seventh Circuit was upholding the application of these standards to exclude *a think tank* from a pool of journalists. *MacIver*, 994 F.3d at 606. This exclusion *could* make some sense, but to say that the Seventh Circuit was endorsing viewpoint-based

---

[8] With respect to these three criteria that the District Court approved of, the record shows that the first two (news dissemination and longevity) are clearly met. 3-ER-403 at ¶1. The third however, is Constitutionally infirm. What is "newsworthy" is not for the government nor a court to decide. The government and the District Court appointed themselves as "media critics" – which is not a proper function for any branch of government.

discrimination against disfavored journalism outlets ignores the actual holding and facts of that case. Indeed, this Court has already distinguished *MacIver*, finding that the Seventh Circuit's decision was based in part on a lack of "evidence that the government had 'manipulate[d] the[] neutral criteria in a manner that discriminate[d]' against the applicant," and that "the applicant's 'other naked assertions of bias' were 'unsupported by references to the record.' That is not the case here." *Sellers*, 2022 U.S. App. LEXIS 33641 at *14 (quoting *MacIver*, 994 F.3d at 611). Further, as noted above, the holding in *MacIver* is inconsistent with *Consumers Union* and its progeny. *See, e.g., Exxon Corp.*, 589 F.2d at 590; *Knight*, 569 F.2d at 129 n.17; *Alaska Landmine*, 514 F. Supp. 3d at 1131 n.53. This Court should not just distinguish *MacIver*, but should support the decision in *Alaska Landmine* and decline to agree with *MacIver*.

The District Court referred to the SPJ Code of Ethics to determine whether the term "conflict of interest" was unconstitutionally vague. 1-ER-9. In doing so, it noted that this code did not create a set of legally enforceable rules. *Id.* at n.2. Yet, it then enforced the SPJ's standards as guideposts for determining the constitutionality of Appellees'

regulations. 1-ER-9–10. Meanwhile, Appellants' expert gave full testimony on how such a standard is no standard at all and that the SPJ itself is biased against "new media." 2-ER-36:1–37:11. Thus, the SPJ's guidelines are neither a neutral source, nor one that should be given the force of law, nor one that should be used to excuse vague governmental regulations. They are not akin to bar rules, but more akin to a code of conduct for a private organization. A private homeowners' association can ban Christmas lights in its private rules. But, no government agency should cite to such rules to uphold such a restriction by the state.

Even if the SPJ standards were an acceptable starting point for determining press credentials, it would not save the regulation challenged here. Appellees claim a broader definition of the term "conflict of interest" in the regulation than the SPJ does. The government claims that the SPJ standard should include a journalist who reports "on issues for which, and candidates for whom, he also advocates." 1-ER-9; 2-ER-93:7-23.[9] This is materially different from the SPJ definition of this term.

---

[9]   Even if this standard were constitutional, there is nothing in the record that shows that the Appellants ever violated such a standard. This is just made up out of thin air. The government showed Conradson volunteering for a Phoenix mayoral candidate in a prior election.

As Professor Leslie testified, conflicts of interest include, for example, reporting favorably on a publicly traded company while owning stock in that company (2-ER-38-39), not a journalist disagreeing with the facts or opinions espoused by the government. The County invented their own interpretation – that reporters may never be politically involved, not even in prior races – and hung that on the SPJ's language, despite that its definition *conflicts* with the SPJ's language. 1-ER-9; 2-ER-93:7-23.

Applying this invention, the government's only evidence of an alleged conflict of interest was that Conradson volunteered for a mayoral candidate in 2020.[10] The District Court's interpretation of "conflict of interest" thus is that if a reporter has *ever* advocated for a candidate, they can be banned as "conflicted" from reporting on elections *at all*.[11] This is a recipe for selective enforcement.

---

2-ER-146; 2-ER-207–210). Is the government saying that once one volunteers on a campaign, one is forever banned from being a journalist?

[10] The candidate, Merissa Hamilton, was not on the ballot this year.

[11] It is worth noting that the Appellants' expert, Gregg Leslie, went from being a reporter to volunteering on the [Bill] Clinton campaign, to then 23 years at the Reporters' Committee for the Freedom of the Press. 2-ER-29:3-17. Under the government's interpretation of its rule, Prof. Leslie would be just as disqualified as Mr. Conradson was. Meanwhile, he is apparently unbiased enough that he is now tasked with training the next generation of journalists at Arizona State University's Cronkite School of Journalism. 2-ER-30:3-8.

The District Court determined that Appellees' broad definition was "not an outlier" because the Arizona Senate's Media Rules provide that journalists "must not be engaged in any lobbying or advocacy, advertising, publicity or promotion of any individual, political party, group, corporation, organization or a federal, state or local government agency …" and Maricopa's actions and regulations are identical. 1-ER-9-10. However, the Senate rules are far clearer, and the record showed that Conradson met the Senate's standards and was issued a Senate pass, a fact the District Court failed to credit.[12] 2-ER-58:21–59:1. A different outcome under the same standard is compelling evidence of the standard being unconstitutionally vague, and is evidence of Appellees exercising unfettered discretion.

Entertaining Appellees' broad interpretation of "conflict of interest" was an abuse of discretion. Under such a standard, any reporting relating to an industry to which a media outlet's *advertiser* belongs would be a

---

[12] This does not mean that the Arizona Senate's rules are constitutional. Just because one governmental entity applies an unconstitutional standard does not mean that a different entity may rely on this fact to defend the constitutionality of its own restriction. It shows the District Court was inconsistent in crediting Appellee's evidence, which consisted entirely of hearsay in media articles, and Appellants' direct evidence of viewpoint discrimination.

conflict of interest. For example, if the *Arizona Republic* ran an ad for Katie Hobbs, it would be disqualified under this standard (if it were applied in a viewpoint neutral manner). This reveals the "standard's" true nature: a blank check for viewpoint-based censorship. The Court need not even draw any inferences to discern the government's improper viewpoint-based motive here; they wear it on their sleeve. In explaining Maricopa's standards, Moseley testified that the government is "really interested in serving journalists who are interested in selling the truth or at least pursuing the truth and that's always our goal," and espoused its views of how it believes journalism should be practiced. 2-ER-89. This is constitutionally impermissible.[13]

What's worse, assuming *arguendo* the government could articulate what a "conflict of interest" really is, it is impossible to determine how a journalist may avoid the government deciding that it *perceives* a conflict. Is *appearing* to favor one political party a conflict of interest? If that is the case, and the rule were applied evenly, all press conferences would

---

[13] The correct answer under the First Amendment is "there is no such line, being opinionated and targeted is every man's right."

be given to empty rooms. This vagueness leads to arbitrary and viewpoint-based enforcement, which happened here.

Requiring that journalists be "free of associations that would compromise journalistic integrity or damage credibility" is equally infirm. It is likewise unclear what conduct is prohibited. What sort of associations would "compromise journalistic integrity or damage credibility?" The District Court held that since these criteria have an analogue in the SPJ's Code of Ethics, they are valid. 1-ER-10. However, what this means to journalists is different from the ad hoc County definition.

Appellants' unrebutted expert testimony was that "associations" would be if, for example, a journalist was also a lobbyist. 2-ER-38:15–39:5. This is consistent with the *MacIver* case, in which a think tank sought to be treated as a journalistic outlet. *MacIver*, 994 F.3d at 611. The District Court erroneously agreed with the County that "associations" meant that journalists were not allowed to have political views or *prior* associations with political candidates who were not even on the 2022 ballot. In essence, the District Court approved of a regulation allowing the government to ban Appellants from press conferences

because Conradson does not hide the fact that he is a Republican. To violate the Free Press clause, the government chose to use the Free Association clause as its tool. This cannot stand.

The regulations lack reasonably specific criteria or objective factors. They claim to rely on the SPJ, but then distort the SPJ's language and interpret it to give them discretion to ban anyone at all. 1-ER-29; 2-ER-93:7-23. Appellees argued that they had "the right to set up criteria for ethical reporting." 2-ER-106:15-25. Appellees' witness, Fields Moseley, said that Conradson "doesn't seek the truth." 2-ER-95:13. The government does not get to decide who is "seeking the truth." Under our Constitution, that is the marketplace's job to decide. The government may not exclude media because it deems their reporting "inaccurate." If the government gets to decide that, then it becomes the "Ministry of Truth" out of 1984, not a neutral party in the quest for truth. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (citing G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003)).

What Appellees want is *stenography* and not *journalism*. If the government gets to decide who reports *the truth according to the*

*government*, then why have a press at all? The government can just publish press releases.

### C. Appellees Engaged in Viewpoint Discrimination

The government may not condition the exercise of First Amendment rights on "obtaining a license or permit from a government official in that official's boundless discretion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). Content-based and viewpoint-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). A restriction is viewpoint-based where "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Univ. of Va.*, 515 U.S. 819, 829 (1995).

Here, the government created a limited public forum where the press may gather to question and observe government officials. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (defining a limited public forum as one "that is limited to use by certain groups or dedicated solely to the discussion of certain subjects"). However, the

government limited access to that forum using a vague and unworkable standard, which they employed using unfettered discretion. In a public forum, "there is broad agreement that ... investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006)); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012). "For this reason, even in cases involving nonpublic or limited public forums, a policy … that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Child Evangelism*, 457 F.3d at 387; *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012). As this Court noted, "even in limited public forums where the government opens a traditionally private place for speech on limited topics, such as opening the County facilities for press conferences as the County did here, the First Amendment's protections against content-based and viewpoint-based restrictions are robust." *Sellers*, 2022 U.S. App. LEXIS 33641 at *10.

"For this reason, even in cases involving nonpublic or limited public forums, a policy … that permits officials to deny access for any reason, or

that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Child Evangelism*, 457 F.3d at 387. For time, place, and manner restrictions, "[a]s an application of the requirement that restrictions be narrowly tailored, a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials." *Gaudiya Vaishnava Soc. v. San Francisco*, 952 F.2d 1059, 1065-67 (9th Cir. 1991) (finding unconstitutional ordinance requiring individuals to obtain a "peddling permit" to sell merchandise that was "inextricably intertwined" with fully protected speech when the chief of police had discretion to deny issuance of a permit and the ordinance provided no specific grounds for granting or denying the permit and placed no explicit limits on the chief's discretion). And, in a case involving a parade ordinance that allowed the chief of police to move marchers onto sidewalks "in the interest of vehicular or pedestrian safety," the Ninth Circuit found that this gave an unconstitutional degree of discretion to the government because of its breadth and the fact that it did not require officials to articulate their reasons for denying permission to march in the streets, as well as an absence of any mechanism for direct administrative or judicial review.

*Seattle Affiliate of the October 22ⁿᵈ Coalition to Stop Police Brutality, Repression & the Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799-802 (9th Cir. 2008).

"Without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988). A government regulation violates the First Amendment "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit." *World Wide Rush, LLC v. City of L.A.*, No. CV 07-238 ABC (JWJx), 2007 U.S. Dist. LEXIS 105249, *35 (C.D. Cal. July 23, 2007) (quoting *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006)). The court in *World Wide Rush* enumerated "three considerations … to determine whether an ordinance confers discretion in violation of the First Amendment":

> (1) whether the ordinance contains "reasonably specific" criteria on which a denial may rest; (2) whether the ordinance outlines objective factors to consider in denying an application under the "reasonably specific" criteria; and (3) whether the ordinance requires officials to "state the reasons for his or her decision to either grant or deny a permit so as to facilitate effective review of the official's determination," which allows the determination to be "enforceable on review."

*Id.* at 35-36.

As explained above, there are no reasonably specific criteria, nor are there objective factors guiding application of Appellees' new press regulations. They claim to rely on the SPJ, but they do not actually use the SPJ's standards, rather manipulating this language to give them a blank check for viewpoint-based censorship. 1-ER-9; 2-ER-93:7-23. To the extent Appellees have stated their reasons for denying Appellants a press pass, they have openly admitted to impermissible viewpoint-based discrimination. Appellees exercised unfettered discretion and used this discretion to discriminate against Appellants because they do not approve of Appellants political associations and viewpoints.

Appellees argued that they had "the right to set up criteria for ethical reporting" (2-ER-106:15-25), which the District Court noted that was "controversial" and "problematic," and Appellants' expert witness strongly disagreed with it. 1-ER-14. The District Court then transformed this unconstitutional assertion of authority into something benign, claiming that forbidding journalists from accessing a limited public forum was not a restriction on newsgathering, but rather "further[ed] the County's legitimate interest in disseminating accurate information to the

public." 1-ER-15. This is a distinction without a difference, as limiting access to the exclusive forum where official information regarding the 2022 election was provided is a restriction on newsgathering. Furthermore, it is constitutionally repugnant to accept that the government may selectively exclude media for the sake of ensuring the reporting of what the government deems to be "accurate" information. The government is a poor arbiter of truth, especially when it may have a vested interest in stifling the dissemination of unflattering, yet accurate, information. In fact, such dissemination of unflattering information by TGP is likely part of this animus toward them.[14] History is replete with examples of governments lying to their constituents. As Justice Black observed in *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971):

> [o]nly a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part

---

[14] TGP was the sole reporter of statements showing an Arizona elections official being an "election denier," leading directly to his resignation. 3-ER-302-324; 2-ER-59:2–60:5. Appellees then promulgated new press pass requirements that, as the Maricopa County Recorder admitted on social media, were designed to keep TGP out of press conferences shortly before the 2022 election. 2-ER-22; Dist. Ct. Dkt. No. 25-1. The retaliatory motive and animus is clear. The District Court's willful blindness of this obvious conclusion shows reversible error.

of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell … In revealing the workings of government that led to the Vietnam war, the newspapers nobly did precisely that which the Founders hoped and trusted they would do.

That is why the First Amendment protects freedom of the press. To accept such censorious motives as a legitimate government interest is a clearly erroneous application of law.

For these reasons, this Court preliminarily found that Appellees' decision to deny Appellants a press pass was viewpoint-based. It noted that "Relying on a reporter's attendance at political party events is weak grounds – and a poor measuring stick – for determining a journalistic conflict of interest," and that Appellees provided no evidence other than Conradson's attendance at such events as evidence of conflicts of interest or problematic associations. *Sellers*, 2022 U.S. App. LEXIS 33641 at *11. It also found that "[p]ermitting 'truth' to be determined by the County violates our foundational notions of a free press," and that the record showed Appellees based its decision on Appellants' political beliefs. *Id*. at *12-14. The Court should re-affirm this decision.

### D. Appellants Were Deprived of Due Process

Not only are the standards employed by Maricopa County vague and unworkable, and applied in a manner that gives the government free license to engaged in viewpoint discrimination, Appellees' decision to deny Appellants a press pass was made in a star chamber, with no opportunity to be heard, no articulated standards, and no opportunity for meaningful appeal or review.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). Numerous courts have found that a journalist's access to a government press conference is a liberty interest which may not be denied without due process. *Sherrill*, 569 F.2d at 130-31; *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1134 (D. Alaska 2021), *appeal voluntarily dismissed*, No. 21-35137, 2021 U.S. App. LEXIS 15820 (9th Cir. Mar. 4, 2021), Doc. 22, Oral Ruling at 6-7; *CNN v. Trump*, No. CV-18-02610-TJK, 2022 U.S. Dist. LEXIS 212609 (D.D.C. Nov. 16, 2018); *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 121 (D.D.C. Mar. 7,

2002). This is not just a right that benefits Appellants – but the public at large. "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [First Amendment] in assuring that … individual newsmen not be arbitrarily excluded from sources of information." *Sherrill*, 569 F.2d at 129.

In a very closely analogous case, a court ruled that plaintiff had a likelihood of success on the merits for a due process claim because the government failed "to memorialize an explicit and meaningful standard governing its denial of press conference access." *Alaska Landmine,* 514 F. Supp. 3d at 1134. The court further noted that an "absence of any formal process, policy, or procedure mak[ing] judicial review [of a First Amendment claim] difficult ... [] highlights the importance of due process as the vehicle by which First Amendment rights are protected." *Id*. To bring a claim under the Due Process Clause, a plaintiff must show: "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a person (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991) (citation omitted).

Usually in cases where there has been a deprivation of due process, there is an examination of the adequacy of the process. However, here the analysis is easier, since there was no process at all. The government decided that Appellants were not to their liking and evicted them from the Fourth Estate. To make matters worse, they then pushed them away from anywhere that they could meaningfully gather news at all. 3-ER-399 at ¶5; 3-ER-404 at ¶5; 2-ER-60:2-5.

The District Court found that Appellants were not deprived of due process because Appellees published the standards they used in denying them a press pass, stated the reasons for the denial, and an undefined appeals process was available to them. 1-ER-11. But, as explained above, the standards Appellees used were unconstitutionally vague and exist as a cover for their viewpoint-based censorship of media outlets they do not like. Using a purportedly viewpoint-neutral standard as a smokescreen for viewpoint discrimination does not mean Appellees comported with due process.

Furthermore, there is no record evidence as to what appeals process was available to Appellants. Conradson's rejection email only cited which sections of the press regulations Conradson allegedly failed to satisfy and

stated "[i]f you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered." 3-ER-396. There is no documentary evidence, testimony, or even attorney argument as to what this appeals process involves, who reviews an appeal, what standard of review is used, or when a decision on an appeal might be made. Indeed, it is difficult to see how Conradson could have effectively appealed his denial, considering that Appellees did not provide any evidence or explanation of how Conradson violated the regulations.

### E.    Appellants Were Deprived of Equal Protection

The Equal Protection Clause provides that no state shall deny to any person within its jurisdiction equal protection of the laws. *See* U.S. Const. *amend. XIV, § 1.* In other words, "[p]ursuant to the Equal Protection Clause, the government must treat all similarly situated persons alike." *Martinez v. Clark County*, 846 F. Supp. 2d 1131, 1135 (D. Nev. 2012). A plaintiff asserts a valid equal protection argument if it demonstrates that "a group was singled out for unequal treatment on the basis of religion." *Carey v. Piphus*, 435 U.S. 247, 248 (1978). If the law that the plaintiff challenges burdens a fundamental right or makes a distinction based on a suspect classification, the Court should employ

strict scrutiny review. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). Alternatively, if the law does not burden a fundamental right or target a suspect classification, it is subject to rational basis review. *See id.*

"[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). When brought together with claims for violation of one's First Amendment freedom of speech, an equal protection claim typically shares the same analysis as the First Amendment claim. *Ray*, 699 F.3d at 1067.

Here, Appellants were selectively treated – they were singled out for denial of a press pass specifically for the content and viewpoint of their speech and their political sympathies. As discussed above, if the standards were equally applied, the press conferences would be attended by no more than a Mesa high school reporter and two tumbleweeds. Despite this, however, and as this Court has already noted, Appellants are the *only* journalists Appellees have purportedly found to have

impermissible conflicts of interests or problematic associations. *Sellers*, 2022 U.S. App. LEXIS 33641 at *14 n.4. The only possible conclusion to draw from this evidence is selective treatment of Appellants, in violation of their equal protection rights.

## III. Appellants Demonstrated Irreparable Harm

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). The freedom of the press also exists to serve the public. *Alaska Landmine,* 514 F. Supp. 3d at 1135 ("the foundational principle of the press clause of the First Amendment is that the media serves the public in offering both governmental transparency and information to the citizenry"). Conversely, there is a public harm in only allowing "viewpoint approved" press to cover the government, and the way the government has acted will undermine confidence that the election is being tallied cleanly.

"When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) (citing Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992))

("[W]hen the government announces it is excluding the press for reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence"). And when the government restricts a publication because of its viewpoint, the government is trying to blind the critical press while allowing in the friendly press. As this Court observed, Appellees' "[v]iewpoint discrimination as to in-person access to such conferences is not a de minimis injury." *Sellers*, 2022 U.S. App. LEXIS 33641 at *16.

Appellees complain that Appellants unreasonably delayed in seeking relief below. To seek relief before November 10 would have been premature.

> To seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1149 (2009). Actual injury was hypothetical until November 8, when the eyes of the world focused upon Maricopa County. If Appellants were similarly denied a press pass in Maine, where the election went off normally, they

would also seek redress, but on a non-emergency basis. It could have waited *months* there. Rushing into court on Saturday, October 1, would have been premature. It was prudent to hold off until the important work of delivering the national news was done – as it was expected to be on November 8.

On November 8, voting machines failed and irregularities worthy of reporting came to the forefront. Appellants tried to first continue covering the news without the pass, but were rebuffed with increasing levels of hostility – even being barred from areas accessible to the general public. 2-ER-108:1-6.[15] Appellants tried to resolve this in person and in writing. 3-ER-396; 2-ER-68:6-14 & 74:3-6. However, the "appeal" process has no temporal requirement, and appears to be no process at all.

On November 10, the Appellants were not even allowed on the curtilage, much less into press conferences. And, that was the date that hostility escalated to threats of arrest. 2-ER-60:3-5. At that point, the

---

[15] Jordan Conradson, "Breaking: TGP's Jordan Conradson and Rav's Ben Bergquam Removed From Maricopa Presser — Then Drone Follows Them From Premises (Video)," THE GATEWAY PUNDIT (Nov. 10, 2022), available at: https://www.thegatewaypundit.com/2022/11/breaking-tgps-jordan-conradson-ravs-ben-bergquam-removed-maricopa-presser-drone-follows-premises-video/ (last accessed Dec. 6, 2022).

Constitutional crisis was ripe, and Appellants sued on November 12. This Court has already found that Appellants' purported delay in seeking injunctive relief is not fatal to the requested injunctive relief, as only "substantial" delay cuts against a finding of irreparable harm. *Sellers*, 2022 U.S. App. LEXIS 33641 at *16 (citing *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)).

The District Court erroneously credited Appellees' argument on this point and found that Appellants' alleged delay in filing suit weighed against any claim of irreparable harm. 1-ER-17. However, Appellants were not sitting on their hands during that gap. They tried to resolve this without litigation both with in-person appeals and written appeals. Further, there was no story of national importance until November 8. And, the escalation of hostility and final rejection of administrative appeals did not occur until Nov. 10. This "delay" rationale is not a clear analysis of the facts nor a valid application of the law.

Appellees also argued that the livestreams they broadcast of these press conferences are just as good as being there in person, and thus being barred from the conferences was not irreparable harm. The District Court correctly noted this is false. 1-ER-16. It ignored just how poor a

substitute the livestreams were, however, as not all of these conferences are livestreamed, and journalists viewing a livestream have no opportunity to ask officials questions. 2-ER-69:4-20; 2-ER-77:3-8; 2-ER-91:14-23. Appellees' argument intuitively makes no sense, either. Why bother having press conferences at all when the government feels no pressure to respond to journalists who attend them and ask questions, and when watching a livestream is just as good?

## IV.  The Balance of Hardships and Public Interest Weigh in Appellants' Favor

It is self-evident that enabling a journalist in newsgathering and reporting activities regarding the government serves the public interest in knowing what their government is up to. And, as this Court noted earlier, "the public interest is served by ensuring that the County's administration of press-pass credentials complies with the First Amendment." *Sellers*, 2022 U.S. App. LEXIS 33641 at *17. Appellees' claim that a livestream is equivalent to attending a press conference applies to this factor as well, but as explained above, that argument is not well-founded. It also undercuts Appellees' position that granting Appellants a press pass would harm them in any way; after all, according

to Appellees, they can simply ignore Appellants during these conferences, an observation this Court made earlier in this case. *Id*.

Appellees also made the unsupported claim that Appellants have caused Maricopa County officials and employees to be threatened. Fields Moseley stated that Conradson "doesn't seek the truth and his articles have led to direct threats to Board of Elections officials and employees." 2-ER-95:13-17. This breathless claim is at best, a fantasy. Appellees' only evidence of these alleged "threats" was inadmissible hearsay, namely a *Reuters* reporter "stating that TGP was cited in highly threatening communications directed at County election employees." 1-ER-5 (citing 2-ER-236 and 2-ER-249. The District Court, for reasons unexplained, chose to credit this Reuters article when weighing the public interest, characterizing it as "evidence suggesting–though not definitively proving–that [TGP's] articles have been associated with threats against County employees." 1-ER-18. There was no finding that TGP's articles actually had this effect on anyone, that anyone had actually received these alleged threats, how many threats there were, or any other thing that could be called "evidence." 2-ER-97:5–98:1.

This Court has already found that, in the absence of any evidence that Appellants themselves made such threats, "the fact that third parties who may have read Conradson's articles engaged in threatening behavior is not such relevant evidence." *Sellers*, 2022 U.S. App. LEXIS 33641 at *12 n.3.[16]

## CONCLUSION

Press licensing "would make it easy for dictators to control their subjects." *Grosjean v. American Press Co.*, 297 U.S. 233, 240 (1936). Maricopa County thinks it has a workaround. It cannot stop opposition media from *publishing* through licensing, but it gags disfavored media's attempts to serve as a watchdog on government by licensing *newsgathering*. That gag must be removed.

The District Court erroneously held that the government's restrictions are not content or viewpoint based, but the government merely made the determination that Appellants' reporting is not of

---

[16] The District Court did not even consider the fact that these third parties may *not have read Conradson's articles.* Indeed, common sense suggests that if some anti-social person is sending a death threat, it is unlikely that they feel that they have an obligation to have proper citations to authority in their emails. Third parties who wish to discredit TGP may have sent such communications.

sufficient "quality." This is the same exact thing, just called by a different name. The District Court also erroneously found that any harm done is of no consequence because Appellants could watch YouTube streams of press conferences and, even with a pass, there is no guarantee Conradson would even be allowed into the room (because they could be full before he arrived), and even if he got into the room, there is no legal obligation for anyone to allow him to ask questions.

If all this is true, then why is the government permitted to revoke long-standing access to press conferences and then issue press credentials to people with arbitrary levels of "journalistic integrity" who may never be called on at all during a press conference? Those two things are completely inconsistent with each other.

The government rarely admits to viewpoint- or content-based discrimination. Here, it has done so, but it seems to think that if it calls it something else, then it just *becomes* something else. It does not. If the District Court's decision is allowed to stand, it will be cited by government agencies across the land who decide that they simply do not like one media outlet or another – and that based on these unconstitutionally vague notions, such outlets can be barred from access

to press conferences or other forms of newsgathering. The District Court and the government have created a "press licensing" system that is perfectly primed to be abused. If one does not like The Gateway Pundit, that is one's right. However, we must picture the tool that the government uses today in the hands of someone we despise, or at least someone with whom we politically disagree. When we do that, we can easily see into the future – and how this will be abused. Either the District Court decision or the Free Press clause can stand – but not both.

The Court should reverse the District Court's order denying Appellants' motion for a temporary restraining order and remand with instructions to grant that motion in its entirety, including to strike down the suspect regulations as unconstitutionally vague. This Court has already done the analysis. *See Sellers*, 2022 U.S. App. LEXIS 33641. In doing so, it nailed it. There is no reason to pull out the nail, letting the Free Press clause come crashing down to the ground, instead of leaving it at the proper heights at which this very Appellate Court placed it.

Date: December 8, 2022.       Randazza Legal Group, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
Gingras Law Office, PLLC

*Attorneys for Appellants*

# STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants certify that there are no known related cases pending in this Court.

Date: December 8, 2022.

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

*Attorneys for Appellants*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,192 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: December 8, 2022.  RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 8, 2022.　　　RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

*Attorneys for Appellants*