No. 22-16826

---

*In the*

# UNITED STATES COURT OF APPEALS
*for the*
# NINTH CIRCUIT

---

TGP COMMUNICATIONS, LLC, D/B/A THE GATEWAY PUNDIT,
AND JORDAN CONRADSON,

*Plaintiffs-Appellants,*

v.

JACK SELLERS, THOMAS GALVIN, BILL GATES, CLINT HICKMAN, STEVE
GALLARDO, STEPHEN RICHER, REY VALENZUELA, SCOTT JARRETT, MEGAN
GILBERTSON, AND MARCUS MILAM,

*Defendants-Appellees.*

---

On Appeal from the
United States District Court for the District of Arizona
No. 2:22-cv-01925-JJT
The Honorable John J. Tuchi

---

# APPELLANT'S EXCERPTS OF RECORD
# VOLUME 2 of 3

---

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Tel: 702-420-2001
ecf@randazza.com

David S. Gingras
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
david@gingraslaw.com

Attorneys for Appellants

1  Marc J. Randazza, #027861
   RANDAZZA LEGAL GROUP, PLLC
2  4974 S. Rainbow Blvd., Suite 100
   Las Vegas, NV 89118
3  Tel: (702) 420-2001
   ecf@randazza.com
4
   David S. Gingras, #021097
5  GINGRAS LAW OFFICE, PLLC
   4802 E. Ray Road, #23-271
6  Phoenix, AZ 85044
   Tel.: (480) 264-1400
7  Fax: (480) 248-3196
   David@GingrasLaw.com
8
   John C. Burns, MBE# 66462*
9  Burns Law Firm
   P.O. Box 191250
10 Saint Louis, MO 63119
   Tel: 314-329-5040
11 Fax: 314-282-8136
   TBLF@pm.me
12
   Attorneys for Plaintiffs
13 TPG Communications, LLC and Jordan Conradson

   *pro hac vice forthcoming

14            **UNITED STATES DISTRICT COURT**

15             **DISTRICT OF ARIZONA**

16 | TGP Communications, LLC, *et al.*, | Case No. 2:22-cv-01925-JJT |

17 |                    Plaintiffs, |

18 |         v.                    | **NOTICE OF FILING EXHIBIT** |

19 | Jack Sellers, *et al.*, |

20 |                    Defendants. |

21

22

23

24

25

## NOTICE OF FILING EXHIBIT

Plaintiffs TGP Communications, LLC and Jordan Conradson give notice of filing the attached exhibit that was presented by Plaintiffs at the hearing on their Emergency *Ex Parte* Motion for a Temporary Restraining Order, which was held on November 17, 2022. The exhibit, attached hereto as **Exhibit 1**, is a true and correct screen capture of a Twitter post made by Defendant Stephen Richer located at the URL: <https://twitter.com/stephen_richer/status/1574836130419130368>.

Dated: November 18, 2022.             Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza, #027861
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118

David S. Gingras, #021097
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044

John C. Burns, MBE# 66462*
BURNS LAW FIRM
P.O. Box 191250
Saint Louis, MO 63119

Attorneys for Plaintiffs
TPG Communications, LLC and
Jordan Conradson

*pro hac vice forthcoming*

ER0022

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case No. 2:22-cv-01925-JJT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 18, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Marc J. Randazza
MARC J. RANDAZZA

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4

**TGP Communications, L.L.C., a**      )
5  **Missouri limited liability company** )
   **doing business as Gateway Pundit,**  )
6  **et al.,**                            )
                                          )
7                     Plaintiffs,         )
                                          )
8            vs.                          )  CV22-01925-PHX-JJT
                                          )
9  **Jack Sellers, et al.,**              )
                                          )  Phoenix, Arizona
10                   Defendants.          )  November 17, 2022
   _____)  10:03 a.m.

11

12          **BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE**

13          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14          <u>**TEMPORARY RESTRAINING ORDER HEARING**</u>

15

16

17

18

19

20

21  Official Court Reporter:
    **Elaine Cropper, RDR, CRR, CCP**
    Sandra Day O'Connor U.S. Courthouse
22  401 West Washington Street
    Suite 312, SPC 35
23  Phoenix, Arizona  85003-2150
    (602) 322-7245

24

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

United States District Court

1                        **APPEARANCES**

2

For the Plaintiffs:
3        **MARC JOHN RANDAZZA, ESQ.**
         Randazza Law Group, P.L.L.C.
4        4974 S. Rainbow Blvd., Ste. 100
         Las Vegas, NV  89117
5        702.420.2001

6        **DAVID SCOTT GINGRAS, ESQ.**
         Gingras Law Office, P.L.L.C.
7        4801 E. Ray Road., Ste. 23-271
         Phoenix, AZ  85044
8        480.668.3623

9    For the Defendants:
         **CHARLES E. TRULLINGER, ESQ.**
10       **THOMAS P. LIDDY, ESQ.**
         Maricopa County Attorney's Office
11       Civil Division
         222 North Central Avenue, Ste. 1100
12       Phoenix, AZ  85004-2206
         602.506.8541

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

1        **P R O C E E D I N G S**

2            (Court was called to order by the courtroom deputy.)

3            (All counsel are present in the courtroom.)

4            (Proceedings begin at 10:03.)

5            COURTROOM DEPUTY:  This is civil case 22-1925, *TPG*      10:03:03

6    *Communications LLC v. Jack Sellers*.

7            This is the time set for Temporary Restraining Order

8    hearing.

9            Counsel, please announce.

10           MR. RANDAZZA:  Good morning, Your Honor.  Marc          10:03:13

11   Randazza on behalf of the plaintiffs.

12           THE COURT:  Mr. Randazza, good morning.

13           MR. GINGRAS:  Good morning, Your Honor.  David

14   Gingras on behalf of plaintiffs.

15           THE COURT:  Mr. Gingras, good morning.                 10:03:23

16           MR. TRULLINGER:  Good morning, Your Honor.  Charles

17   Trullinger and Thomas Liddy on behalf of the Maricopa County

18   defendants.

19           THE COURT:  Mr. Trullinger, Mr. Liddy, good morning.

20           MR. LIDDY:  Good morning, Your Honor.                  10:03:33

21           THE COURT:  Give me just one moment, please.

22           All right.  One housekeeping matter.  I watched the

23   witness list potentially grow a little bit over the subsequent

24   filings.  I understand everybody's moving fast in this

25   situation.                                                     10:04:00

ER0026

1    Mr. Randazza, you had one logistical issue with    10:04:03
2  regard to having two experts on the issue of journalistic
3  ethics.  One of them -- and the logistical issue is, one of
4  them is not physically present and your request to me was could
5  they testify telephonically; correct?    10:04:17
6    MR. RANDAZZA:  Yes, Your Honor, but I may be able to
7  make this easy for you.  I don't think we're going to need
8  Mr. Glasser.
9    THE COURT:  All right.  Thank you because, in my
10  mind, especially for an executive hearing at this point that we    10:04:26
11  need to move in a limited amount of time, I was not inclined to
12  allow two experts on the same subject matter and so you've
13  resolved that for me.
14    What I'd like to do now, counsel, is as follows:
15  I've read and internalized everything that you have supplied to    10:04:40
16  me, not just the briefs but all of the background materials and
17  exhibits and so we're going to dispense with any kind of
18  openings.  I want to get into any witnesses or evidence that
19  the parties want to present to me today.  I'm going to give
20  each side 45 minutes to do that because I need to reserve time    10:05:00
21  for you to then sum up and I may well have questions for you as
22  well.  We will start with plaintiffs.
23    So, Mr. Randazza, if you would call your first
24  witness.
25    MR. RANDAZZA:  Yes, Your Honor.    10:05:12

United States District Court

**ER0027**

1    Your Honor, I would proffer Professor Gregg Leslie as    10:05:17

2    our expert.

3    THE COURT:  All right.

4    Mr. Leslie, if you would please step forward to my

5    courtroom deputy, she'll swear you in.    10:05:22

6    MR. RANDAZZA:  And, Your Honor, having not appeared

7    before you before, do you prefer me at the podium or at counsel

8    table?

9    THE COURT:  It's changed since the COVID protocols

10   have gone off and I've gotten a little bit more permissive one    10:05:33

11   way or the other.  Historically, it's always from the podium

12   but I'm fine if you want to do it from your counsel table today

13   and that means from your seat if you like.

14   MR. RANDAZZA:  Okay.  Thank you, Your Honor.

15   COURTROOM DEPUTY:  Please state your name and spell    10:05:48

16   your first and last name for the record.

17   THE WITNESS:  Gregg Leslie.  L-E-S-L-I-E.

18   (602.506.8541, a witness herein, was duly sworn or

19   affirmed.)

20   THE COURT:  Whenever you're ready, sir.  Thank you.    10:06:13

21   **DIRECT EXAMINATION**

22   BY MR. RANDAZZA:

23   Q.   Professor Leslie, can you please tell us your current

24   employment position?

25   A.   I am a Professor of Practice and the Executive Director of    10:06:20

United States District Court

1  the First Amendment Clinic at the ASU Sandra Day O'Connor      10:06:23
2  College of Law.
3  Q.   And can you tell me about your educational background,
4  sir?
5  A.   I have a BA from Georgetown University from 1985 and then  10:06:31
6  I attended Georgetown University Law Center, graduating in
7  1990.
8  Q.   And what did you do after you graduated, sir?
9  A.   Soon after I ended up as a legal fellow at the Reporter's
10 Committee for Freedom of the Press, a nonprofit organization in  10:06:50
11 Washington, D.C., that defends free press rights and helps
12 journalists with all kinds of legal issues.

13         After that when the fellowship ended after a year and
14 a half, I was between jobs so I volunteered for the Clinton
15 campaign.  This was in '92.  And then within a year of that I   10:07:08
16 came back to the Reporter's Committee as a staff attorney and I
17 was there for 23 years, ultimately as Legal Defense Director.

18         THE COURT:  Counsel, I'm sorry.  I need to interrupt
19 you for just a moment.  I think I need to disclose to you that
20 while I have never met Professor Leslie before, I do from time   10:07:27
21 to time teach as an adjunct faculty member at the ASU College
22 of Law Professional Responsibility Course.  I'm doing it this
23 semester.

24         I don't know that that presents a problem here with
25 anybody's perception of the Court's balance on this because, as  10:07:44

ER0029

GREGG LESLIE - Direct

1  I said, I've never met the professor before.  But if anybody                    10:07:48
2  wants to raise that point, this would be a good time.
3          MR. LIDDY:  Your Honor, on behalf of Maricopa County,
4  we are very proud to have the Walter Cronkite School in our
5  county.  We understand how important it is to have the next        10:08:02
6  generation prepared, and we have no problem with this witness
7  teaching at the same institution that you sometimes teach so no
8  objection, Your Honor.
9          THE COURT:  All right.  Thank you.
10         MR. RANDAZZA:  I concur with my friend.                      10:08:15
11         THE COURT:  All right.  Thank you.
12         And I'll try not to interrupt again.
13         Go ahead.
14         MR. RANDAZZA:  Thank you, Your Honor.
15 BY MR. RANDAZZA:                                                    10:08:21
16 Q.   Mr. Leslie, during your tenure at the Reporter's
17 Committee, can you give me a brief outline of your
18 responsibilities and projects that you worked on there?
19 A.   Well, we really got ourselves involved in any freedom of
20 information or First Amendment related problem that journalists    10:08:37
21 face.  So we were constantly helping reporters when they were
22 involved in libel suits, when they were -- when they were
23 credentialing issues, we were often involved.  When they had
24 news-gathering restrictions placed on them, like by maybe
25 police during a protest and a reporter wanted to cover it and      10:08:57

United States District Court

GREGG LESLIE - Direct

1  yet were stopped from doing so because they were treated like          10:09:02

2  protesters or just -- their news-gathering rights were

3  violated.  So really anything to do with news gathering and

4  presenting the news to the public we would get involved in.

5          Usually we got involved as amicus curiae, filing           10:09:18

6  amicus briefs; but in many of the cases, we worked closely with

7  defense counsel.  You know, usually if the reporter was

8  somebody from the Associated Press or the New York Times or any

9  other decently sized publication, they had in-house counsel and

10 so we worked with them.  And then in the later years I was          10:09:37

11 there, we directly litigated on behalf of reporters as well.

12 Q.  And did you have any part in working on, for example,

13 media education at the time?

14 A.  We were often involved in that.  Both educating reporters

15 about their rights but also educating public officials and          10:10:05

16 police officials about reporters' rights.  Every four years at

17 both national political conventions we would run a hotline for

18 reporters who had legal issues and part of that hotline work

19 involved going to those cities beforehand, before the

20 conventions, and actually working with police and with usually      10:10:23

21 the mayor's office would have a representative who coordinated

22 it.  We would work with them to talk about what the media does

23 and how it might look like they are part of a protest when

24 instead, they are not.  They are there to cover it and pass

25 that information on the public so -- onto the public.                10:10:43

United States District Court

GREGG LESLIE - Direct

1       And, you know, and then as kind of an awkward part,        10:10:46

2   we would warn them about what a 1983 suit is and what happens

3   if they violate a reporter's First Amendment rights.

4       So, yes, public education and education of the

5   officials who might be tempted to interfere with reporter's    10:10:59

6   rights was a big part of the job.

7   Q.  And was that at state, federal, local, congressional

8   levels?

9   A.  We did it at all levels, sure.  Yeah.  We worked with

10  Congress -- you know, the press galleries there are the ones   10:11:13

11  that handle credentialing of journalists.  Congress purposely

12  avoided -- they didn't want to take on the role of deciding who

13  was a journalist or who was fit to cover the proceeding, so

14  they ceded that authority to the press galleries.  And we often

15  worked with them, almost on a consulting basis to -- especially 10:11:34

16  when they wanted to modify their policies to accommodate what

17  was then 15 years ago the emerging field of bloggers and online

18  journalists who traditionally had not fit in the definition of

19  a journalist at the Capitol.

20      MR. RANDAZZA:  Your Honor, I would present him as an       10:11:55

21  expert in media credentialing, media ethics, media practices.

22      THE COURT:  Mr. Randazza, this Court does not certify

23  experts per se.  If he's on the stand, I'm allowing him to

24  testify absent objections.  And especially since there's no

25  jury here, I think I'm able to weed anything out that is        10:12:12

United States District Court

1  inappropriate.                                                              10:12:14

2         So please go ahead and ask your substantive

3  questions.

4         MR. RANDAZZA:  Okay.

5  BY MR. RANDAZZA:                                                            10:12:18

6  Q.   Professor Leslie, you've reviewed the pleadings next?

7  A.   Yes.

8  Q.   Is it your understanding that in large part the Government

9  is relying on Society of Professional Journalists' standards

10 for their position?                                                         10:12:32

11 A.   Yes.  It does seem that that is a big factor in their

12 determinations, yes.

13 Q.   Are you familiar with the Society of Professional

14 Journalists which I'll abbreviate by SPJ for everyone's

15 convenience?                                                                10:12:45

16 A.   Yes.  I've worked with them many times on an almost weekly

17 basis for almost 20 years.  I've known all of their attorneys

18 at Baker and Hostetler who handle their legal matters.  And,

19 yes, I'm very familiar with their practices and their ethics

20 code.                                                                       10:13:03

21 Q.   Can you tell me what the SPJ is?

22 A.   It's a group that has got a very interesting history.

23 It's a society of professional journalists and it was started

24 by a number of journalists who wanted to make journalism a

25 professional -- well, a profession rather than just what was                10:13:16

ER0033

1  seen as a lesser practice where just anybody could do it.  So  10:13:21

2  they wanted to elevate the standards of the industry and so

3  they very early on adopted an ethics code that was meant to be

4  aspirational to talk about what a professional journalist

5  should be.  10:13:38

6         And I don't know if they knew at the time but it

7  certainly has been understood since that journalism is not

8  really a profession.  You don't invite licensing by the

9  Government.  You don't invite admission to the field through

10  Government regulation.  So in the traditional sense, it's not  10:13:53

11  really a profession but they just wanted to elevate the

12  profession and they created an aspirational code to do that.

13  Q.   Have you seen their standards sheet used or attempted to

14  be used in litigation very often?

15  A.   I think reflexively it always is.  People always want to  10:14:15

16  say, "Well, this is what a journalist is supposed to do and if

17  they fall short of the SPJ code, they must be negligent," and

18  that is never what the code was supposed to be.

19         In fact, the SPJ on its own website talks about the

20  code and says it was never meant to punish journalists.  It was  10:14:31

21  never meant to be a legal standard.  It was always supposed to

22  be an aspirational code and, I mean, I think that's a big part

23  of working with journalists as a lawyer.  Looking at a question

24  from the aspect of whether there's a legal standard that

25  governs and whether there's an ethical standard and the lawyers  10:14:53

United States District Court

**ER0034**

1  are always concerned about the legal standard.  Somebody                10:14:55

2  committed to being the best journalist they can be would be

3  definitely committed to the ethics standards.  But, you know,

4  they are not meant to regulate the field certainly.

5  Q.   Are there competing ethics codes?                                  10:15:11

6  A.   There are many.  Every association that starts up often,

7  you know -- especially more than ten years ago, people would

8  decide they didn't want to be a part of SPJ or, in an emerging

9  field like online journalism, a group called The Online News

10 Association emerged and every time one of these groups started,    10:15:30

11 they did develop an ethics code because they wanted to

12 distinguish themselves.  They wanted to say what they stood for

13 but they never made it a bar to admission or a standard for

14 becoming a journalist.  They just said, "Here's what we aspire

15 to.  Here's what our educational purpose will be."                     10:15:50

16        And then as well every news organization of any

17 decent size has its own standards, usually specifically

18 targeted to a community.  And it was very popular a century ago

19 when every newspaper wanted to say to the City exactly what

20 they stood for and how their reporters would behave.                   10:16:10

21 Q.   So would it be accurate to say that if you followed the

22 SPJ's code, you're not necessarily following a universal code?

23 A.   Right.  You've just adopted a standard that you think

24 holds you out as a more professional -- you know, a higher

25 level of a journalist.                                                  10:16:30

United States District Court

ER0035

GREGG LESLIE - Direct

| | | |
|---|---|---|
| 1 | Q.   Do you think there's any bias in the SPJ's code? | 10:16:31 |

1   Q.   Do you think there's any bias in the SPJ's code?   10:16:31

2   A.   I think, you know, because it's so old, there has been

3   bias all along.  Once you decide that you're the standard for a

4   professional journalist, by definition, you start weeding out

5   people who you don't think qualify.   10:16:45

6        And so for many years that included free-lance

7   journalists.  SPJ was not always big on allowing free-lance

8   journalists.

9        Once we got into the Internet age, they were very

10  slow to accommodate online journalists.  They wanted to say you   10:16:58

11  had to work for a newspaper or an established publication.  And

12  that's why we now have multiple organizations dedicated to

13  online journalism, because SPJ was very slow to get into that

14  field.  So they have had a bias in favor of what is a

15  well-established definition of a journalist.   10:17:25

16  Q.   In your professional opinion and academic opinion then,

17  would using the SPJ's code to determine who is and who is not a

18  credentialed journalist be a good practice?

19  A.   It's not a good practice at all.  I would say it's similar

20  to an actor, if they want to become an actor in movies, they   10:17:48

21  have to meet the minimums to join Actors Equity or whatever the

22  union is, but that's different than meeting aspirational goals

23  that get you to winning an Oscar, for instance, so it's a big

24  divide.

25        The SPJ code is really about developing you as the   10:18:07

United States District Court

1  best journalist you can be, what you should be concerned about.  10:18:10
2  But it's never meant to be a bar to admission to the field.
3       And again I would stress that SPJ notes that.  I'm
4  not criticizing SPJ there.  They have disclosed that they don't
5  mean this to be a definition of who is a journalist and who  10:18:27
6  qualifies for protection as a journalist.
7  Q.   So in your experience, SPJ wouldn't even want their code
8  used this way?
9  A.   Right.  Yes.  And they've seen so many battles over that,
10  that's why they specifically wrote that into a statement that  10:18:44
11  is still on their website.
12  Q.   So let's set that aside for a moment.  We will accept your
13  position on that but let's just look at the code itself.  Part
14  of the code that is at issue in this case is that to determine
15  if someone is a bona fide correspondent of repute, there are  10:19:05
16  two factors that the Government has cited to reject my client,
17  one being that both the journalist and the publication, quote,
18  avoid real or perceived conflicts of interest and that both are
19  free of associations that would compromise journalistic
20  integrity or damage credibility.  10:19:34
21       Professor Leslie, I would like to first address the
22  real or perceived conflicts of interest.  In your professional,
23  educational and learned opinion, what does that mean in the
24  context of the practice of journalism, conflicts of interest?
25       MR. TRULLINGER:  Objection, Your Honor.  The witness  10:19:55

ER0037

1    is not a journalist.                                    10:19:56

2         THE COURT:  I'm going to allow him to answer the

3    question in this context.  As I said before, I think I can sift

4    through the information for the Court as the finder of fact as

5    it were.  The objection is overruled.                  10:20:15

6         You can answer the question.

7         Do you need it repeated back to you?

8         THE WITNESS:  Sure.

9         MR. RANDAZZA:  Actually, I'm going to rephrase it.

10         THE COURT:  Okay.                                 10:20:27

11   BY MR. RANDAZZA:

12   Q.   In your opinion, how does the journalistic -- I guess it's

13   not a profession; correct, sir?

14   A.   Right.  Yeah, in the strict definition.

15   Q.   How does the journalism world define conflict of interest?  10:20:39

16   A.   I think this gets to that distinction between how you can

17   be the best journalist to impress people and impress the public

18   versus what you have to do before you're considered so biased

19   you shouldn't be a journalist.  And so what this means is in

20   that context -- and, again, I've worked with SPJ lawyers on     10:21:01

21   this before.  They are -- mainly you would be concerned with

22   somebody, say, owning a stock of a publicly traded company and

23   not disclosing that and reporting on that company favorably

24   knowing it will affect the market value of what you have owned.

25   There can be other conflicts of interest but they are really    10:21:23

1   meant to be very specific things to make sure you're not          10:21:27
2   undermining journalism directly by, say, if your true purpose
3   is to get a law passed as a lobbyist or an advocate of some
4   type, they don't want you to masquerade as a journalist when
5   you've got that conflict of interest.                              10:21:48
6   Q.   So would that have anything to do with being opinionated?
7   A.   I don't think it does at all because, you know, as I said,
8   this battle early on was about what a professional journalist
9   is because there was always a history in journalism of being
10  incredibly opinionated, directly working in collusion with        10:22:07
11  political parties and all and yet those journalists still have
12  First Amendment rights even if you go that far.
13       So, yeah, I think that's -- it doesn't -- having an
14  opinion still does not determine whether you are a journalist.
15  I think Rachel Maddow at MSNBC is always brought up as an          10:22:30
16  example of this.  It's clear what perspective she has and what
17  opinion she's promoting, but she does good journalism at the
18  same time.  So you can be a journalist have a strong opinion.
19  Q.   What about the second factor here, to be free of
20  associations that compromise journalistic integrity or damage     10:22:55
21  credibility?
22  A.   I think, again, it's when you hear that at first, they
23  don't give examples.  It's a very broad statement and it's
24  because its an aspirational goal.  So if you think of it as an
25  aspirational goal, it makes sense.  You just stay away from       10:23:14

United States District Court

**ER0039**

1    anything that makes you look biased.  You don't do anything      10:23:18

2    that is going to damage your credibility, whatever that may be,

3    and they don't list factors there because it just means be a

4    good journalist.

5         If you try to bring it down to the position of where      10:23:33

6    it's going to be used in the statute to regulate journalism,

7    you know, it should only be used when it's actually something

8    like you have a direct conflict of interest, usually meaning

9    monetary.  Journalists just don't regulate their own field that

10   way by saying if you have a political opinion or if you do      10:23:56

11   something that makes you look biased that you can't be a

12   journalist.  That's never been part of the definition of who is

13   a journalist.

14   Q.   So your example of Rachel Maddow, the fact that she might

15   really support a candidate, would that be relevant to her      10:24:17

16   status as a journalist?

17   A.   I think it would be relevant.  I think people would

18   question various things about then is she telling the truth

19   when she questions other candidates?  And so that's why it's an

20   aspirational goal that you shouldn't look biased in that sense.      10:24:32

21   But at the same time, you know, nobody would say she's not a

22   journalist because she's endorsed the candidate.  There's a

23   long tradition in this country dating back to the founding era

24   of newspapers endorsing candidates.  They sometimes see that as

25   a separate role of an editorial board that is not part of the      10:24:54

ER0040

1   news room but that's not a law and that's not a required custom    10:24:58

2   either.

3   Q.    So that isn't a conflict of interest?

4   A.    No.   I mean, it's not the kind of conflict of interest

5   that would define who can be a journalist.   It might be    10:25:10

6   considered a conflict to say, you know, if you're trying to

7   present yourself as the best journalist out there.   Other

8   journalists might use that against you to say you shouldn't be

9   doing that but not in the sense of not saying you're not a

10  journalist.    10:25:31

11          MR. RANDAZZA:   Thank you, sir.   I have no more

12  questions for you.

13          THE COURT:   All right.   Thank you.

14          Mr. Trullinger, do you have questions for this

15  witness?    10:25:44

16          MR. TRULLINGER:   I do, Your Honor.   Thank you.

17          Is it okay if I come to the podium, Your Honor?

18          THE COURT:   Yes.   That's fine.

19                      **CROSS - EXAMINATION**

20  BY MR. TRULLINGER:    10:25:56

21  Q.    Good morning, Mr. Leslie.   How are you doing?

22  A.    Good morning.   All right.

23  Q.    First of all, the criteria that is at issue here is not

24  based on the Society of Professional Journalism.   It's based on

25  a Seventh Circuit Court of Appeals' opinion.   Are you not aware    10:26:20

ER0041

1  of that?                                                                10:26:24

2  A.   No.   I think that language came from the code of ethics,

3  didn't it?

4  Q.   There are some overlap but there's a difference between

5  the Society of Professional Journalism rules or codes I should      10:26:33

6  say and the criteria that has been adopted by Maricopa County

7  to whether or not to allow Press Passes.  So just for clarity,

8  your focus is on the Society of Professional Journalism and

9  that code of ethics, that's what you're testifying about today;

10  correct?                                                             10:26:53

11  A.   It's really about what standards Government officials can

12  use to determine who is a journalist and the language is so

13  similar in the code of ethics and some of these regulations

14  because of this temptation to say, "Well, if this huge

15  journalism society has adopted these codes, that must be the        10:27:08

16  rule."  And so that's the important thing, to weed that out, to

17  say that these are not rules of the profession as much as

18  aspirational goals.

19  Q.   Sure.  But as we sit here today, you've not looked at the

20  criteria that the county is using; true?                            10:27:23

21  A.   No.   I've read the regulation that they use, yes.

22  Q.   So you agree that the Government does have a right to

23  limit press -- access to press conferences and buildings for

24  photographs and interviewing people and things like that;

25  correct?                                                             10:27:38

ER0042

1  A.   For noncontent or viewpoint-related reasons, they do and          10:27:39

2  that's --

3  Q.   That's my point.  I just asked you -- you've answered the

4  question.

5       And you agree also that when -- well, in fact, let me          10:27:50

6  ask you this.  I assume a lot of your clients have faced that

7  issue where they have had to get some sort of credentials

8  before they could get into a press conference; true?

9  A.   Yes.

10 Q.   And that's not uncommon for a Government to require a          10:28:06

11 journalist to be credentialed before they get into a press

12 conference.  Yes?

13 A.   It's much less common than it used to be but it is still a

14 practice, yes.

15 Q.   And the Government agency that sets those criteria has a          10:28:17

16 right to set whatever criteria they want so long as it's

17 content-neutral; true?

18 A.   I would say if it comes down to litigation, no, that they

19 should only make reasonable time, place, and manner

20 restrictions, like if they don't have enough room to let people          10:28:34

21 into a particular press conference.

22 Q.   Okay.  So one of the criteria that's acceptable in your

23 eyes is that if there's a concern about logistics or how big

24 the building is or how much room there is.  Fair?

25 A.   That's common, yes.          10:28:49

ER0043

GREGG LESLIE - Cross

| | | |
|---|---|---|
| 1 | Q.   And another concern would be security, right, the need for | 10:28:55 |
| 2 | security in the building.   True? | |
| 3 | A.   Sure.   That could be a factor. | |
| 4 | Q.   And ethical practice, making sure attorneys have ethical | |
| 5 | practice and they have integrity, that would be another factor. | 10:29:06 |
| 6 | True? | |
| 7 | A.   You said attorneys? | |
| 8 | Q.   I'm sorry.   Journalists. | |
| 9 | A.   See, that points to the difference between, you know, | |
| 10 | attorneys' rule of ethics really is a governing rule of the | 10:29:16 |
| 11 | profession.   With a journalist, no, I don't think the State | |
| 12 | should look into what it should consider ethical consideration | |
| 13 | of a journalist. | |
| 14 | Q.   Do you think the Government has a right to base criteria | |
| 15 | on ethical standards for journalists? | 10:29:34 |
| 16 | A.   I don't think so for the same reason the courts don't do | |
| 17 | that when they determine who gets into a courtroom, including | |
| 18 | media.   You know, they recognize that they shouldn't be making | |
| 19 | those kind of judgment calls because the public wants all | |
| 20 | voices or all listeners to be represented there. | 10:29:52 |
| 21 | Q.   You said earlier that bloggers and YouTube posters and | |
| 22 | social media influencers were traditionally not thought of as | |
| 23 | journalists; right? | |
| 24 | A.   As the field was emerging, groups like The Society of | |
| 25 | Professional Journalists were slow to recognize them as | 10:30:14 |

United States District Court

**ER0044**

GREGG LESLIE - Cross

1   journalists.                                                    10:30:16

2   Q.   Is it fair to require that a journalist be ethical.  Fair?

3   A.   Are you saying for the Government to require that they be

4   ethical?

5   Q.   It's fair for the Government to want a journalist to be    10:30:27

6   ethical.

7   A.   But that's such a loaded term to say the Government can

8   require you to be ethical because does that mean you have to

9   interview two people before you go with the fact or does that

10  mean you shouldn't be engaged in fraud?  Yes, there's a certain 10:30:40

11  amount of ethical standard that they can enforce but they

12  should not be enforcing a code of ethics.

13  Q.   The Government has a right to expect journalists to write

14  truthful articles; true?

15  A.   Well, everybody does but, again, once you make that a      10:30:55

16  Government standard --

17  Q.   That's all I need.  That's all I needed.

18          It's appropriate for a Government to expect that a

19  journalist will do fact checking before he or she writes an

20  article.  Fair?                                                 10:31:10

21  A.   No, especially before a public body, no.

22  Q.   That's all I asked.

23          Journalists have other ways of covering press

24  conferences, especially if they are, for example,

25  live-streamed; correct?                                         10:31:41

United States District Court

1    A.   Especially if they are what, live-streamed?                10:31:42

2    Q.   Live streamed.

3    A.   You see a lot of the elements of a press conference if you

4    get a live stream.  It's certainly better than nothing.

5    Q.   Sure.  And a journalist doesn't have to be called on even   10:31:51

6    if they do attend a press conference; correct?

7    A.   Right.

8    Q.   So watching a press conference live-streamed without

9    asking questions is just as good as being in the room and not

10   asking questions, isn't it?                                      10:32:10

11   A.   No.  I would say it's not.  There's a big difference

12   between being in the room and getting to observe multiple

13   people at once versus whatever the camera happens to be focused

14   on.

15   Q.   Do you agree that a journalist should take responsibility   10:32:36

16   for the accuracy of their work?

17   A.   As an ethics matter, yes.

18   Q.   And you think that journalists should only publish

19   articles that they know to be true?

20   A.   As an ethics matter, yeah.  I mean, sometimes you report    10:32:49

21   things that you think are newsworthy that somebody has alleged

22   and you can't confirm whether they are true or false and so

23   there are judgment calls involved.

24   Q.   Do you agree with me that citing a Twitter feed of someone

25   else's opinion is not a source of fact?                          10:33:05

ER0046

1   A.   Of someone else's opinion.  By definition, an opinion is        10:33:08

2   not a source of fact, yes.  But, I mean, the issue here is

3   whether Government agencies enforce that.

4   Q.   You've answered my question.  Thank you, sir.

5        Do you agree that a journalist should balance the               10:33:23

6   public's need for information against the potential harm or

7   discomfort that could come from writing an article?

8   A.   That's always something to think about and part of the

9   ethics considerations the journalists make all the time.

10  Q.   Do you agree that journalists should avoid political and        10:33:39

11  other outside activities that may compromise integrity or

12  impartiality?

13  A.   Again, that's the aspirational goal.  Everybody's

14  definition of what kind of activity would compromise their

15  credibility is going to be different.  It's going to be a           10:33:55

16  case-by-case call that is not up to the Government to decide.

17  Q.   Well, you've already said the Government has the right to

18  establish standards before they allow journalists to attend a

19  press conference, do they not?

20  A.   All of the standards you're talking about are either           10:34:08

21  content or viewpoint based.  If it's -- if you're saying if

22  you've worked for --

23  Q.   I'm just asking you -- let me just ask it again.  Do you

24  agree that the Government has the right to set standards before

25  allowing a journalist into a press conference; true?              10:34:21

United States District Court

1   A.   Well, the word "standards" is so wide open that I would   10:34:25

2   say yes, very small things like time, place, and manner

3   restrictions.

4   Q.   Do you agree that if a journalist is a member of any

5   particular group and they write an article in -- against --   10:34:41

6   they write articles against another group, whatever that group

7   happens to be, there is a -- their bias comes into -- their

8   bias and credibility can be questioned?

9   A.   That would come into play certainly and that would be

10  exactly what the public is judging when they read that   10:35:04

11  journalism.

12  Q.   Do you think that a journalist should say that they have a

13  bias when they write an article?

14  A.   If it's not obvious they usually do and it's a good

15  practice if you know you are approaching something from a   10:35:17

16  particular perspective and it's not obvious by the nature of

17  the writing, then it's a good ethical practice to disclose

18  that, yes.

19  Q.   Whether aspirational or not, do you believe journalists

20  should practice good ethics?   10:35:32

21  A.   They should, yes.

22  Q.   And do you believe that journalists should try to aspire

23  to ethical standards?

24  A.   Again aspire to, Yes, that's always it's issue.  You

25  should always be training and learning to improve your skills.   10:35:46

United States District Court

**ER0048**

GREGG LESLIE - Cross

1   Q.   Do you agree that if you publish an article that is          10:35:57
2   negative about a person, just an ordinary citizen, you
3   shouldn't publish along with it that citizen's picture or
4   contact information?
5   A.   I mean, I don't think there's a rule like that.  If you      10:36:13
6   were talking about aspirational standards, you should always
7   try to minimize harm caused but there's no absolute rule as to
8   what you should or shouldn't publish.
9   Q.   And do you agree that if a journalist tries to get --
10  tries to get an answer out of somebody and they don't want to    10:36:32
11  answer the question, they turn away, the journalists shouldn't
12  run after them and yelling questions at them, should they?
13  A.   That is by no means a rule.  I mean, every situation is
14  different and there can be a lot of circumstances where the
15  journalist feels their article will only be fair if they get a   10:36:48
16  comment.  And many times that comment only comes after pursuing
17  somebody.
18  Q.   One of the things you said earlier is that you mentioned
19  that newspapers sometimes endorse candidates or do it all the
20  time maybe you said.  But they endorse candidates.  But you      10:37:04
21  also said that that endorsement is in the editorial section,
22  not in the news section; correct?
23  A.   Not always.  I said that's often a practice.
24  Q.   And that's a good practice, that if you're going to write
25  an opinion piece, it should be in the editorial section rather   10:37:19

United States District Court

ER0049

1  than in the news section where facts are supposed to be        10:37:23
2  presented.  Fair?
3  A.   That is the tradition from cren journalism.  It doesn't
4  always have to carry over, as a matter of law.
5  Q.   Shouldn't online journalism follow that same rule?        10:37:35
6  A.   It's much, much, more difficult.  You don't have different
7  sections in the same way.  You don't have different staffs.  I
8  mean, you know, a well-funded newspaper a century ago had a big
9  staff for writing editorials and including endorsements and
10 they just don't do that much any more.  Newspapers just don't    10:37:53
11 have an opinion-based staff at all.
12 Q.   If a journalist has a question about something that a
13 Government does, the journalist should call the Government and
14 ask a question, should it not?
15 A.   They should always try to get everybody's response, sure.   10:38:20
16 Q.   They shouldn't just write something because it was an
17 opinion somewhere else on a Twitter feed or somewhere else?
18 A.   Well, but I worry when you say they shouldn't do it.  They
19 should aspire to do better than that, yes.
20 Q.   And just because a journalist is not physically located in  10:38:35
21 the building, so long as they have access to the same
22 information, either by watching through a YouTube live feed or
23 by calling the Government and asking questions, they have the
24 same ability to write a story about something that they are
25 interested in.  Fair?                                            10:38:51

United States District Court

1   A.   I think that is too general.  Journalism isn't a science.   10:38:53

2   You know, it's a still.  And if you can be there in the room,

3   like the musical Hamilton said, "In the room where it

4   happened," if you can be there, you can see other people

5   involved.  You can see who's got an interest.  You can talk to   10:39:10

6   others as they leave the room.  There's just a lot about

7   journalism that benefits from having access to the official

8   proceedings.

9   Q.   And you've already said that you're not a journalist;

10  right?   10:39:24

11  A.   I'm not now, no.

12  Q.   Have you ever attended a press conference yourself

13  personally?

14  A.   Yes, as journalist.  I was a journalist during law school.

15  Q.   When was that?   10:39:34

16  A.   1986 to 1990.

17  Q.   That's all I have, sir.  Thank you.

18          THE COURT:  All right.  Thank you.

19          Any redirect, Mr. Randazza?

20          MR. RANDAZZA:  Yes, Your Honor.   10:39:45

21          THE COURT:  Go ahead, please.

22          MR. RANDAZZA:  Thank you.

23                  **REDIRECT EXAMINATION**

24  BY MR. RANDAZZA:

25  Q.   Professor Leslie, you said it is -- I believe you said --   10:39:50

**ER0051**

1  and tell me if I'm mischaracterizing it -- sometimes it's only    10:39:54

2  fair to get a comment from somebody before you write about

3  them?

4  A.   Right.

5  Q.   And my friend was asking you about whether you're chasing    10:40:03

6  someone for that comment.   Is that commonplace in the

7  journalism field?

8        MR. TRULLINGER:  Objection, Your Honor.  That's

9  speculation, foundation.

10       THE COURT:  I'll allow him to answer the question for    10:40:16

11 what it's worth.

12       Go ahead.

13       THE WITNESS:  I would say it's common in my

14 experience with libel cases, especially where a lot of these

15 news-gathering elements get examined and pursued.  I've often    10:40:27

16 heard journalists say they just don't get the story by asking

17 one question at a press conference.  Sometimes you have to look

18 a little bit like a bully and rephrase the question and come

19 again and then follow the person to the elevator.  Some of the

20 best journalism is done that way and it doesn't always look    10:40:47

21 good but that's kind of the aggressiveness that gets you a good

22 story as a journalist and it's considered perfectly ethical

23 behavior.

24 BY MR. RANDAZZA:

25 Q.   And is it more ethical in your view or less ethical in    10:41:05

1   your view to ask a source a question directly before writing
2   about it?
3   A.   It's more ethical, yes, to pursue as much information as
4   you can.  So if you have an opportunity to ask a source
5   directly, that's always beneficial.
6   Q.   So would it be more or less ethical to write about that
7   source by speaking to them directly or watching them on a video
8   feed?
9   A.   Again, because you can get so much of a different reaction
10   from the room, from other participants, from people as they
11   walk away from an interview, it's always more useful to be
12   there in person.  That's how good journalism is done.
13   Q.   So if a journalist could go to a press conference or could
14   stay at home and watch it on a feed, which would be the better
15   decision?
16   A.   I would think the practice of journalism is that you would
17   always rather be there in person.
18   Q.   Do you believe it's unethical for a journalist who happens
19   to be an Arizona Cardinals fan to write about the National
20   Football League?
21   A.   No, not at all.
22   Q.   What if they had been a life-long fan of the Cardinals
23   since before they even moved to Arizona?
24   A.   I think that shows, you know, that's the kind of case
25   where you don't even have to disclose a bias like that, because

10:41:08
10:41:22
10:41:41
10:42:04
10:42:24
10:42:36

ER0053

1  people kind of assume there's a little home town interest in          10:42:39

2  the home town team.  So I think a bias like that is going to be

3  known, is going to be assumed maybe or maybe would be directly

4  disclosed and is commonplace.

5  Q.   But would it be unethical to cover the NFL?                       10:42:57

6  A.   No.  I don't think it would at all.

7  Q.   What if you had a Cardinals tattoo?

8  A.   I don't think those factors really matter.  I think the

9  things that would make it directly unethical in the sense of

10 violating standards versus not reaching the aspirational goals,        10:43:13

11 the things that would make a difference would be if you're

12 somehow making a profit off of that.  If you got money because

13 you had positive coverage or if that led to some company you

14 have stock in being more profitable.  It's that kind of direct

15 conflict of interest that's much more relevant.                        10:43:35

16 Q.   You mentioned that credentialing is less and less common.

17 A.   Right.

18 Q.   Can you tell me more about that?

19 A.   It used to be there was a day when every police department

20 and every public body knew exactly who the journalists were.          10:43:50

21 Every courtroom had every daily newspaper represented, you

22 know, every -- most trials would at least have a pop-in by a

23 reporter.  Everybody knew who the journalists were because they

24 were working full time for a newspaper or a broadcast station

25 or maybe a magazine.  Those days are gone.  That has been the         10:44:11

ER0054

toughest question for all public institutions is answering the      10:44:15

question of who is a journalist.

        And so many organizations have given up.  The U.S.

Congress, the White House, they have actually, you know, given

the question up to the press itself to let the press galleries      10:44:32

decide who is a journalist.

        So the same thing with police departments.  It used

to be when we were doing these hotlines for journalists at the

political conventions, we would say, "Make sure you register

with the police department to get police credentials," because      10:44:50

police credentials are meaningful in the sense that they get

you behind a police line.

        I would say now most police departments do not issue

media Press Passes because they just found it too difficult to

answer who is and isn't a journalist.                               10:45:07

Q.   When they did, did you ever encounter one that would judge

the quality of the writing prior to issuing the pass?

A.   No.  The credentials were almost always -- were never

related to that.  They would give you credentials and then if

there was a certain press conference where they could only fit     10:45:27

20 people in the room or something, they might go to the

biggest circulation publications for instance.  They would

always -- well, I can't say always but the tradition would be

that they would try to avoid content- or viewpoint-based

determinations and, instead, look for objective facts that         10:45:46

ER0055

1  would -- where the information is most likely to get out to the   10:45:49

2  public.  So they would look for the largest circulation

3  publications usually.

4  Q.   Would you say you're judging -- you were asked about this

5  Seventh Circuit case, the *MacIver* case, and I'm not going to   10:46:06

6  ask you for any legal analysis of it.  But are you familiar

7  with that case?

8  A.   Yes.

9  Q.   Was it a journalist seeking credentials in that case?

10 A.   No.  The important thing there was that it was something   10:46:18

11 that described itself as a think tank and so, you know, that's

12 always going to be a different evaluation, because that's

13 exactly what a lot of credentialing is meant to weed out.  If

14 somebody's really an advocacy organization trying to actually

15 get legislation passed but they also print a newsletter, they   10:46:39

16 are going to want to say they are a journalist.  But the way

17 it's mostly done now is you look at not the title of what the

18 person says they are but the function of what they're

19 performing.  And I think we've got better Ninth Circuit case

20 law on who is a journalist than the Seventh Circuit standard.   10:46:56

21 Q.   You said you did look at the Government's brief and you

22 saw this kind of schedule of standards that they are talking

23 about; correct?

24 A.   Right.

25 Q.   Did you see anything in it that talked about security?   10:47:13

ER0056

| | | |
|---|---|---|
| 1 | A.   I remember a discussion of security but I don't remember | 10:47:19 |
| 2 | if that was in the standard or not.  I think in their briefing | |
| 3 | they did discuss security issues but I don't remember it in the | |
| 4 | standard. | |
| 5 | Q.   Is anything in the standards about how much room there is | 10:47:29 |
| 6 | or how much space? | |
| 7 | A.   No, because the standards are supposed to define who gets | |
| 8 | a credential and not who gets in the room necessarily.  So I | |
| 9 | think that would be a later determination. | |
| 10 | Q.   Thank you, sir. | 10:47:45 |
| 11 |       I have no further questions, Professor. | |
| 12 |       THE COURT:  All right.  Thank you, sir. | |
| 13 |       You may step down, sir. | |
| 14 |       (Witness excused.) | |
| 15 |       THE COURT:  Please call your next witness, | 10:47:53 |
| 16 | Mr. Randazza.  You have -- hang on for a second -- 18 minutes. | |
| 17 |       MR. RANDAZZA:  I'm going to call Jordan Conradson. | |
| 18 |       THE COURT:  Mr. Conradson, if you would come up to | |
| 19 | the bar to my courtroom deputy, she'll swear you in. | |
| 20 |       COURTROOM DEPUTY:  Please state your first and last | 10:48:23 |
| 21 | name and spell them both for the record. | |
| 22 |       THE WITNESS:  It's Jordan Conradson.  J-O-R-D-A-N. | |
| 23 | C-O-N-R-A-D-S-O-N. | |
| 24 |       COURTROOM DEPUTY:  Raise your right hand. | |
| 25 |       (JORDAN CONRADSON, a witness herein, was duly sworn | 10:48:35 |

United States District Court

ER0057

| | | |
|---|---|---|
| 1 | or affirmed.) | 10:48:35 |
| 2 | **DIRECT EXAMINATION** | |
| 3 | BY MR. RANDAZZA: | |
| 4 | Q.   Hello, Mr. Conradson. | |
| 5 | A.   Hi. | 10:48:59 |
| 6 | Q.   Can you -- how are you employed, sir? | |
| 7 | A.   I'm a full-time journalist with thegatewaypundit.com.  How | |
| 8 | long did you say? | |
| 9 | Q.   No.  But I will ask that.  How long have you been doing | |
| 10 | that? | 10:49:12 |
| 11 | A.   Oh, I have been doing it for over a year and a half now. | |
| 12 | Q.   And what is the primary topic you cover? | |
| 13 | A.   I cover politics in Arizona. | |
| 14 | Q.   Have you ever interviewed Katie Hobbs? | |
| 15 | A.   I've tried to but she refused to speak with me. | 10:49:29 |
| 16 | Q.   Have you ever interviewed Kari Lake? | |
| 17 | A.   Yes.  She has spoken with me so I have covered Kari Lake. | |
| 18 | Q.   If Ms. Hobbs would speak to you, would you report her | |
| 19 | perspective? | |
| 20 | A.   Yes. | 10:49:46 |
| 21 | Q.   Have you ever received press credentials anywhere? | |
| 22 | A.   Yes.  The Arizona Senate gave me press credentials. | |
| 23 | Q.   And how long ago was that? | |
| 24 | A.   That was sometime in 2021. | |
| 25 | Q.   And have they ever threatened to revoke them? | 10:50:05 |

United States District Court

**ER0058**

1    A.    No.                                                          10:50:07

2    Q.    Are you aware -- I'm sorry.  You wrote a series of

3    articles last year about Maricopa County Supervisor Steve

4    Chucri; is that correct?

5    A.    Yes.  Steve Chucri, he was a Maricopa County Supervisor    10:50:27

6    but he resigned shortly after I broke my series of articles.

7    Q.    And what were your articles about?

8    A.    They are undercover -- I wouldn't say undercover.  He was

9    having a conversation with some people and they recorded it

10   and, basically, in the conversation, he admitted to everything  10:50:45

11   that the Board of Supervisors was publicly stating, he admitted

12   that all of was false.  He didn't believe it.  He did not stand

13   by them.  He even made some disparaging comments about his

14   colleagues.

15   Q.    Were you the first one to report on that?                  10:51:04

16   A.    Yes.

17   Q.    Were you the only one?

18   A.    I believe so.  I think some people covered his resignation

19   but I don't think anyone put out the actual audiotapes.

20   Q.    Are you aware of why he resigned?                          10:51:16

21   A.    Yes.  He stated that it was over some comments that he

22   made.

23   Q.    The comments you reported on?

24   A.    The comments that I reported on, yes.

25   Q.    Have you encounter the any hostility from the Board of     10:51:29

1    Elections and other defendants in this case since then?          10:51:31

2    A.    Yes.   So the -- it has been increasing since then,

3    especially recently.   They followed me off of their property

4    with a drone after I tried to gain entry and they used

5    sheriff's deputies to intimidate me and threaten arrest.          10:51:46

6    Q.    And do you recall when they -- when the defendants

7    instituted this credentialing requirement?

8    A.    Yes.   It was sometime in September, at the end of

9    September, maybe the 27th.

10   Q.    And did a member of your -- a competing news organization     10:52:08

11   write a tweet about that?

12   A.    Yes.   They said that -- they hinted that it was

13   specifically designed to keep me out of the press conferences.

14   Q.    And then did any Government official retweet that?

15   A.    Yes.   Stephen Richer, the Maricopa County Recorder, he      10:52:25

16   retweeted it and it looked like he was agreeing with it and

17   confirming it.   He put a GIF on it saying -- agreeing with her

18   that he was fancy in doing this to, basically, do that, keep me

19   out.

20   Q.    When you applied for your press credentials, did you         10:53:09

21   submit samples of your work.

22   A.    Yes, I did.

23   Q.    Was that requested?

24   A.    Yes.

25   Q.    How many did you submit?                                     10:53:19

ER0060

1  A.    I think I did three.                                    10:53:21

2  Q.    Did you submit any other information, though?

3  A.    Pretty much all of my information.  I believe I had to put

4  where I lived, all of my contact information, the contact

5  information for my editors, and I think there was a few more   10:53:32

6  things on the list.

7  Q.    Did you ask you any questions geared towards security

8  threats?

9  A.    I don't believe so.

10 Q.    Did they ask you any questions as to how much room you    10:53:46

11 would need at a press conference?

12 A.    No.

13 Q.    Have you ever been ejected from a press conference?

14 A.    No.

15 Q.    Have you ever been disruptive in a press conference?     10:53:56

16 A.    No.

17 Q.    Thank you, sir.  Actually, I do have another question for

18 you.  Sir, what is your favorite political party?

19 A.    The Republican Party but I wear that on my sleeve.  Most

20 people who actually -- actually, everybody who reads my work    10:54:23

21 knows that I am very transparent about it.

22 Q.    So you've never tried to hide that?

23 A.    I've never tried to hide it whatsoever.

24 Q.    Why do you need these press credentials?

25 A.    So that I can fairly cover the actual -- the election     10:54:37

ER0061

1 that's going on.  It was for the election press conferences, so 10:54:41

2 I can fairly cover it and receive firsthand information of what

3 is going on in that room.

4 Q.   Do you think it would be more fair to someone you're

5 reporting on to ask them questions directly? 10:54:51

6 A.   Yes.

7 Q.   Can you do that over a video feed?

8 A.   No.

9 Q.   Can you do that from the free speech zone with the

10 protesters off the curtilage of the property of the Board of 10:54:59

11 Elections?

12 A.   No.

13   MR. RANDAZZA:  I have no further questions, sir.

14   THE COURT:  All right.  Thank you, Mr. Randazza.

15   Mr. Trullinger or Liddy, any questions for this 10:55:08

16 witness?

17   MR. TRULLINGER:  A few, Your Honor.  Can you tell me

18 how much time I have, please.

19   THE COURT:  You have 30 minutes.

20   MR. TRULLINGER:  30 minutes.  Thank you, sir. 10:55:16

21   It's my understanding if they have exhibits for the

22 Court, we can just submit them; is that correct?

23   THE COURT:  As long as the other side has seen them

24 or has copies, yes.

25   MR. TRULLINGER:  I'm going to offer to the Court 25 10:56:03

ER0062

1   exhibits, the first 20 of which were --                    10:56:05

2           THE COURT:  Attached to the response; correct?

3           MR. TRULLINGER:  Yes.

4           THE COURT:  So I have those.

5           MR. TRULLINGER:  The first 20 were in response, the  10:56:11

6   last five were not.  So those are the extra ones.

7           COURTROOM DEPUTY:  How are you going to show them to

8   the witness, on the document camera or your computer?

9           MR. TRULLINGER:  Document camera.

10                  **CROSS - EXAMINATION**                      10:56:44

11  BY MR. TRULLINGER:

12  Q.   Mr. Conradson, when you wrote the article --

13           Can you see it up there on your screen?

14  A.   Yes.

15  Q.   This is an article you wrote September 26, 2022, and that  10:57:09

16  has your by line; correct?

17  A.   Yes.

18  Q.   So is it fair to say that everything that has your by line

19  is something that you wrote?

20  A.   Yes.                                                   10:57:19

21  Q.   When you wrote that article, did you call anybody from the

22  County to find out about the Press Pass?

23  A.   The one that's on my screen?

24  Q.   I apologize.

25           Sorry.  The one on your screen now is Exhibit 3    10:57:44

United States District Court

1    entitled "Breaking:  Maricopa County creates 'Ministry Of          10:57:47

2    Truth' To Silence The Gateway Pundit -- Now Requiring Official

3    Press Pass for Media 'To ENTER ITS FACILITIES And/Or Cover

4    Events Related To The 2022 General Election."

5            Just to clarify again, that's written by you;             10:58:05

6    correct?

7    A.    Yes.

8    Q.    Did you call anybody from the County to ask about the

9    Press Pass criteria?

10   A.    I did.                                                       10:58:12

11   Q.    Is there a reason that you don't cite anything in there,

12   in that article?

13   A.    Because they just told me to go online and email for a

14   press credential, which I did.

15   Q.    So the headline "Ministry of Truth"?                        10:58:21

16   A.    Yes.  I put that in quotes.

17   Q.    What's that?

18   A.    I put that in quotes.

19   Q.    Right.  That's just your opinion; correct?

20   A.    Yes, but it's also the opinion of many others.              10:58:37

21   Q.    I'm just asking if it's -- it was your opinion?

22   A.    Yes.

23   Q.    Is there a reason you didn't say it is my opinion that

24   this is a ministry of truth?

25   A.    I'm sorry.  Can you repeat the question?                    10:58:47

1   Q.   You present this as if it was a true thing, right, instead      10:58:49
2   of just your opinion, I mean?
3   A.   I mean, everyone who reads my work, they know I'm very
4   opinionated, maybe not very opinionated but opinionated, yes.
5   Q.   And Exhibit Number 6 is another article written by you; is      10:59:05
6   that correct?
7   A.   Yes.
8   Q.   It says, "ELEVEN Locations Had No Republicans At All" and,
9   "OVER 100 More Democratic Poll Workers Than Republicans" were
10  hired.                                                               10:59:44
11          Did you call the County to ask whether that was fact
12  or not?
13  A.   I don't believe so.
14  Q.   You just assumed it or where did you get the information?
15  A.   Well, there was a lawsuit against Maricopa County which is      10:59:53
16  where I took that information from.
17  Q.   So you got it from secondhand information; correct?
18  A.   I wouldn't say that.
19          MR. RANDAZZA:  Objection.
20  BY MR. TRULLINGER:                                                   11:00:06
21  Q.   Is there a reason that you didn't --
22          THE COURT:  Hold it.  There's an objection pending.
23          Mr. Randazza, the rule?
24          MR. RANDAZZA:  Mischaracterizes the testimony.
25          THE COURT:  No.  I'll allow it.  He's free to agree          11:00:15

United States District Court

1  or disagree.

2        Mr. Conradson, do you need to have the question read

3  back to you.

4        THE WITNESS:  Yes, can you repeat the question?

5        THE COURT:  Elaine, please.

6        (Question not read.)

7  BY MR. TRULLINGER:

8  Q.    Is there a reason that you did not call anyone from the

9  County to verify whether this was a truthful statement or a not

10  truthful statement?

11  A.    I wasn't sure.  A lot of the times I've called the County

12  in the past, people give me conflicting answers.  So I wasn't

13  sure if that was the best place to go.

14  Q.    Okay.  So you didn't call the County?

15  A.    To the County employees, no, I did not.

16  Q.    You were denied a Press Pass on September 30 of 2022; is

17  that correct?

18  A.    Yes.

19  Q.    And after being denied a Press Pass, you came into the

20  building on October 13, 2022, and tried to get in with other

21  people that had Press Passes correct?

22  A.    I tried to see if there was -- yes, I did.  I came to the

23  building.

24  Q.    And you had a camera with you that was hidden on you;

25  correct?

ER0066

JORDAN CONRADSON - Cross

1    A.    I don't have a hidden camera.  It was not hidden.    11:01:15

2    Q.    Okay.  Where was the camera?

3    A.    It was open and notoriously on my chest, just around my

4    chest.  Lens cap was off.  Everybody could see it.

5    Q.    But in any event, you tried to -- you knew you weren't    11:01:30

6    supposed to be there because you didn't have a Press Pass;

7    true?

8    A.    I didn't know I wasn't supposed to be there.  It's a

9    public building.  I just attempted to speak to them and plead

10   my case for why I should be there.    11:01:42

11   Q.    Sure.  But you're aware that you were not supposed to be

12   in the building or attending press conferences without a Press

13   Pass?

14   A.    I was not aware that I was not supposed to be in the

15   building.    11:01:55

16   Q.    You applied for a -- well, you had applied for a Press

17   Pass and were denied; correct?

18   A.    Yes.

19   Q.    So what led you to believe that you could be in the

20   building without it?    11:02:04

21   A.    It's a public building.  So I went up there and tried to

22   see if I could possibly get -- I told them exactly who I was in

23   the building.  I told them what outlet I was with.

24   Q.    And when they asked you to leave, you didn't leave.  You

25   continued to argue your case until they walked you out of the    11:02:21

United States District Court

1  building; correct?                                          11:02:24

2  A.   They did not walk me out of the building.  I walked out

3  myself.

4  Q.   I'm sorry?

5  A.   I walked out myself.                                   11:02:28

6  Q.   You showed up again on November 10, 2022, again, without a

7  Press Pass; correct?

8  A.   I believe that it was November 10, yes.

9  Q.   And by that time, you knew for sure you weren't supposed

10 to be there without a Press Pass; true?                     11:02:42

11 A.   No.  I had submitted an appeal to my application and I

12 also had a cease and desist order from my attorney, so I was

13 going to go in and present that to them and see if they had

14 gotten me through the appeals process.

15 Q.   So let's talk about that just for a minute.  The appeal  11:02:58

16 that you presented, that was an email sent on that same day of

17 November 10, 2022; correct?

18 A.   Yes.

19 Q.   So between September 30 and November 10, you didn't

20 appeal; correct?                                            11:03:12

21 A.   I wasn't sure that I would need to but with the increasing

22 news store --

23 Q.   I'm just asking you, did you or did you not appeal within

24 that 41-day time period?

25 A.   I did not.                                             11:03:24

ER0068

JORDAN CONRADSON - Cross

1    Q.    Looking at Exhibit Number 13, is that a copy of the denial    11:03:48

2    letter that you got?

3    A.    Yes.

4    Q.    And one of the things on there, the last paragraph

5    basically says, "Further, any press conference about the 2022    11:03:58

6    election will be streamed to a Maricopa County YouTube channel

7    and are you welcome to view it"; correct?

8    A.    Yes.

9    Q.    Did you take advantage of that?  Did you watch all of the

10   other press events on the YouTube stream after that?    11:04:11

11   A.    I watched a few of them but some of them were not

12   live-streamed I noticed on Maricopa County's YouTube page.

13   Q.    Did you watch all of them that were live streamed?

14   A.    I tried to.

15   Q.    When you say "tried to," that means some you just weren't    11:04:25

16   interested in or what?

17   A.    No.  Sometimes there were complications with getting onto

18   it, getting the Internet working and everything like that.  But

19   I was able to watch it but not actually be there which damages

20   my ability to gather news.    11:04:41

21   Q.    And there were a number of press conferences between

22   September 30 and November 8 and yet you didn't appeal during

23   that time period; correct?

24   A.    No, because the news story --

25   Q.    Thank you.  You answered the question.    11:04:59

United States District Court

1    A.    -- got a lot bigger after November 8.                11:05:00

2    Q.    Do you agree that it's important to keep privacy of

3    individuals in the back of your mind when you're writing a

4    story?

5    A.    Yes.                                                 11:05:24

6    Q.    I'm going to show you real quick Exhibit 18.  This is an

7    article from Reuters dated November 6, 2022, entitled "'Kill

8    them':  Arizona election workers face midterm threats."

9          Do you see that?

10   A.    Yes.                                                 11:06:20

11   Q.    One of the things this article talks about is that on July

12   31 that Gateway Pundit reported that Maricopa County election

13   staff technician gained unauthorized access to a computer

14   server room where he deleted 2020 election data that was set to

15   be audited.  That's a story you wrote; correct?            11:06:47

16   A.    I believe so.

17   Q.    And the website, the story that you published also

18   included the name of the staff technician and his photo;

19   correct?

20   A.    It wasn't -- you couldn't -- you couldn't identify his    11:06:57

21   face in the photo but yes.

22   Q.    You put his name in the article?

23   A.    Yes.

24   Q.    And you're aware that when you put someone's name in an

25   article after you're criticizing them, that they are likely to  11:07:08

ER0070

1  get threats?                                                    11:07:11

2          MR. RANDAZZA:  Objection.  Calls for speculation.

3          THE COURT:  He can either agree or disagree.  The

4  objection is overruled.

5          You can answer, Mr. Conradson.                          11:07:21

6          THE WITNESS:  I would disagree with that.

7  BY MR. TRULLINGER:

8  Q.  You're aware that people have claimed to have gotten

9  threats as a result of something you wrote; correct?

10 A.  I have not aware that people got threats as a result of     11:07:33

11 something that I wrote.

12 Q.  And the information that you got or the information that

13 your article was based on didn't come from the County, did it?

14 A.  No.

15 Q.  It came from some blogger out there that --                 11:07:47

16 A.  Well, not from a blogger.  It came from security footage

17 that did come from the County and using time stamps on the

18 footage, I linked that to another report.

19 Q.  Exhibit 23 is an article that you wrote on July 31, 2022;

20 correct?                                                        11:08:24

21 A.  Yes.

22 Q.  And in that article you posted a picture and the name of

23 the staff technician; correct?

24 A.  Oh, yes.  I did that to show that he is employed with

25 Maricopa County Elections.                                      11:08:56

ER0071

1   Q.   And at the top of the picture it says, "On Saturday it was   11:08:58

2   revealed by Vanbibber that Maricopa County election Database

3   Administrator Brian Ramirez was granted unauthorized entry to

4   the server room on multiple occasions."  That's the source of

5   your information; correct?   11:09:14

6   A.   Yes, but, actually, I would say the source of my

7   information is the video that I saw.

8   Q.   All right.  But you didn't see the video.  Vanbibber saw

9   the video and reported on it?

10  A.   No.  I was there to see the video.  I believe I included   11:09:25

11  the video in my report.

12  Q.   Did you ever call Maricopa County to ask them about that?

13  A.   I don't think so.

14        UNIDENTIFIED MALE:  Can I have a word just before you

15  guys continue?  Do you mind?  It's Board of Commission, transit   11:09:48

16  of commerce to USC, and an individual that was marked about an

17  arrest stop.  I am from California.

18        THE COURT:  Sir, you cannot interrupt this proceeding

19  in this way.

20        UNIDENTIFIED MALE:  Okay.  Just say you mind and I   11:10:12

21  won't, until the end.

22        THE COURT:  I'm not going to allow you to address the

23  Court.  You're not a party in this matter.  Please be seated.

24        Call the marshals, please, Julie.

25        UNIDENTIFIED MALE:  Well, yeah, but it's just that I   11:10:22

ER0072

1    sued the state and I want to get what department pays.          11:10:25

2          THE COURT:  Sir, we are in the middle of a proceeding

3    on a specific matter that has been noticed.

4          UNIDENTIFIED MALE:  Well, I'm in the middle of

5    changing my address.                                            11:10:38

6          THE COURT:  That has nothing to do with this matter.

7          UNIDENTIFIED MALE:  All right.  This is the time

8    stamped and I get paid for the -- in the center heading, so

9    it's kind of a bother.  I mean, you guys can go ahead and call

10   but I have to know.  You're the judge; right?  You're just --  11:10:52

11         Are you telling me to get out?

12         THE COURT:  Sir, that is not something I can help you

13   in any event.  Maybe the Clerk's Office can help you on the

14   first floor.  Yes.  But to just come into a random courtroom --

15         UNIDENTIFIED MALE:  So I won't get ignored.  You're     11:11:08

16   going to send them out after the U.S. Post Office post card?

17         THE COURT:  No, I am not, sir.  You are disrupting a

18   proceeding.

19         UNIDENTIFIED MALE:  Okay.  The post card.

20         THE COURT:  The marshals have been contacted and I     11:11:20

21   need you to please either leave or be seated and be silent.

22         UNIDENTIFIED MALE:  Yeah.  Maybe you go ahead and

23   consume some chemicals.

24         THE COURT:  I'm sorry, counsel, and to the members of

25   the gallery.                                                   11:11:41

United States District Court

1          Please proceed.                                        11:11:42

2    BY MR. TRULLINGER:

3    Q.   Mr. Conradson, two days ago you went back to the Maricopa

4    County Tabulation and Election Center and you tried to get in

5    again; correct?                                              11:11:53

6    A.   Yes, I tried to appeal my case.

7    Q.   And, again, you had to be escorted out of the building,

8    did you not?

9    A.   I did not have to be.

10   Q.   Were you?                                               11:12:04

11   A.   No.  I was asked to leave and I left.  I did not enter the

12   building either.

13   Q.   One of the stories you wrote about Katie Hobbs you

14   mentioned that when you tried to interview her, she walked away

15   from you.  You actually -- did you chase after her?  Did you   11:12:23

16   run after her?

17   A.   I didn't run.  I walked after her but that's standard of

18   journalists.  That's what we do I would say.

19        MR. TRULLINGER:  That's all I have, Your Honor.

20   Thank you.                                                   11:12:46

21        THE COURT:  Thank you, Mr. Trullinger.

22        Do you have any redirect, Mr. Randazza?

23        MR. RANDAZZA:  I do, Your Honor.

24

25


United States District Court

**ER0074**

**REDIRECT EXAMINATION**                                    11:12:51

BY MR. RANDAZZA:

Q.   Sir, when you were asked about Exhibit-- actually, I'm

going to come up there.

        When you were asked about Exhibit 3, do you recall    11:13:11

that, the article?

A.   Which one was that exactly?

Q.   This one here.

A.   Yes.

Q.   You said you got information for that article from the   11:13:31

court file?

A.   No, not this one.  From the one about poll workers.

Q.   Okay.  You got information for that one from the court

file?

A.   Yes.                                                     11:13:43

Q.   Do you often get information from the court file before

you report on something?

A.   Yes.

Q.   Why from the court file?

A.   Because it has the facts of the case and what one party is   11:13:52

arguing and what the other party is also arguing.

Q.   And you've discussed a tweet where one of the defendants

retweeted somebody essentially mocking you for getting

excluded?

A.   Basically, yes.                                          11:14:10

1   Q.   Is this a true and correct copy of that?                    11:14:11

2   A.   Yes.  That is the exact tweet.  Jen Fifield said:  County

3   elections are getting all fancy.  Really gonna miss The Gateway

4   Pundit rolling in and trying to listen in on legitimate

5   reporter conversations, slash, intimidate public officials.      11:14:24

6           And Stephen Richer retweeted it saying -- agreeing

7   saying, "Yes, I am so fancy," with this GIF cartoon.

8           MR. RANDAZZA:  Your Honor, this is the only exhibit

9   that the Court has not had.

10          THE COURT:  The defense has seen it?                     11:14:44

11          MR. RANDAZZA:  Yes.  We provided them with a copy.

12  BY MR. RANDAZZA:

13  Q.   And then you were questioned about your hidden camera;

14  correct?

15  A.   Yes.  I -- I don't own a hidden camera, though.            11:14:51

16  Q.   Did you try to bring the camera with you today?

17  A.   I did, yes.

18  Q.   What happened?

19  A.   They told me I couldn't bring a camera into the courtroom.

20  Q.   Is this photograph a true and correct copy of that camera? 11:15:03

21  A.   Yes.

22  Q.   Now there's two cameras in that picture.  Can you specify

23  which one?

24  A.   Oh.  Okay.  So there's my cell phone, which is the camera

25  I'm taking a photo of myself with.  The one on my stomach,       11:15:14

**ER0076**

1  that's my hidden camera.  It's not actually hidden.  It's right   11:15:17
2  out in the open.  It's pretty big, too.
3  Q.  You were provided with -- when you were rejected for your
4  press credentials, the rejection said that all of the press
5  conferences would be live-streamed; correct?   11:15:35
6  A.  Yes.
7  Q.  Were they?
8  A.  Not all of them.
9  Q.  Do you take any money from any subjects of anything that
10 you write about?   11:15:49
11 A.  No.
12 Q.  Do you own any -- do you have any ownership interest in
13 any subject that you write about?
14 A.  No.
15 Q.  Are you related to anybody that you write about?   11:15:56
16 A.  No.
17 Q.  Are you in any way -- do you have any relationship with
18 anybody that would call your ethics or bias into question?
19 A.  I'm sorry, can you repeat the question?
20 Q.  Yeah.  That was a terrible question.  I'm ashamed of it.   11:16:12
21         Is there -- you heard the expert testify about
22 journalistic standards, bias?
23 A.  Yes.
24 Q.  Would you say that any of those are a problem for you?
25 A.  No.   11:16:26

United States District Court

**ER0077**

1    Q.   Do you meet any of those criteria?  Do you own stock in

2    any company that you report on?

3    A.   No.

4    Q.   Are you -- you're not related to any candidates?

5    A.   No.

6    Q.   I have no further questions for you, sir.

7    A.   Thank you.

8            THE COURT:  All right.  Mr. Conradson, you may step

9    down.  Thank you.

10           THE WITNESS:  Thank you, Your Honor.

11           (Witness excused.)

12           THE COURT:  Mr. Randazza, you have about six minutes

13   left.  Do you have any other witnesses?

14           MR. RANDAZZA:  Yes.  I call Joseph Hoft.

15           THE COURT:  We're going to have to hold for a second

16   until my courtroom deputy returns.  There's no one that can

17   administer the oath properly.

18           Folks, if everybody wants to take a break, you can

19   stand up and stretch.

20           MR. RANDAZZA:  May I take a brief break?

21           THE COURT:  Comfort break, yes.

22           If anybody needs to use the restroom, we will resume

23   in about five minutes.

24           MR. TRULLINGER:  Could you let me know my time,

25   please.

11:16:29

11:16:38

11:16:49

11:17:04

11:17:34

11:17:44

1      MR. LIDDY:  Because there was an interruption and          11:17:45

2   we --

3      THE COURT:  I took it off.  I still have you with 17

4   minutes on the defense side.

5      MR. TRULLINGER:  That's for witnesses and stuff?          11:17:51

6      THE COURT:  Yes.

7      MR. TRULLINGER:  Thank you, sir.

8      (Recess at 11:18; resumed at 11:26.)

9      (Court was called to order by the courtroom deputy.)

10     THE COURT:  All right.  Thank you, everyone.  Please       11:26:09

11   be seated.

12     And Mr. Hoft, if you could step forward now,

13   Ms. Martinez will swear you in.

14     COURTROOM DEPUTY:  Please state your name and spell

15   your first and last name for the record.                    11:26:18

16     THE WITNESS:  My name is Joseph Hoft, Joseph Walter

17   Hoft.  J-O-S-E-P-H; Walter, W-A-L-T-E-R; and Hoft, H-O-F-T.

18     COURTROOM DEPUTY:  Raise your right hand.

19     (JOSEPH HOFT, a witness herein, was duly sworn or

20   affirmed.)                                                  11:26:29

21                   **DIRECT EXAMINATION**

22   BY MR. RANDAZZA:

23   Q.   Mr. Hoft, what is your position with The Gateway Pundit?

24   A.   Currently, I'm vice president, contributor and editor of

25   The Gateway Pundit.                                         11:27:06

United States District Court

1    Q.    How long has The Gateway Pundit been publishing?

2    A.    Since approximately 2004.  My twin brother founded the

3    site.

4    Q.    And do you know approximately how many readers per month

5    it gets?

6    A.    It varies.  Right now, like last week with the election,

7    we probably had three and a half million people a day.  We have

8    had as much as seven million people a day.  We've had nearly --

9    well, close to a billion hits last year, 900 million and

10    growing.  Every year we've grown.

11    Q.    I have no further questions, sir.

12              MR. TRULLINGER:  No questions, Your Honor.

13              THE COURT:  All right.  It sounds like you can step

14    down then, Mr. Hoft.  Thank you.

15              (Witness excused.)

16              THE COURT:  That was your last witness; is that

17    correct?

18              MR. RANDAZZA:  It is, Your Honor.  Thank you.

19              THE COURT:  All right.  Very good.

20              Then we'll pass over to the defendants.  I believe

21    you're calling someone telephonically; is that right,

22    Mr. Trullinger?

23              MR. TRULLINGER:  Yes, Your Honor.

24              THE COURT:  All right.  Mr. Moseley is already on the

25    line?

1          All right.  Very good.                                          11:28:29

2          Mr. Moseley, this is Judge Tuchi.  Can you hear me

3     all right, sir?

4          THE WITNESS:  Yes, sir.  Judge.  Thank you for

5     letting me appear in court today.                                    11:28:38

6          THE COURT:  Thank you.  My courtroom deputy is now

7     going to administer the oath.

8          Go ahead, Julie.

9          COURTROOM DEPUTY:  Mr. Moseley, can you state your

10    name, first and last, and spell them both for the record,           11:28:45

11    please.

12         THE WITNESS:  My name is Roy Fields Moseley.  R-O-Y.

13    F-I-E-L-D-S.  M-O-S-E-L-E-Y.

14         COURTROOM DEPUTY:  Thank you.  I can't see you but if

15    you can raise your right hand, please.                              11:29:02

16         (ROY MOSELEY, a witness herein, was duly sworn or

17    affirmed.)

18         COURTROOM DEPUTY:  Mr. Moseley are you on a speaker

19    phone?

20         THE WITNESS:  I am not.                                        11:29:20

21                          **DIRECT EXAMINATION**

22    BY MR. TRULLINGER:

23    Q.   Mr. Moseley, can you hear me?

24    A.   I can.

25    Q.   All right.  This is Chuck Trullinger, just so you know who     11:29:25

United States District Court

1    is speaking.                                                    11:29:28

2           Could you tell us your current job title, please.

3    A.   I am the Communications Director for Maricopa County.

4    Q.   How long have you been doing that job?

5    A.   Approximately seven and a half years.                      11:29:43

6    Q.   And prior to that, did you work in journalism or somewhere

7    else?

8    A.   I was a television journalist for almost 22 years.

9    Q.   And did you do both writing and on the air or can you

10   describe that a little bit for us?                              11:30:01

11   A.   Yes.  I reported regularly throughout my career so writing

12   my own stories.  At the local level, you don't have big, fancy

13   entourage of people that are writing things for you.  You write

14   it yourself and get it approved by the editorial process and

15   then broadcast it.                                              11:30:22

16   Q.   And I understand at one point you worked for azfamily.com;

17   is that right?

18   A.   Yes.  That's the digital portion of the Channel 3.  It

19   used to be Channel 3, now it's 3 and 5 here in this market.

20   Q.   And did you cover events in Utah at the Capitol?           11:30:42

21   A.   Yes.  I worked in Utah for the CBS affiliate for a little

22   over ten years.

23   Q.   In your experience as a journalist, have you ever had to

24   apply for some sort of credentials or access to attend an

25   event?                                                          11:31:00

A.   Many times.  I have a whole pile in a drawer of
memorabilia of various events that I've applied for over the
years.

Q.   The Press Pass credentials that are at issue in this
present case, those are -- you put those into place; is that
correct?

A.   I did.

Q.   And I want to ask you some questions about that.  Was the
intention of the Press Pass criteria to keep people out who may
write negative articles about the county?

A.   No, it was not.  We have a lot of tough questions every
day.

Q.   What was the purpose of the Press Pass conference or the
criteria?

A.   It was mainly to make sure that we were making space and
for people that we knew were legitimate members of the media
that could reach a large audience to help spread facts.  And
also reflect the fact that we had a cross of national and
international media in 2020 and that wasn't expected at that
time.  That happened somewhat organically.

        And then we understand that we can't allow everyone
in our buildings or access to our leadership without limits,
and we wanted to ensure that they at least had our side and are
regularly -- in a regular fashion so we could control the size
of the crowd and the security at those events.

11:31:01
11:31:15
11:31:32
11:31:51
11:32:12
11:32:30

1   Q.   Okay.  I'm going to read to you from Exhibit Number 1       11:32:33

2   which is the maybe 2022 election pass criteria.  One of the

3   things it says is, "Because of logistical and security

4   considerations, it is impossible to give the public and the

5   media limitless access to Members of the Board of Supervisors,   11:32:49

6   the County Recorder and election experts for events such as

7   press conferences and availabilities."

8           And I want to ask you first about logistics.  Is

9   there limited space for press conferences?

10  A.   That is correct.                                            11:33:05

11  Q.   I understand that they started off at the 10th floor of

12  Building 301 and then since then they have moved to the

13  Maricopa County Tabulation and Election Center; is that

14  correct?

15  A.   Yeah.  The one that's in 301 on the 10th floor is in the    11:33:19

16  Board of Supervisors' conference room.  That room also affords

17  us the ability to stream to YouTube.  It's a built-in system

18  because that room is used for meetings of the Board that are

19  streamed publicly.

20          So once we made room for cameras and everything, we      11:33:34

21  had approximately 50 seats that could accommodate reporters.

22  Q.   Sure.  And after the 2020 election, did you anticipate

23  there would be a whole lot more people wanting to attend press

24  conferences?

25  A.   I think it's fair to say yes.  And I think it's fair to     11:33:53

ER0084

1    say that we needed a venue where we could address people

2    instead of having 50 requests a week, that, "Can I get 15

3    minutes, ten minutes, an hour with the Chairman," or the

4    Recorder or whoever it might be.  I'm not the press person for

5    the Recorder, so I can't speak for him.  But I think all of

6    them try to make themselves available when they can.  But this

7    was a way to streamline that and make sure everyone's needs

8    were served.

9            THE COURT:  Mr. Trullinger, I need to interrupt you

10   for a moment.

11           Mr. Moseley, this is Judge Tuchi.  The quality of the

12   phone connection is not great and so I'm going to ask you to

13   slow down just a little bit because I'm concerned about the

14   court reporter and her ability to get it completely accurate

15   record for review later.

16           Is that all right?

17           THE WITNESS:  Okay.  Does this sound better?

18           MR. TRULLINGER:  We'll see.  I'll ask a question and

19   we'll see.

20   BY MR. TRULLINGER:

21   Q.   You can't see but there's a court reporter here and she's

22   taking down what all of us say, so we just need to make sure we

23   slow down a little bit so that she can catch everything we say.

24   A.   I apologize.

25   Q.   All right.  With regard to security concerns, was there

11:33:55
11:34:10
11:34:25
11:34:39
11:34:48
11:35:01

ER0085

1   anytime after 2020 when people tried to get into the Elections          11:35:05

2   Department Center?

3   A.   Well, during 2020, yes, following the 2020 election, on

4   the Wednesday night afterward, people tried to follow media.

5   We had no formal process over at MCTEC at that time and I was          11:35:26

6   trying just --

7            THE COURT:  Okay.  Mr. Moseley.  Mr. Moseley.  You

8   have not slowed down one bit, sir.  I need you to be very

9   conscious of that.  I need you to go a little slower for the

10  purposes of the court reporter and for my understanding.  Thank          11:35:41

11  you, sir.

12  BY MR. TRULLINGER:

13  Q.   Go ahead and start over, just so we make sure that

14  everybody hears you.  Thank you, sir.

15  A.   The night after the election in 2020, a large crowd          11:35:52

16  gathered outside of MCTEC, which is the Maricopa County

17  Tabulation and Election Center.  Several people were not

18  members of the media but perhaps might say they are, but they

19  are not what we would call news reporters.  They managed to

20  follow legitimate news crews into the lobby of MCTEC.  This was          11:36:14

21  a security concern.  They had to be removed.  There was a large

22  crowd gathered outside and we didn't want a repeat of that type

23  of situation when we came up on 2022.

24  Q.   Gotcha.  And one of the things that were instituted as

25  well was fencing; is that correct?          11:36:37

1 A.   Correct.  There is now permanent fencing outside of MCTEC    11:36:42

2 which houses a smaller parking lot for certain employees who

3 work there all the time.  There is some temporary fencing along

4 the exterior.

5      And I think it's fairly well-documented that what    11:36:57

6 happened leading up to the primary this year, that certain

7 people who call themselves First Amendment auditors were

8 outside.  They were videotaping or recording or taking pictures

9 of employees, their license plates as they came into the

10 parking area and, therefore, there was a temporary fencing.    11:37:17

11     That evolved into a larger security effort by MCSO

12 and the Sheriff has spoken extensively about this to set up

13 Free Speech Zones and put up barricades to make sure nobody was

14 in danger from traffic or anything like that if they chose to

15 come and protest at MCTEC.    11:37:38

16 Q.   With regard to the Press Pass criteria, I understand

17 there's an online form that people have to fill out and submit;

18 is that correct?

19 A.   That is correct.

20 Q.   And who gets that form?  Who is part of the -- is it you    11:37:55

21 or is it a team or who is it?

22 A.   That is a team of eight of us that were -- that receive

23 that form.  Some of them are on there because they handle

24 logistics of responding and about six of those people are all

25 communicators, most of them with the journalism background as    11:38:17

ER0087

1  well, and it takes two yeses to approve somebody.          11:38:20

2  Q.   So if two of the people say yes, the person who has

3  applied gets a Press Pass, otherwise they do not; is that

4  correct?

5  A.   Well, it would take it to another level of consideration.   11:38:35

6  Why are we -- what are the -- what are the reasons under the

7  criteria that are listed on the website.

8  Q.   Okay.  Has the County granted Press Passes to members of

9  press who write regularly negative stories about the County?

10 A.   I think everybody in this market has written a negative   11:38:56

11 story at least once about the County.

12 Q.   Can you give us some examples of news media that have

13 gotten Press Passes?

14 A.   In addition to local --

15 Q.   Well, let me --                                          11:39:13

16 A.   -- local TV stations and their crews?

17 Q.   I'm sorry.  I missed that.

18 A.   So please repeat the question.

19 Q.   Let me ask you again.  Was a Press Pass given to Newsmax,

20 for example?                                                  11:39:31

21 A.   Correct.

22 Q.   And does Newsmax --

23 A.   Newsmax --

24 Q.   Sorry.  Go ahead.

25 A.   Yes.  In addition to local journalists with whom we are   11:39:41

ER0088

1    more familiar, most of the well-known networks, also some not          11:39:45

2    so well-known perhaps, Newsmax, Fox News, The Center Square,

3    Epoch Times, Fox Business.  And most recently, surprisingly,

4    after the election, a reporter from The Western Journal applied

5    as well and they are not always kind to us.          11:40:08

6    Q.    Is the County afraid of being asked hard questions?

7    A.    Of course not.

8    Q.    Would you rather have a journalist ask a question than

9    present something without asking?

10   A.    I would always prefer that.          11:40:31

11   Q.    And are you available and others available in the County

12   if someone wants to call and ask a question or to verify a

13   story?

14   A.    I handle probably 90 percent of the questions, at least

15   initially that come to the Board of Supervisors and some other          11:40:48

16   departments and, yes, we handle those by email, phone calls,

17   interviews if appropriate all the time.

18   Q.    And with regard to the criteria that has been set out

19   for getting a Press Pass, what sort of journalist is the County

20   expecting?  What sort of ethical rules or guidelines or what          11:41:15

21   are you looking for with those Press Pass criteria?

22   A.    Well, we are really interested in serving journalists who

23   are interested in selling the truth or at least pursuing the

24   truth and that's always our goal.

25   Q.    Has Mr. Conradson ever called you to ask you to verify any          11:41:47

United States District Court

**ER0089**

1  information?                                                    11:41:52

2  A.   Not that I'm aware of.

3  Q.   Are you aware of whether he's ever called anybody else

4  from the County that you're aware of to ask about -- or to fact

5  check on anything?                                              11:42:05

6  A.   I believe he has tried to call Megan Gilbertson at the

7  Elections Department.

8  Q.   The press conferences are YouTube streamed; is that

9  correct?

10 A.   That was part of our communications plan as we headed      11:42:28

11 toward the 2022 general election, correct.

12 Q.   And do you try to live stream all of the press

13 conferences?

14 A.   We did and when we -- if we ran into a bandwith issue or

15 some sort of other technical interruption, we were regarding it  11:42:46

16 and we posted it later so it is available to the general

17 public.

18 Q.   Okay.  So if there was a problem while you were live

19 streaming it, it was still recorded and it would be available

20 later.  Is that what you're saying?                             11:43:00

21 A.   That is correct.

22 Q.   Did Mr. Conradson ever call you to ask you about the Press

23 Pass criteria or why he was not granted a Press Pass?

24 A.   He did not.

25 Q.   And when he sent his appeal letter in, did he give any     11:43:24

ER0090

1   reason why the decision should be changed?                    11:43:27

2   A.   He said we should change it because -- I believe it was

3   because -- and I know this is an exhibit but from memory, I'm

4   just saying he believed his First Amendment rights were being

5   violated.  He did not address the reasons that we felt his pass    11:43:43

6   should be denied.

7   Q.   All right.  Mr. Moseley, in the interest of time, I'm

8   going to -- I think I may be done for now so the other attorney

9   will be asking you some questions.  So hold on.

10          THE COURT:  Mr. Randazza, you have four minutes left.    11:44:05

11          MR. RANDAZZA:  Thank you.

12                    **CROSS - EXAMINATION**

13  BY MR. RANDAZZA:

14  Q.   Sir, you said that you tried to stream all the press

15  conferences; correct?                                          11:44:15

16  A.   That is correct.

17  Q.   But you haven't been successful?

18  A.   I think it depends on which things you're calling a press

19  conference.

20  Q.   When you do live stream a press conference, is there an    11:44:33

21  opportunity through that platform for journalists or members of

22  the public to ask questions?

23  A.   No, there is not.  Like a Webinar you mean?

24  Q.   Your answer is sufficient, sir.

25          You said in 2020 some people had to be removed from     11:44:52

United States District Court

1    the premises; is that correct, sir?                              11:44:57

2    A.    That's my recollection.

3    Q.    Were any of them Mr. Conradson?

4    A.    Not that I know of.

5    Q.    When this team of eight meets to decide which journalists   11:45:09

6    are approved and not approved, do you record those meetings?

7    A.    No.

8    Q.    Do you take minutes of those meetings?

9    A.    No.

10   Q.    So there's no record of those meetings at all?            11:45:22

11   A.    There were no meetings.  It's an email chain.

12   Q.    And you said that Newsmax got approved; correct?

13   A.    That is correct.

14   Q.    Did Newsmax ever write a story that cost a member of the

15   commission their job?                                           11:45:42

16   A.    Are you talking about the member of the Board of

17   Supervisors?

18   Q.    Yes, sir.

19   A.    Not that I know of.  I'm not a Newsmax viewer, though.

20   Q.    Who fact checks stories published by the media in your     11:46:04

21   office?

22   A.    I would say we all have a role in observing what is going

23   on out there, but there's no way we can ever fact check every

24   single publication and story that is written about Maricopa

25   County.                                                         11:46:27

United States District Court

1    Q.   Can you tell me which conflicts of interest that either    11:46:30

2    The Gateway Pundit or Mr. Conradson presents to you?

3    A.   Mr. Conradson doesn't present as an ethical journalist who

4    practices with integrity or professionalism.  He doesn't

5    contact us to seek the truth or to seek our response to what an   11:46:55

6    accusation might be.

7    Q.   Is that your definition of a conflict of interest, sir?

8    A.   My definition of a conflict of interest would be advocacy.

9    As your Professor Leslie said, you know, are you an advocacy

10   organization?  Are you advocating for one conclusion or    11:47:19

11   somebody or some thing to get passed?

12   Q.   Can you tell me about --

13   A.   He's someone that exhibits those characteristics.

14   Q.   Can you tell me what legislation Mr. Conradson was

15   advocating to pass?    11:47:38

16   A.   He was advocating for candidates.

17   Q.   And you derive that from the content of his reporting?

18   A.   I can, yes.

19   Q.   Can you tell me which associations he has that would

20   compromise his journalistic integrity?    11:48:02

21   A.   I believe he just told everybody that his political

22   leanings, that he wears that on his sleeve and everybody that

23   reads his work knows that's where he stands.

24   Q.   Thank you, sir.  I appreciate your time.

25        I have no further questions.    11:48:25

United States District Court

ROY MOSELEY - Redirect

| | | |
|---|---|---|
| 1 | THE COURT: All right. Thank you, Mr. Randazza. | 11:48:27 |
| 2 | Mr. Trullinger, do you have any redirect? | |
| 3 | MR. TRULLINGER: Yes, Your Honor. Thank you. | |

**REDIRECT EXAMINATION**

BY MR. TRULLINGER:                                                    11:48:33

Q.   Mr. Moseley, does the Election Department have any drones?

A.   No.

Q.   Are there drones flying around at the -- were there drones

flying up put up -- by the Maricopa County Sheriff's

Department?                                                          11:48:53

A.   You would have to ask the Maricopa County Sheriff's

Department about that, but I did see drones around MCTEC during

the past week and a half.

Q.   On a regular basis?

A.   Not a regular basis, no.  I saw them -- I saw them as        11:49:06

security went up the day before the election.

Q.   Mr. Conradson, has he tried to get back into the building

or attend Press Passes since being denied a Press Pass?

A.   I believe you outlined this earlier, but yes.  He came two

days ago and went to the gate, the doorbell at the gate, and he   11:49:31

said he was, once again, there to take up pick up media

credentials for which he wasn't approved.

Q.   One of the things he alleged is that when he was not

allowed into the building, that somehow drones were following

him.  Did the Elections Department send drones to follow him?     11:49:50

United States District Court

| | | |
|---|---|---|
| 1 | A.   Of course not. | 11:49:55 |
| 2 | Q.   Do you care whether Mr. Conradson writes articles that are | |
| 3 | adverse or negative to the County?  Or are you interested in | |
| 4 | something else -- I'm sorry.  Go ahead. | |
| 5 | A.   I don't care if he writes articles that are adverse to the | 11:50:22 |
| 6 | County. | |
| 7 | Q.   Was he denied a Press Pass because of his opinions? | |
| 8 | A.   No. | |
| 9 | Q.   In your words, can you just tell us why was he denied a | |
| 10 | Press Pass? | 11:50:43 |
| 11 | A.   Did you want the official statement? | |
| 12 | Q.   Sure. | |
| 13 | A.   He was denied because he doesn't avoid real or perceived | |
| 14 | conflicts of interest.  If you look at his social media or his | |
| 15 | articles, they not only present a conflict.  He doesn't seek | 11:51:04 |
| 16 | the truth and his articles have led to direct threats to Board | |
| 17 | of Election officials and employees. | |
| 18 | Q.   All right.  Thank you, Mr. Moseley.  I think that's all I | |
| 19 | have. | |
| 20 | THE COURT:  All right.  Thank you.  That exhausts the | 11:51:25 |
| 21 | witnesses that all parties had for the Court today; is that | |
| 22 | right? | |
| 23 | MR. TRULLINGER:  That's correct, sir. | |
| 24 | (Witness excused.) | |
| 25 | MR. RANDAZZA:  Yes, Your Honor. | 11:51:31 |

1          THE COURT:  Very good.                                    11:51:32

2          Mr. Moseley, you can stay on the line if you like or

3     go off.  But I can excuse you from testifying now.

4          Thank you.

5          Mr. Randazza, I'm going to go ahead and hear your       11:51:51

6     argument now.  Before you do that, I'm sorry, there was one

7     housekeeping matter I wanted to note.  In the moving papers

8     before the Court, and I believe it was from plaintiff, you had

9     asked the Court to take judicial notice of the exhibits that

10    were submitted.  That's not going to be necessary because they  11:52:07

11    are all before the Court and they all will be considered so

12    nobody needs to worry about the formality of that point.

13         They are all before me.  And you can argue off of any

14    of those.

15         Go ahead, please.                                        11:52:20

16         MR. RANDAZZA:  Thank you.

17         Your Honor, we have heard and read a lot about

18    integrity here but the integrity that I hope that this Court

19    focuses on is the integrity of the First Amendment, the

20    integrity of freedom of the press, the integrity of our       11:52:54

21    governmental institutions and the integrity of that fourth

22    estate, that watchdog on these -- you heard testimony that

23    Gateway Pundit is a massive publication, huge readership.  They

24    cannot possibly be excluding them because they are too small.

25    They do make some arguments about there are security issues.   11:53:17

                    United States District Court

1   Well, nobody raised any concerns about this as a matter of    11:53:21

2   security.  There was no question about Mr. Conradson's

3   background, no question about him as a violent person, no

4   question about him trying to bring a weapon on the grounds.

5          I think often when the Government wants to engage in    11:53:37

6   censorship, it does raise this specter of security.  The one

7   thing that we did hear at the end is his reporting led to death

8   threats and the basis for that, nothing.  Nothing at all.

9          They cite to a Reuters article that claims that I saw

10  ten percent of some threats came in, cited The Gateway Pundit    11:53:56

11  as their source, but I don't accept Reuters -- competition for

12  The Gateway Pundit -- to be a definitive source of how many

13  came in, but we don't even have the universe.  So were there

14  ten and one, 100 and ten?

15         And then when we have -- we had testimony that there    11:54:17

16  were millions upon millions of readers.  I think if we went out

17  and we just got a random sampling of a million human beings,

18  we've got about 15 here today, and I don't mean to disparage

19  the gentleman who seemed to have some mental health issues who

20  stood up during Court today, but even in that little sampling,    11:54:36

21  what percentage of the people in your courtroom were crazy?  It

22  happens.

23         So if we have some crazy readers, I would say we

24  probably have no greater of a percentage than the New York

25  Times or then ABC news.  But that's not before you.  That is    11:54:49

United States District Court

ER0097

1   not really what this is about.                               11:54:55

2       If the press's function is to act as a watchdog on

3   Government, the press's job is to inform the public.  We cannot

4   have the Government making all of the determinations that it

5   really -- it rarely admits.  It's very rare that the Government   11:55:10

6   admits its determinations are content based but they have done

7   that today.  All day long.  All hearing long.  Every bit of

8   testimony here was based on we don't like the content of his

9   work.  It wasn't that he's caused problems.  It wasn't that The

10  Gateway Pundit isn't a real publication.  It isn't that The      11:55:30

11  Gateway Pundit is too small.  And we heard testimony that we

12  have to limit it for room.  Yeah.  Okay.  If he had showed up

13  with his Press Pass and they had said, "We're sorry.  We only

14  have 50 seats.  51 people showed up.  We all drew straws.  You

15  got the short straw.  Go watch it on television, Jordan," I      11:55:48

16  think we would have a very different argument before you today,

17  but that's not what we have.

18      We have we don't like The Gateway Pundit's content.

19  Now, we have seen this argument that the Seventh Circuit

20  decision in *MacIver* is somehow persuasive.  I don't find it    11:56:03

21  persuasive at all.  I think that adopting those standards is a

22  legal standard for whether somebody is a journalist or not.  I

23  would trust professor Leslie over the Seventh Circuit panel on

24  that case, and you are no more bound by that than you are bound

25  by the *Alaska Land Mine* decision that we cited in our briefing  11:56:23

United States District Court

**ER0098**

1  which I think gets it right.    11:56:28

2      However, I'm not going to say that the Seventh

3  Circuit's decision was completely wrong because it did say:  It

4  is worth emphasizing, however, that First Amendment rights do

5  not turn on, nor are they calibrated to, the quality of the    11:56:44

6  reporting.  Imagine a system where the Government doled out the

7  freedom of press based on a Government official's assessment of

8  the quality of the reporting or the credentials of the

9  reporters.

10      We just got testimony that doesn't require us to    11:57:00

11  imagine that.  We're living it.  We're here.

12      Now, if that watchdog over the press happens to be a

13  member of the Republican Party or the Democratic Party or the

14  Communist Party or the Fascist Party, I don't think it matters.

15  What difference does it make?    11:57:21

16      We heard testimony and, frankly, I think we can all

17  take notes of the fact that Rachel Maddow is a darn good

18  journalist and Rachel Maddow doesn't make any bones about the

19  fact that she's hard left.  She supports left-wing candidates.

20  Good for her.  She's a fellow American.  She should be able to    11:57:38

21  do that.

22      But The Gateway Pundit serves a large audience and

23  that large audience, you know, we look through -- they look at

24  Maricopa County through the eyes of The Gateway Pundit.  They

25  trust them.    11:57:53

United States District Court

**ER0099**

1       Now, we have had I think -- you know, there's this          11:57:56
2   epithet that goes around a lot called election denier.  We had
3   a member of the Board of Elections here that was one.  Gateway
4   Pundit reported on that.  They may have reported on it because
5   they agreed with him, but they were the only ones who exposed     11:58:13
6   that.  And being an election denier, whether you like it or not
7   or I like it or not, our opinion is irrelevant.  The public
8   generally doesn't like it.  And that public outcry, that public
9   influence, that public weight, that was only brought to bear
10  because this was the only journalism outfit that would report    11:58:33
11  on it and that led to the resignation of a member of the
12  defense.
13      It's Woodward and Bernstein on a small scale.  I'm
14  sure that the Nixon Administration didn't find them to be
15  credible journalists or good journalists, found them to be       11:58:50
16  biased, just like President Trump found Jim Acosta from CNN to
17  be and threw him out of the White House Press Corps, a decision
18  that was quickly reversed by the D.C. Circuit -- I'm sorry,
19  District of Columbia.
20      Freedom of the Press in Arizona is not something that        11:59:10
21  I generally worry about.  This is a place where Freedom of the
22  Press does seem to be well-respected.  When Arizona joined the
23  Union, it didn't need to also put a Freedom of the Press clause
24  in its state constitution.  It could have just relied on the
25  federal one.  But the founders of this state chose to follow     11:59:30

United States District Court

**ER0100**

1    the founders of this country and follow its Freedom of the            11:59:35
2    Press constitutional provision.  That provision, as well as the
3    federal one, is at threat here.

4        So what have we heard today that justifies this, this
5    conflict, we heard testimony from one member of this                  11:59:45
6    eight-member panel that doesn't keep minutes, that doesn't have
7    meetings, that doesn't record any of it.  One member, the only
8    member who testified today, told us this conflict was
9    absolutely viewpoint based.  I believe he may have been the
10   best witness for the plaintiffs that we heard from today.            12:00:08

11       So how can we -- how can we trust the Government to
12   make this determination?  You're going to make a determination
13   on who's going to look over your shoulder?  Who is going to
14   report the facts?  Who's going to be your watchdog?  Well, if
15   you do that, then you have nothing more than a lap dog, not a        12:00:30
16   watchdog.

17       So I would ask that Your Honor examine all of the
18   evidence that we've shown here today including -- including one
19   thing that was missing.  One thing that was missing in the
20   *MacIver* case, evidence of bias.  When you have a member -- we      12:00:47
21   have one of the defendants actually mocking Gateway Pundit for
22   being excluded because there was an approved member of the
23   press that also was mocking them.  I guess they are in the cool
24   kids club.  Gateway Pundit isn't and I understand.  Even the
25   Society of Professional Journalists, as we heard, is somewhat        12:01:09

United States District Court

**ER0101**

1   biased towards new media.  But there is nothing about this        12:01:12

2   media that is any different than the Arizona Republic and any

3   other organization that might want to watch the Government.

4          Another epithet that we've heard not in this

5   courtroom, not from anybody here but we hear a lot of this,        12:01:29

6   conspiracy theorist.  Nobody likes this speculation that calls

7   everything into question.  I do because I'm an incurable cynic

8   but it doesn't make Government happy but, you know, the best

9   place to create one, if this Court wants to create one, the

10  best environment for that is a shadow, not sunshine.  So where     12:01:53

11  is that shadow?  Gateway Pundit obviously looks at things from

12  a different perspective than anyone else just as a matter of

13  the human condition.

14         But Mr. Conradson asks probing questions, sure.  Did

15  he follow somebody to ask them for a comment?  I don't think       12:02:11

16  any of us are unfamiliar with reporters doing that, whether

17  it's Bernie Madoff fleeing from the reporters or anybody

18  fleeing from reporters with a hood over their head saying, "No

19  comment."  That's a problem?

20         We heard that he brought a hidden camera in.  That          12:02:25

21  wasn't true.  So what did this guy do?  He acted as a

22  hard-hitting journalist.  Frankly, it sounds like he acted as

23  an ethical journalist.

24         Now the alternate avenues, argument that the

25  Government tries to make that he could have just watched it on     12:02:39

United States District Court

1   live stream, well, not all of it.  And whether that was by          12:02:42

2   design or simply by an honest mistake, not all of -- we heard

3   that it's more ethical to question a witness, question a direct

4   source.  Well, how can you do that?  You can't do that if

5   you're not in the room and if you're excluded from the room.       12:03:00

6   Because there's simply not enough room, okay.  That happens.

7   Luck of the draw.

8           But when it happens because you have a Government

9   that doesn't like the content of the reporting, now you have

10  the Government putting their finger on the scale of the First      12:03:15

11  Amendment.  We can't have that.

12          I've seen no justification here, not even if we

13  accept the standards that the Government puts forward.  I do

14  not accept them and I don't think this Court should either.  I

15  think the Seventh Circuit was wrong to do so.  But even if we      12:03:35

16  accept them, they have made it clear today that those very

17  standards were not properly employed when they used them to

18  exclude him.

19          So they have the rights, yes, to limit for space,

20  maybe limit for size of publication.  If it was over that, if      12:03:51

21  it was over the size of the publication, I might still be here

22  today making some arguments but not the same that I'm making.

23  But I am making what I think is an easy constitutional argument

24  here, that we do have nothing more than a content-based

25  restriction against a journalist from having the same access       12:04:10

United States District Court

| | |
|---|---|
| 1 | that every other journalist should have. | 12:04:13 |

        Freedom of the Press will not tolerate that, Your
Honor.

        I thank you for your time.  I thank my friends and
the witnesses for the time.                                    12:04:21

        THE COURT:  All right.  Thank you, Mr. Randazza.

        And Mr. Trullinger?

        MR. TRULLINGER:  Thank you, Your Honor.

        Let me just be clear about one thing.  It's not about
content.  It's about quality.  It's about quality and it's      12:05:04
about integrity.  Press conferences are a nonpublic forum and
all the case law says that if there's a nonpublic forum the
Government has a right to set criteria for allowing people to
get into buildings and to attend press conferences.

        The criteria that was selected here for the Maricopa    12:05:26
County comes directly from criteria in the Seventh Circuit that
was approved.  And some of those criteria which are relevant
here is number five:  Is the petitioner a bona fide
correspondent of repute in their profession and do they and
their employing organization exhibit the following             12:05:45
characteristics:  A, they both avoid real and perceived
conflicts of interest; and, B, they both are free of
associations that would compromise journalistic integrity or
damage credibility.

        Mr. Conradson's articles, again, it's not about the    12:06:03

ER0104

1   content.  It's about the quality and the integrity.  He writes    12:06:14
2   argument without checking facts.  He harasses people by
3   following them and yelling questions at them.  He publishes
4   personal photos and contact information for people that he
5   criticizes in his reporting, continues to try to get into a    12:06:31
6   building that he was specifically told he does not have access
7   to.  Three times he's done that.  All of those reasons are
8   consistent with the County's Press Pass policy.  They are all
9   content-neutral reasons.  It's all about the integrity of him
10  and the quality of his -- and professionalism of being just a    12:06:51
11  journalist.
12          For all of those reasons, based on the County's
13  judgment, he was properly denied a Press Pass.
14          In addition to that, there's no harm in any event.
15  He watches the -- he can watch the press conferences being    12:07:10
16  streamed and even if they are not all live streamed, they are
17  all recorded and he can watch it when they are played back
18  later.  So he has access to all of the press releases in any
19  event.  And in any event, he went from September 30, 2022, when
20  he was first denied, all the way through November 10 of 2022    12:07:29
21  without challenging it.  So didn't send an email, didn't send
22  an appeal.  He just -- he did nothing and yet the plaintiffs
23  are calling this an emergency Temporary Restraining Order.
24  This is not an emergency Temporary Restraining Order.  The
25  delay alone should be enough to deny the motion for an    12:07:52

United States District Court

1    injunction and Temporary Restraining Order.    12:07:59

2         Finally, he is asking for -- plaintiffs are asking

3    for a mandatory injunction.  There's a distinction between an

4    injunction where you maintain the status quo while the lawsuit

5    is going forward and where you're asking for something right    12:08:15

6    now.  They are asking to be given a Press Pass right now.  And

7    this is in the brief but where the movant seeks a mandatory

8    injunction rather than a prohibitory injunction, injunction

9    relief is subject to a higher standard and is permissible when

10   extreme or very serious damage will result that is not capable    12:08:37

11   of compensation of damages and the merits of the case are not

12   doubtful.

13        Under that standard, the motion for a Temporary

14   Restraining Order should be denied.

15        One of the things that is interesting in this case    12:08:52

16   today was their expert that testified, essentially said there

17   are no ethics.  There's no ethical rules whatsoever.  You can

18   do whatever you want.  All of these ethical standards that

19   anybody writes are just aspirational.  Yeah, somebody should

20   follow these aspirational ethical guidelines but they don't    12:09:10

21   have to.

22        The County respectfully disagrees and has the right

23   to set up criteria for ethical reporting.  And they did that in

24   this case.  It's consistent with the Seventh Circuit Court of

25   Appeals criteria and for those reasons also, the motion for    12:09:29

United States District Court

**ER0106**

1  Temporary Restraining Order should be denied.                    12:09:35

2          Thank you, Your Honor.

3          THE COURT:  All right.  Mr. Trullinger, thank you.

4          MR. RANDAZZA:  Your Honor, do I have a reply?

5          THE COURT:  You carry the burden of proof so you get    12:09:52

6  to speak first and last, Mr. Randazza.

7          MR. RANDAZZA:  Thank you, Your Honor.

8          Your Honor, I will first address the timing issue.  I

9  think that's a fair question.  Correct.  It was denied 40 odd

10 days ago.  This was not a story 40 days ago.  There was no      12:10:09

11 story to report.  If this were Utah or Colorado or New Mexico,

12 we wouldn't be having this discussion because about nobody

13 cares.  It became a story on November 8.  On November 8 is when

14 it mattered.  November 8 is when this, the largest county in

15 Arizona, number of voting machines failed, number of           12:10:31

16 irregularities happened that the public has a right to about

17 and the public wants to know about, so I don't think he should

18 be judged by not considering it to be something worthy of a

19 federal court's time when there's no story.  If I was bringing

20 this case in New Mexico, I believe your colleague there might   12:10:45

21 be looking at me somewhat incredulously thinking, "What's the

22 big deal?"

23         There's also an escalation of hostility.  So there's

24 an escalation of the importance of the story and as escalation

25 of hostility.  First he couldn't go not press conferences.     12:11:02

1    Then he couldn't go into public buildings, buildings that we          12:11:05
2    heard today were open to the public, just not him.  He's the
3    only guy that couldn't go in, yet they say there's no hostility
4    toward him.  Then he couldn't even be on the curtilage of the
5    building, sent over to the free speech zone with the                 12:11:20
6    protesters.

7          So if Your Honor is examining the temporal element
8    here, that temporal element began on November 8.  I don't have
9    the date in front of me.  We filed on November 12.  It's about
10   as fast as we could get going, Your Honor.                           12:11:36

11         Now, they also say that this is not about content but
12   rather about quality.  I don't understand how those two phrases
13   don't contradict each other.  If it's about quality, it's about
14   content.  If we're going to question the quality of his work,
15   we're questioning the content.                                       12:11:58

16         Now if you have a public forum of any kind -- and I
17   agree this is not an open public forum.  Not every single
18   person can walk into that press conference.  But when the
19   Government does open up a forum, even a limited public forum
20   that it has opened up to all journalists, as long as they fill       12:12:16
21   out this form and make these statements and swear to these
22   conditions, then they cannot have any kind of a viewpoint-based
23   or content-based restriction on who gets there.
24         We've cited cases, a string cite of cases in our
25   briefing about this but that it is frequent that the Government      12:12:35

United States District Court

**ER0108**

1  will say it's not about content.  But then it is about content.  12:12:38

2  I just haven't seen anything here that says it's about anything

3  other than quality.  And that is quality as judged by this

4  panel of eight that we know only one of who directly said it

5  was about the content.  12:12:53

6      Now as far as irreparable harm goes, that's just a

7  given.  I don't mean to say that glibly.  A violation of the

8  First Amendment is always irreparable harm.  Every single

9  moment that goes on, there's irreparable harm.  There's

10  irreparable harm to my client for not being able to report  12:13:14

11  fully.  There's irreparable harm to the public for not getting

12  the full panel of voices and views that it should get from such

13  an important event.  There's even irreparable harm to the

14  Government.  I cannot think of a better way for the Government

15  to create mistrust in itself than to say this press that we've  12:13:32

16  mocked, this press that we don't like, this press that costs

17  one of our colleagues their job, this press that we've shown

18  obvious hostility to and vice versa, they can't report.

19      What better way to tell the public they should be

20  suspicious?  And what better way to dispel that than to say  12:13:54

21  this Government agency is operating on a perfectly above-board

22  manner, come and see for yourselves?

23      Now, if you think about this, if you think about what

24  they are doing, they are judging the quality of this journalist

25  before they allow them to practice journalism.  You know,  12:14:10

United States District Court

1    anytime I'm arguing a First Amendment case with somebody, I try   12:14:15

2    to make them understand that imagine that judgment call in the

3    hands of the worst person you can imagine.  I have no negative

4    opinion of any of the defendants except for what they have done

5    here today.  But these people change.  Anybody could wind up   12:14:31

6    there one day.  And if they can do that to The Gateway Pundit,

7    why can't they do it to National Public Radio?  Why can't they

8    do it to CNN?  Why can't they do it to whatever your favorite

9    news source is?  Why can't they do it to them?

10        So whatever tool you leave in the hands of the   12:14:51

11    Government today, Your Honor, will inevitably be used in a way

12    that we don't predict today.  That is why the First Amendment

13    requires that we look at everything in a content neutral manner

14    when we are making a governmental decision about First

15    Amendment rights.   12:15:08

16        Thank you, Your Honor.

17        THE COURT:  All right.  Mr. Randazza, I have

18    questions for both counsel.  You can remain at your counsel

19    table but keep everybody on even footing here.

20        One or two questions for framing, first of all, for   12:15:41

21    plaintiffs.  I was going to ask you, Mr. Randazza, if there was

22    any contest about whether or not the Court analyzes here in the

23    form of nonpublic forum versus public.  I think I heard you

24    loud and clear to say that the test is that for a nonpublic

25    forum, which has two elements essentially.  One is that any   12:16:04

1  action taken then must be reasonable and, two, is that it must    12:16:10

2  not be an effort to suppress the opposing viewpoint.

3        I want to know if your argument goes just to number

4  two because I heard you loud and clear that it's your position

5  that this is an effort to suppress an opposing view point or    12:16:33

6  whether it's also number one.

7        MR. RANDAZZA:  Your Honor, I would say that we do not

8  say it is not a public forum.  It's not -- there are three

9  kinds of public fora.  This is not a general public forum.  I

10  would not argue that in the least.  I don't think it is a    12:16:49

11  nonpublic forum either.  It is a limited public forum.  It has

12  been opened for a certain purpose so once that purpose is open,

13  then it must be done on a completely neutral manner.

14        But even if we do it on the more strict standard that

15  you've asked me about, I do not think that the limitations are    12:17:08

16  reasonable.

17        Reasonable might be -- I'll draft a reasonable policy

18  for them right now.  There are only a certain number of people

19  who can come in.  If more than the number of people who wish to

20  show up on a given day, if they are more than there are seats,    12:17:24

21  then by all means we are going to have a lottery.  Heck, maybe

22  if they want to weight that lottery towards larger

23  publications.  But here I don't think they even understand

24  their own test so how can it be reasonable?  But, nevertheless,

25  you know, part two, if it doesn't meet part two anyway, then it    12:17:44

United States District Court

1  doesn't pass First Amendment muster.                          12:17:50

2        So I would say that that's not the right standard but

3  I don't even need you to get to the right standard.  Even the

4  easiest burden on the Government they have failed on both of

5  those trip wires.                                             12:18:06

6        THE COURT:  My next question has to do with the

7  Court's observation that the scope of the injunctive relief

8  sought appears to have shifted somewhat from when you filed

9  your papers in that I read your motion loud and clear to be

10 about the need to get in there to observe vote counting and now  12:18:31

11 the vote counting in Maricopa County -- and Mr. Gingras is

12 nodding his head -- and now the vote counting in Maricopa

13 County is either over or all but over and so what I'm hearing

14 today is that it's about more than that.  It's about continuing

15 access to press conferences and so forth.                     12:18:52

16       How do I get that out of what you wrote is my point?

17 What got us here?

18       MR. RANDAZZA:  I'm unaware of the state of the

19 recounts.  So -- are we done?  Has there been a concession?  So

20 I would say that that is important.  But this story continues.  12:19:13

21 This very story and, yes, Your Honor, ongoing access in the

22 form of either being granted access or being granted a Press

23 Pass is the relief we're seeking.

24       THE COURT:  So what was the business in the written

25 product about I don't really want a Press Pass because that's a  12:19:30

United States District Court

1  badge of dishonor?  I've got to tell you, that seemed to be                    12:19:33

2  beneath the dignity of the process somewhat.

3         MR. RANDAZZA:  Well, I apologize, Your Honor.  But I

4  think if we accept what they are saying, I believe that that

5  rhetoric was necessary to make the point that either -- if the   12:19:49

6  Press Pass is simply a sign that we like your press, we are

7  Government approved press and it's on the basis of quality, and

8  I'll agree, that was an inarticulate way of putting it.  But if

9  it's on the basis of qualities.  If it's saying you are

10 quality, the content of your reporting is so unthreatening to    12:20:11

11 us that here's your nonthreatening pass.  We don't necessarily

12 need that.  But throw it away.

13        If that's not what it is.  If it's not content based,

14 then we'll take one.

15        So which is it?                                            12:20:29

16        THE COURT:  Well, if the overarching thrust of the

17 argument now is that Mr. Conradson and The Gateway Pundit want

18 to be treated like everybody else, that means press credential?

19        MR. RANDAZZA:  Yes, Your Honor, and that is our

20 position now.                                                     12:20:51

21        THE COURT:  I take from Professor Leslie's testimony

22 a large thrust of it was, there is not a hard-and-fast

23 definition of what a journalist is and I understand the point.

24        If that's the case, is it necessarily the plaintiff's

25 position that the answer is to let anyone in who wants to be      12:21:19

1    there?                                                          12:21:27

2           MR. RANDAZZA:  No, Your Honor.

3           THE COURT:  I think I understand you put

4    qualifications on that but I want to hear from you.

5           MR. RANDAZZA:  No, Your Honor, I would not say that.    12:21:33

6    I wouldn't say that anybody who simply walks up is a

7    journalist.  You know, it's probably more akin to Potter

8    Stewart's analysis of pornography:  There's no legal definition

9    but you know it when you see it.

10          Here there's probably a zone where we have no doubt     12:21:50

11   somebody walked in here with a CNN badge, I would have no

12   question that person is a member of the press.  They work for a

13   large organization.  We've all heard of it.  They practice

14   journalism on a regular basis.

15          Then there's the other end where we have somebody       12:22:09

16   with a Myspace page with five followers, they clearly wouldn't

17   fit.  I don't think that my client falls into a gray area

18   however.  My client has been publishing for -- I can't remember

19   the exact date he said he started but it sounded like over a

20   decade.  More than 10 years, millions of viewers, regularly     12:22:26

21   publishes on matters of public concern.

22          So I think you could say there might be a close call

23   here and there, but I hope that you have the luxury now of not

24   seeing this as a close call.

25          But I am not asking you to simply open the flood         12:22:42

                    United States District Court

**ER0114**

1  gates to every single person who shows up and says, "I have a    12:22:46
2  camera phone and a grievance and I would like to be in there."
3  I wouldn't go that far, wouldn't even ask you to go that far.

4      THE COURT:  So how would one draw the line to address
5  the circumstance you just identified?                            12:23:04

6      MR. RANDAZZA:  Well, I would draw the line the facts
7  that are before the Court today Your Honor, the facts before
8  the Court today on this record are that The Gateway Pundit is a
9  legitimate news source.  And I say that not from terms of
10 quality, not from terms of tone, not from terms of what we like  12:23:22
11 about them but they do deliver the news on a regular basis.
12 They are a real publication.  This isn't -- this isn't anywhere
13 close to the bottom end of heck, if I walked up there and said
14 I wanted press credentials, I don't think they should give them
15 to me.                                                           12:23:41

16     So on the record before you today, Your Honor, I'm
17 not asking for an overarching change except I am asking -- we
18 have asked as a facial challenge to these two conditions, that
19 they simply be stricken.  However, if you are not prepared to
20 strike them in their entirety, I think if you did, you would     12:23:59
21 not have the flood gates opened to every Tom, Dick, and Harry
22 with a Facebook page and 20 followers, you would still have
23 significant contours here and they could go back and retool it
24 and say, "You've got to have this many viewers."  I like --
25 some of their qualifications I like.  You must have been doing    12:24:16

United States District Court

1  news for I think 18 months.  I don't have a problem with that.  12:24:20

2  Somebody might but I don't.

3          But here even if you don't strike these regulations

4  themselves down as vague -- and I think they should be because

5  I don't think anybody even in this courtroom can come to a real  12:24:36

6  consensus about what they mean, you should absolutely strike

7  down what they have done on an as-applied basis as to this

8  journalist and this publication only.

9          THE COURT:  One or two more questions for you,

10  Mr. Randazza.  The next one I'm going to take you back to the  12:24:54

11  issue of the timing of the application.

12          MR. RANDAZZA:  Yes, Your Honor.

13          THE COURT:  In the materials that plaintiffs have

14  submitted there are stories specifically from Mr. Conradson

15  from the last general election and then in the interim that are  12:25:16

16  all about Maricopa County Attorney and their process and the

17  elections and how they conduct the elections.  The Chucri

18  stories in the summer to fall I think, 2001 (sic), up to the

19  primaries in this go-around.  So I'm having trouble following

20  the argument or crediting the argument that this was not a  12:25:43

21  story.

22          This is your quote from just a minute ago in the

23  argument:  This was not a story 40-odd days ago.  It seems to

24  me that it has been somewhat of a focus for The Gateway Pundit

25  and for Mr. Conradson specifically long before 40 odd days ago.  12:26:02

United States District Court

1           What am I missing?                                    12:26:07

2       MR. RANDAZZA:  Well, Your Honor, you can cover

3   Maricopa County and Maricopa County elections without it

4   becoming -- there's a term used in the journalism industry

5   called hot news.  So this hot news did not become hot enough to   12:26:18

6   warrant relief until November 8.  Everything else he could have

7   reported on separately but this is a hot news situation.

8           When we are having regular press conferences about

9   it, I don't know that they were doing that before.  So

10  throughout all of this period that he's reporting, he did not    12:26:39

11  need this kind of access but that access, remember, was

12  available to him until 41 days ago.  So in those 41 days and 30

13  of those 41 days this was not an exigent circumstance.

14          It became exigent when this became such an important

15  question.  Perhaps I spoke inartfully saying it's not a          12:26:58

16  question but the Maricopa County election became more important

17  on November 8 than that Arapahoe County election in Colorado on

18  that date.  So that's when the emergency came up.  And again,

19  Your Honor, as I stated, there are two escalations here.  Both

20  the escalation of the importance but also the escalation of the  12:27:21

21  exclusion, the exclusion went, as I said, from you can't be in

22  the press conferences, to you can't be in the building, to now

23  you can't even be anywhere near it.

24          So that confluence of circumstances is what led us to

25  seek emergency relief.                                           12:27:37

ER0117

1    THE COURT:  Okay.  Thank you.                    12:27:46

2        Mr. Trullinger, I have a couple of questions for you.

3        As I read both of your written materials and as I

4    process your witness's testimony, the argument that is

5    presented to me is as follows:  That Mr. Conradson in what he    12:28:25

6    writes does not follow many or any of the conventions of

7    journalists.  He doesn't source or confirm many statements of

8    purported fact.  He selects other articles or statements that

9    he either agrees with or doesn't agree with, disagrees with,

10   and then writes his opinion agreeing or disagreeing, at times    12:28:52

11   in rather incendiary language and terms.  He then cherrypicks

12   other tweets or quotes from others that support his position.

13       Is that summary of justification that I just laid out

14   the description of a content-based decision?

15       MR. TRULLINGER:  I don't think so, Your Honor.  The    12:29:21

16   difference is, I think of a content-based decision as we don't

17   like what he says about us.  We don't like the content of his

18   articles.  As opposed to the quality of being a journalist and

19   all of those things, not getting sources.  That is -- that goes

20   to integrity which is a direct element in the Press Pass    12:29:41

21   criteria, avoiding conflicts of interest.  Credibility.  If

22   you're getting your information from -- when you could call and

23   ask for something but you don't, you get something from a tweet

24   like you see a GIF on a tweet and you just make an assumption

25   that that means something.  It's not that you write an article    12:30:06

United States District Court

**ER0118**

1  that is unfavorable.  It's that that is not the journal --   12:30:12
2  that's not good journalism.  It's not within the criteria the
3  County is looking for because it doesn't matter.  It doesn't
4  matter if you are one side or the other.  It doesn't matter
5  what the content is.  It matters that you try to get the facts   12:30:27
6  right.  It matters that you -- and if it is an opinion, you
7  should say it's an opinion.

8      THE COURT:  So if I understand it correctly then,
9  your position is the decision is not the decision to deny the
10  access pass credential here is not based on how Mr. Conradson   12:30:44
11  or somebody else comes out but it's based on, you've said,
12  quality and other things.  I understand that to be almost based
13  on process and is nonconformity with the process.

14      MR. TRULLINGER:  Yeah.  That's a much better way to
15  say what I was trying to say, Your Honor.   12:31:08

16      THE COURT:  All right.  I think I understand the
17  argument there.  The other thing I wanted to ask you about, and
18  this may be my last question for you, I would like your
19  reaction to -- as Mr. Randazza put it, the attribution of
20  conduct by defendants that, as I understand it, is termed   12:31:32
21  almost as an escalation.  There was a denial of the credential.
22  Then there was a denial of access, Mr. Randazza was very
23  specific, access to a building that others did have access to
24  and then there was a denial even to the curtilage and law
25  enforcement involvement is the factual assertion as laid out.   12:31:55

United States District Court

1  Do the defendants have any issue with that?                    12:32:05

2       MR. TRULLINGER:  Well, it's inaccurate.  So one

3  thing -- there's two problems with that.  One is his conduct by

4  itself, the fact that he knew he didn't have a Press Pass and

5  he kept coming back.  The other thing is that I think it's a    12:32:17

6  misrepresentation to say that -- the escalation was not -- it

7  was because of his own conduct.  So he applied for a Press Pass

8  September 30.  Nothing happens until October 13 when he comes

9  back again.  He comes back again without Press Pass October 13.

10 He was kicked out at that point in time.  Nothing happens to    12:32:37

11 November 10.  November 10 is when they asked him to leave the

12 building.

13      And if you look at Exhibit 14, there's a video dated

14 November 10, 2022.  So it may be that he showed up on -- to

15 make that very thing happen.  I don't know if he did or not but  12:32:57

16 there wasn't -- I don't know that there was an escalation other

17 than by his own conduct.  So it was him coming and trying to

18 get a pass when he was told he didn't have one.

19      And the building was closed to the public at the

20 time, Your Honor.                                              12:33:19

21      THE COURT:  All right.  Thank you, counsel, for your

22 overall presentation and the marshaling of the materials, the

23 facts and the arguments on such short notice.

24      Give me just one moment.

25      (Discussion off the record.)                              12:34:04

United States District Court

1        THE COURT:  All right.  Everyone, thank you for your    12:34:13

2   patience.

3        I'm taking this under advisement.  I'll enter a

4   ruling as soon as I can.

5        Thank you.                                               12:34:19

6        We are adjourned.

7        (Whereupon, these proceedings recessed at 12:34 p.m.)

8                        *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

```
1                   C E R T I F I C A T E                    12:34:21

2

3         I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of       12:34:21

6    Arizona.

7

8         I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled     12:34:21

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 20th day of November,    12:34:21

16   2022.

17

18

19

20                        s/Elaine M. Cropper                       12:34:21

21                       _____

22                        Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  12:34:21


                    United States District Court
```

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**CIVIL MINUTES - TEMPORARY RESTRAINING ORDER HEARING**

Phoenix Division

CV-22-01925-PHX-JJT_____     DATE: 11/17/2022_____
Year   Case No  Initials

Title: TGP Communications, et al.___   vs.   Jack Sellers, et al._____
     Plaintiffs                   Defendants

HON: JOHN J. TUCHI_____

Deputy Clerk : Julie Martinez_____     Court Reporter: Elaine Cropper_____

David Gingras and Marc Randazza_____     Charles Trullinger and Tom Liddy_____
Attorney(s) for Plaintiff(s)             Attorney(s) for Defendant(s)

**PROCEEDINGS:    _X_ Open Court   __Chambers   ____Other**

10:03 a.m. Court convenes. This is the time set for Temporary Restraining Order Hearing re: Corrected Emergency Ex Parte Motion for Temporary Restraining Order (Doc. [7]). Discussion held. Gregg Leslie is sworn and examined. Witness is excused. Jordan Conradson is sworn and examined. Witness is excused. 11:18 a.m. Court is in recess.

11:26 a.m. Joseph Hoft is sworn and examined. Witness is excused. Roy Fields Moseley is sworn and examined. Witness is excused. Closing arguments. Discussion held. **IT IS ORDERED** taking this matter under advisement. Formal order to issue.

12:34 p.m. Court adjourned.

                                             Time in court: 2 hrs. 23 mins.
                                             Start: 10:03 AM
                                             End: 12:34 PM

Marc J. Randazza, #027861
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, NV 89118
Tel: (702) 420-2001
ecf@randazza.com

David S. Gingras, #021097
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
Fax: (480) 248-3196
David@GingrasLaw.com

John C. Burns, MBE# 66462*
Burns Law Firm
P.O. Box 191250
Saint Louis, MO 63119
Tel: 314-329-5040
Fax: 314-282-8136
TBLF@pm.me

Attorneys for Plaintiffs
TPG Communications, LLC and Jordan Conradson

*pro hac vice forthcoming

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

|  |  |
|---|---|
| TGP Communications, LLC, *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>Jack Sellers, *et al.*,<br><br>            Defendants. | Case No. 2:22-cv-01925-JJT<br><br>**PLAINTIFFS' NOTICE OF FILING SECOND AMENDED LIST OF WITNESSES** |

Plaintiffs TGP Communications, LLC d/b/a The Gateway Pundit, and Jordan Conradson ("Plaintiffs") hereby file their list of witnesses expected to appear and testify at the hearing on Plaintiffs' Corrected Emergency *Ex Parte* Motion for a Temporary Restraining Order (Dkt. No. 7) scheduled in this matter on November 17, 2022, at

10:00 a.m. This list of witnesses is provided for the purposes of scheduling only. Plaintiff reserves the right to call additional witnesses as necessary, should a compelling need arise.

**Plaintiffs' List of Witnesses:**

1.  Joe Hoft, Vice President of TGP Communications, LLC (Plaintiff)

2.  Jordan Conradson (Plaintiff)

3.  Charles Glasser, Esq.[1] (testifying as an expert in journalistic practices and journalistic ethics) (*see* **Exhibit 1**, curriculum vitae; **Exhibit 2**, Columbia University faculty profile).

4.  Gregg Leslie (testifying as an expert in journalistic practices and journalistic ethics) (*see* **Exhibit 3**, curriculum vitae; **Exhibit 4**, Arizona State University faculty profile).

Plaintiffs reserve the right to call and/or examine any witness called by any other party.

Dated: November 16, 2022.     Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza, #027861
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118

David S. Gingras, #021097
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044

---

[1]   With leave of the Court, Mr. Glasser will be appearing telephonically or via Zoom – whichever manner the Court prefers.

**ER0125**

John C. Burns, MBE# 66462*
BURNS LAW FIRM
P.O. Box 191250
Saint Louis, MO 63119

Attorneys for Plaintiffs
TPG Communications, LLC and
Jordan Conradson

*pro hac vice forthcoming*

**ER0126**

Case No. 2:22-cv-01925-JJT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Marc J. Randazza
Marc J. Randazza

ER0127

# **<u>EXHIBIT 1</u>**

Glasser
*curriculum vitae*

ER0128





Charles J. Glasser, Jr., Esq., LLC
A LIMITED LIABILITY CORPORATION

53 Valley Way, West Orange, NJ 07052
charlesglasseresq@gmail.com
+1(973) 666-6270
www.charlesglasser.net

## PROFESSIONAL EXPERIENCE

**Charles J. Glasser, Esq., LLC / charlesglasser.net**                    **June 2013 to Present**

*Media Consultancy.* Providing on-demand services to media entities, journalists, and multinational corporations, including pre and post-publication review, reputation management, Freedom of Information requests and appeals, strategic planning for emerging business, particularly digital information platforms and advice on international privacy, data, defamation, managing intellectual property distribution and regulatory issues. Adjunct Professor at New York University Graduate School of Journalism and CUNY/Newmark Graduate School of Journalism teaching Media Law. Represents several NGO's in media matters regarding regulatory, intellectual property issues, human rights and free press issues. Serves as expert witness in a variety of defamation and intellectual property cases in arbitration and both state and federal courts.

**Bloomberg News, NY, NY**                    **May 2002 to May 2013**

*Global Media Counsel.* Reported to Editor-in-Chief and Board of Directors. Responsible for pre-publication review and ethics standards worldwide of all Bloomberg-branded content, including Bloomberg News, *Bloomberg Businessweek* and Bloomberg Television. Oversight of more than 2,200 reporters in 120 bureaus globally on a 24/7 basis. Provided analysis and advice for acquisition of content-providing products and strategic partnerships in broadcast as well as management of financial regulatory issues around the world. Ombudsman for resolution of correction demands and significant reader complaints. Responsible for managing litigation of newsroom issues, including defamation, privacy, copyright and Freedom of Information. Particular expertise includes international media law, preparation of investigative and financial reporting, cyberspace and social media issues, and broadcast journalism. Legal work on award-winning stories including Pulitzer Finalist stories, Gerald Loeb Award, Society of American Business Editors and Writers (SABEW) and National Press Club Award (Political Reporting).

**Willkie Farr & Gallagher, NY, NY**                    **March 1999 to May 2002**

*Senior Litigation Associate*. Responsible for litigating media law and newsroom issues for Bloomberg L.P., including motion practice and trial preparation. Extensive litigation in trademark, copyright, internet and contractual issues including licensing and media content distribution.

**Squadron, Ellenoff, Plesent & Sheinfeld, NY, NY**                    **January 1998 to March 1999**

*Litigation Associate.* Practice in Media Litigation Group, representing News Corporation, Fox Television Stations, *New York Post*, *Star Magazine*, *National Enquirer*, *New York Magazine*, *Readers' Digest* and others in libel, privacy, copyright actions. Brief writing, motion practice, taking and defending depositions, discovery management, research and pre-publication review.

**Preti, Flaherty, Beliveau & Pachios, Portland, ME**                    **August 1996 to January 1998**

*Litigation Associate.* Practice in Litigation Practice Group, including commercial litigation, pre-publication review for newspapers and weeklies, brief writing, motion practice, taking and defending depositions, discovery management, oral argument before trial and appellate courts, including United States Court of Appeals. Worked with Senator George Mitchell on media regulatory matters for Gannett family interests, including Gannett television stations in New England.

**NBC News / Law Department, NY, NY**                    **Sept. 1995 to June 1996**

*Law Clerk.* Assisted in pre-publication libel and privacy vetting for NBC network news programming, including *Dateline, NBC Nightly News* and network-owned stations. Also provided substantive research for intellectual property issues such as network-owned trademark filings and opposition filings.

**ER0129**

<u>SIGNIFICANT CASES</u>

- *Mirafuentes v. Estevez and Forbes Magazine* (E.D. Va., Nov. 20, 2015) (Dismissal of libel claims brought by Mexican government official and millionaire against reporter and Forbes Magazine.)

- *Bloomberg, LP v. Board. of Governors of the Federal Reserve*, 601 F.3d 143 (2d Cir. 2010) *cert. den.* (Precedent-setting Freedom of Information case against Federal Reserve Bank exposing details of secret pre-TARP bank bailouts.)

- *Computerized Thermal v. Bloomberg L.P.*, 312 F.3d 1292 (10th Cir. 2002) (Dismissal of $150 million libel complaint on common-law grounds).

- *Johnnie Cochran v. NYP Holdings*, 58 F.Supp.2d 1113 (C.D. Cal. 1998) (Dismissal of libel claim against *New York Post* on constitutional grounds)

- *Levinsky v. Wal-Mart*, 127 F.3d 122 (1st. Cir. 1997) (Reversed $600,000 libel verdict on constitutional grounds).

- *Rudolph v. City of Portland (Unreported)* (August 15, 1997, D. ME) (Lead Counsel for ACLU pro-bono matter upholding free speech rights of homeless under Section 1983). https://archive.bdnblogs.com/1997/08/15/for-500-portland-settles-panhandling-lawsuit-brought-by-homeless-man/

<u>ASSOCIATIONS AND ADMISSIONS</u>

- Admitted to State of Maine (1996), New York, (1998); First Circuit (1997); Second Circuit (1998) Tenth Circuit (2000).

- Member, New York City Bar Association Committee on Media Law; Reporters Committee for Freedom of the Press; Committee to Protect Journalists; Resident Expert at Columbia University Global Freedom of Expression Project.

<u>EDUCATION</u>

**Juris Doctorate, New York University School of Law**          **June 1996**

Classes included First Amendment Law; Federal Appellate Practice; Trademark and Copyright Law; Advanced Trademark Litigation Seminar; Constitutional Law; Justice Wm. Brennan Seminar on Constitutional Issues; Trial Advocacy.

- Managing Editor, *The NYU Law Commentator*; Articles and Note Editor, JOURNAL OF INTERNATIONAL LAW AND POLITICS.

- *Papers and Publications: Drafting Constitutionally Permissible Restrictions on Libel in the Campaign Context*, (Prof. Burt Neuborne, Justice Wm. Brennan); *Deference to Juries and Independent Appellate Review in First Amendment Cases After Connaughton*, (Judge Harry Edwards, Appellate Practice Seminar)

- *Awards*: Arthur T. Vanderbilt Medal, (Community Service) Larry Fleisher Prize in Sports and Entertainment Law, American Bar Association, Legal Editorial Writing, 1995

**B.A., Hunter College (City University of New York)**          **June 1993**

*Summa cum laude*. Thomas Hunter Honors Program, double major in Political Science and Philosophy. Captain, Varsity Fencing Team, 1991-1993.

- *Awards:* Interdisciplinary Honors, 1989, 1990, 1991, 1992. Hunter Scholar-Athlete, 1992; NCAA Division III Team Foil Champions; Kathryn Booker Prize, (Political Science Writing), 1992

<u>JOURNALISM EXPERIENCE</u>

**TIME INC. (*People* Magazine)**          **1987-1992**

    *Copy Editor/Factchecker.* Staff position closing *People* Magazine on a weekly basis, responsible for copy and style editing, copyfitting, fact-checking features and coordinating page layouts with Senior Editors.

ER0130

**AGENCE FRANCE-PRESSE (AFP), THE ASSOCIATED PRESS       1983-1985**

*Photojournalist/Reporter.* Contract photojournalist and reporter to one of Europe's largest news agencies. Wrote and photographed magazine stories in England, (six months) and India (year and a half). Stories published in *Geo, New York Times Magazine, Smithsonian Magazine, Boston Globe Sunday Magazine*. Covered President Ronald Reagan; reported on the fall of the Somoza government in Nicaragua and guerrilla fighting in El Salvador; covered the Coast Guard interdiction in the Caribbean drug wars. Also filed stories from Guatemala, Honduras, Mexico, Jamaica, Puerto Rico, Haiti, and Cuba.

## SIGNIFICANT PROFESSIONAL PUBLICATIONS:

Books: "*The International Libel and Privacy Handbook: A Global Reference for Journalists, Publishers, Webmasters and Lawyers*" LEXIS NEXIS, 6th Edition, 2022 https://store.lexisnexis.com/categories/shop-by-jurisdiction/national-194/international-libel-and-privacy-handbook-skuusSku23170467

Articles: "*Purposeful Avoidance of the Truth: The Other Side of Actual Malice*", Article 19, November 10, 2016 https://www.article19.org/resources/purposeful-avoidance-of-the-truth-the-other-side-of-actual-malice/

"*This Just In, and the Rush to Publish*" Five-part series TALKING BIZ NEWS, June 26, 2013 https://talkingbiznews.com/they-talk-biz-news/this-just-in-and-the-rush-to-publish

"*Congress Should Pass the Federal Shield Law for Journalists, Bloggers*", THE WASHINGTON EXAMINER, August 05, 2013 https://www.washingtonexaminer.com/congress-should-pass-the-federal-shield-law-for-journalists-bloggers

"*Media Law Policy in the Internet Age*" THE UNIVERSITY OF HONG KONG INTERNATIONAL CONFERENCE, October 18, 2013 https://www.youtube.com/watch?v=0MM2lf2Zo6c

Selected   "*US Gun Law Debate: Is Partisan Politics Harming Public Safety*?" I24 GLOBAL NEWS, May 25, 2022
Press:        https://youtu.be/53cN2rEcZyo

"*The President, the Press, and the Dossier*" LEGAL TALK NETWORK, September 4, 2020 https://legaltalknetwork.com/podcasts/lawyer-2-lawyer/2020/09/the-president-the-press-and-the-dossier/

"*Disney "Pink Slime" Lawsuit Settled for Whopping $177 million*" CBS NEWS, August 10, 2017 https://www.cbsnews.com/news/disney-pink-slime-lawsuit-settled-for-177-million-abc-news/

"*No Apology, No Explanation: Fox News And The Seth Rich Story*" NATIONAL PUBLIC RADIO "MORNING EDITION" September 15, 2017 https://www.npr.org/2017/09/15/551163406/fox-news-has-yet-to-explain-what-what-wrong-in-seth-rich-story#

## SIGNIFICANT EXPERT WITNESS WORK:

*Ciabatonni v. Teamsters Local 326 et. als.,* (Del. Sup. Ct, 2017)  No.: N15C-14-059 VLM (Expert witness for plaintiff explaining defamatory meaning).

*AIG v. Walt Disney, ABC News* (Private arbitration, Cal.) (Expert witness for insurance company explaining "Actual Malice" shown in infamous "Pink Slime" libel suit regarding AIG's duty to defend in $25 million settlement).

*Steve Wynn v. Lisa Bloom,* (D. Nev, 2018) 2:18-cv-00609-RFB-GWF (Expert witness for defense explaining standards of care in defamation case).

*State of Tennessee v. Boyd*, (Hamilton Cty. Crim. Court, 2018) No. 304647 (Expert witness for County Prosecutor explaining where criminal speech is not protected by First Amendment).

ER0131

# **<u>EXHIBIT 2</u>**

Glasser
Columbia University Profile

**ER0132**

Global Freedom of Expression | Charles Glasser - Global Freedom of Expression

Columbia University in the City of New York



Global Freedom of Expression
Columbia University

EN | ES | FR | عربي | PYC | PT

**NEWSLETTER SIGN UP**

# Charles Glasser

Charles Glasser spent twelve years as the Global Media Counsel for Bloomberg News (https://www.bloomberg.com/), where he was responsible for pre-publication review, ethics issues, and training more than 2,200 reporters in more than 120 bureaus around the world on legal issues and journalistic fundamentals, particularly focusing on investigative and business news. He also managed media litigation globally, and is acknowledged as an expert in international media law. He is the author and editor of "The International Libel and Privacy Handbook" (Third Edition, 2013, John Wiley and Sons) and is a regular panelist and contributor for several media law and journalism organizations including The Media Law Resource Center, The Committee to Protect Journalists, and the Media Law Defence Institute (UK). Mr. Glasser also served as the news organization's ombudsman, and was responsible for managing complaints, corrections and interacting with public relations and investor relations professionals who sought input into Bloomberg content, both before and after publication. Prior to joining Bloomberg, Mr. Glasser represented a wide variety of general circulation publications including Reader's Digest, the New York Post, Star Magazine, and others. He is currently managing his own consultancy, providing legal and media ethics advice to publishers, managing Freedom of Information litigation and providing content and privacy guidelines to web-based startups. He currently acts as a media consultant to a wide range of news and content platforms at www.charlesglasser.net.

© 2022 Columbia University | Statement on Disability

**Global Freedom of Expression**
Columbia University
91 Claremont Ave,
Suite 523
New York, NY 10027
**1-212-854-6785**

📞 **1-212-854-6785**     ✉ **GLOBALFREESPEECH@COLUMBIA.EDU**     🐦 **COLUMBIAGFOE**
▶ **YOUTUBE**

**ER0133**

# **EXHIBIT 3**

Leslie
*curriculum vitae*

**ER0134**

## GREGG P. LESLIE

ASU Sandra Day O'Connor College of Law
111 E. Taylor St., MC 8820
Phoenix, AZ 85004
(480) 727-7398
Gregg.Leslie@asu.edu

---

**ASU Sandra Day O'Connor College of Law**

*Professor of Practice; Executive Director, First Amendment Clinic*

Founded and directs a legal clinic that give students hands-on experience promoting and defending First Amendment and Freedom of Information rights.

**The Reporters Committee for Freedom of the Press**
*Legal Defense Director, 2000 – present Staff*
*Attorney, 1994-1999*

- Responsible for legal and editorial work of the Reporters Committee. Supervise and prepare *amicus* briefs, protest letters and comments.
- Engaged in advocacy before legislatures and Congress related to reporters' shield laws, anti-SLAPP laws, newsgathering restrictions, court and government access rules, and credentialing issues.
- Manage legal defense hotline calls, which are handled by both myself and a staff of young lawyers under my supervision. Hotline work involves a wide range of activities, including reviewing journalists' articles before publication, counseling on how to contest subpoenas, helping to gain access to courtrooms and other proceedings, and making referrals to other attorneys as necessary.
- Handle media inquiries and interviews, speaking on behalf of the organization, on First Amendment issues.
- Regularly create coalitions of media companies for the briefs and letters, often getting 30-50 media organizations to join.
- Edited quarterly magazine, *The News Media & The Law*, as well as regular news items on our web site. Supervise lawyers and journalism student interns in preparing articles.
- Created our first web site in 1995, including our automated FOIA letter generator, and continued to develop and maintain the site since.

**Georgetown University School of Continuing Studies**
*Adjunct Professor, Media Law, Summer 2014*

- Taught media law to graduate students in the Master of Professional Studies in Journalism program.

**Various freelance writing, legal and volunteer positions, 1989-1994**

- Jan. 1993 – Sept. 1994 (and other times overlapping with positions below): Freelance journalism (tech/legal) writer.

- Sept. 1992 – March 1993: Various volunteer and staff positions with the Clinton campaign, transition team, and Janet Reno confirmation team.
- April 1991 – August 1992: Legal fellowship at the Reporters Committee for Freedom of the Press.
- Sept. 1989 – March 1991: Legal research for a nonprofit organization working on immigration law reform.

### Regardie's Magazine
*Writer and Research Director, 1985-1989*

- Wrote stories and led research projects for monthly political and business magazine in the Washington, D.C., area. Had sole responsibility for compilation of annual research projects on the 100 wealthiest and 100 most powerful people in Washington. Managed a staff of interns each semester to help on these and other projects.

## PROFESSIONAL ACTIVITIES

**Member, Governing Committee, ABA Communications Law Forum** (Jan. 2015 to present).  Help manage the largest organization of media lawyers in the country, and help plan events including an annual conference.

**Member, Advisory Board, Howard Center for Investigative Reporting, ASU Walter Cronkite School of Communications** (Jan. 2022 to present). Serve as expert advisor for the investigative reporting center underwritten by the Scripps-Howard Foundation.

**Member, Advisory Council, Foundation for Individual Rights and Expression (FIRE)'s Student Press Freedom Initiative.** (Feb. 2022 to present). Serve on council to advise on student media rights issues for FIRE, a nationwide advocacy and assistance organization.

**Chairman, D.C. Bar Arts, Entertainment, Media & Sports Law Section** (2014-2016).  Ran section of the bar that hosted events and seminars for lawyers practicing in these fields. Responsible for managing budget, recruiting members and running monthly meetings of the steering committee.

**Member, ABA Fair Trial/Free Press Task Force** (2011). Served as a member of the committee tasked with updating standards for lawyers and judges involving how they interact before, during and after civil and criminal trials. Was the sole representative speaking for the interests of the news media generally, and specifically represented the ABA Communications Law Section and Litigation Section's First Amendment subcommittee.

**Chairman, District of Columbia Bar Media Law Committee** (2006-2010). Duties included hosting monthly meetings of Washington media lawyers, creating agenda and arranging speakers for meetings, and planning and hosting occasional evening seminars for a larger audience of attorneys and members of the public.

**EDUCATION Georgetown University Law Center** (J.D., 1990)

- Coursework included: Free Press Seminar; Communications Law and Policy; Communicative Torts; and Administrative Law.

**Georgetown University** (B.A., 1985)

- Majored in Philosophy, minored in Government. Served as editor-inchief (senior year) and news editor (junior year) of weekly campus newspaper, *The Georgetown Voice*.

**ER0137**

# **EXHIBIT 4**

Leslie
ASU Faculty Profile

ER0138



ASU Search



# Gregg Leslie

**Professor of Practice**, Sandra Day O'Connor College of Law

gregg.leslie@asu.edu          480-727-7398

Sandra Day O'Connor College       **Mail code:** 9520
of Law 111 E. Taylor St. Office      **Campus:** Dtphx
578
Phoenix, AZ 85004

## Biography          Teaching

**Long Bio**

Gregg Leslie is the executive director of the First Amendment Clinic. He was previously a staff attorney with the Reporters Committee for Freedom of the Press, a Washington, D.C. nonprofit association that provides legal assistance to journalists, and served as the organization's legal defense director for 17 years.

Leslie serves on the governing committee of the Communications Law Forum of the American Bar Association, and was a member of the ABA's Fair Trial and Free Press Task Force in 2011. He also served as chairman of the D.C. Bar's Media Law Committee and Arts, Entertainment, Media & Sports Law Section, and taught media law in Georgetown University's Master of Professional Studies in Journalism program.

**Expertise Areas**

Media Law



ASU Search





# #1 in the U.S. for innovation

**ASU ahead of MIT and Stanford** — U.S. News & World Report, 8 years, 2016−2023

Copyright and Trademark                                                                 Terms of Use

Accessibility                                                                                      Emergency

Privacy                                                                              COVID-19 Information

**ER0140**

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:     THOMAS P. LIDDY (019384)
        CHARLES E. TRULLINGER (018936)
        JOSEPH J. BRANCO (031474)
        JOSEPH E. LA RUE (031348)
        Deputy County Attorneys
        liddyt@mcao.maricoa.gov
        trullingc@mcao.maricopa.gov
        brancoj@mcao.maricopa.gov
        laruej@mcao.maricopa.gov

CIVIL SERVICES DIVISION
225 West Madison Street
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-4316
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

*Attorneys for Maricopa County Board of
Supervisors, Maricopa County Recorder
Stephen Richer, Rey Valenzuela, Scott Jarrett,
Megan Gilbertson, and Marcus Milam*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TGP Communications, LLC, d/b/a The Gateway Pundit, a Missouri limited liability company; and Jordan Conradson, an individual, | NO. CV-22-01925-JJT |
| Plaintiffs, | **RESPONSE TO CORRECTED EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| v. | |
| Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo, in their respective official capacities as members of the Maricopa County Board of Supervisors; Stephen Richer, in his official capacity as the Maricopa County | |

1

ER0141

Recorder; Rey Valenzuela and Scott Jarrett, in their official capacities as Maricopa County Election Directors; and Megan Gilbertson and Marcus Milam, in their official capacities as Maricopa County Communications Officers,

Defendants.

Defendants Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo (in their official capacities as members of the Maricopa County Board of Supervisors), Stephen Richer (Maricopa County Recorder), Rey Valenzuela and Scott Jarrett (Maricopa County Election Directors) and Megan Gilbertson and Marcus Milam (Maricopa County Communications Officers) (together, where appropriate, the "County"), hereby respond to Plaintiffs' Corrected Emergency *Ex Parte* Motion For A Temporary Restraining Order, as follows:

## I.   BACKGROUND

This case is not about a government entity imposing a restraint on Plaintiffs' freedom to report on the 2022 election. Nor is it about limiting Plaintiffs' access to view and report on press conferences held as part of the County's efforts to provide timely and accurate information to the public. Instead, it involves the County's considered judgment about the best way to allocate its limited resources to make accurate information available to voters in Maricopa County and throughout Arizona. Plaintiffs' eleventh-hour demand to be allowed physical access to a non-public County facility does not warrant the mandatory injunctive relief that Plaintiffs are asking this Court to impose.

Out of a concern for logistical difficulties and security, Maricopa County requires an official Press Pass for members of the press to attend news conferences at, or to otherwise enter, the Maricopa County Tabulation and Election Center ("MCTEC") and the tenth floor of the County Administration building to conduct interviews, take photos, and/or video. This is important not only because of the limited amount of space within the large room where press appearances and interviews are conducted, but also because of security

2

ER0142

concerns: one or more of the Maricopa County Board of Supervisors, the County Recorder, other County officials, and Election Department employees are more easily accessible to members of the press than they are to the public at large.

This concern for safety is legitimate.  Following the November 3, 2020, general election, large crowds of protesters gathered at MCTEC in response to former president Trump's and others' claims that the election had been "stolen." On the night of Wednesday, November 4, several hundred protesters attempted to storm MCTEC and enter the building while Elections Department employees were present tabulating ballots. *See, e.g.*, KTAR News, "Protesters gather outside Maricopa County Elections Department," Nov. 5, 2020, *available at* https://ktar.com/story/3678840/protesters-gather-outside-maricopa-county-elections-department/. Following the public unrest that occurred at the National Capitol on January 6, 2021, large crowds of pro-Trump supporters gathered at the Arizona Capitol and erected a guillotine, promising "holy hell" to those who had "stolen" the election from him. *See, e.g.*, Madeline Ackley, "'No more political options': Trump rally at Capitol highlights GOP fractures," AZMIRROR, January 7, 2021, *available at* https://www.azmirror.com/2021/01/07/no-more-political-options-trump-rally-at-capitol-highlights-gop-fractures/.

These types of protests, as well as the multitude of death threats that the Defendants and other employees of the Maricopa County Elections Department have received since the 2020 election, are good cause for any election department to be concerned about security. In fact, permanent fencing was placed around MCTEC in early 2021 and additional temporary fencing was installed at the direction of the Maricopa County Sheriff's Office (MCSO) after the primary election in August because of people taking video of voters and Election Department employees and threatening their access to MCTEC.

The criteria for determining whether an applicant qualifies as a "Member of the Press," is clearly set out on the County's website.[1] The criteria is as follows:

---

[1]   See attached Exhibit 1 or the following link:

ER0143

1.      Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?

2.      Does the parent news organization meet the following criteria?

    a.      It has published news continuously for at least 18 months, and;

    b.      It has a periodical publication component or an established television or radio presence.

3.      Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?

4.      Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?

5.      Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

    a.      Both avoid real or perceived conflicts of interest;

    b.      Both are free of associations that would compromise journalistic integrity or damage credibility;

    c.      Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and

    d.      Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

The same criteria were approved in—and drawn directly from—a Seventh Circuit Court of Appeals opinion.

> The first three of the criteria listed in the memorandum are reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories. The list prioritizes access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets (such as tribal publications). The criteria listed in numbers four and five of the memorandum are reasonably related to the viewpoint-

https://www.maricopa.gov/5856/Maricopa-County-2022-Elections-Press-Pas#criteria.

4

**ER0144**

> neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying. Similar standards are also used by other governmental bodies such as the United States Congress.

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610–11 (7th Cir. 2021), *cert. denied,* 142 S. Ct. 711 (2021). The legal memorandum prepared by the Governor's legal counsel that was used as an exhibit in the *Evers* case is attached hereto as Exhibit 2. The Defendants' guidelines follow that memorandum and Seventh Circuit decision.

On September 27, 2022, Jordan Conradson, from The Gateway Pundit,[2] applied for a Press Pass. On the same day he submitted his application, he wrote an article in The Gateway Pundit entitled:

> BREAKING:  Maricopa County Create 'Ministry Of Truth' To Silence the Gateway Pundit – Now Requiring Official Press Pass for Media 'To ENTER ITS FACILITIES And/Or Cover Events Related To the 2022 General Election.'[3]

Thus, even before he received a response to his application, he stated in an article that Maricopa County was "covering its tracks ahead of the 2022 General Election," that the County or newly formed Elections Command Center is a "Ministry of Truth," and that "The Gateway Pundit previously reported on these same tactics employed by the Biden Regime." The article does not identify a single inquiry made to understand the reason behind the policy. The article simply announces the policy and takes the presumptive position that the policy was enacted to suppress opinions like those from The Gateway Pundit.

---

[2]   https://www.thegatewaypundit.com/

[3]   See attached Exhibit 3 or the following link: https://www.thegatewaypundit.com/2022/09/breaking-maricopa-county-creates-ministry-truth-silence-gateway-pundit-now-requiring-official-press-pass-media-enter-facilities-cover-events-related-2022-ge/

ER0145

As part of the application process, Mr. Conradson submitted three links to work examples.[4] Those three articles, similar to the article just mentioned, do little more than proselytize The Gateway Pundit's views. Each article germinates from a news report or press release (such as the County's announcement of Press Pass criteria). Mr. Conradson then expresses an opinion about the news report or press release and supports that opinion by referencing like-minded social media posts, prior articles by The Gateway Pundit, and allying websites that express the same viewpoints. Moreover, each article uses inflammatory and/or accusatory language, such as "Fake News Media," "globalist elitist establishment," and "highly flawed 2022 Primary Elections." And while Mr. Conradson is certainly entitled to express his opinions, his poorly sourced, researched, and reported work lacks the journalistic integrity and credibility required by the Press Pass criteria.

In addition, Mr. Conradson participates in political party events and associates with people and groups that demonstrate an inability to avoid real or perceived conflicts of interest. See attached Exhibit 7 (photo at an event with Wendy Rogers, Jeff Pedersen, David Clements, and Mr. Conradson),[5] Exhibits 8 and 9 (photos of participants in the Cyber Ninja audit, including Mr. Conradson),[6] Exhibits 10 and 11 (photos of Mr. Conradson participating in a Merissa Hamilton campaign event).

The *Society of Professional Journalists* has a code of ethics, which requires ethical journalists to abide by four key principals: (1) Seek truth and report it; (2) Minimize harm;

---

[4]   See attached Exhibits 4, 5, and 6 or the following links:
Ex. 4: https://www.thegatewaypundit.com/2022/09/watch-trump-endorsed-kari-lake-joins-tucker-carlson-italy-elects-first-female-populist-leader-not-attacking-probably-not-truly-representing/;

Ex.  5:  https://www.thegatewaypundit.com/2022/09/fcked-really-dont-real-true-freedom-speech-youtube-star-pro-boxer-jake-paul-responds-gateway-pundit-reporters-question-big-tech-censorship-pre-fig/;

Ex. 6:  https://www.thegatewaypundit.com/2022/09/maricopa-county-appointed-100-democratic-poll-workers-republicans-extremely-flawed-primary-election-eleven-locations-no-republicans/

[5]   See full Tweet here: https://www.reuters.com/world/us/kill-them-arizona-election-workers-face-midterm-threats-2022-11-06/

[6]   See full Tweet here: https://twitter.com/WendyRogersAZ/status/1438487340138340358?s=20&t=nb-Ugc2zplCQweKrpexTEQ

ER0146

(3) act independently; and (4) Be accountable and transparent. *See* attached Exhibit 12.[7] Among other things, this code requires a journalist to:

> Take responsibility for the accuracy of their work. Verify information before releasing it. Use original sources whenever possible.

> Avoid undercover or other surreptitious methods of gathering information unless traditional, open methods will not yield information vital to the public.

> Balance the public's need for information against potential harm or discomfort. Pursuit of the news is not a license for arrogance or undue intrusiveness.

> Avoid conflicts of interest, real or perceived.

> Avoid political and other outside activities that may compromise integrity or impartiality or may damage credibility.

On September 30, 2022, Plaintiff Conradson was sent an email denying his application, stating:

> Thank you for applying for a Maricopa County Press Pass. This email is to notify you that you have been denied a press credential based on the following criteria which is listed on Maricopa.gov:

> #4: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.

> If you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered.

> Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it. [8]

Despite being denied a Press Pass, Plaintiff Conradson appeared at press conference on October 13, 2022, with a hidden camera. On November 10, 2022, he showed up at MCTEC under the guise of being there to pick up his credentials. He became disruptive and

---

[7]   See the link here: https://www.spj.org/ethicscode.asp

[8]   *See* attached Exhibit 13. The reference to 4(a) & (b) was a scrivener's error and should have been 5(a) & (b). Compare to Exhibit 1.

ER0147

Defendants had to remove him from the facility. Plaintiff Conradson and Ben Bergquam, another person denied a press pass (also removed from the property for trespassing), produced at least one video about their removal.[9]

Despite framing their Motion for Temporary Restraining Order as one for emergency relief, Plaintiffs waited 41 days to seek the TRO, even though the County held multiple press conferences in the weeks leading up to and the days after the November 8, 2022, election. Indeed, Plaintiff Conradson did not even reply to the denial email until November 10, 2022, the same day the Complaint and Motion for Temporary Restraining Order were filed. *See* attached Exhibit 15. However, his purported appeal was not an appeal at all because it failed to state any substantive reasons his application should be reconsidered or how he met the criteria.

## II.    LEGAL STANDARD

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002). The only distinction between the two is that under the federal rules of civil procedure, a preliminary injunction requires notice to the adverse party, whereas a temporary restraining order may be issued without notice. Fed. R. Civ. P. 65.

To succeed on a motion for preliminary injunction, the moving party must establish each of the following four elements: "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest." *Alaska Landmine, L.L.C. v. Dunleavy*, 514 F. Supp. 3d 1123, 1128 (D. Alaska 2021), *appeal dismissed,* No. 21-35137, 2021 WL 2103741 (9th Cir. Mar. 4, 2021) (citing *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008)).

---

[9]    See Exhibit 14 (still shot). Full video is linked here:
https://twitter.com/BenBergquam/status/1590893457249558528?s=20&t=Ot_HxMs48Ekt1_Z2UET_3w

**ER0148**

"[I]f a plaintiff shows 'that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor.'" *Dunleavy*, 514 F. Supp. 3d at 1128. "Serious questions are 'substantial, difficult, and doubtful,' as to make them a fair ground for litigation and thus for more deliberative investigation." *Id*.

There are two types of preliminary injunctions, those that prohibit a party from taking action and thus preserve the status quo (a prohibitory injunction), and those that seek to order a responsible party to take action (a mandatory injunction). "Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is 'subject to a higher standard' and is 'permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Atwood v. Days*, No. CV2000623PHXJATJZB, 2021 WL 5811800, at *3 (D. Ariz. Dec. 7, 2021), *clarified on denial of reconsideration,* No. CV2000623PHXJATJZB, 2021 WL 6091278 (D. Ariz. Dec. 23, 2021) (citing *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017). Plaintiffs' motion requests a mandatory injunction subject to the higher standard. Specifically, they request that "the Gateway Pundit must be permitted to attend press conferences, immediately," which would mandate the Defendants to issue a Press Pass. *See* Corrected Emergency *Ex Parte* Motion for a Temporary Restraining Order (Doc. 7) at 5:20-21.

A plaintiff alleging constitutional torts under 42 U.S.C. § 1983 must allege that "every government defendant—supervisor or subordinate—acted with the state of mind required by the underlying constitutional provision." *OSU Student All. v. Ray*, 699 F.3d 1053, 1070 (9th Cir. 2012).

## III.   ANALYSIS

### A.   Plaintiffs are not likely to succeed on the merits.

The aim of the Press Pass criteria is to provide safety and security for County officials, temporary employees, and credentialed political party volunteers to perform their important duties while also allocating limited resources to permit credentialed journalists to

**ER0149**

attend conferences, observe the actions of the elections department, and interact with election officials so they can report accurate information to the public.

A traditional public forum, *e.g.*, public streets, is open to anyone and speakers cannot be excluded from a traditional public forum without a compelling governmental interest. *Dunleavy*, 514 F. Supp. 3d at 1130. But press conferences are nonpublic forums and public entities are entitled to limit persons who can attend. "[I]n 'nonpublic forums,' access may be restricted 'as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Moreover, "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808. The government also has the ability to restrict access to a government building that is not intended as a public forum. *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 497 (9th Cir. 2015) (granting selective access under pre-established guidelines that impose speaker-based or subject-matter limitations negates any suggestion that the government intends to open its property to the "indiscriminate use by all or part of the general public.").

Once the government decides to restrict attendance at press conferences, it must have written guidelines that are subject to evaluation. "In essence, given the import of First Amendment rights, the government must publicly memorialize the applicable standards to ensure both due process and compelling government interests for any and all denials of access." *Dunleavy*, 514 F. Supp. 3d at 1132 (citing *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977)). Here, the County articulated the written criteria that would be applied when considering an application for a Press Pass. And the criteria are viewpoint neutral.[10]

---

[10]   See Exhibit 1, or the link here: https://www.maricopa.gov/5856/Maricopa-County-2022-Elections-Press-Pas#criteria.

ER0150

Although Plaintiffs' motion claims the criteria for a Press Pass are vague, Plaintiff Conradson failed to inquire about them at any time, either before he applied for a Press Pass, at the time he wrote his article criticizing the policy, or after his application was denied—or even when he filed his belated "appeal." Thus, the criteria were either clear enough to him or he didn't care enough to ask. In any event, as indicated above, the same criteria were approved in—and drawn directly from— *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610–11 (7th Cir. 2021), *cert. denied,* 142 S. Ct. 711 (2021). Seventh Circuit Court of Appeals opinion.

Plaintiff Conradson's actions of appearing at the MCTEC office lobby, trying to sneak into the building alongside credentialed Press Pass members, and refusing to leave until escorted out of the building, can only be described as disruptive. In addition, his article about the creation of the Press Pass criteria, the three articles he submitted, as well as his associations, clearly indicate that he was properly denied a Press Pass for the reasons cited in the denial email.

Plaintiffs are unlikely to succeed on the merits of their complaint because the Defendants were permitted to limit access to their building and nonpublic press conferences, the criteria for obtaining limited access via a Press Pass are clearly stated on the website and content neutral, Plaintiff Conradson does not meet the criteria, and the criteria used have been approved by the Seventh Circuit Court of Appeals. While the Seventh Circuit's decision is not binding on this Court, it is certainly sufficient authority to deny Plaintiffs' motion.

**B.**     **Plaintiffs are not likely to suffer irreparable harm in the absence of preliminary relief**.

As the denial email stated, "Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it."[11] Any alleged harm is greatly minimized when the press conference at issue is live

---

[11]   *See* Exhibit 13.

ER0151

streamed over the internet. "Harm is admittedly *de minimis* while the COVID-19 pandemic requires events like press conferences to be held virtually and the governor's office offers a public livestream that anyone can access." *Dunleavy*, 514 F. Supp. 3d at 1135.

Moreover, access to a press conference does not mean a member of the press has a right to be called on or to have his or her questions answered. *Dunleavy*, 514 F. Supp. 3d at 1135 ("[T]he Governor possesses the discretion to refrain from calling on Plaintiffs or answering their questions."). Plaintiff Conradson thus cannot make out a showing of any actual harm: he can view the press conference online to gather any information from the County about which he wants to report, and he would not be constitutionally entitled to ask questions even if he were physically present within the press conference room.

### C. The balance of equities and public interest favors denial of Plaintiffs' motion.

The harm to the opposing party and consideration of the public interest elements merge when the government is the opposing party. *Dunleavy*., 514 F. Supp. 3d at 1128–29. Here, there is a strong public interest in ensuring that individuals who have a record of providing accurate information to the public have access to the limited space in the building and press conferences to gather the news and report to the public.

However, the County would be overly burdened if it granted access to everyone with a social media presence and a propensity to write opinion pieces that are not fact checked by writers who fail to avoid conflicts of interest. The Gateway Pundit has been identified as the reason for threats made against election officials. *See* Exhibit 16 (12/2/2021 Reuters article regarding two Georgia workers suing The Gateway Pundit for their articles leading to workers being harassed and threatened);[12] Exhibit 17 (12/3/2021 Reuters article citing The Gateway Pundit as being responsible for 25 election workers being targeted);[13] Exhibit

---

[12]  See article linked here: https://www.reuters.com/business/media-telecom/two-georgia-election-workers-sue-far-right-website-over-false-fraud-allegations-2021-12-02/

[13]  See article linked here:  https://www.reuters.com/investigates/special-report/usa-election-threats-gatewaypundit/

ER0152

18 (11/6/2022 Reuters article regarding harassment and threats made to Maricopa County employees, including how The Gateway Pundit published the name and photos of a staff technician against whom readers then made threats);[14] Exhibit 19 (11/7/2022 Vice news article regarding how many threats made against Arizona election workers were fueled by coverage from far right blogs and pundits, including The Gateway Pundit).[15] In addition, Plaintiff Conradson posted an article and video about harassing State Senator Michelle Ugenti-Rita until he was ordered to leave the building. *See* attached Exhibit 20.[16]

During the days following the General Election, when County officials and members of the public assist with the process of finalizing the election results, it is especially important that the process not be disrupted by individuals with an agenda antithetical to ethical reporting. And, given Plaintiff Conradson's behavior following the denial of a Press Pass and his previous disruptive behavior at campaign-related events, it is not unreasonable to believe he would be similarly disruptive at County press conferences designed to provide accurate information about election processes. This, coupled with concerns about Plaintiff Conradson's journalistic impartiality—as evidenced by his attendance as a participant (not a reporter) at political and campaign events—more than justifies the County' decision to deny him press credentials. Both the public interest in obtaining true reporting on the election process, and the government's interest in security and optimizing it limited manpower and resources balances if favor of the Defendants.

### D.  Plaintiffs' Equal Protection argument has no merit.

Finally, Plaintiffs' motion alleges a violation of the Fourteenth Amendment Equal Protection Clause. However, the analysis is essentially the same as the First Amendment analysis. Because the forum in question is nonpublic, the County needs only to articulate a

---

[14]  See article linked here:  https://www.reuters.com/world/us/kill-them-arizona-election-workers-face-midterm-threats-2022-11-06/

[15]  See article linked here: https://www.vice.com/en/article/z348da/arizona-election-workers-threats-midterms

[16]  See article and video (at the end) here: https://www.thegatewaypundit.com/2021/07/state-senator-michelle-ugenti-rita-tgp-reporter-removed-trump-rally-arrested-booed-off-stage-video/

ER0153

rational basis for the Press Pass policy.  In *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983), a school board of education granted exclusive access of the interschool mail system and teacher mailboxes to the exclusive bargaining representative for the school district and denied that same access to any rival union. Plaintiff sued the school district under both the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. The Supreme Court first held that the First Amendment was not violated by the preferential access because the public property at issue was not a forum for public communication, the regulation of speech was reasonable and not an effort to suppress expression that the school officials opposed, and because the differential access was consistent with the school board's legitimate interest in preserving the property for the use to which it was lawfully dedicated. *Id.* at 37–38. Regarding appellant's Equal Protection argument, the Court stated,

> The differential access provided the rival unions does not constitute impermissible content discrimination in violation of the Equal Protection Clause. Since the grant of exclusive access to PEA does not burden a fundamental right of PLEA, the School District's policy need only rationally further a legitimate state purpose. That purpose is clearly found in the special responsibilities of an exclusive bargaining representative.

*Id.* at 38; *see also OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) (noting that a party's Equal Protection claims rise and fall with their First Amendment claims when they do not allege membership in a protected class or contend that the government's conduct burdened any fundamental right, and that "[o]nly when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged." (citing *Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1200 (9th Cir. 1987)).

In summary, Plaintiffs are not likely to prevail on their Equal Protection claim for the same reasons they are not likely to prevail on their First Amendment claims.

## IV.  CONCLUSION

As was stated in the introduction, this case is not about a government entity imposing a restraint on Plaintiffs' freedom to report on the 2022 election. Nor is it about limiting

14

ER0154

Plaintiffs' access to view and report on press conferences held as part of the County's efforts to provide timely and accurate information to the public. Instead, it involves the County's considered judgment about the best way to allocate its limited resources to make accurate information available to voters in Maricopa County and throughout Arizona. Based on the articulated Press Pass criteria, Plaintiff Conradson was properly denied a press pass. Plaintiffs' motion for a Temporary Restraining Order should be denied.

**RESPECTFULLY SUBMITTED** this 16th day of November 2022.

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

BY: */s/ Charles E. Trullinger*
    THOMAS P. LIDDY
    CHARLES E. TRULLINGER
    JOSEPH J. BRANCO
    JOSEPH E. LA RUE
    *Attorneys for Maricopa County Board of*
    *Supervisors, Recorder Stephen Richer, Rey*
    *Valenzuela, Scott Jarrett, Megan*
    *Gilbertson, and Marcus Milam*

ER0155

1

## CERTIFICATE OF SERVICE

2
3

I hereby certify that on November 16, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4
5
6
7

Honorable John J. Tuchi
Judge of the United States District Court
Sandra Day O'Connor U. S. Courthouse Suite 525
401 West Washington Street SPC 83
Phoenix Arizona 85003 2161

8
9

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
ecf@randazza.com

10
11
12

David S. Gingras
GINGRAS LAW OFFICE, PLLC
David@GingrasLaw.com

13
14
15
16

John C. Burns
BURNS LAW FIRM
TBLF@pm.me
*Attorneys for Plaintiffs*
*TGP Communications, LLC and Jordan Conradson*

17

18

*/s/ D. Shinabarger*

19

S:\CIVIL\CIV\Matters\GN\2022\TGP Communications v. Sellers 2022-3214\Pleadings\Word\Response to Motion for TRO Final.docx

20
21
22
23
24
25
26
27
28

ER0156

Exhibit 1

Search

# MARICOPA COUNTY 2022 ELECTIONS PRESS PASS



Maricopa County will require an official Press Pass for members of the press to enter its facilities and/or cover events related to the 2022 General Election. Because of logistical and security considerations, it is impossible to give the public and media limitless access to Members of the Board of Supervisors, the County Recorder and election experts for events such as press conferences and availabilities.

Select Language ⌄

# Official Press Pass Criteria

Search

The official press pass will allow a member of the press to attend news conferences or enter the Elections Department's office to conduct interviews, take photos, and/or video.

(see disclaimer below)

"Member of the press" will be evaluated by Maricopa County on the following criteria:

 Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?

 Does the parent news organization meet the following criteria?
**a.** It has published news continuously for at least 18 months, and;
**b.** It has a periodical publication component or an established television or radio presence.

 Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?

**4** Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?

**5** Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?
**a.** Both avoid real or perceived conflicts of interest;
**b.** Both are free of associations that would compromise journalistic integrity or damage credibility;
**c**. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and
**d.** Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

This list is not exhaustive. The time, manner, and place limitations or needs of any one event may require consideration of additional factors.

Members of the news media must submit this form for review.

Each staff member must apply. Maricopa County will not issue a generic pass to a news organization to be used by any staff member.

Please allow at least three days before an event for pass approval.  Passes must be picked up in person at the Maricopa County Tabulation and Elections Center,  510 S. 3rd Ave. Phoenix AZ 85003. Be prepared to show a valid driver license, state ID, or passport to receive credentials.

Select Language

**ER0159**

Search

Select Language

Exhibit 2

**MEMORANDUM**

RE: Press Access
Date: 6/26/2019
From: Office of Legal Counsel
To: Office of the Governor and Office of the Lt. Governor, Communications

---

Because of logistical and security considerations, it is impossible to give the public and media limitless access to the Governor and Lt. Governor for events like press conferences and press avails. This memo is designed to provide guidance for determining how and when media is granted access to the Governor for exclusive/limited-access events.

The most important consideration is that access is based on neutral criteria. When an individual or organization petitions for media access, you should consider the following factors:[1]

1. Is the petitioner employed by or affiliated with an organization whose principal business is news dissemination?
2. Does the parent news organization meet the following criteria?
   a. It has published news continuously for at least 18 months, and;
   b. It has a periodical publication component or an established television or radio presence.
3. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with a Wisconsin high school, university, or college?
4. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?
   a. Both avoid real or perceived conflicts of interest;
   b. Both are free of associations that would compromise journalistic integrity or damage credibility;
   c. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and
   d. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.
5. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation or organization?

---

[1] This guidance is based on established standards used by the Wisconsin Capitol Correspondents Board (http://presscredentials.legis.wisconsin.gov/) and the US Congress (https://www.dailypress.senate.gov/?page_id=70). This office will not do formal credentialing.

This list is not exhaustive. The time, manner, and place limitations or needs of any one event may require consideration of additional factors, and you are encouraged to seek legal advice at any point for guidance.

If you create any set media distribution lists, please consult with the Office of Legal Counsel prior to its use.

Exhibit 3

# BREAKING: Maricopa County Creates "Ministry Of Truth" To Silence The Gateway Pundit – Now Requiring Official Press Pass For Media "To ENTER ITS FACILITIES And/Or Cover Events Related To The 2022 General Election"

By Jordan Conradson
Published September 27, 2022 at 9:32pm
1087 Comments





**Maricopa County is already covering its tracks ahead of the 2022 General Election with what some are calling a "Ministry of Truth" to prevent real media and honest questions.**

"Maricopa County will require an official Press Pass for members of the press to enter its facilities and/or cover events related to the 2022 General Election," **stated** a new order from the County.

ER0165

x

In order to register for a press credential, reporters must provide the following information, agree and sign their name attesting to the following:

> By signing this application for a Maricopa County Press Pass, I certify that I am a journalist without a conflict of interest or association that would compromise my journalistic integrity.
>
> Further, I do not receive compensation or special treatment from advertisers or political organizations that would influence my coverage related to Maricopa County or its elections.
>
> I am not a lobbyist, advertiser, paid advocate or influencer for any individual, political party, corporation, or organization.

Therefore, no left-wing media outlet should be allowed to cover the election. However, that is probably not the case.

This is part of an announcement of the newly formed "Elections Command Center to Share Info with Voters, Combat Disinformation."



x

The Gateway Pundit previously reported on these same tactics employed by the Biden Regime. After announcing the Biden Regime's failed "**disinformation governance board**," the White House later announced a new program called "the White House Task Force to Address Online Harassment and Abuse." This was created to "address" (silence) what the government deems to be "online harassment, abuse, and disinformation campaigns."

> **'Ministry of Truth' 2.0: Kamala Harris to Lead New Task Force Targeting "Online Harassment, Abuse, and Disinformation Campaigns"**

**Maricopa County** shared the following message on Twitter announcing the newly formed "Command Center."



**Maricopa County** ✓
@maricopacounty · **Follow**

NEW: Board, Recorder, and @maricopavote establish th
2022 Elections Command Center as a central hub of inf
leading up to & following the Nov. 8 General Election.
Plan to host regular news conferences in October and
November for credentialed media.
More: content.govdelivery.com/accounts/AZMAR...

11:38 AM · Sep 27, 2022

GP

ER0167


♥ 19      💬 Reply      ⬆ Share                                    ✕

**Read 42 replies**

The official **announcement** states,

## Maricopa County Forms Elections Command Center to Share Info with Voters, Combat Disinformation

Six elected officials and a team of elections and communications professionals are coming together as one ahead of the 2022 November General Election in Maricopa County.  Today, Board of Supervisors Chairman Bill Gates and Recorder Stephen Richer established the "2022 Elections Command Center" which will serve as a central hub of information for the weeks leading up to and following the Nov. 8 General Election.

"At the beginning of the year, I promised we would run the most transparent elections this county has seen, and I'm proud of what the Board of Supervisors, the Recorder's Office, and our elections team have done to date," said Chairman Bill Gates, District 3.  "The Command Center will further deliver on that promise by creating a structure that allows us to reach more people, faster, with factual information about how elections are run and how people can successfully participate."

"We ran a terrific Primary Election, but because of our 'continuous improvement' work ethic, we will have an incredible communications team assembled that will allow us to better respond to constituent concerns and combat misinformation during the General Election," said Maricopa County Recorder Stephen Richer.  "I look forward to partnering with the Board of Supervisors to make this a great election for Maricopa County voters."



x

The Elections Command Center will bring together communicators and subject matter experts from the Elections Department, Recorder's Office, County Manager's Office, and other county agencies for the following purposes:

- Clear, consistent communication about voting deadlines and election processes to Maricopa County's more than 2.4 million eligible voters which enables them to cast their ballot in the way they choose.
- Outreach and response to local, national, and international media covering Arizona elections
- Quick and accurate response to mis-, dis-, and mal-information related to the administration of elections in Maricopa County
- Updates on tabulation and reporting of results following Election Day

**Starting today, all media requests related to the November General Election in Maricopa County should be directed to the Elections Command Center using the following email address:** **media@risc.maricopa.gov**. This applies to requests for interviews as well. The Elections Command Center will host regular news conferences in October and November for credentialed media.  Reporters interested in getting credentialed can **apply here**.  News conferences will also be streamed live via social media for members of the public.

For reliable information about Maricopa County election administration, visit **elections.maricopa.gov** and follow Maricopa County, Maricopa County Elections Department, and Maricopa County Recorder's Office on **social media**.

Arizona GOP Chairwoman Dr. Kelli Ward told The Gateway Pundit,



x

**Ward: Suppression of the free press by a government entity is a clear violation of the First Amendment. Arizona does not want or need its own "Ministry of Truth." Again, what is Maricopa County trying to hide? Especially regarding elections?**

Liberal Hack journalist Jen Fifield, the same "reporter" who got **smacked down by Save America attorney Christina Bobb** and **Vernon Jones** at the Arizona audit, hinted that this new Ministry of Truth was designed specifically to target The Gateway Pundit correspondent Jordan Conradson for "trying to listen in" on Fake News reporters' conversations and asking questions that "intimidate public officials."

This is because of the incredibly botched 2022 Primary Election in Maricopa County. The Gateway Pundit previously **reported** on the election day incompetence in Maricopa County, where Republican voters were turned away from the polls due to printer malfunctions and ballots not being available while facing other issues stemming from the County's shady felt-tipped pen recommendation.

**We also reported that 145 more Democratic activists than Republicans were hired by the RINO-controlled County to watch the polls, which is likely illegal.**

BREAKING: Maricopa County Election Day Incompetence – PRINTERS NOT WORKING, Voters Told They've ALREADY VOTED, Polling Locations Not Seen On AZSOS Webpage – UPDATES

They truly are intimidated by our real questions.



**ER0170**

x

x

Abe Hamadeh's War Room account came to our defense and declared they "proudly stand in journalistic solidarity" with The Gateway Pundit correspondent Jordan Conradson and The Western Journal's Olivia Brown.



Stephen Richer also boasted about the County's suppression of The Gateway Pundit, and grassroots activist Merissa Hamilton slammed his Orwellian tactics.

**Stephen Richer—Maricopa Cnty Recorder...** ✓ · Sep 27, 2022
@stephen_richer · **Follow**

GP

**ER0172**

x

**Watch on Twitter**

GIF

**Jen Fifield** ✔ @JenAFifield

County elections getting all fancy. Really gonna miss The Gateway Pundit rolling in and trying to listen in on legitimate reporter conversations/intimidate public officials.

**Merissa Hamilton** 🗳️ 🧾 🧧
@merissahamilton · **Follow**

How very 1984 of @maricopacounty to create a Ministry of Truth policy



**ER0173**

x



2:07 PM · Sep 27, 2022

❤ 20     💬 Reply     ⬆ Share

Kelli Ward slammed Maricopa County for discriminating against the free press on Twitter.



ER0174



♥ 47     💬 Reply     ⬆ Share                                    x

Read 4 replies

This all comes after former Maricopa County Supervisor Steve Chucri resigned because The Gateway Pundit released undercover audio tapes where he admits that he does not feel comfortable with Dominion Voting Machines and that County Recorder Stephen Richer agreed with him.

> **BREAKING – LEAKED AUDIO: Maricopa County Supervisor Steve Chucri Admits: "I DON'T FEEL COMFORTABLE WITH DOMINION" – And County Recorder Stephen Richer AGREES!**

The same leftist news organizations promulgating conspiracy theories about "Russian collusion" in the 2016 Presidential Election will be allowed in, but likely not The Gateway Pundit and other conservative truth-telling outlets.

**Contact Maricopa County now to demand free and fair press coverage during the 2022 Election.**

Submit a Correction



f Share     Twitter     Gab          Gettr          Share     ✉     ➦

**Jordan Conradson**

Recent Posts | Contact

**Kari Lake Speaks Out On BS Stolen Election: "Arizonans Know BS When They See It"**

**(VIDEO) Charlie Kirk Show Discusses Votes That Need To Be Cured - Republicans Must Cure Their Ballots And GOP Has Not Been Given The List, At Least One Dead Voter Discovered**

**BREAKING: Another Absolutely Fraudulent Ballot Drop Makes Katie Hobbs Arizona Governor -**

GP

**Demons Stole Arizona!**

**BREAKING: Maricopa County Dumps Damning Batch - Kari Lake Picks Up 56.8% But It's Likely Not Enough**

**ARIZONA VOTERS: Check Your Ballot Status Now In Case It Needs To Be CURED - Deadline Is Wednesday**

**See more...**

The Gateway Pundit is moving back to Disqus! All of your account information and comment history has been saved and will be uploaded as quickly as possible to Disqus. If you do not already have a Disqus account, you will need to create one. Please use the same email address that you used for Insticator for your comment history to be carried over. We greatly appreciate your patience and continued support!

**Gateway** Pundit

*Where Hope Finally Made a Comeback.*

© 2022 The Gateway Pundit – All Rights Reserved.

Home
About
Advertise
Privacy
Facebook

GETTR
YouTube
Terms
Contact



**ER0176**

Exhibit 4

ER0177

# WATCH: Trump-Endorsed Kari Lake Joins Tucker Carlson After Italy Elects Its FIRST Female Populist Leader: "If They're Not Attacking You, You're Probably Not Truly Representing The People Of Your Country"

**By Jordan Conradson**
**Published September 26, 2022 at 10:20pm**
**173 Comments**





**Trump-Endorsed Kari Lake joined Tucker Carlson Tonight on Monday to respond to the election of Italy's new Prime Minister, Giorgia Meloni.**

ER0178

The Gateway Pundit recently reported on his historic feat of electing their first female leader – who is also a Center Right populist.

## BREAKING: Italy Elects Its First Female and Populist Leader in History – Giorgia Meloni

**Meloni understands what is good and what is right: God, family, and country.**

Because of this, the globalist left Fake News Media tried all they could to smear her as a fascist and prevent her from being elected.

Republican Arizona Gubernatorial Nominee Kari Lake, who is in a similar position and facing the same attacks, recently spoke out in support of Meloni.

The video below tells you exactly why the globalist elitist establishment tried so hard to stop her.



ER0179



7:00 AM · Sep 26, 2022

❤️ 9K    💬 Reply    ⬆️ Share

**Read 205 replies**

On Monday, Kari Lake joined Tucker Carlson after an incredible opening, where he explained the tactics used to stop Meloni.

The Gateway Pundit previously reported on her last appearance, where Tucker said he could see why the establishment is trying to stop Kari.

> **"I Can See Why They're Trying To Silence You" – Tucker Carlson On Trump-Endorsed Kari Lake After She Gave THE BEST Response To Propagandist's 2020 Election Question**

On tonight's appearance, Lake told Tucker, "What I am scared to death of is what happens if we don't step in right at this moment and do something, afraid of the world that our children will live in."

Rep. Marjorie Taylor Greene agreed with Lake and shared the same fears in a recent tweet.

**Rep. Marjorie Taylor Greene**🇺🇸 ✓
@RepMTG · **Follow**

.@KariLake and I share the same fear.

ER0180

The fear of not stopping the evil attacks on our children's future.

To be extremely clear.

WE WILL NEVER BACK DOWN.

The American Revival is only beginning.

We have just begun.



Watch the full interview below.

**Carlson:** So you were one of the very first American politicians to weigh in on this election. You were paying attention, which I appreciated. What do

you make of this?

**Lake: I'm so excited. You know, it's funny. I looked this Italian Ms. Meloni up when I heard about her about a week ago, and I couldn't find any straight-up information on her. Everything was, 'she's a fascist, she's a racist. She's this, she's that,' and I thought, 'wow. This is somebody who I can relate to' because they're doing the same thing about me. And it makes me realize that if they're not calling you all of these slurs, if they're not attacking you, then you're probably not truly representing the people of your country.**

**Carlson:** But it's just so interesting that this is a change. **If you're elected in Arizona, it will be a change. Donald Trump was a change.** The people who are rejected by voters in this representative democracy that we have, never for one second learn anything from that rejection. Why do you think that is?

**Lake:** I don't know. I can't get into their minds. But I mean, I think of the Marjorie Taylor Greenes of the world, the Congressman Paul Gosars, the Donald Trumps of the world, what's happening in Italy, myself. The people who are truly understanding what's happening in this country, which is we're losing this country, are the ones who are being attacked. And I'm on the campaign trail; we're working six to 10 events a day. We're working really hard, and I had somebody reach out to me the other day and say, 'Kari, you are fearless. You are so fearless. you're not afraid of anything.' And I stopped him, and I said, Actually, I have great fear. **I'm not afraid of the fake news. I'm not afraid of the globalist. I'm not afraid of anything that I'm facing on the campaign trail. I'm not afraid of the cartels. What I am scared to death of is what happens if we don't step in right at this moment and do something, afraid of the world that our children will live in. That's what scares me to death.**

## Submit a Correction



 **Jordan Conradson**

| Recent Posts | Contact |
|---|---|

**Kari Lake Speaks Out On BS Stolen Election: "Arizonans Know BS When They See It"**

**(VIDEO) Charlie Kirk Show Discusses Votes That Need To Be Cured - Republicans Must Cure Their Ballots And GOP Has Not Been Given The List, At Least One Dead Voter Discovered**

**BREAKING: Another Absolutely Fraudulent Ballot Drop Makes Katie Hobbs Arizona Governor - Demons Stole Arizona!**

**BREAKING: Maricopa County Dumps Damning Batch - Kari Lake Picks Up 56.8% But It's Likely Not Enough**

**ARIZONA VOTERS: Check Your Ballot Status Now In Case It Needs To Be CURED - Deadline Is Wednesday**

See more...

The Gateway Pundit is moving back to Disqus! All of your account information and comment history has been saved and will be uploaded as quickly as possible to Disqus. If you do not already have a Disqus account, you will need to create one. Please use the same email address that you used for Insticator for your comment history to be carried over. We greatly appreciate your patience and continued support!

**Gateway** Pundit

*Where Hope Finally Made a Comeback.*

© 2022 The Gateway Pundit – All Rights Reserved.

Home

About

Advertise

Privacy

Facebook

GETTR

YouTube

Terms

Contact

Exhibit 5

11/16/22, 1:36 PM    "It's F*cked Up. We Really Don't Have Real, True Freedom of Speech!" – YouTube Star and Pro Boxer Jake Paul Responds to G…

Case 2:22-cv-01925-JLT Document 17-1 Filed 11/16/22 Page 32 of 52

# "It's F*cked Up. We Really Don't Have Real, True Freedom of Speech!" – YouTube Star and Pro Boxer Jake Paul Responds to Gateway Pundit Reporter's Question at Pre-Fight Conference, Calls Out Zuckerberg (VIDEO)

By Jordan Conradson
Published September 13, 2022 at 9:50pm
1200 Comments





Via Jake Paul on Twitter

**ER0186**

**YouTube sensation turned pro boxer Jake Paul took a direct swipe at Mark Zuckerberg and big tech oligarchs on Tuesday for their censorship of the American people.**

Jake Paul recently came under fire by those who wish to silence views they disagree with. He came out against the censorship of social media influencer Andrew Tate, **saying**, "I don't roll with Andrew Tate… But, I roll with free speech."

Andrew Tate was recently banned from all social media platforms because of his views. Tate **says** that he was even banned from banks, Skype, Airbnb, and Uber in a "coordinated effort all at once." No matter how much you disagree with someone's speech, censorship is un-American.

The Regime is censoring everybody these days, including The Gateway Pundit. We recently **reported** that Jim Hoft of The Gateway Pundit is a key plaintiff in a **lawsuit** filed by the State of Missouri. The lawsuit alleges that the public statements, emails, and recently released documents, establish that the President of the United States and other senior officials in the Biden Administration violated the First Amendment by directing social-media companies to censor viewpoints that conflict with the government's messaging on Covid-19 and election integrity, which is a **direct assault** on the First Amendment.

The censorship of The Gateway Pundit is intended to harm dissidents of the Biden Regime and silence the truth about these issues.

As The Gateway Pundit reported, Jake Paul has been vocal in the past about the Biden Regime's failed policies that have led to "highest gas prices, worst inflation, plummeting crypto prices, highest rent prices ever, and creating new and incomprehensible language."

GP

ER0187

11/16/22, 1:36 PM   "F*cked up…" We Really Don't Have Real, True Freedom of Speech" – YouTube Star and Pro Boxer Jake Paul Responds to G…

Case 2:22-cv-01925-DJH   Document 17-1   Filed 11/16/22   Page 34 of 52

**YouTube Stars Are Beginning To Turn On Biden, Showing A Younger Generation Is Fed Up With His Poor Leadership**                                  X

If you're reading this and voted for Biden and you still don't regret it then you are the American problem," Jake concluded on Twitter.

Jake Paul squared off with Anderson Silva in front of the media on Tuesday in preparation for their upcoming boxing match.

The undefeated YouTube sensation is set to take on the former UFC champion from Brazil on October 29th at the Gila River Arena in Glendale, Arizona.

During the conference, The Gateway Pundit correspondent **Jordan Conradson** asked Paul, "what do you think of attempts to censor Americans by big tech companies and the current occupant of the White House?"

Everybody was caught off guard by the question, but Jake gave an excellent answer. He also used the opportunity to take a swipe at Zuckerberg and the Fake News Media for censoring information.

The crowd cheered when he agreed with our right to free speech. One attendee even shouted "f*ck Joe Biden!"

**Paul: I think it's a good question. I think the state of our society is in a really interesting place and a bad place at that. Simply put, man, I don't think there should be censorship; freedom of speech. And the fact that these privately held companies can just take someone right off of their platform is f*cked up, and in fact, the scary part about it is even speaking up against them – like I am currently doing – could get me censored. So we really don't have real, true freedom of speech**

**GP**

**ER0188**

anymore, which is scary. And personally, you just see Mark Zuckerberg admit to it live on Joe Rogan, and the news wasn't really talked about. So, all of these media platforms have controlled narratives by people who are paying them in their pockets.

X

The Gateway Pundit reported that Mark Zuckerberg admitted to Joe Rogan that Facebook algorithmically censored the Hunter Biden laptop story for seven days on a request from the FBI to protect the Bidens.

This is not the only critical content that Facebook has censored to control the narrative.

**Mark Zuckerberg Tells Joe Rogan Facebook Censored Hunter Biden Laptop Story For 7 Days on Request From FBI (VIDEO)**

**Watch below:**

OANN's Daniel Baldwin shared the clip on his Twitter account. Watch below:

GP

11/16/22, 1:36 PM                "F\*cked up": We Really Don't Have real, true Freedom of Speech" | YouTube Star and Pro Boxer Jake Paul Responds to G…

Case 2:22-cv-01925-LK   Document 17-1   Filed 11/16/22   Page 36 of 52

X



**Daniel Baldwin**
@baldwin_daniel_ · **Follow**

"We really don't have real, true freedom of speech anymore."

The great @jakepaul rips Big Tech for censoring private speech online during the #PaulSilva press conference. #JakePaul brings up Mark Zuckerberg on #JoeRogan as proof.

Great question from @ConradsonJordan

Watch on Twitter

2:04 PM · Sep 13, 2022 from Arlington, VA

**Read the full conversation on Twitter**

♥ 129        💬 Reply      ⬆ Share

**Read 14 replies**

**Submit a Correction**



11/16/22, 1:36 PM
Case 2:22-cv-01925-JJT Document 17-1 Filed 11/16/22 Page 37 of 52
'F*cked up! We Really Don't Have Real True Freedom of Speech' 1-YouTube Star-Pro Boxer Jake Paul Responds to G...

X

 **Jordan Conradson**

| Recent Posts | Contact |
|---|---|

**BREAKING: Grassroots Group Releases Footage of Maricopa County Ballot Mules Stuffing Ballots in a Drop Box - VIDEO**

**Maricopa County Dumps More Ballots And Will Continue Counting After Stealing from GOP Candidates - Trump-Endorsed Abe Hamadeh Closes In On Democrat Attorney General Opponent**

**Maricopa County Supervisors Meeting TOMORROW (Wednesday) - AZ Patriots Sign Up To Speak By 8 AM**

**Turncoat Mike Pence Teases Potential 2024 Run Against President Trump**

**PATRIOTS IN ARIZONA: Document Your Affidavit Of Corrupted Voting Experience HERE**

**See more...**

The Gateway Pundit is moving back to Disqus! All of your account information and comment history has been saved and will be uploaded as quickly as possible to Disqus. If you do not already have a Disqus account, you will need to create one. Please use the same email address that you used for Insticator for your comment history to be carried over. We greatly appreciate your patience and continued support!

**ER0191**

11/16/22, 1:36 PM
Case 2:22-cv-01925-JT Document 17-1 Filed 11/16/22 Page 38 of 52
"Fcked up, We Really Don't Have Real True Freedom of Speech" - YouTube Star Pro Boxer Jake Paul Responds to G...

X

**Gateway** Pundit

*Where Hope Finally Made a Comeback.*

© 2022 The Gateway Pundit – All Rights Reserved.

Home

About

Advertise

Privacy

Facebook

GETTR

YouTube

Terms

Contact

GP

Exhibit 6

# Maricopa County Appointed OVER 100 More Democratic Poll Workers Than Republicans In Extremely Flawed Primary Election – ELEVEN Locations Had No Republicans At All

By Jordan Conradson
Published September 14, 2022 at 4:20pm
376 Comments





**Maricopa County officials are accused of violating the law that requires them to have an equal number of poll workers from each party in the highly flawed 2022 Primary Elections.**

ER0194

11/15/22, 5:12 PM    Maricopa County Appointed OVER 100 More Democratic Poll Workers Than Republicans Extremely Flawed Primary Election …

Case 2:22-cv-01925-DJH    Document 1    Filed 11/16/22    Page 41 of 52

The Gateway Pundit previously **reported** on the election day incompetence in Maricopa County, where Republican voters were turned away from the polls due to printer malfunctions, ballots not being available, and faced issues stemming from the County's felt-tipped pen recommendation.

We also **reported** that Maricopa County stopped the counting in the middle of the night on election night, just after Trump-Endorsed Kari Lake took the lead. **It took the County over a week to finish the tabulation process.**

Similar election day discrepancies were **reported** in Arizona's three largest counties. Multiple polling locations in **Pinal County** even ran out of Republican ballots, and voters were prevented from voting.

Two days after Election Day, The Maricopa County Republican Committee formally censured Maricopa County Recorder Stephen Richer, citing his election maladministration, which "resulted in significant failures (including reports of printers and scanners not working and the Pentel felt-tip pen smearing and not drying), unnecessary delays, and irregularities; all of which significantly tarnishing the reputation of Maricopa County on the national stage."

> **BREAKING EXCLUSIVE: Ultra-MAGA Patriots FIGHT BACK! Maricopa County Republican Committee Passes Resolution To Formally Censure County Recorder Stephen Richer**

And now, a letter from RNC attorney Eric Spencer may explain these issues.

**145 more Democratic activists than Republicans were hired by the RINO-controlled County to watch the polls. Eleven polling locations**



**ER0195**

11/15/22, 5:12 PM    Maricopa County Appointed OVER 100 Democratic Poll Workers than Republicans in Extremely Flawed Primary Election …

Case 2:22-cv-01825-JJT   Document 17-1   Filed 11/16/22   Page 42 of 52

were not assigned any Republicans.    X

Additionally, the receiving and inspection boards, responsible for receiving and inspecting ballots and ballot chain of custody, were filled with just ten Republican employees compared to 58 Democrats.

Breitbart **reported**,

> **Arizona law requires election officials to hire "an equal number" of Republican and Democrat election inspectors at all voting locations.**
>
> However, Maricopa county, which was the focus of several lawsuits and a contested recount stemming from the 2020 presidential election, hired over 100 more Democrat poll workers than Republicans during its August primary elections.
>
> **While Maricopa county hired 857 Democrat poll workers, the county only had 712 Republicans.**
>
> In a letter sent to Maricopa County Attorney's office, Eric H. Spencer, who works for a firm that represents the RNC with respect to oversight of Arizona election administration, demanded answers about the disparity in poll workers.
>
> Although Maricopa County Republican Committee chairwoman Mickie Niland provided the county with a list of "several hundred" Republican poll worker names ahead of the primary election, the letter revealed that **11 vote centers ended up with no GOP election inspectors at all.**
>
> Spencer also highlighted a "significant disparity between political parties in the central processing boards utilized at the Maricopa County Tabulation and Election Center (MCTEC) during the primary."

GP

**ER0196**

**Only ten Republican poll workers ended up in the "receiving/inspection boards," compared to 58 Democrats. This disparity would violate the state's election procedures manual, which requires each central board to be "comprised of two members of different political parties."**

x

The RNC is requesting a written explanation as to why an equal number of Republican poll workers were not appointed for the primary and why the county did not utilize the list of names chairwoman Niland provided.

Further, the RNC requested any written documentation "that demonstrates the County's efforts to hire Republican poll workers at the 11 voting locations in question."

The letter also revealed that Maricopa county required some poll workers to make multi-day or multi-week commitments and work long or late hours.

"Rigorous working conditions are not uncommon during an election, but the County has artificially limited its pool of board workers (especially Republican board workers) by refusing to allow more manageable shifts," Spencer wrote.

The RNC is also requesting an answer as to why the county could not provide greater flexibility for work hours "in light of the substantial Republican volunteer workforce ready and willing to serve."

The letter to Maricopa county comes after the RNC **pressed** Kalamazoo, Michigan, for hiring 132 Democrats compared to 60 Republicans, and Flint, Michigan, for hiring just 27 Republicans compared to 442 Democrats.

GP

ER0197

x

> The RNC demanded a response from Maricopa County officials no later than September 16.

Spencer wrote:

> It is critical that the County provide this information as soon as possible, and no later than September 16, in order to assure the RNC and countless stakeholders that the requisite number of Republican workers will be recruited, trained, and assigned to all locations and positions for the forthcoming general election.

**Nobody is above the law, and Maricopa County must be held accountable before the General Elections.**

## Submit a Correction



 **Jordan Conradson**

Recent Posts | Contact

**Turncoat Mike Pence Teases Potential 2024 Run Against President Trump**

**PATRIOTS IN ARIZONA: Document Your Affidavit Of Corrupted Voting Experience HERE**

**Kari Lake Speaks Out On BS Stolen Election: "Arizonans Know BS When They See It"**

**(VIDEO) Charlie Kirk Show Discusses Votes That Need To Be Cured - Republicans Must Cure Their Ballots And GOP Has Not Been Given The List, At Least One Dead Voter Discovered**

**BREAKING: Another Absolutely Fraudulent Ballot Drop Makes Katie Hobbs Arizona Governor -**

GP

ER0198

11/15/22, 5:12 PM    Maricopa County Appointed 100+ Democratic Poll Workers than 1 Republican Single-Handedly Flawed Primary Election …

Case 2:22-cv-01925-JJT Document 17-1 Filed 11/16/22 Page 45 of 52

Demons Stole Arizona!

See more...

X

The Gateway Pundit is moving back to Disqus! All of your account information and comment history has been saved and will be uploaded as quickly as possible to Disqus. If you do not already have a Disqus account, you will need to create one. Please use the same email address that you used for Insticator for your comment history to be carried over. We greatly appreciate your patience and continued support!

Gateway Pundit

*Where Hope Finally Made a Comeback.*

© 2022 The Gateway Pundit – All Rights Reserved.

Home
About
Advertise
Privacy
Facebook

GETTR
YouTube
Terms
Contact

GP

ER0199

Exhibit 7

ER0200

← Tweet

# Explore

⚙ Settings



Wendy Rogers ✓
@WendyRogersAZ

Here are some photos from the #AZAudit volunteer
reunion last night. Wonderful time. For those saying
the audit is "fake" and "not real" and "nothing is going
to happen" - take a look at these audit volunteers.
Patriots, everyone of them - real people who did the
Lord's work.



5:58 AM · Sep 16, 2021 · Twitter Web App

834 Retweets   145 Quote Tweets   3,428 Likes

🔍 Search Twitter

## New to Twitter?

Sign up now to get your own personalized timeline!

🔵 Sign up with Google

 Sign up with Apple

Sign up with phone or email

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

## Relevant people



Wendy Rogers ✓          Follow
@WendyRogersAZ

Arizona Senator. Conservative
America First. Pro-Trump Republican in
#LD7. Air Force pilot, biz
entrepreneur, homeschool mom.
#MAGA #AmericaFirst 🇺🇸

## What's happening

NCAA Men's Basketball · Last night
Bulldogs at Red Raiders

Trending in United States

ER0201

Exhibit 8



Twitter

Explore

Settings

**Tweet**

**Wendy Rogers** ✔
@WendyRogersAZ

Here are some photos from the #AZAudit volunteer reunion last night. Wonderful time. For those saying the audit is "fake" and "not real" and "nothing is going to happen" - take a look at these audit volunteers. Patriots, everyone of them - real people who did the Lord's work.

5:58 AM · Sep 16, 2021 · Twitter Web App

834 Retweets   145 Quote Tweets   3,428 Likes

**Mastermattie** @mastermattie · Sep 16, 2021
Replying to @WendyRogersAZ
Show the results please, people are getting impatient.
💬 13    ⟲ 3    ♡ 33

**DeeReedBrklyn**🐾 @DeeReedBrklyn · Sep 16, 2021
Replying to @mastermattie and @WendyRogersAZ
There are no results, or you would have seen them already.
💬 1    ⟲    ♡ 55

**The Ryan Express** @MENO5076 · Sep 16, 2021
Replying to @WendyRogersAZ
Enough of the cheerleading already....American's just want the results of the audit good or bad.
💬 8    ⟲    ♡ 32

**Jmf** @JamesFales2 · Sep 16, 2021
Replying to @MENO5076 and @WendyRogersAZ
Sane Americans know the results.
💬    ⟲    ♡ 11

**Proudly Smiling in AZ** @Sarah73770415 · Sep 16, 2021
Replying to @WendyRogersAZ

🔍 Search Twitter

**New to Twitter?**
Sign up now to get your own pers

G   Sign up with G

🍎   Sign up with /

Sign up with phone

By signing up, you agree to the Te
Privacy Policy, including Cookie U

**Relevant people**

**Wendy Rogers** ✔
@WendyRogersAZ
Arizona Senator. Co
First Pro-Trump Rep
Air Force pilot, biz e
homeschool mom.
#AmericaFirst 🇺🇸

**What's happening**

NCAA Men's Basketball · Last nig
**Blue Devils at Red Storm**

Trending in United States
**#TSxCapitalOne**
5,910 Tweets

Politics · Trending
**Zelensky**
187K Tweets

US elections · LIVE
**Arizona: Election news and updates**

NCAA Men's Basketball · Last nig
**Beacons at Beavers**

Show more

Terms of Service   Privacy Policy
Accessibility   Ads info   More ···
© 2022 Twitter, Inc.

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   S

**ER0203**

Explore

Settings

Search Twitter

⬜ 2          ⟲ 5          ♡ 34          ⬆

This Tweet is from a suspended account. Learn more

**Martin Gardner** @mglovesfun · Sep 16, 2021          ···
Replying to @Sam07556462 and @WendyRogersAZ
No-one, of course.

⬜          ⟲          ♡ 2          ⬆

**EnoughAlready** @DaustiniTheGr8t · Sep 16, 2021          ···
Replying to @WendyRogersAZ
This is a great idea.  Why wait until there are even results?  That's just silly. I think high school juniors should throw a reunion right now. Why wait 10 years?  No need to actually finish anything or wait that long.

⬜ 1          ⟲          ♡ 73          ⬆

**Don't miss what's happening**
People on Twitter are the first to know.

Log in          S

**ER0204**

Exhibit 9



Exhibit 10

ER0207



ER0208

Exhibit 11

ER0209



Exhibit 12

*Society of Professional Journalists*

# C**SPJ**ODE *of* ETHICS

## PREAMBLE

Members of the Society of Professional Journalists believe that public enlightenment is the forerunner of justice and the foundation of democracy. Ethical journalism strives to ensure the free exchange of information that is accurate, fair and thorough. An ethical journalist acts with integrity.

The Society declares these four principles as the foundation of ethical journalism and encourages their use in its practice by all people in all media.

## SEEK TRUTH AND REPORT IT

Ethical journalism should be accurate and fair. Journalists should be honest and courageous in gathering, reporting and interpreting information.

Journalists should:

▸ Take responsibility for the accuracy of their work. Verify information before releasing it. Use original sources whenever possible.

▸ Remember that neither speed nor format excuses inaccuracy.

▸ Provide context. Take special care not to misrepresent or oversimplify in promoting, previewing or summarizing a story.

▸ Gather, update and correct information throughout the life of a news story.

▸ Be cautious when making promises, but keep the promises they make.

▸ Identify sources clearly. The public is entitled to as much information as possible to judge the reliability and motivations of sources.

▸ Consider sources' motives before promising anonymity. Reserve anonymity for sources who may face danger, retribution or other harm, and have information that cannot be obtained elsewhere. Explain why anonymity was granted.

▸ Diligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing.

▸ Avoid undercover or other surreptitious methods of gathering information unless traditional, open methods will not yield information vital to the public.

▸ Be vigilant and courageous about holding those with power accountable. Give voice to the voiceless.

▸ Support the open and civil exchange of views, even views they find repugnant.

▸ Recognize a special obligation to serve as watchdogs over public affairs and government. Seek to ensure that the public's business is conducted in the open, and that public records are open to all.

▸ Provide access to source material when it is relevant and appropriate.

▸ Boldly tell the story of the diversity and magnitude of the human experience. Seek sources whose voices we seldom hear.

▸ Avoid stereotyping. Journalists should examine the ways their values and experiences may shape their reporting.

▸ Label advocacy and commentary.

▸ Never deliberately distort facts or context, including visual information. Clearly label illustrations and re-enactments.

▸ Never plagiarize. Always attribute.

## MINIMIZE HARM

Ethical journalism treats sources, subjects, colleagues and members of the public as human beings deserving of respect.

Journalists should:

▸ Balance the public's need for information against potential harm or discomfort. Pursuit of the news is not a license for arrogance or undue intrusiveness.

▸ Show compassion for those who may be affected by news coverage. Use heightened sensitivity when dealing with juveniles, victims of sex crimes, and sources or subjects who are inexperienced or unable to give consent. Consider cultural differences in approach and treatment.

▸ Recognize that legal access to information differs from an ethical justification to publish or broadcast.

▸ Realize that private people have a greater right to control information about themselves than public figures and others who seek power, influence or attention. Weigh the consequences of publishing or broadcasting personal information.

▸ Avoid pandering to lurid curiosity, even if others do.

▸ Balance a suspect's right to a fair trial with the public's right to know. Consider the implications of identifying criminal suspects before they face legal charges.

▸ Consider the long-term implications of the extended reach and permanence of publication. Provide updated and more complete information as appropriate.

## ACT INDEPENDENTLY

The highest and primary obligation of ethical journalism is to serve the public.

Journalists should:

▸ Avoid conflicts of interest, real or perceived. Disclose unavoidable conflicts.

▸ Refuse gifts, favors, fees, free travel and special treatment, and avoid political and other outside activities that may compromise integrity or impartiality, or may damage credibility.

▸ Be wary of sources offering information for favors or money; do not pay for access to news. Identify content provided by outside sources, whether paid or not.

▸ Deny favored treatment to advertisers, donors or any other special interests, and resist internal and external pressure to influence coverage.

▸ Distinguish news from advertising and shun hybrids that blur the lines between the two. Prominently label sponsored content.

## BE ACCOUNTABLE AND TRANSPARENT

Ethical journalism means taking responsibility for one's work and explaining one's decisions to the public.

Journalists should:

▸ Explain ethical choices and processes to audiences. Encourage a civil dialogue with the public about journalistic practices, coverage and news content.

▸ Respond quickly to questions about accuracy, clarity and fairness.

▸ Acknowledge mistakes and correct them promptly and prominently. Explain corrections and clarifications carefully and clearly.

▸ Expose unethical conduct in journalism, including within their organizations.

▸ Abide by the same high standards they expect of others.

The SPJ Code of Ethics is a statement of abiding principles supported by additional explanations and position papers (at spj.org) that address changing journalistic practices. It is not a set of rules, rather a guide that encourages all who engage in journalism to take responsibility for the information they provide, regardless of medium. The code should be read as a whole; individual principles should not be taken out of context. It is not, nor can it be under the First Amendment, legally enforceable.

ER0212

Exhibit 13

ER0213

| | |
|---|---|
| **From:** | CAO Media - CAOX |
| **Sent:** | Friday, September 30, 2022 3:55 PM |
| **To:** | Jordanc@thegatewaypundit.com |
| **Subject:** | Media Credential |

Dear Mr. Conradson,

Thank you for applying for a Maricopa County Press Pass. This email is to notify you that you have been denied a press credential based on the following criteria which is listed on Maricopa.gov:

- #4: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.

If you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered.

Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it.

Thank you,

Elections Command Center

Exhibit 14

ER0215



Twitter

Home
Explore
Notifications
Messages
Bookmarks
Lists
Profile
More

**Tweet**

← Tweet

 Ben Bergquam - Real America's Voice (RAV-TV) News
@BenBergquam   ···

Here's the video! Maricopa County elections official uses sheriff deputies to deny our 1st Amendment right and threatens to arrest arrest me and @ConradsonJordan of the Gateway Pundit. Simple question, what are they trying to hide? Is it incompetence or corruption?
@RealAmVoice



208.6K views    0:43 / 6:51

7:25 PM · Nov 10, 2022 · Twitter for iPhone

3,105 Retweets   336 Quote Tweets   5,845 Likes

Search Twitter

**Relevant people**

 Ben Bergquam - Real ...   Follow
@BenBergquam
Host of "Law & Border " on RAV News / Founder of Frontline America / Christian Conservative Husband & Father. MyPillow.com. TriggerALib.us promo code: FRONTLINE

 Jordan Conradson   Follow
@ConradsonJordan
📰#GatewayPundit #ElectionAudit Correspondent 🇺🇸America FIRST 📍Phoenix, AZ☀️

Real America's Voice ...   Follow
@RealAmVoice
Delivering news programs and live-event coverage that captures the authentic voice and passion of real people all across America. Just Real News & Honest Views!

**What's happening**

US elections · LIVE
**Arizona: Election news and updates**

#DisneyStrangeWorld 🎬
In theaters 11/23, get tickets NOW!
Promoted by Disney's Strange World

Exhibit 15

ER0217

 **Gmail**

Jonathon Burns <john@burns-law-firm.com>

---

## Fwd: Re: Media Credential
1 message

---

**jordanc@thegatewaypundit.com** <jordanc@thegatewaypundit.com>                                          Thu, Nov 10, 2022 at 4:51 PM
To: john@burns-law-firm.com

-------- Original Message --------
Subject: Re: Media Credential
Date: 10.11.2022 15:31
From: jordanc@thegatewaypundit.com
To: CAO Media - CAOX <CAOMedia@maricopa.gov>

On 30.09.2022 15:55, CAO Media - CAOX wrote:
Dear Mr. Conradson,

Thank you for applying for a Maricopa County Press Pass. This email
is to notify you that you have been denied a press credential based on
the following criteria which is listed on Maricopa.gov:

* #4: You (a) do not avoid real or perceived conflicts of interest
and (b) are not free of associations that would compromise
journalistic integrity or damage credibility. Therefore, you are not a
bona fide correspondent of repute in your profession.

If you would like to appeal this decision, please reply to this email
stating the reasons it should be reconsidered.

Further, any press conference about the 2022 Election will be streamed
to a Maricopa County YouTube channel and you are welcome to view it.

Thank you,

Elections Command Center


Hello,

I applied for a media credential recently and I was denied. The denial of my request was sent to
JordanC@thegatewaypundit.com. I am writing you to appeal this denial, as it violates my First Amendment rights to free
speech and free press. Your denial of press credentials to me and my organization is a text-book impermissible content-
based prior restraint of speech and in direct violation of my rights.

I will be coming in shortly to attend a press conference and receive my credentials.

Thank you,

Jordan Conradson

**ER0218**

Exhibit 16

**Media & Telecom**

3 minute read · December 2, 2021 10:53 PM MST · Last Updated a year ago

# Two Georgia election workers sue far-right website over false fraud allegations

By Peter Eisler





Dec 2 (Reuters) - Two Georgia election workers targeted by former U.S. President Donald Trump in a vote-rigging conspiracy theory have sued a far-right website that trumpeted the false story, alleging it incited months of death threats and harassment against them.

The defamation suit against The Gateway Pundit was filed Thursday by Wandrea "Shaye" Moss, a voter registration officer in the Fulton County elections office, and her mother, Ruby Freeman, who was a temp worker for the 2020 election. The women **were featured in a Reuters report published Wednesday** on their ordeal.

Advertisement · Scroll to continue

writer Joe Hoft. It alleges they repeatedly published demonstrably false claims that portrayed the women as "traitors" who conspired to "steal the presidential election in Georgia."



**Register for free to Reuters and know the full story**

**Register now**

A lawyer for Jim Hoft and The Gateway Pundit did not immediately respond to a comment request Thursday morning. Joe Hoft did not respond to a comment request.

The lawsuit, filed in St. Louis Circuit Court, alleges that the Pundit's "lies" about Freeman and Moss "devastated" their reputations and "instigated a deluge of intimidation, harassment, and threats that has forced them to change their phone numbers, delete their online accounts, and fear for their physical safety." the suit says. Freeman went into hiding.



[1/4] An employee of the Fulton County Board of Registration and Elections processes ballots in Atlanta, Georgia, U.S., November 4, 2020. REUTERS/Brandon Bell/File Photo

‹   1  2  3  4   ›

## Latest Updates

Lifestyle

**Beyonce ties Jay-Z as most nominated artists in Grammy awards history**

29 min ago

Lifestyle

**Factbox: Key nominations for the 2023 Grammy Awards**

an hour ago

View 2 more stories ⌄

The lawsuit, which seeks unspecified damages, revolves around false allegations first raised by a volunteer Trump campaign attorney at a Dec. 3 hearing of Georgia state legislators. Freeman and Moss worked in heavily Democratic Fulton County, which includes Atlanta, where a strong showing by Democrat Joe Biden helped give him a narrow Georgia victory.

Trump, a Republican, and his surrogates falsely alleged that Freeman and Moss pulled "suitcases" full of fake ballots for Biden and processed them late at night on Election Day, Nov. 3, after most poll workers and election observers left.

Advertisement · Scroll to continue

**ER0223**

State officials including Republican Secretary of State Brad Raffensperger quickly and forcefully debunked the allegations, explaining that the "suitcases" were standard ballot containers and the votes were properly counted under the watch of an independent monitor and a state investigator.

The Gateway Pundit covered the false allegations in multiple stories, including one that identified Freeman by name with the headline: "What's Up, Ruby? Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED." The Pundit identified Moss in another story.

The Pundit stories continued through the summer, even as multiple audits and reviews confirmed the accuracy of Fulton County's vote results.

"I couldn't have imagined the lies that The Gateway Pundit would tell about me, pushing people to harass me and my family and to threaten us with violence," Freeman said in a statement issued by her lawyers.



**Register for free to Reuters and know the full story**

Register now

    

Our Standards: **The Thomson Reuters Trust Principles.**

## Read Next / Editor's Picks

Lifestyle

**Beyonce leads Grammy nominees, ahead of Kendrick Lamar and Adele**

31 min ago

Lifestyle

**Factbox: Key nominations for the 2023 Grammy Awards**

an hour ago

World

**North Korea sees more use of cell phones, WiFi networks - U.S. researchers**

November 14, 2022

Technology

**Analysis: Twitter executives could face big FTC fines - former officials**

November 14, 2022

Newsletter | Sent every weekday.

## Reuters Daily Briefing

All the world, U.S. and business news you need to start your day, curated by Reuters journalists.

Sign up

ER0225

## More from Reuters



**New truckers' strike could bring Spain to a halt**
01:18



**China property rescue package lifts stocks, bonds**
01:20



**EV makers burn through cash amid sky-high costs**
01:22



**Legal Explainer: Regulators face unique hurdles in**
02:01



**Bezos to give away most of his $124 billion net worth**
00:41



**U.S. stocks fade as Fed fears simmer**
02:03



**Analyst: Amazon layoffs mark 'dark times in tech'**
01:41



**Live for the work week. Find your Fidelity today.**

Sponsored by Fidelity Investments



**7 Secrets People Who Retire Comfortably Know About Financial Advisors**

Sponsored by smartasset



**11 Credit Cards You Should Not Ignore If You Have Excellent Credit**

Sponsored by NerdWallet



## Media & Telecom

# prison stock

Finance · November 14, 2022

Scion Asset Management's Michael Burry, known for his timely bets against housing ahead of the 2008 financial crisis, added five new companies to his portfolio in the last quarter including prison operator CoreCivic , filings released on Monday showed.

---

Lifestyle

**Adele returns to Las Vegas for delayed concerts**

November 14, 2022

---

Legal

**Google to pay nearly $400 million to settle U.S. location-tracking probe**

November 14, 2022

---

World

**Mexico's president dismisses mass protest against electoral overhaul**

November 14, 2022

---

World

**Factbox: Deadly Istanbul blast echoes past attacks in Turkey**

November 14, 2022

**Your Savings Could Blossom With a High-interest Account**

Sponsored by NerdWallet



**Do You Have Enough To Retire? Use Our Free Retirement Calculator.**

Sponsored by Personal Capital



**The 4 Dumbest Things We Keep Spending Too Much Money On**

Sponsored by The Penny Hoarder

**7 Tips for First-Time Home Buyer**

Sponsored by Charles Schwab



**Credit Cards You Should Not Ignore If You Have Excellent Credit**

Sponsored by NerdWallet



**10 Lucrative Dividend Stocks With Double Digit Dividend Yields**

Sponsored by Liberty Through Wealth

Latest

Home

Media

📹 Videos 🔗
📷 Pictures 🔗
🖼 Graphics 🔗

Browse

World

Business

Legal

Markets

Breakingviews

Technology

Investigations 🔗

Lifestyle

ER0229

**About Reuters** ⧉
**Careers** ⧉
**Reuters News Agency** ⧉
**Brand Attribution Guidelines** ⧉
**Reuters Leadership** ⧉
**Reuters Fact Check** ⧉
**Reuters Diversity Report** ⧉

Stay Informed
**Download the App** ⧉
**Newsletters** ⧉

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

---

Thomson Reuters Products

**Westlaw** ⧉

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⧉

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉

The industry leader for online information for tax, accounting and finance professionals.

---

Refinitiv Products

**Refinitiv Workspace** ⧉

**Refinitiv Data** ⧉

**Refinitiv World-Check** ⧉

ER0230

highly-customised workflow experience on desktop, web and mobile.

of real-time and historical market data and insights from worldwide sources and experts.

globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ↗    **Advertising Guidelines** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ↗    **Terms of Use** ↗    **Privacy** ↗    **Digital Accessibility** ↗    **Corrections** ↗    **Site Feedback** ↗

© 2022 Reuters. All rights reserved

ER0231

**ER0233**

ER0235

Exhibit 17

ER0236

A REUTERS SPECIAL REPORT

# Pro-Trump news site targets election workers, inspiring wave of menace

ER0237

Gateway Pundit founder Jim Hoft. The Iowa native writes many of the site's articles himself, along with his twin brother and a half-dozen or so contributors.

The Gateway Pundit, which started as a tiny opinion blog, saw readership surge to nearly 50 million views a month as it amplified Donald Trump's false stolen-election claims. Reuters documented the impact: 25 election workers targeted by more than 100 violent threats or hostile messages citing the Pundit.

By PETER EISLER and JASON SZEP  |  Filed Dec. 3, 2021, noon GMT

*This story contains offensive language.*

The story had a bombshell headline: "Thousands of fake votes" had been discovered in Madison, Wisconsin, two weeks after Democrat Joe Biden narrowly beat then-President Donald Trump in the state.

The bogus report from the far-right website Gateway Pundit drew attention to a set of initials — MLW — inscribed on what it claimed were "fake" ballots. Then a reader posted a comment on the story correctly identifying MLW: Maribeth L. Witzel-Behl, the Madison city clerk, whose duties include administering elections.

Other commenters soon called for Witzel-Behl's execution. She found one post especially unnerving. It recommended a specific bullet for killing her — a 7.62 millimeter round for an AK-47 assault rifle.

Witzel-Behl was stunned by the threats and the angry calls that poured into her office. Contrary to the story's insinuation that the initials meant the ballots were fake, in reality she and her staff wrote her initials on all absentee ballots, before they were given to voters, as a matter of policy.

Witzel-Behl is among 25 election officials and workers targeted by more than 100 threatening and hostile communications that have cited the Gateway Pundit since last year's election, according to a Reuters review of the materials, which included emails, letters and phone messages, as well as comments posted on the website's stories.

The messages targeted officials and staff in four jurisdictions that featured repeatedly in false or misleading Pundit reports on voter-fraud claims: the Wisconsin cities of Madison and Milwaukee; Fulton County, Georgia; and Maricopa County, Arizona.

At least five of the officials, including Witzel-Behl, received threats they considered serious enough to report to law enforcement. Among those targeted were a municipal election director in Milwaukee and a Republican supervisor in Maricopa County.  The targets also included Ruby Freeman and Wandrea "Shaye" Moss, a mother and daughter who staffed a ballot counting operation in Fulton County; their ordeal was detailed this week by Reuters.

After Gateway Pundit ran an Aug. 14 story about them, a commenter posted below the piece: "The two women are traitors to the country and should be hung by the neck until dead."

Two additional officials, a Fulton County election commissioner and another Maricopa county supervisor, blamed the Gateway Pundit for inciting serious threats of violence they received after the site implicated the officials in baseless claims of election-rigging. Those threats did not reference the website by name.

*"The two women are traitors to the country and should be hung by the neck until dead."*

THREAT TO GEORGIA ELECTION WORKERS POSTED UNDER A GATEWAY PUNDIT STORY

**ER0238**

Most of the 25 officials received harassing messages that were less violent but often intimidating, racist or misogynistic. Many messages accused officials of treason, for instance, or called for their imprisonment.

The threats and harassment inspired by the Gateway Pundit illustrate the central role of disinformation in a campaign of fear being waged by Trump supporters against the frontline administrators of American democracy.

"The Gateway Pundit brought your betrayal of Wisconsin and America to my attention," said one threat emailed to Claire Woodall-Vogg, the Milwaukee elections director. "I hope you know there are consequences for your actions. I know a lot of information about you. I will have to think about what comes next."

The harassing communications linked to the Gateway Pundit are among more than 800 menacing messages to election officials documented by Reuters this year, including more than 100 threats that legal experts said could meet the legal threshold for federal criminal prosecution. Such threats are considered crimes if they instill fear of imminent violence or death. Law enforcement, however, has held almost no one accountable.



Threatening email sent to Milwaukee Elections Director Claire Woodall-Vogg after several Gateway Pundit stories suggested she conspired to rig the city's 2020 voting against Donald Trump.

In more than 10% of those 800 messages, the harassers cited the Gateway Pundit as the source of the information that caused them to lash out at election officials. No other media outlet or social-media platform was mentioned more than a handful of times.

The Federal Bureau of Investigation declined to comment on whether it was investigating any of the Gateway Pundit-inspired messages but said it "takes all threats of violence seriously." No arrests have been made. The Department of Justice, which in June launched a task force to address threats against election workers, did not respond to a comment request.

The Gateway Pundit has emerged as a major player in an expanding far-right media universe that includes TV broadcasters One America News Network and Newsmax, along with the video-sharing site BitChute and social media platforms Parler and Gab. Since the 2020 election, the Pundit has bolstered Trump's false stolen-election narrative with coverage that generated outrage and helped grow its audience.

The Pundit's U.S. web traffic approached 50 million monthly visits in the weeks after Trump's November loss, up from about 15 million a year earlier, according to Similarweb, an internet-traffic intelligence service. More recently — from July through September — the audience settled at an average of 33 million monthly visits. That's nearly double the 17 million monthly visits averaged over the same period by the website for MSNBC, the cable news channel known for left-leaning hosts.

**BREAKING EXCLUSIVE: THOUSANDS of Fake Votes Found at Wisconsin Recount in Dane County – Photos and Report from GOP Observer**

By Jim Hoft
Published November 28, 2020 at 9:30am

Share | Tweet | Share | Email | Print

f Share on Facebook (2k)   🐦 Tweet   Share   ✉ Email

TRENDING

**BREAKING: President Trump Announces Rally in Georgia on Saturday Night - December 5th**

Screenshot of a Gateway Pundit story targeting Maribeth Witzel-Behl. Captured Nov. 28, 2020 at 16:54 GMT. Source: Internet Archive

The Gateway Pundit describes itself as a publisher of news and commentary. Launched in 2004 as an opinion blog, it established itself as one of Trump's most dogged promoters in the 2016 presidential race. During the campaign, Trump regularly cited or retweeted Gateway Pundit stories. Once elected, he quickly granted the site White House press credentials.

A Trump spokesperson did not respond to requests for comment.

The U.S. Constitution's free-speech and free-press provisions give news outlets – even those that publish false stories that spur threats – broad protections against any legal liability, especially criminal charges. Media can be sued for defamation, but such cases can be especially challenging to win for public officials, including many election workers and administrators.

Officials must prove not only reputational damage but "actual malice." That standard, established by the U.S. Supreme Court, means plaintiffs must prove not only that they were harmed by the publication of false information, but also that the publisher either knew the information was false or operated with "reckless disregard for the truth," said Roy Gutterman, a Syracuse University media law professor.

"Defamation is difficult to win for everybody, but it's more difficult for public figures like most of these plaintiffs," Gutterman said.

The Gateway Pundit currently faces at least three defamation suits filed by people who allege they faced numerous threats after being vilified in false stories. The first two suits don't involve public officials; the site is contesting both, asserting it broke no laws and had no responsibility for the threats of violence. The third was filed yesterday by Freeman and Moss, the election workers in Georgia. A lawyer for Gateway Pundit had no comment on that suit.

The Pundit has faced some commercial blowback for its false and incendiary content. In September, it lost a major revenue source when Google stopped placing ads on the site, citing its publication of "demonstrably false" election stories. Over the previous 10 months, the Pundit earned an estimated $1.3 million from ads placed through Google's AdSense program, according to an analysis by the Center for Countering Digital Hate, which combats online extremism.

The Pundit has retained other advertising, mostly "clickbait" promotions placed by ad networks on behalf of hundreds or thousands of companies and products. The site gets paid based on the number of ads clicked.

RELATED CONTENT

 Two Georgia election workers sue far-right website over false fraud allegations

 Trump campaign demonized two Georgia election workers – and death threats followed

 Reuters unmasks Trump supporters who terrified U.S. election officials

 U.S. election workers get little help from law enforcement as terror threats mount

 Trump-inspired death threats are terrorizing election workers

 How AT&T helped build far-right One America News

 The tech entrepreneur who founded Trump's go-to TV news network

Reuters asked five ad networks that have appeared prominently on Gateway Pundit if they were concerned about its content. Two, Jeeng and ZergNet, said they reviewed the site in response to the Reuters inquiry and decided to stop placing ads on it. Two others, Revcontent LLC and MGID, said they are reconsidering their relationships with the site. A fifth, LockerDome, did not respond to comment requests.

Gateway Pundit's owner and editor, Jim Hoft, is an Iowa native with a college biology degree and no previous journalism background. Hoft writes many of the articles, along with his twin brother, Joe Hoft, and a half-dozen or so contributors. After a mass shooting in 2016 killed 49 people at Pulse, a gay nightclub in Orlando, Florida, Hoft wrote a Breitbart News column in which he came out as gay. Noting that the shooter sympathized with radical Islamist groups, he argued that the best way to protect gay people from more attacks was to elect Trump because he would be tough on extremists.

Jim Hoft did not respond to interview requests sent to him and his lawyer. Joe Hoft also had no comment.



Gateway Pundit was given White House press credentials after Trump's election as president. Here, editor Jim Hoft listens as Trump speaks at a 2019 meeting with conservative social media figures. REUTERS/Carlos Barria

"We never support any violence," Jim Hoft said in an August deposition for a lawsuit. The suit alleged that his site defamed and incited threats against a former staffer of Dominion Voting Systems, a voting equipment maker often featured in the Pundit's coverage. "We report on different individuals every day, and we always consider their safety."

Hoft is seeking reader support through several online fundraising campaigns on GiveSendGo, a crowdfunding site. Those campaigns have raised more than $250,000 to date, according to the site. On the Pundit site, Hoft urges readers to show support by buying subscriptions. "There's a battle for survival of the Gateway Pundit," he says in the message.

## "We're coming for you, Claire"

The threat that came to Milwaukee election chief Woodall-Vogg — citing the Gateway Pundit on her "betrayal" — was sent to the private email address she reserves for friends and family. The subject line: "Hello Marxist Bitch."

The Pundit began targeting Woodall-Vogg days after the election, when she informed the Wisconsin Elections Commission that a flash drive used with the city's vote-tabulating machines was inadvertently left at a processing center on election night. The drive was retrieved within minutes and was never unattended, she explained in a letter to the commissioners. The county district attorney reviewed the matter and found no evidence of tampering.

The Gateway Pundit responded with a story headlined: "Milwaukee Elections Chief Lost Elections Flash Drive in Morning Hours of November 4th When Democrats Miraculously Found 120,000 Votes for Joe Biden."

Woodall-Vogg began getting angry emails almost immediately. The messages continued as multiple audits and reviews confirmed Milwaukee's results, which had helped Biden win Wisconsin.

In late July, another Pundit headline sparked a new wave of intimidation: "BREAKING EXCLUSIVE: Uncovered Email Shows Milwaukee Elections Executive Woodall-Vogg Laughing About the Election Steal on Election Night." The evidence: a joking email exchange between Woodall-Vogg and Ryan Chew, a staffer with The Elections Group, a nonprofit organization that provided free pre-election guidance to localities on improving 2020 voting processes.

Shortly after Milwaukee's final votes were reported late on election night, Chew wrote: "Damn, Claire, you have a flair for drama, delivering just the margin needed at 3:00 a.m. I bet you had those votes counted at midnight and just wanted to keep the world waiting!" Woodall-Vogg replied: "Lol. I just wanted to wait to say I had been awake for a full 24 hours."

Chew and Woodall-Vogg told Reuters the exchange was an unfortunate but meaningless joke. Chew said it would have been "absurd" for Woodall-Vogg to stay up late to add drama. "That absurdity was the essence of the joke," Chew said.

The Pundit characterized the exchange as evidence that Woodall-Vogg was part of a multi-state fraud to manufacture a late-night "drop" of Biden votes. Woodall-Vogg's inbox exploded with more than 70 furious messages. Many cited the Pundit. Some called for her execution. One asked if she had private security. Some people left threatening voicemails. One said: "We're coming for you, Claire."

Woodall-Vogg left town with her two children, working remotely for 10 days. She referred a half-dozen threatening messages to Milwaukee police. The department told Reuters it had referred the communications to the FBI after police determined they could not be prosecuted under state or local law.

0:00 / 0:20

🎥 Click to hear audio of a menacing voicemail left for Claire Woodal-Vogg

At the elections office, security glass and other protections are being added.

"The threats where I truly was concerned — the ones specific to me and my family — those didn't happen until the Gateway Pundit article," she said.

## 'Tick, Tick, Tick'

In June, Vernetta Nuriddin, a Democratic member of Georgia's Fulton County election board, was starting her summer vacation when her inbox filled with two dozen hostile emails. One subject line: "Tick, Tick, Tick."

"Not long now…," the email read.

Nuriddin said she found the email "frightening," suggesting a bomb or other "imminent danger."

**From:** Brian Lohman <████████@gmail.com>
**Sent:** Tuesday, June 29, 2021 11:12:37 AM
**To:** ████████@live.com <████████@live.com>
**Subject:** Tick, Tick, Tick

Not long now...

Message sent to Georgia official Vernetta Nuriddin, after her name and email address were reported by Gateway Pundit.

That morning, the email addresses of Nuriddin and other board members were published in a Gateway Pundit report that said they were named in an activists' lawsuit seeking a review of county absentee ballots. The suit was later dismissed.

Other outlets had reported on the suit days earlier, but the hostile messages to Nuriddin and other board members didn't start until the Pundit published their email addresses. Some of the messages cited the Gateway Pundit specifically; others, including the tick-tick email, did not. Nuriddin, who left the board this summer when her four-year term ended, said the Pundit's reports often sparked messages from "people wishing the absolute worst on you, who don't even know you."

Nuriddin referred the tick-tick email to the Fulton County Police Department. It dropped the case after deciding the message was not an "articulated threat" that constituted a crime under Georgia law, said Fulton's chief, Wade Yates.



Vernetta Nuriddin is one of many Fulton County election officials who came under attack after a Gateway Pundit story. REUTERS/Elijah Nouvelage

Reuters identified the sender of the "Tick, Tick" threat: Brian Lohman, of Jacksonville, Florida. He was among nine people who said in interviews for a Nov. 9 Reuters report that they had harassed or threatened election officials.

Lohman told Reuters he didn't mean to suggest a bomb. He said he had read that Nuriddin was named in the lawsuit over Fulton County ballots and meant to suggest time was running out before she "had to go in front of a judge." He declined to say whether he got the news – or Nuriddin's email address – from the Gateway Pundit story.

'Hanging or guillotine?'

After the 2020 presidential election, the Pundit ran a slew of stories alleging voter fraud in Arizona's Maricopa County, which includes Phoenix, the state's largest city.

Many of these reports were false, including a May 9 article claiming the county deleted voting-machine data needed for a state audit. An hour after the story was published, county Board of Supervisors Vice Chair Bill Gates and other members received an email with a link to the article.

"You dirty mother f***ing ass holes," the subject line read. "You all have eyes in the back of your heads?" the message continued. "People have a limit."

> *"People are going to be coming and visiting the homes of the board of supervisors and basically executing their families. Should be fun."*
>
> VOICEMAIL LEFT FOR MARICOPA COUNTY SUPERVISOR CLINT HICKMAN

The Pundit continued publishing stories with false voter-fraud claims as multiple audits confirmed the results and Maricopa supervisors defended their accuracy. On Aug. 9, an email landed in the supervisors' public inbox, asking: "Hanging or Guillotine?" The message cited a debunked Gateway Pundit story that claimed completed ballots from the 2020 election were shredded before they were counted.

Over the next month, Gates and his fellow supervisors would get at least nine more emails from the same sender, several of them citing Gateway Pundit stories and all repeating the warning: "TREASON Hanging or Guillotine?"

The supervisors were already on edge. Gates' fellow Republican board member, Clint Hickman, had received a voicemail on Aug. 4 that warned: "People are going to be coming and visiting the homes of the board of supervisors and basically executing their families. Should be fun."



Maricopa County Supervisor Bill Gates. The Arizona county's election operation was the subject of a series of false Pundit stories. REUTERS/Caitlin O'Hara

The voicemail did not mention the Gateway Pundit. But Hickman and Gates said they blamed the Pundit's bogus reporting for inspiring many of the threats and harassing messages against board members. "There's no question this blog has generated threats toward me, my colleagues,

and even my family's 77-year-old business," Hickman said, adding that the site conjures "ridiculous scenarios" with "no fact-checking."

Gates told Reuters he has referred about a dozen hostile messages to police.

The Maricopa County Sheriff's Office said it has been assessing threats against the supervisors. It has made no arrests.

## Threats of hanging and shooting

Days after the election, Gateway Pundit posted a false story that targeted election officials in Rock County, Wisconsin, about an hour south of Madison.

The site reported that a software glitch led to 10,000 votes being "moved" from Trump to Biden "in just one Wisconsin county." Such glitches, it said, were a Democratic scheme to "steal" the race.

That article was tweeted by Eric Trump, the former president's son. He did not respond to an interview request sent through the former president's office.

In reality, the vote count never changed. The Associated Press had made an error in an election-results table it published and quickly corrected it.

The next morning, County Clerk Lisa Tollefson got a call about the story around 7 a.m. and raced to work, finding the phone lines jammed with enraged Trump voters yelling at her staff. The furor lasted four days, and "was bad enough that we let the sheriff know, and he put protection on us," Tollefson said.

Two weeks later, on Nov. 28, the Gateway Pundit turned its sights on Maribeth Witzel-Behl, the clerk in Madison, Wisconsin, whose initials appeared on the thousands of absentee ballots that the Pundit had wrongly characterized as "fake."

Concerned by the story's inaccuracies and the threats they provoked, she consulted with City Attorney Michael Haas, who sent Hoft an email requesting the Pundit correct the piece and remove the threatening comments.

"If there are additional threats or actual harassment against our employees we will be holding you accountable," Haas wrote.

The next day, the story was updated: The references to "fake votes" were changed to "suspect votes." All the comments also were removed from the page. The story was marked as "updated," but contained no correction.

Joe Hoft, the brother of site founder Jim Hoft, wrote a follow-up story about Haas's warning. Haas, he asserted, was attacking the Pundit's free-speech rights.

"We found the City Attorney's response threatening," he wrote.

*Editor's note: This story was updated to correct a misspelling of Jim Hoft's name in the penultimate paragraph, and to correctly state in paragraph 27 that Trump was elected (not re-elected) in 2016.*

## Facebook's struggle with Gateway Pundit highlights challenge of containing disinformation

he Gateway Pundit, a far-right news site, has used its Facebook page - with more than 630,000 followers - to post bogus stories alleging the 2020 election was stolen from former President Donald Trump. Some commenters responded with threats of violence.

After Gateway Pundit posted a June story on Facebook that included debunked claims of voter fraud in Arizona, a commenter said the governor and secretary of state should be "fed feet first through a woodchipper." A story featuring false claims of vote-rigging in Fulton County, Georgia, drew comments on Facebook calling for an election worker to be hanged or "shot for treason."

For years, Facebook has imposed sanctions on Gateway Pundit's account to limit the spread of its misinformation. But Gateway Pundit still uses its Facebook page to amplify its reporting and raise money: The page features a prominent appeal asking readers to buy subscriptions to support its "battle for survival."

---

### Arizona officials should be "fed feet first through a woodchipper"

Facebook commenter reacting to a baseless Gateway Pundit story alleging voter fraud

---

Gateway Pundit's continuing presence on Facebook illustrates the platform's worldwide struggle to stop the spread of disinformation and to balance content-policing with free-speech concerns. Facebook has taken a barrage of criticism this year from critics and a company whistleblower who say its practices stoke anger and division to increase user engagement.

In a statement to Reuters, Facebook said it seeks to label misinformation and "reduce its spread." The company uses fact checkers and artificial intelligence to identify false or misleading material and warns readers who try to share it. Facebook partners with about 80 organizations, including Reuters, to independently fact-check content that appears on its site.

Facebook said repeat offenders, such as the Gateway Pundit, are subject to tougher sanctions, including having their posts pushed to the bottom of users' news feeds (the lists of posts they see), and being barred from Facebook's content-promotion services.

But Facebook almost never removes the offending posts or shuts down the pages – that happens only in rare circumstances, such as posts pushing COVID misinformation, the company says. Sites that directly threaten violence also may be shut down, but account holders are not held responsible for comments on their pages.

Twitter has taken a more aggressive approach with Gateway Pundit, permanently suspending the @gatewaypundit account of Jim Hoft, the site's founder and editor, as well as the account of his twin brother, Joe Hoft, a writer.

Jim Hoft declined a request for comment; Joe Hoft did not respond to comment requests.

Facebook and Twitter both have been blasted by right-leaning politicians for what they call censorship of conservative voices. Jim Hoft testified in a 2018 congressional hearing that his site's traffic from Facebook had tanked after the platform imposed restrictions on the spread of the Pundit's content, saying such sanctions make "book burning" look benign.

Yet Gateway Pundit's traffic has boomed: In the wake of the 2020 election, it peaked at nearly 50 million visits a month, according to one estimate, illustrating the power of viral disinformation. Reuters found the site's often-debunked election-fraud claims were cited in about 100 of more than 800 threatening or harassing messages sent to election officials since last November.

**Facebook has long recognized Gateway Pundit as a source of false and divisive content. A July 2019 internal report on "potential misinformation and polarization risks" listed the site as one of Facebook's "common misinfo offenders."**

Facebook has long recognized Gateway Pundit as a source of false and divisive content. A July 2019 internal report on "potential misinformation and polarization risks" listed the site as one of Facebook's "common misinfo offenders." The report was among a cache of documents provided to the U.S. Securities and Exchange Commission and Congress by Frances Haugen, a former Facebook product manager who left the company in May and has been a leading public critic of its practices.

Reuters identified a dozen Gateway Pundit stories on Facebook that contained baseless election-fraud claims, two of which Facebook labeled as containing false information. Under four of those stories, nine Facebook users called for the execution of election workers or officials. Only one of those four stories was flagged by Facebook for containing false information.

In August, Gateway Pundit reported that a Milwaukee official had been threatened after being featured in Pundit stories alleging voter fraud. The result? Even more threats. On the site's Facebook page, one reader commented: "There is only one punishment acceptable for traitors, being drawn and quartered."

---

**Campaign of Fear**
By Peter Eisler and Jason Szep, with additional reporting by Linda So
Photo editing: Corinne Perkins
Art direction: John Emerson
Edited by Brian Thevenot

    

Follow Reuters Investigates 

REUTERS INVESTIGATES

 More Reuters investigations and long-form narratives

 Got a confidential news tip? Reuters Investigates offers several ways to securely contact our reporters

---

OTHER REUTERS INVESTIGATIONS



**The Green Machine**
U.S. colleges like to tout their green credentials. But many are burning highly polluting fuels in their campus power plants, Reuters has found.



**Besieged Barrister**
Chow Hang-tung is one of few Hong Kong activists still criticizing China's leaders. Her story shows how Beijing is trying to silence the city's best lawyers.

ER0247



**Going for Broke**

Wealthy company leaders regularly escape accountability for corporate
scandals by demanding lifetime protection from related lawsuits in bankruptcy
court.



**Russian Roulette**

When Russian troops fled the Ukrainian town of Balakliia last month, they left
behind thousands of documents that show in unprecedented detail the inner
workings of the Russian war machine.

Exhibit 18

ER0249



🔍  ☰

⊞ My View       👤 Following       🔖 Saved

8 minute read · November 6, 2022 4:04 AM MST · Last Updated 9 days ago

# 'Kill them': Arizona election workers face midterm threats

By Linda So, Peter Eisler and Jason Szep



[1/3] Eliza Luna, a ballot designer with the Maricopa County Elections Department, counts ballots for the Arizona Presidential Preference Election at the Maricopa County Tabulation and Election Center in Phoenix, Arizona, U.S., March 17, 2020. REUTERS/Cheney Orr/File Photo

**Read more**



1  2  3



Nov 6 (Reuters) - Election workers in Arizona's most fiercely contested county faced more than 100 violent threats and intimidating communications in the run-up to Tuesday's midterms, most of them based on election conspiracy theories promoted by former President Donald Trump and his allies.

The harassment in Maricopa County included menacing emails and social media posts, threats to circulate personal information online and photographing employees arriving at work, according to nearly 1,600 pages of documents obtained by Reuters through a public records request for security records and correspondence related to threats and harassments against election workers.

Advertisement · Scroll to continue

Between July 11 and Aug. 22, the county election office documented at least 140 threats and other hostile communications, the records show. "You will all be executed," said one. "Wire around their limbs and tied & dragged by a car," wrote another.

**Register for free to Reuters and know the full story**

ER0251

The documents reveal the consequences of election conspiracy theories as voters nominated candidates in August to compete in the midterms. Many of the threats in Maricopa County, which helped propel President Joe Biden to victory over Trump in 2020, cited debunked claims around fake ballots, rigged voting machines and corrupt election officials.

**Latest Updates**

Legal

**Siebel Newsom, wife of California governor, accuses Harvey Weinstein of rape**

10:14 AM MST

Legal

**Lawyer Michael Cohen can sue Trump's company to cover legal bills**

14 min ago

View 2 more stories ⌄

Other jurisdictions nationwide have seen **threats and harassment** this year by the former president's supporters and prominent Republican figures who question the legitimacy of the 2020 election, according to interviews with Republican and Democratic election officials in 10 states.

The threats come at a time of **growing concern over the risk of political violence,** highlighted by the Oct. 28 attack on Democratic House Speaker Nancy Pelosi's husband by a man who embraced right-wing conspiracy theories.

Advertisement · Scroll to continue

election workers, according to previously unreported incidents documented in the emails and interviews with county officials.

A number of temporary workers quit after being accosted outside the main ballot-counting center following the Aug. 2 primary, Stephen Richer, the county recorder who helps oversee Maricopa's elections, said in an interview. One temporary employee broke down in tears after a stranger photographed her, according to an email from Richer to county officials. The unidentified worker left work early and never returned.

She wasn't a political person, she told Richer. She just wanted a job.

On Aug. 3, strangers in tactical gear calling themselves "First Amendment Auditors" circled the elections department building, pointing cameras at employees and their vehicle license plates. The people vowed to continue the surveillance through the midterms, according to an Aug. 4 email from Scott Jarrett, Maricopa's elections director, to county officials.

"It feels very much like predatory behavior and that we are being stalked," wrote Jarrett.

## ATTACKS PERSISTED

Since the 2020 election, **Reuters has documented** more than 1,000 intimidating messages to election officials across the country, including more than 120 that could warrant prosecution, according to legal experts.

Many officials said they had hoped the harassment would wane over time after the 2020 results were confirmed. But the attacks have persisted, fueled in many cases by right-wing media figures and groups that continue without evidence to cast election officials as complicit in a vast conspiracy by China, Democratic officials and voting equipment manufacturers to rob Trump of a second presidential term.

In April, local election officials in Arizona participated in a drill simulating violence at a polling site in which several people were killed, according to an April 26 email from Lisa Marra, the president of the Election Officials of Arizona, which represents election administrators from the state's 15 counties. The drill aimed to help officials prepare for Election Day violence, and left participants "understandably, disturbed" said the email to more than a dozen local election directors.

In a statement, Marra said: "This is just one other tool we can use to ensure election safety for all."

message boards calling for workers to be executed or hung. Some messages sought officials' home addresses, including one that promised "late night visits." Employees were filmed arriving and leaving work, according to emails among county officials.

Two days after the Aug. 2 primary election, the county's information security officer emailed the FBI pleading for help.

"I appreciate the limitations of what the FBI can do, but I just want to underline this," wrote Michael Moore, information security officer for the Maricopa County Recorder's Office. "Our staff is being intimidated and threatened," he added. "We're going to continue to find it more and more difficult to get the job done when no one wants to work for elections."

A special agent for the FBI acknowledged the agency's limitations, according to the emails. "As you put it, we are limited in what we can do - we only investigate violations of federal law," the FBI agent responded in an Aug. 4 email. Reporting threats to local law enforcement is "the only thing I can suggest," the agent wrote, "even if at this point it has not resulted in any action."

The FBI declined to comment on the agent's response to Moore. It also declined to confirm or deny the existence of ongoing investigations into the threats.

Moore did not respond to requests for comment, but Richer, his boss, said in a statement that he greatly appreciated the FBI's partnership and vigilance. "This is an inherently emotional topic - communications of the most vile nature have been repeatedly sent to my team," the statement said.

One anonymous sender using the privacy-protective email service ProtonMail sent "harassing emails" for almost a year, Moore, wrote in an Aug. 4 email to the FBI. One message warned Richer that he'd be "hung as a traitor."

"I'd like to have a black and white poster in my office of you hanging from the end of a rope," the sender wrote.

The harassment and threats were affecting the mental health of election workers, Jarrett wrote in his Aug. 4 memo. "If our permanent and temporary staff do not feel safe, we will not be able (to) recruit and retain staff for upcoming elections."

In all, county officials referred at least 100 messages and social media posts to FBI and state counter-terrorism officials. Reuters found no evidence in the correspondence that officials saw any of the

the territory of a prosecutable threat.

The U.S. Justice Department declined to comment on specific ongoing investigations but said it has opened dozens of cases nationwide involving threats to election workers. Eight people face federal charges for threats, including two who targeted Maricopa County officials.

DOJ spokesperson Joshua Stueve said that while the "overwhelming majority" of complaints the agency receives "do not include a threat of unlawful violence," he said the messages are "often hostile, harassing, and abusive" towards election officials and their staff. "They deserve better," Stueve said.

## ONLINE INSPIRATION

Misinformation on right-wing websites and social media fueled much of the hostility towards election staff, according to the internal messages among Maricopa officials.

On July 31, the Gateway Pundit, a pro-Trump website with a history of publishing false stories, reported that a Maricopa County election official allowed a staff technician to gain unauthorized access to a computer server room, where he deleted 2020 election data that was set to be audited. The website published the names and photos of the official and the tech; readers responded with threats against both.

"Until we start hanging these evil doers nothing will change," one reader wrote in the Gateway Pundit's comment section. Another suggested death for the computer tech identified in the story: "hang that crook from (the) closest tree so people can see what happens to traitors."

The tech hadn't deleted anything, according to a Maricopa spokesperson. The county election director had instructed him to shut down the server for delivery to the Arizona State Senate in response to a subpoena. A review of server records confirmed nothing was deleted, the spokesperson told Reuters, and all data from the 2020 election had been archived and preserved months earlier.

Election employees singled out in Gateway Pundit stories "tend to see a surge in being targeted" for threats and harassing messages, Moore, the county's information security officer, said in a Nov. 18, 2021, email to the FBI. Those stories, he added, are often "flagrantly inaccurate." **A Reuters investigation** published last December found the Gateway Pundit cited in more than 100 threatening and hostile communications directed at 25 election workers in the year after the 2020 election.

allegations against Maricopa officials. In August, right-wing provocateur Charlie Kirk posted a comment in Telegram accusing Richer, the county recorder, and "his cronies" of making Arizona's elections "a Third-World circus."

"When do we start hanging these people for treason?" one reader commented. Another simply added, "Kill them."

The Gateway Pundit and Kirk did not respond to requests for comment.

After a security assessment by the U.S. Department of Homeland Security in late 2021, Maricopa strengthened doors, added shatterproof film on windows and bought more first aid kits, according to the documents.

But the harassment has continued.

"This goes beyond just onsite security. It is a mental health issue," Jarrett, the county elections director, wrote in an email to county officials two days after the primary.

"I very much respect freedom of speech and welcome public scrutiny," Jarrett added. "However, allowing this predatory activity to occur is damaging and threatening the viability of the elections department."



**Register for free to Reuters and know the full story**

*Register now*

Reporting by Linda So, Peter Eisler and Jason Szep; Editing by Suzanne Goldenberg



Our Standards: **The Thomson Reuters Trust Principles.**

## Read Next / Editor's Picks

United States
**Trump to make new White House bid, aiming to get a jump on rivals**
30 min ago

California tries to harness megastorm floods to ease crippling droughts

4:13 AM MST

---

United States

**Republicans on verge of U.S. House majority in midterm elections**

9:32 AM MST

---

Lifestyle

**NASA prepares for third attempt at Artemis lunar rocket launch**

30 min ago

**Newsletter** | Sent every weekday.

**Reuters Daily Briefing**

All the world, U.S. and business news you need to start your day, curated by Reuters journalists.

Sign up

## More from Reuters



**Britain, France sign new illegal migration deal**
02:29



**U.S. would defend allies from N Korea - Biden at G20**
01:04

**Biden departs White House for COP27**
01:12



**Warnock says Georgia runoff about 'right and**
01:38



**Election 'was a good day' for democracy - Biden**
01:55



**Georgia U.S. Senate race heads to runoff, again**



**ER0257**

a 'good day' for
democracy
02:08

## Sponsored Content

Dianomi ▷

Arizona: The List Of The Top Financial Advisor Firms Is Out 

Sponsored by smartasset

Hands Down One of the Best Cards for Good Credit

Sponsored by The Motley

Uncover unique insights on the economy, global transformation & more.

Sponsored by Bank of America Institute

The 4 

### United States

# Siebel Newsom, wife of California governor, accuses Harvey Weinstein of rape

Legal · November 15, 2022 · 10:14 AM MST

Jennifer Siebel Newsom, a documentary filmmaker and the wife of California's governor, testified on Monday that former film producer Harvey Weinstein raped her in 2005 when she was trying to build a career as a producer and actor.

---

Legal

**Trump, U.S. win dismissal of Michael Cohen lawsuit over alleged book retaliation**

November 14, 2022

---

United States

**Trump defied Jan 6 committee subpoena, panel says**

5:39 AM MST

---

Business

**U.S. says six airlines issue $622 million in refunds**

November 14, 2022

---

Legal

**Oscar-winner Paul Haggis must pay total of $10 million in civil rape case**

November 14, 2022

**ER0259**

When the S&P 500 Lost 20%... They Gained 246%. Tips and Tricks Inside



Sponsored by Trade Of The Day

Our exclusive guide has steps to start and build a thriving RIA.



Sponsored by Fidelity Investments

Reputation matters. Yours and ours. Apply today.



Sponsored by Fidelity Investments

Arizona Residents With Credit Card Debt Should Read This

Sponsored by Freedom

Which Travel Card Has The Most Valuable

Hands Down the Best Card for Holiday Shopping



---

Latest

**Home**

Media

🎥 **Videos** ⧉
📷 **Pictures** ⧉
🖼 **Graphics** ⧉

Browse

**World**
**Business**
**Legal**
**Markets**
**Breakingviews**
**Technology**
**Investigations** ⧉
**Lifestyle**

About Reuters

**About Reuters** ⧉
**Careers** ⧉
**Reuters News Agency** ⧉
**Brand Attribution Guidelines** ⧉
**Reuters Leadership** ⧉
**Reuters Fact Check** ⧉
**Reuters Diversity Report** ⧉

Download the App ⧉

**Newsletters** ⧉

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

---

Thomson Reuters Products

**Westlaw** ⧉

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⧉

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉

The industry leader for online information for tax, accounting and finance professionals.

---

Refinitiv Products

**Refinitiv Workspace** ⧉

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue** ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ⧉    **Advertising Guidelines** ⧉

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⧉   **Terms of Use** ⧉   **Privacy** ⧉   **Digital Accessibility** ⧉   **Corrections** ⧉   **Site Feedback** ⧉

© 2022 Reuters. All rights reserved

ER0261

ER0262

ER0263

ER0264

ER0265

**ER0266**

Exhibit 19

 

 News

# Arizona Election Workers Are Being Bombarded With Threats

"You will all be executed," read one communication to Maricopa County election officials.

PB   By <u>Paul Blest</u>

November 7, 2022, 9:26am     



ELECTIONS WORKERS INSPECT MAIL-IN BALLOTS AS H UP AND SORTS MAIL-IN BALLOTS PRIOR TO TABULATION AT THE MARICOPA COUNTY TABULATION AND ELECTION CENTER ON NOVEMBER 06, 2022 IN PHOENIX, ARIZONA.(JUSTIN SULLIVAN/GETTY IMAGES)

Election workers in Arizona's largest county received more than 100 intimidating messages and threats of violence during a one-month period in the lead-up to the midterm elections this year, Reuters reported Sunday.

Maricopa County election officials received at least 140 such threats between July 11 and August 22, according to more than 1,600 pages of documents obtained by Reuters via public records request. The period covered in the request included the state's contentious August 2 primary, and many of the threats appear to have been fueled by coverage from far-right blogs and pundits.

ADVERTISEMENT

The threats to Maricopa County officials offer just a glimpse of the many threats faced by election workers all over the country this year, after two years of Republican politicians boosting the lie that the 2020 election was stolen from former President Donald Trump.

"You will all be executed," said one communication to Maricopa County election officials, according to Reuters. In a reply to an August Telegram post by Turning Point USA founder Charlie Kirk accusing Maricopa County's Republican county recorder and his "cronies" of turning the county's elections into a "Third World Circus," one user reportedly responded: "Kill them."

A temporary election employee reportedly broke down in tears and effectively quit on the spot after she was photographed outside of a ballot-counting center following the August primary. And on Aug. 3, a group of people wearing tactical gear and calling themselves "First Amendment Auditors" picketed outside of the elections department's offices and pointed cameras at employees and their license plates, Reuters reported Sunday.

ADVERTISEMENT

"It feels very much like predatory behavior and that we are being stalked," the county elections director wrote in an Aug. 4 email to Maricopa County officials.

In another instance, the pro-Trump misinformation blog Gateway Pundit published the names and photos of an election official and a technician the blog claimed had conspired to "illegally delete elections files" in April 2021—after which both the technician and the election official received threats, Reuters reported.

"We talk, shout, cry and scream for what?" one commenter on the post said. "Until we start hanging these evil doers, nothing will change."

The threats in Arizona have only continued to grow as the election has drawn closer. Armed vigilantes have posted up near ballot drop boxes during early voting claiming to monitor the boxes for illegal activity. They were encouraged by GOP Secretary of State nominee Mark Finchem, a self-described Oath Keeper, QAnon-adjacent state legislator and hard-line election denier.

ADVERTISEMENT

**ER0271**

We must watch all drop boxes because they do not have live cameras on them streaming to the public for people to ensure there is no fraud in the process," Finchem tweeted.



Last week, a federal judge <u>ordered them to stay at least 250 feet away from the boxes</u>.

Maricopa County is expected to be pivotal in several races Tuesday, including the state's U.S. Senate race, gubernatorial election, and race for secretary of state to be Arizona's

~~they won't accept the results of the election~~ .. they lose.

**Want the best of VICE News straight to your inbox? <u>Sign up here.</u>**

---

TAGGED: <u>ARIZONA</u>, <u>REPUBLICANS</u>, <u>ELECTION WORKERS</u>, <u>BIG LIE</u>, <u>EXTREMISM</u>, <u>THREATS</u>, <u>2022 MIDTERMS</u>



## GET THE LATEST FROM VICE NEWS IN YOUR INBOX. SIGN UP RIGHT HERE.

| Your email address | Subscribe |
|---|---|

By signing up, you agree to the <u>Terms of Use</u> and <u>Privacy Policy</u> & to receive electronic communications from Vice Media Group, which may include marketing promotions, advertisements and sponsored content.

# YOU
# MAY LIKE





ER0273

**Earbuds...**

ADVERTISEMENT: ...

**Anythi...**

ADVERTISEMEN...

**Before B...**

ADVERTISEMENT: H...

**Fat Like...**

ADVERTISEMENT: ...









**Hands Down! The...**

ADVERTISEMENT: ...

**Arizona Gov't Will...**

ADVERTISEMEN...

**Research 5 Star Roofing...**

ADVERTISEMENT: Y...

**Search For Payroll And HR...**

ADVERTISEMENT: Y...

# MORE FROM VICE

News

**'We Will Find You': Election Officials in Arizona Are Receiving Threats Before the Midterms**

DAVID GILBERT

10.26.22

News

**New Election Day Conspiracies Are Already Running Wild**

DAVID GILBERT

11.08.22

News

**Trumpism Didn't Kill Democracy—This Time**

TODD ZWILLICH

11.11.22

ER0274

**A Democratic Candidate Was Beaten and Knocked Unconscious at His Home**

PAUL BLEST

11.01.22

---

News

**Arizona Has Become the Epicenter of Midterm Conspiracies and Possible Violence**

LIZ LANDERS

11.04.22

---

News

**'I'm Just Really Stressed Out': Arizona Republican Charged With Masturbating Near a Preschool**

PAUL BLEST

10.20.22

---

ADVERTISEMENT

ER0276

ER0277

ABOUT

JOBS

PARTNER

VICE VOICES

CONTENT FUNDING ON VICE

SECURITY POLICY

PRIVACY & TERMS

ACCESSIBILITY STATEMENT

DO NOT SELL MY INFO



© 2022 VICE MEDIA GROUP

ER0279

# CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 8, 2022      RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

David S. Gingras
GINGRAS LAW OFFICE, PLLC
*Attorneys for Appellants*