No. 22-16826

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TGP COMMUNICATIONS L.L.C, D/B/A THE GATEWAY PUNDIT, ET AL.,

*Plaintiffs-Appellants*,

v.

JACK SELLERS, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
District of Arizona
No. CV-22-01925-PHX-JJT
Hon. John J. Tuchi

## ANSWERING BRIEF

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

Thomas P. Liddy
Charles E. Trullinger
Joseph J. Branco
Sean M. Moore
Deputy County Attorneys
MARICOPA COUNTY ATTORNEY'S OFFICE
CIVIL SERVICES DIVISION
225 W. Madison Street
Phoenix, AZ 85003
ca-civilmailbox@mcao.maricopa.gov

*Attorneys for Defendants-Appellees*

December 19, 2022

# Table of Contents

Table of Contents ................................................................... i

Table of Authorities ............................................................. iii

Introduction ......................................................................... 1

Statement of Jurisdiction ...................................................... 3

Statement of the Issues ......................................................... 4

Statement of Pertinent Constitutional and Statutory Provisions ......... 5

Statement of the Case ........................................................... 6

   I.     The County implements a press pass policy to avoid problems encountered with the 2020 election. ......................................... 6

   II.    TGP applies for and is denied a press pass over concerns of security and conflicts of interest. ................................................... 10

   III.   The present litigation ................................................ 12

Summary of the Argument ...................................................... 14

Standard of Review ............................................................... 16

Argument ........................................................................... 17

   I.     Preliminary Injunction Standard ..................................... 17

   II.    TGP does not stand a reasonable likelihood of success on the merits. .... 18

      A.    The County may limit attendance at its press conferences using a Policy that the Seventh Circuit determined is facially constitutional. 18

      B.    The decision to deny TGP's request for a press pass was based on TGP's conflict of interest and well-founded security concerns, not opinions. ...................................................................... 26

      C.    This record does not support any finding of due process or equal protection violations ................................................... 33

          1.    Due Process ...................................................... 33

          2.    Equal Protection ................................................. 35

   III.   TGP does not show that it will suffer irreparable harm ............. 35

   IV.   The balance of hardships and the public interest favors the County. ...... 37

Conclusion ...............................................................................................37

Statement of Related Cases......................................................................39

Certificate of Compliance .......................................................................40

# Table of Authorities

## Cases

*Alaska Landmine, L.L.C. v. Dunleavy*,
514 F. Supp. 3d 1123 (D. Alaska 2021) ......................................... 17, 19, 34, 35

*Branzburg v. Hayes*,
408 U.S. 665 (1972).................................................................. 21, 22, 36

*Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*,
365 F. Supp. 18 (D.D.C. 1973)...........................................................23

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ................................................................. 19, 20

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ......................................... 16, 31, 32, 34

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) ..............................................................21

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ..............................................................18

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ..............................................................17

*Hill v. Colorado*,
530 U.S. 703 (2000)................................................................. 23, 25

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)...........................................................................21

*Iancu v. Brunetti*,
139 S. Ct. 2294 (2019)............................................................. 26, 29

*JB Pictures, Inc. v. Dep't of Def.*,
86 F.3d 236 (D.C. Cir. 1996)...............................................................21

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
994 F.3d 602 (7th Cir. 2021) ................................................... passim

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ................................................... 18, 19

*Matthews v. Eldridge*,
424 U.S. 319 (1976)......................................................................33

*Nader v. Brewer,*
  386 F.3d 1168 (9th Cir. 2004) ........................................................16

*OSU Student All. v. Ray,*
  699 F.3d 1053 (9th Cir. 2012) ........................................................35

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983)...........................................................................18

*Republic of the Philippines v. Marcos,*
  862 F.2d 1355 (9th Cir. 1988) ........................................................30

*Schenck v. Pro-Choice Network Of W. New York,*
  519 U.S. 357 (1997).........................................................................29

*Sherrill v. Knight,*
  569 F.2d 124 (D.C.Cir. 1977)................................................... 23, 33

*Sierra On-Line, Inc. v. Phx. Software, Inc.,*
  739 F.2d 1415 (9th Cir. 1984) ................................................. 16, 30

*Winter v. Nat'l Res. Def. Council, Inc.,*
  555 U.S. 7 (2008).............................................................................17

*Zemel v. Rusk,*
  381 U.S. 1 (1965).............................................................................21

**Constitutional Provisions**

U.S. Const., amend. I ............................................................................5

**Statutes**

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1343 ..................................................................................3

**Rules**

9th Cir. R. 28-2.6 ...............................................................................39

Fed. R. App. P. 32...............................................................................40

Fed. R. App. P. 4(a) .............................................................................3

**Introduction**

The district court's measured consideration of First Amendment principles and the record throws cold water on the exaggerated claims in TGP's[1] Opening Brief. For example, TGP frames its Opening Brief on the assertion that the County[2] "revoked [TGP's] long-standing right to cover press conferences," and that the County "requires a permit or a license to gather news." [Opening Brief ("OB") at 18, 26]. Nonsense. The County did not prevent TGP from reporting on the 2022 election. Indeed, TGP has continually published pieces on its online blog concerning the election.

Instead, this case is about the County recognizing that there was a limit on the number of reporters that could be physically present in the space at the Maricopa County Tabulation and Election Center ("MCTEC") and in the Maricopa County Board of Supervisors conference room for press conferences relating to the 2022 election. To address that issue, the County created a reasonable and constitutionally-permitted process for limiting the number of reporters present. TGP's exaggerations are a poor substitute for a compelling record that would justify overturning the district court's denial of TGP's *ex parte* application for a temporary restraining

---

[1] For the purposes of this brief, "TGP" collectively refers to Appellants TGP Communications, L.L.C., and Jordan Conradson, where appropriate.

[2] For the purposes of this brief and consistency with the district court's order, "the County" collectively refers to the Defendants-Appellees.

order.

On this record, the County's decision to deny a press pass to Mr. Conradson was based on constitutionally-valid reasons that have been recognized as legitimate government interests. Namely, TGP and Mr. Conradson have conflicts of interest that led to unethical conduct and publications from TGP filled with false information have directly led to calls for violence and death threats against various County officials. The record fails to demonstrate that these criteria are influenced by viewpoint discrimination. Moreover, the County's denial of TGP's press pass application did not, in any way, limit TGP's ability to speak and publish, and the record does not support TGP's claim that it hindered its ability to gather news.

The Court should affirm because the record reflects that the district court did not clearly err in determining that the County declined to issue a press pass to TGP for constitutionally valid reasons.

## Statement of Jurisdiction

The district court had jurisdiction over TGP's Complaint under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The district court denied TGP's *ex parte* emergency motion for temporary restraining order on November 23, 2022. TGP timely filed its notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a) on November 28, 2022. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## Statement of the Issues

1.    Did the district court abuse its discretion in denying TGP's emergency *ex parte* application for temporary restraining order when the County's press pass policy has already been evaluated and found to be constitutionally valid, and the evidence in the record demonstrates that Mr. Conradson's application was denied over security concerns and because his conflicted interest lead to unethical journalistic practices?

## Statement of Pertinent Constitutional and Statutory Provisions

**U.S. Const., amend. I:**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Statement of the Case**

## I. The County implements a press pass policy to avoid problems encountered with the 2020 election.

During the 2020 election, Maricopa County encountered a number of problems relating to its elections press conferences and to disseminating information relating to the election. First, the sudden, extreme press interest in Maricopa County's election, related to the false and fabricated allegations of misconduct, overwhelmed the County's press relations efforts. [*See* 2-ER-0083-85]. The County's press relations processes were not designed to efficiently handle this sudden influx of requests. [2-ER-0084-85]. The County sought to set up a more efficient process for disseminating information relating to the 2022 general election. The County decided that it would hold press conferences at the Maricopa County Board of Supervisors conference room and at MCTEC. [2-ER-0084]. The County decided this would be the most effective method to disseminate information "that could reach a large audience and help spread facts." [2-ER-0083].

Both the conference room and MCTEC have limited space available for reporters. For example, the Board of Supervisors' conference room can only accommodate 50 members of the press, but it is also set up to allow to the press conferences to be live streamed on YouTube. [2-ER-0084].

Second, happenings in recent elections also prompted the County to have security concerns relating to the planned press conferences. During the 2020

election, the County did not have any press pass policy in place. This allowed protesters outside MCTEC to gain access to the building by stating that they were members of the media. [2-ER-0086]. This event caused a safety concern for the election workers inside MCTEC, and the protesters had to be removed from the building. [2-ER-0086]. As a result of this intrusion, a permanent fence was erected around MCTEC to prevent the public from gaining unauthorized access to the building. [2-ER-0086-87].

During the 2022 primary elections, election workers at MCTEC were approached by individuals maliciously recording their license plate numbers and otherwise harassing the workers around MCTEC. This led to further fencing and barricading around MCTEC for the 2022 general election. [Id].

To address these concerns about space and security, the County implemented the press pass policy at issue in this appeal (the "Policy"). [2-ER-0083 (stating that the Policy was intended to "control the size of the crowd and the security at those events")]. Maricopa County Communications Director Fields Moseley implemented the Policy. [2-ER-0082-83]. As Mr. Moseley testified, the purpose of the Policy was not to keep people out of press conferences who write negative stories about the County. [2-ER-0083]. The County introduced the Policy by plainly stating the reasons for its adoption: "Because of logistical and security considerations, it is impossible to give the public and media limitless access to the

Members of the Board of Supervisors, the County Recorder and election experts for events such as press conferences and availabilities." [2-ER-158]

When creating the Policy, the County did not create a new standard from whole cloth. Instead, the County adopted the Policy essentially verbatim from a press pass policy already used in the Office of the Governor of Wisconsin. [*Compare* 2-ER-0159 *with* 2-ER-0162]. As discussed below, the County felt safe adopting this Policy because it had already been examined by the Seventh Circuit and determined to be constitutionally valid. The Policy asks the following questions of individuals seeking a press pass:

1.  Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?

2.  Does the parent news organization meet the following criteria?

    a.  It has published news continuously for at least 18 months, and;

    b.  It has a periodical publication component or an established television or radio presence.

3.  Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?

4.  Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?

5.  Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

    a.  Both avoid real or perceived conflicts of interest;

b. Both are free of associations that would compromise journalistic integrity or damage credibility;

c. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and

d. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

[2-ER-159]. The Policy further states that the press pass will allow the holder to "attend news conferences or enter the Elections Department's office to conduct interviews, take photos, and/or video." [2-ER-0159].

The process for reviewing an application for a press pass is comprehensive. When an individual applies for a press pass, the application is sent to a team of eight people, including Mr. Moseley. [2-ER-0087]. That team consists of individuals with a journalism background and individuals that handle the logistics of responding. [*Id.*]. After the review, the panel votes on whether to grant the applicant a press pass, and they will grant the press pass if two members of the team vote yes. [2-ER-0087-88]. If the applicant is denied, they have the opportunity to appeal that decision and state the reasons why they believe the decision to be wrongful. [2-ER-0214]. Importantly, even if an applicant was denied a press pass, the applicant can still view and report on the subject press conferences because press conferences are livestreamed and/or posted to YouTube. [2-ER-0090].

**II.    TGP applies for and is denied a press pass over concerns of security and conflicts of interest.**

On September 27, 2022, Mr. Conradson submitted an application for a press pass.  At the evidentiary hearing, the County presented significant evidence that TGP, and Mr. Conradson specifically, have a conflict of interest due to their personal investment and involvement in the matters they cover.  For Mr. Conradson, evidence of this conflict of interest came from numerous photographs, social media posts, and articles showing that Mr. Conradson is deeply and personally involved with political parties and candidates. [2-ER-0146, -0199-210].

Additionally, TGP's publications have repeatedly prompted calls for violence against County officials and other government officials across the country.  Reuters found more than 100 such threats in direct response to TGP articles.  [2-ER-0237-48].  Threats to County officials directly stemming from TGP articles have included statements that certain officials should be "fed feet first through a woodchipper," and that individuals would visit the homes of the Maricopa County Board of Supervisors and execute their families.  [2-ER-0244-46].  These concerns are not isolated.  [*See generally* 2-ER-0219-79].  For example, Mr. Conradson published a blog post wherein he falsely accused an election worker of improperly accessing and deleting election data, and he included the election worker's name and photograph in the post.  [2-ER-0070].  This post directly led to the election worker in question receiving death threats, including statements such as "hang that crook from [the]

10

closest tree so people can see what happens to traitors," in the comments to Mr. Conradson's post. [2-ER-0255].

The team reviewing Mr. Conradson's application determined that he did not meet the qualifications to obtain a press pass and denied his application on September 30, 2020. [2-ER-0214]. Specifically, his application was denied because "he doesn't avoid real or perceived conflicts of interest," and because "his articles have led to direct threats to Board of Election officials and employees." [2-ER-0095]. At the hearing in the district court, Mr. Moseley specifically denied that Mr. Conradson's application was denied because of his opinions. [*Id.*]. Furthermore, and contrary to TGP's assertion that Mr. Conradson's application was denied for his viewpoint,[3] the County granted press passes to members of several news organizations that share TGP's apparent political preferences, such as Newsmax, the Western Journal, and the Epoch Times. [2-ER-0088-89].

Following the denial of his application, Mr. Conradson simply carried on reporting on "matters of public concern in Maricopa County." [3-ER-0399]. Mr. Conradson and TGP did not take any action to either appeal the denial or bring the denial before a court until after election day.[4] [2-ER-0068]. Finally, **41** days after

---

[3] OB, at 12, 33-34.

[4] Showing his open disregard for the County's policies, Mr. Conradson twice tried to sneak onto restricted County property in this time and had to be removed from the premises on at least one occasion. [2-ER-0067-68]. A video of this removal is

receiving the denial, on November 10, 2022, TGP finally decided to appeal the denial via an email from Mr. Conradson that did not refute the basis of the denial other than to baldly allege that the denial violated his First Amendment rights. [2-ER-0218]. This *de minimis* appeal was not successful.

## III. The present litigation

TGP filed this action on November 12, 2022. [3-ER-410]. At the same time, TGP filed an emergency *ex parte* application for temporary restraining order. [3-ER-377]. The County responded and the parties participated in a two-hour evidentiary hearing on November 17, 2022. [2-ER-0024]

On November 23, 2022, the district court issued an order denying the application for temporary restraining order. [1-ER-0002]. In the order, the district court made specific findings of fact that are dispositive on appeal because TGP's Opening Brief does not show that the findings were an abuse of discretion.

First, the district court reviewed the evidence presented and found that the Policy was not vague largely because all of the operative phrases are used in the Code of Ethics of the Society of Professional Journalists, showing that these phrases are commonly understood in the world of journalism. [1-ER-0009-10]. Next, the district court found that substantial evidence shows that Mr. Conradson's application was denied because his conflict of interest led to unethical journalistic practices, and

---

available in the record. [2-ER-0148].

the County has a legitimate interest in the accurate dissemination of information to the public. [1-ER-0015]. The district court explicitly found that TGP's evidence did not substantiate its claim that the County discriminated against TGP for its viewpoint. [1-ER-0015-16]. Regarding the irreparable harm factor, the district court found that TGP's 41-day delay in seeking relief for the denial was strong evidence that TGP did not perceive the harm from the denial to be particularly harsh. [1-ER-0017].

TGP appealed from this order denying the application.

## Summary of the Argument

TGP's Opening Brief does not demonstrate that the district court's factual findings are so devoid of support in the record that they constitute an abuse of discretion. TGP has provided no evidence other than rank speculation to support its assertion that the County was animated by any viewpoint-based reason when denying Mr. Conradson's application. Moreover, both sides recognize that the district court utilized the correct legal standards, so there is no legal error that could cause a finding that the district court abused its discretion.

Despite the fact that TGP spends most of its opening brief discussing the value of free speech and the free press, neither of those things are at issue in this case. Maricopa County has done nothing to prevent TGP from freely publishing its viewpoint, and the Court can be sure the TGP clearly feels free to publish whatever it wants to say. Accordingly, much of TGP's argument and authority is inapposite.

The County had valid reasons to establish the Policy following the massive media interest from the 2020 general election that overwhelmed the County's then-established media relations system. The County needed to establish a system for press conferences relating to the 2022 general election, but limited space for reporters to attend these press conferences and security concerns that arose from coverage relating to elections in Maricopa County necessitated a press pass policy to limit the number of attendees. The County implemented the Policy in its current

form because it had already been constitutionally analyzed and approved in the Seventh Circuit. TGP provides no convincing argument that the Seventh Circuit's analysis was faulty.

Applying the Policy's terms to Mr. Conradson's application for a press pass, the County properly denied the application because of Mr. Conradson's conflicts of interest. The Seventh Circuit has already stated that it is reasonable and viewpoint-neutral for the government to promote ethical conduct. The County is interested in the accurate dissemination of the information provided at the press conferences related to elections. The fact that Mr. Conradson's publications have been shown to lead to calls for violence against County officials, creating a security concern, provided another independently sufficient basis for the County to deny Mr. Conradson's application.

**Standard of Review**

TGP appeals from a denial of an application for temporary restraining order. This Court reviews the district court's denial on an abuse of discretion standard. *Nader v. Brewer*, 386 F.3d 1168, 1169 (9th Cir. 2004) ("We subject a district court's order regarding preliminary injunctive relief only to limited review"). Appellate courts are loathe to interfere with a trial court's determination on a preliminary injunction. *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984) ("the grant of a preliminary injunction is a matter committed to the discretion of the trial judge"). Thus, the district court's ruling will only be overturned "if the district court based its decision on either an erroneous legal standard or clearly erroneous factual findings." *Nader*, 386 F.3d at 1169. "Because our review is deferential, we will not reverse the district court where it got the law right, even if we would have arrived at a different result, so long as the district court did not clearly err in its factual determinations." *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Where the district court identifies the correct legal standard, an appellate court will only overturn the denial of a preliminary injunction if the district court's application of the law was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id*. (citation omitted).

Though the Opening Brief pays lip service to this standard of review at the

beginning of its argument, it functionally ignores the standard for the rest of the Brief and treats this as an appeal *de novo*. The Opening Brief is unpersuasive because it fails to explain how the district court's factual findings were "without support" from the factual record, that its findings of fact were "clearly erroneous," or that its legal conclusions were illogical or implausible. This failure of analysis is fatal to TGP's appeal.

## Argument

### I.      Preliminary Injunction Standard

To succeed on its emergency *ex parte* application for temporary restraining order, TGP had the burden to prove "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest." *Alaska Landmine, L.L.C. v. Dunleavy*, 514 F. Supp. 3d 1123, 1128 (D. Alaska 2021) (citing *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008)). Moreover, TGP requested a mandatory injunction, which required the County to take a desired action rather than maintain the status quo. To obtain a mandatory injunction, the proponent must show "extreme or very serious damage will result that is not capable of compensation in damages, and the merits of the case are not doubtful." *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (internal quotations omitted). Furthermore, "[t]he Supreme Court has emphasized that

preliminary injunctions are an extraordinary remedy never awarded as of right."

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## II. TGP does not stand a reasonable likelihood of success on the merits.

### A. The County may limit attendance at its press conferences using a Policy that the Seventh Circuit determined is facially constitutional.

In the First Amendment context, a government restriction faces varying levels of judicial scrutiny based on the forum in which that restriction applies. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983). A public forum, subject to the strictest scrutiny, is a typical street, sidewalk, or park, the traditional public soapboxes; neither party asserts that the press conferences are public fora. *See id.* at 45. The same standards generally apply to the second category of fora, designated public fora, which are generally "not traditionally open for public speech" but which the government has made available for "expressive use by the general public or by a particular class of speakers." *Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019) (internal quotation marks omitted). Examples of designated public fora include university meeting facilities, school board meetings, and municipal theaters—essentially places where the public is allowed to come and speak for specific purposes. *Id.* Finally, nonpublic fora are that place that are "not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46.

Other cases have held that press conferences are nonpublic fora. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610 (7th Cir.), *cert. denied,* 142 S. Ct. 711 (2021); *Alaska Landmine*, 514 F. Supp. 3d at 1131. This conclusion makes sense. Government press conferences are not a soapbox for the general public, nor are they made available for "expressive use by the general public or by a particular class of speakers." *Koala*, 931 F.3d at 900. Indeed, the reporters attending a government press conference do not have a right to be heard at all—not even to ask a question. *See Alaska Landmine*, 514 F. Supp 3d. at 1135 ("[T]he Governor possesses the discretion to refrain from calling on Plaintiffs or answering their questions.").

The record shows that the press conferences are held at MCTEC and at the Board of Supervisors conference room. Nothing in the record indicates that these places are open for the public to express themselves. This status is in accord with the general assumption that government workplaces are nonpublic fora. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 805–06 (1985). Allowing a limited number of reporters to attend these press conferences with a press pass does not make these nonpublic areas designated public spaces. *MacIver*, 994 F.3d at 609 ("Requiring permission, limiting access, and having 'extensive admission criteria' as the state does here . . . are signs that the government has not created a designated public forum."). "The government does not create a public

forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. After examining the facts, the district court found that the press conferences are nonpublic fora, and nothing in the record shows the County opened up the physical space in which these press conferences occurred to public discourse, so this Court cannot find that the district court clearly erred in ruling the press conferences to be nonpublic fora. [1-ER-0013-14].

Because the subject press conferences are nonpublic fora, the Policy is constitutionally permitted so long as it is "reasonable in light of the purpose served by the forum and [is] viewpoint neutral." *Cornelius*, 472 U.S. at 806. The Policy has already been thoroughly analyzed by the Seventh Circuit and found to be constitutional:

> The first three of the criteria listed in the memorandum are reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories. The list prioritizes access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets (such as tribal publications). The criteria listed in numbers four and five of the memorandum are reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying. Similar standards are also used by other governmental bodies

such as the United States Congress.

*MacIver*, 994 F.3d at 610–11.  In sum, the Policy was directly taken from the Office of the Governor of Wisconsin via the Seventh Circuit, and it was based on standards used by the Wisconsin Capitol Correspondent's Board and in the United States Congress.  *Id*.  The Policy is not some radical new device the County invented.  It is widely used; and it has been tried, tested, and found to pass constitutional muster.

1.    As an initial matter, the United States Supreme Court has held that information gathering is not afforded the same protection as free speech under the First Amendment.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."); *Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972); *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."); *see also Fusaro v. Cogan*, 930 F.3d 241, 252 (4th Cir. 2019); *JB Pictures, Inc. v. Dep't of Def.*, 86 F.3d 236, 238 (D.C. Cir. 1996).  The Supreme Court has also proven skeptical of arguments that a certain policy is unconstitutional simply because it hampers the ability to gather information.  *See Zemel*, 381 U.S. at 17.  Below, TGP's expert witness implicitly recognized that the alleged harm to TGP was to harm its ability to collect information from personal attendance at the press conferences, not a limitation on TGP's ability

to engage in speech. [2-ER-0051]. TGP's broad reliance on all manner of First Amendment jurisprudence to attack the Policy is therefore inapposite.

**2.** On appeal, TGP offers no compelling argument to suggest that the Seventh Circuit's analysis was incorrect nor that the Policy, or any of its component parts, has been found unconstitutional in any other setting or court. Contrary to the Opening Brief's incredulous tone, a press pass policy is not a new and devious creation intended to defeat the free press. [*See, e.g.*, OB, at 18-19]. Limiting the size of press conferences and requiring a press pass to attend a press conference has been a standard practice in this country for many decades. [*See* 2-ER-0080-81]. And even TGP itself admitted at the trial level that the County may place a limit on the number of individuals allowed to attend its press conferences. [2-ER-0112-13].

**3.** TGP attempts to distinguish *MacIver* by arguing that the plaintiff there was a think tank and not an online blog like TGP. [OB, at 27] This attempted distinction is without import. The press' rights under the First Amendment are the same as any other citizen's. *Branzburg*, 408 U.S. 665, 705. The press is far from unique in claiming that it engages in important public speech and helps inform the citizenry. *Id*. ("The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public.").

The identity of the plaintiff in *MacIver* is entirely irrelevant—either the Policy is constitutional or it is not—and TGP offers no compelling argument to find the Seventh Circuit's analysis on the reasonableness of the policy was incorrect.[5]

4.    TGP also argues that the Policy is unconstitutionally vague.  Its vagueness arguments are at odds with commonly held understandings in both the legal and journalistic worlds.  A regulation is impermissibly vague when "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  When considering vagueness, it is important to note that nearly all assemblies of words will carry some degree of vagueness.  *Id.* ("[B]ecause we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'").  Courts generally reject broad or hypothetical vagueness challenges.  *Id.*  ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a

_____

[5] TGP also makes a throwaway argument that the Court should side with *Alaska Landmine* and not *MacIver*.  [OB, at 28].  But those cases are not similar in their relevant facts.  The government in *Alaska Landmine* excluded a news organization from press conferences without any policy for determining the issuance of press passes or any opportunity for recourse if a press pass is denied.  The court there found that system lacked due process.  514 F. Supp. 3d at 1133-34.  That holding has no bearing on the present circumstances.

Similarly, TGP's reliance on *Sherrill v. Knight*, 569 F.2d 124 (D.C.Cir. 1977), and *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18 (D.D.C. 1973), is misplaced: no written guidelines supported the press credentialling system in either case. Further, there was no dispute of fact in Consumers Union that "[t]here are ample periodical press facilities." *Id.* at 22.

facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'").

Here, TGP's vagueness arguments amount to little more than the nit-picking and hypothetical complaints that the Supreme Court has disfavored. First, TGP claims that the phrase "conflict of interest" is unconstitutionally vague. Initially, this assertion is undercut by the testimony of TGP's expert, Gregg Leslie, who relevantly testified that conflicts of interest include situations where "your true purpose is to get a law passed as a lobbyist of an advocate of some type, they don't want you to masquerade as a journalist when you've got that conflict of interest." [2-ER-0039]. As discussed below, it is exactly this kind of conflict, along with its resulting unethical conduct, that lead to the denial of Mr. Conradson's application.

Moreover, as the district court correctly recognized, the concept of a conflict of interest is one that is well understood in the law. [1-ER-0009 (citing Ariz. R. Sup. Ct. 42, ER 1.7, 1.8)]. The district court also noted that the concept of a conflict of interests is well-understood in the journalism world as well because the Society of Professional Journalists ("SPJ") includes avoiding conflicts of interest in its Code of Ethics. [1-ER-0009].

TGP argues that the district court should not have looked to the SPJ standard because, according to Mr. Leslie's testimony, the SPJ did not intend for its Code of Ethics to be used as a legal standard. [OB, at 7]. This argument is a red herring. It

does not matter what the SPJ intended for its Code of Ethics, it only matters whether a person of ordinary intelligence can understand what the phrase "conflict of interests" means. *Hill*, 530 U.S. at 732. The fact that the main professional organization in journalism uses the phrase "conflict of interests" in its Code of Ethics is strong evidence that the phrase is commonly understood in journalism.

Similarly, the district court noted that other press pass policies contain similar standards. For example, the Arizona State Senate includes in its media rules the requirement that the journalist "must not be engaged in any lobbying or advocacy, advertising, publicity or promotion of any individual, political party, group, corporation, organization or a federal, state or local government agency . . . ." [1-ER-0009-10]. The district court reasonably concluded that the common use of these concepts means that they are well understood in the journalism context and are not unconstitutionally vague. [1-ER-0010]. TGP does not offer any argument to show that the district court's ruling in this regard was "illogical" or "implausible."[6]

TGP also asserts that the phrase "conflict of interest" is vague because it is unclear who "perceives" the conflict. Similarly, TGP argues that the portion of the Policy regarding avoiding associations that would compromise journalistic integrity

_____

[6] TGP's other arguments primarily concern hypotheticals—such as if the County denied an application because of an advertisement, or if a journalist advocated for a candidate but without TGP's unethical practices, [*see* OB, at 30-32]—that the Supreme Court expressly rejected in vagueness challenges. *Hill*, 530 U.S. at 732.

is vague.  Again, these phrases are used in the SPJ Code of Ethics, strong evidence at this stage of the litigation that these phrases are well-understood.  There is nothing vague here.

### B.  The decision to deny TGP's request for a press pass was based on TGP's conflict of interest and well-founded security concerns, not opinions.

In the First Amendment context, a restriction is inappropriately viewpoint-based when it "discriminate[s] against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).  The district court reviewed TGP's viewpoint-discrimination claims and made specific factual findings that TGP failed to carry its burden to show that the County engaged in viewpoint discrimination in denying Mr. Conradson's application, characterizing TGP's evidence as "conjectural."  [1-ER-0015].  The district court specifically agreed with Mr. Moseley's testimony that the denial was not based on TGP's viewpoint or political preferences.  [1-ER-0016].  The Court should affirm because TGP offers nothing to show that these findings from the district court were clearly erroneous.

To begin with, the government has a legitimate interest in promoting journalistic ethics and deterring the spread of intentional misinformation.  *See MacIver*, 994 F.3d at 610–11 (recognizing that the operative prongs of the Policy "are reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or

entanglement with special interest groups, or those that engage in advocacy or lobbying."). Thus, despite Mr. Leslie's testimony that ethical conduct is merely "aspirational" in the world of journalism,[7] that does not stop the County from promoting ethical conduct with its Policy as long as it does so in a manner that is reasonable and viewpoint neutral.

And the County provided significant evidence that Mr. Conradson presents conflicts of interest. The evidence shows that Mr. Conradson personally worked to campaign on behalf of and promote candidates and races he was covering in his blog posts, and the district court found that this evidence led the County to determine a conflict existed. [1-ER-0015].[8] This definition of a conflict comports with Mr. Leslie's testimony that a conflict of interests includes when "your true purpose is to get a law passed as a lobbyist of an advocate of some type, they don't want you to masquerade as a journalist when you've got that conflict of interest." [2-ER-0039]. Under the Policy, it does not matter who those candidates are, or which political party they belong to, it is the existence of the conflict that matters.

Critically to this analysis, it is not only TGP's and Mr. Conradson's conflicts of interest that caused the County to deny Mr. Conradson's application; it is the

---

[7] [2-ER-0042].

[8] For the first time on appeal, TGP makes representations about the timeframe of the circumstances that led to Mr. Conradson's conflict of interest. [OB, at 30]. Nothing in the record supports this assertion.

unethical conduct that results from those conflicts that directly led to the denial. [2-ER-0093 (stating that Mr. Conradson and TGP present a conflict in part because he doesn't "present as an ethical journalist who practices with integrity or professionalism.")]. TGP's and Mr. Conradson's conflicts have real world impacts on their ability to accurately present the news. The County offered testimony that Mr. Conradson repeatedly published misinformation about the County and County officials without reaching out to the County for the County's comment, or even to fact check the validity of his rumors.[9] [2-ER-0089-90]. The County also provided various news articles covering TGP and explaining that TGP is a "repeat offender" in propounding misinformation and is "a common misinfo offender." [2-ER-0246-47]. It is these qualities about TGP and Mr. Conradson—not the particular affiliated political party or any other opinion—that led to the press pass denial. [1-ER-0015-16 (finding that "Plaintiffs have not substantiated their [viewpoint discrimination] claim," and rejecting claims related to (1) reporting on a former supervisor, (2) a tweet, and (3) "political leanings")].

To be clear, the County is not determining who is and is not a journalist, as

[9] On appeal, TGP takes out of context Mr. Moseley's comment that Mr. Conradson never approaches the County to seek truth to assert that the County wants a stenographer and not a journalist. [OB, at 34]. Properly considered, Mr. Moseley's statement refers to process, not outcome—referring to the fact that Mr. Conradson never fact checks any of his largely baseless assertions with the County. [*See* 2-ER-0086-87, -0090].

TGP repeatedly asserts. Rather, the Policy is drafted and applied for a legitimate government interest: to grant press passes to those reporters and news outlets who are most likely to accurately report the news to the public, regardless of whether that coverage is favorable. *See MacIver*, 994 F.3d at 610–11; [*see also* 2-ER-0088 (testifying that County granted press passes to members of the press who write unfavorably about the County)]. Certainly, this concern about TGP's ethical practices is not discrimination based upon "the opinions or ideas it conveys," but rather its journalistic practices. *See Iancu*, 139 S. Ct. at 2299.

Legitimate security concerns also animated the County's decision to deny Mr. Conradson's application. The County provided evidence that Mr. Conradson has previously published blog posts that led to calls for violence against County officials. For example, in one blog post, Mr. Conradson wrongfully accused a County employee of tampering with data relating to the 2020 election along with the employee's name and photograph. [2-ER-0070]. The post resulted in death threats against the employee in the comments to Mr. Conradson's post. [2-ER-0255]. Indeed, the County presented news articles detailing the many threats of violence against government officials across the country as a direct result of TGP's posts. [*See generally* 2-ER-0219-79]; *cf. Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 376 (1997) (stating that "the significant governmental interest in public safety" impacts the first amendment analysis).

On appeal, TGP does not point to any evidence or argument to show that it was an abuse of the district court's discretion to determine that concerns over ethics and security motivated the County's press pass denial, rather than a viewpoint-based reason. Initially, TGP offers no evidence or argument that Mr. Moseley's testimony of TGP's misdeeds is untrustworthy or cannot be relied upon. TGP then only offers limited argument against the news articles which document TGP's repeated publication of misinformation that led to calls for violence. In the Opening Brief, TGP only addresses these articles by arguing that they are hearsay. [OB, at 31, 52] TGP did not argue below that the articles were hearsay, waiving this argument. [*See generally* 2-ER-0096-104]. More importantly, it is within the district court's discretion to admit and consider hearsay evidence in the context of a preliminary injunction hearing. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

Nor did TGP present competent evidence showing that the County's decision to deny Mr. Conradson's application was motivated by viewpoint-based reasoning. It was TGP's burden at the district court to show that the County's decision was viewpoint based, and that burden only increased in this appeal through the abuse of discretion standard. *Sierra On-Line*, 739 F.2d at 1421. To carry this burden, TGP offers only two pieces of tenuous evidence in support of the idea that the County

discriminated against it for a viewpoint-based reason.[10]  First, TGP points to articles it published about a former Maricopa County Supervisor which, TGP claims, caused the former Supervisor to resign.  [OB, at 4].  This assertion fails because, as the district court correctly observed, it is "conjectural."  [1-ER-0015].  TGP produced no evidence that the posts about the former Supervisor motivated the County's denial at all.

The second piece of evidence is the text of a tweet that was then retweeted by Maricopa County Recorder Stephen Richer.  The tweet, which was not originally posted by Recorder Richer, is not even present in the record for the Court's review.  [*See* 2-ER-0021-23].  TGP again did not produce any evidence that this sentiment animated the County's denial, or that Recorder Richer even weighed in on the decisions on who should be awarded a press pass under the Policy.

To show that the district court's finding that TGP's evidence was too speculative to show a likelihood of success was an abuse of discretion, TGP must show that the district court's finding was implausible, illogical, or entirely without support from the record.  *Disney Enterprises*, 869 F.3d at 856.  Given the complete lack of direct and uncontroverted evidence showing that viewpoint-based sentiments animated the County's decision, TGP necessarily fails to carry its burden to show

---

[10] In addition to repeatedly taking Mr. Moseley's comments out of context, which is addressed above.

that the district court's decision was an abuse of discretion.

TGP's claim that the County engaged in viewpoint discrimination based on "political leanings" lacks support in the record: the County granted press passes to several other organizations with a similar viewpoint such as Newsmax, the Western Journal, and the Epoch Times. [2-ER-0088-89.] The fact that the County granted press passes to these organizations is strong evidence that the County was not animated by hostility to TGP's viewpoint, as the district court correctly recognized. [1-ER-0016]. There is no evidence supporting the assertion that the County discriminated against TGP because of its viewpoint.

To be sure, the County's evidence detailing its bases for denying Mr. Conradson's application—TGP's and Mr. Conradson's conflicts, the resulting unethical conduct, and the security problems TGP poses—is not as developed as it might be. But that is the nature of a two-hour evidentiary hearing occurring five days after this lawsuit was filed. The nature of these proceedings leads to the deference owed to the trial court. *See Disney Enterprises*, 869 F.3d at 856 ("Because our review is deferential, we will not reverse the district court where it got the law right, even if we would have arrived at a different result, so long as the district court did not clearly err in its factual determinations."). In sum, because the district court applied the correct legal standards here, and the record fails to support TGP's argument that the district court abused its discretion in rejecting TGP's factual

theories on viewpoint discrimination, this Court should affirm.

### C. This record does not support any finding of due process or equal protection violations

#### 1. Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts have held that a governmental entity cannot exclude a reporter or news organization from a limited-attendance press conference without due process for doing so. *E.g.*, *Sherrill*, 569 F.2d at 130-31. But the due process required in such circumstances is not extensive and can generally be fulfilled if the government provides "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut." *Id*.

Here, the County met these due process requirements. The County plainly laid out the Policy on its website before any member of the press was able to apply. The Policy plainly stated the bases upon which applications would be judged. After an application was received, eight County officials reviewed the application, and if only two voted to approve the application, then the applicant was given a press pass. [2-ER-0087-88] If the applicant was denied, then the reasons for the denial were communicated to the applicant, and the applicant was given an opportunity to appeal. [2-ER-0214]. The County's actions on this record satisfied Mr. Conradson's due

process rights.

TGP's reliance on *Alaska Landmine* proves the point. There, the Alaska governor's office had a system where reporters were either invited or not invited to attend press conferences on the whims of officials. No policy guided the issuance of press passes, let alone a written policy. *Id*. at 1127 ("This administration does not have a process to allow members of the press access or attendance to press conferences."). When a reporter stopped receiving invitations to attend press conferences without any reason given, he sued. *Id*. at 1127-28. The district court found that the lack of any process or notice when evaluating whether to invite reporters to press conferences was a wrongful denial of due process. *Id.* at 1133-34. The situation here stands in stark contrast to *Alaska Landmine* because the County provided all of the due process that the *Alaska Landmine* court found lacking. *See id*. Thus, *Alaska Landmine* actually highlights the validity of the County's processes.

The remainder of TGP's arguments on this point are generic assertions that the County's processes are described in vague terms, but it provides no legal authority to suggest that any of the County's processes fall below due processes requirements. Once again, TGP fails to carry its burden to show that the district court abused its discretion when ruling that the County's processes satisfied due process. *See Disney Enterprises*, 869 F.3d at 856.

### 2.    Equal Protection

TGP's Equal Protection claim does not add any substantive analysis to the case. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) (noting that "[t]he equal protection claims rise and fall with the First Amendment claims," where they are raised at the same time and on the same bases). Here, TGP does not raise any basis independent of its other arguments for finding a violation of the Equal Protection clause. Therefore, TGP does not show a likelihood of success on this claim for the same reasons it fails to do so on its First Amendment claims, as discussed above. [*See* 1-ER-0016, at n.4].

## III.    TGP does not show that it will suffer irreparable harm

The record fails to support TGP's assertion that it will suffer irreparable harm. TGP's cited cases largely support the inapposite principle that the loss of the ability to speak freely is necessarily an irreparable harm. Here, in contrast, the County has taken no action to prevent TGP from speaking freely. At worst, the County has only imposed a minor imposition on TGP's ability to gather information. But TGP has full access to the information presented at all press conferences concerned in this lawsuit because all such conferences are livestreamed on YouTube and can be accessed freely. The law recognizes that alleged harm to First Amendment rights from the denial of a press pass are *de minimis* where the same press conference is available by livestream. *Alaska Landmine*, 514 F. Supp. 3d at 1135. Moreover, TGP

has no greater right to gather information than does the general public. *Branzburg*, 408 U.S. at 684.

The fact that TGP did not stand to suffer much harm is supported by the fact that TGP waited 41 days to bring this action after receiving the denial. [2-ER-0068]. TGP attempts to get around this fact by using the same arguments that failed at the district court. TGP argues that it did not know that Maricopa County elections would be newsworthy until election day. The mere fact that Mr. Conradson applied for the press pass at the end of September—more than a month before the election— undercuts this argument. [OB, at 8]. Further, this is a thin excuse given that Maricopa County is by far the largest county in an important swing state, and was the center of much post-election media attention in 2020. [*See* 2-ER-0083-85]. And Mr. Conradson's testimony that he continued to report "matters of public concern in Maricopa County"—presumably the 2022 general election—during the time that he was not appealing the decision belies this argument. [3-ER-0399; 2-ER-0058 ("I cover politics in Arizona.")]. As the district court recognized, there was every indication the 2022 election would be newsworthy, and if TGP truly felt that the denial would result in irreparable harm to it, it would have taken more prompt action to rectify the situation. [1-ER-0017]

Simply put, TGP is not suffering irreparable harm because it has every ability to gain information from the press conferences.

**IV.    The balance of hardships and the public interest favors the County.**

The level of hardships TGP is suffering is low, if it exists at all.  As discussed above, the Policy only made a minor impact on TGP's ability to gather information, not its ability to speak freely.  This impact on information gathering was minimal at worst because TGP had full ability to view the press conferences on YouTube, and continued to publish posts relating to the 2022 election in Maricopa County.

In contrast, throwing out the Policy would have subjected the County to the same problems and dangers it encountered in the aftermath of the 2020 election, when it did not have an appropriate policy in place to deal with the sudden and unexpected surge in media interest in the County.  [*See* 1-ER-0014, 18.]  Further, it would have rendered the County's authority to limit the number of people who could attend press conferences at MCTEC and the Board of Supervisors illusory.  Ultimately, this factor, while admittedly less important to the analysis in this situation, weighs in the County's favor.

## Conclusion

For the reasons stated above, the County respectfully requests that the Court affirm the district court's denial of TGP's emergency *ex parte* application for temporary restraining order.

**RESPECTFULLY SUBMITTED** this 19th day of December 2022.

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:  <u>/s/ *Sean M. Moore*</u>
     Charles E. Trullinger
     Thomas P. Liddy
     Joseph J. Branco
     Sean M. Moore
       Deputy County Attorneys

     MARICOPA COUNTY ATTORNEY'S OFFICE
     CIVIL SERVICES DIVISION
     225 W. Madison St.
     Phoenix, AZ 85003
     ca-civilmailbox@mcao.maricopa.gov
     *Attorneys for Defendants-Appellees*

**Statement of Related Cases**

Under Ninth Circuit Rule 28-2.6, Defendants-Appellees assert that they are unaware of any known related case pending before this Court.

**Certificate of Compliance**

1.  This brief complies with the type and volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,510 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in Times New Roman 14-point type.

Respectfully submitted,

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By: /s/ *Sean M. Moore*

Sean M. Moore
Deputy County Attorney
MARICOPA COUNTY ATTORNEY'S OFFICE
CIVIL SERVICES DIVISION
225 W. Madison Street
Phoenix, AZ 85003
ca-civilmailbox@mcao.maricopa.gov

December 19, 2022

## Certificate of Service

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

[X]    I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

[ ]    I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants (list each name and mailing/email address):

Respectfully submitted,

RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:    /s/*Sean M. Moore*

Sean M. Moore
Deputy County Attorney
MARICOPA COUNTY ATTORNEY'S OFFICE
CIVIL SERVICES DIVISION
225 W. Madison Street
Phoenix, AZ 85003
ca-civilmailbox@mcao.maricopa.gov

December 19, 2022