## No. 22-16826

*In the*

# UNITED STATES COURT OF APPEALS

*for the*

# NINTH CIRCUIT

TGP COMMUNICATIONS, LLC, D/B/A THE GATEWAY PUNDIT,
AND JORDAN CONRADSON,

*Plaintiffs-Appellants,*

v.

JACK SELLERS, THOMAS GALVIN, BILL GATES, CLINT HICKMAN, STEVE
GALLARDO, STEPHEN RICHER, REY VALENZUELA, SCOTT JARRETT, MEGAN
GILBERTSON, AND MARCUS MILAM,

*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Arizona
No. 2:22-cv-01925-JJT
The Honorable John J. Tuchi

# APPELLANTS' REPLY BRIEF

Marc J. Randazza (*Lead Counsel*)
RANDAZZA LEGAL GROUP, PLLC
4974 S. Rainbow Blvd., Suite 100
Las Vegas, Nevada 89118
Tel: 702-420-2001
ecf@randazza.com

David S. Gingras
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel: (480) 264-1400
david@gingraslaw.com

John C. Burns (*Admission Pending*)
BURNS LAW FIRM
P.O. Box 191250
Saint Louis, MO 63119
Tel: 314-329-5040
TBLF@pm.me

Jay M. Wolman
RANDAZZA LEGAL GROUP, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
Tel: 702-420-2001
ecf@randazza.com

Attorneys for Appellants

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants TGP Communications, LLC d/b/a The Gateway Pundit and Jordan Conradson hereby provides the following information:

There are no parent corporations or publicly held corporations that own 10% or more of the stock of TGP Communications, LLC. Jordan Conradson is a natural person.

Date: December 23, 2022.

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza

David S. Gingras
GINGRAS LAW OFFICE, PLLC

John C. Burns
BURNS LAW FIRM

*Attorneys for Appellants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................... 1

ARGUMENT.......................................................................... 3

I.  APPELLANTS DEMONSTRATED A LIKELIHOOD OF SUCCESS................. 3

   A.  The First Amendment Broadly Protects Newsgathering
       Activities........................................................................ 3

   B.  Maricopa's Press Pass Standards are Facially Invalid ............... 4

   C.  Appellees Used the Press Pass Standards to Engage in
       Viewpoint Discrimination............................................. 12

       1.  So-Called "Security Concerns" are a Red-Herring ................ 15

       2.  Appellees Cannot Retaliate Against Appellants for the
           Speech of Others ..................................................... 17

       3.  Appellees Targeted Appellants ................................. 25

   D.  Appellants are Likely to Prevail on Their Due Process and
       Equal Protection Claims............................................. 28

II.  TGP WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF THE
     REQUESTED INJUNCTION ................................................ 29

III.  THE REMAINING FACTORS FAVOR APPELLANTS ................................ 32

CONCLUSION ...................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Alaska Landmine, LLC v. Dunleavy,*
514 F. Supp. 3d 1123, 1135 (D. Alaska 2021) ................................ 30, 31

*Arc of California v. Douglas,*
757 F.3d 975 (9th Cir. 2014) ................................................. 32

*Bible Believers v. Wayne Cty.,*
805 F.3d 228 (6th Cir. 2015) ................................................. 21

*Brandenburg v. Ohio,*
395 U.S. 444 (1969) ............................................................. 18

*Bryant v. Cox Enters.,*
311 Ga. App. 230 (2011) ........................................................ 9

*Bullfrog Films, Inc. v. Wick,*
847 F.2d 502 (9th Cir. 1988) ............................................... 5, 7

*Chaker v. Crogan,*
428 F.3d 1215 (9th Cir. 2005) ............................................ 13, 20

*Cox Broadcasting Corp. v. Cohn,*
420 U.S. 469 (1975) ............................................................. 4

*Eramo v. Rolling Stone, LLC,*
209 F. Supp. 3d 862 (W.D. Va. 2016) ........................................ 10

*Fair Hous. Council v. Roommates.com, LLC,*
521 F.3d 1157 (9th Cir. 2008) ............................................... 18

*Flemming v. Warden, Salinas Valley State Prison,*
No. 1:12-CV-00383 AWI GSA HC, 2012 U.S. Dist. LEXIS 120889
(E.D. Cal. Aug. 24, 2012) ..................................................... 5

*Guenther v. C.I.R.*,
889 F.2d 882 (9th Cir. 1989) ................................................................ 29

*Interpipe Contr., Inc. v. Becerra*,
898 F.3d 879 (9th Cir. 2018) ................................................................ 13

*Jones v. Dirty World*,
755 F.3d 398 (6th Cir. 2014) .......................................................... 18, 21

*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) .................................................................. 3

*Ludwig v. Astrue*,
681 F.3d 1047 (9th Cir. 2012) .............................................................. 29

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ............................................................................... 28

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974) ................................................................................. 5

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ............................................................................... 23

*Oakland Tribune, Inc. v. Chronicle Pub. Co.*,
762 F.2d 1374 (9th Cir. 1985) .............................................................. 32

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972) ................................................................................... 5

*Ridley v. Mass. Bay Trans. Auth.*,
390 F.3d 65 (1st Cir. 2004) ................................................................... 13

*Seattle Mideast Awareness Campaign v. King Cnty.*,
781 F.3d 489 (9th Cir. 2015) ................................................................ 21

*St. Michael's Media, Inc. v. Mayor & City Council of Balt.*,
566 F. Supp. 3d 327 (D. Md. 2021) ................................................. 23, 24

*State of Cal. ex rel. Lockyer v. FERC,*
  329 F.3d 700 (9th Cir. 2003) .................................................. 28

*TGP Commc'ns, LLC v. Sellers,*
  No. 22-16826,
  2022 U.S. App. LEXIS 33641 (9th Cir. 2022) ............... 3, 10, 12, 30, 32

*Thomas v. Collins,*
  323 U.S. 516 (1945) ................................................................ 7

*United States v. Associated Press,*
  52 F. Supp. 362 (S.D.N.Y. 1943) ............................................ 4

*United States v. Ciavarella,*
  716 F.3d 705 (3d Cir. 2013)..................................................... 9

## STATUTES

47 U.S.C. § 230 ......................................................................... 18

# INTRODUCTION

The County instituted a press pass policy claiming it was necessary to keep out protesters and to ensure that no more than 50 journalists at a time crowded into press conferences. However, the policy was used to target a single journalist that has an adverse relationship with the County.

There would be no quarrel with *some* policy being in place that addresses legitimate concerns about impostors and space. But the County adopted a vague policy they lifted from somewhere else, while assigning their own, novel, meanings to the terms in that policy. They then used the cover of vagueness and their novel definitions to discriminate against a single journalist and publication that has been a gadfly on them – as any good journalist should be to government.

The County appointed itself as a "media critic" and claimed that its justification for the policy is "*the government has a legitimate interest in promoting journalistic ethics and deterring the spread of intentional misinformation.*" This is not a legitimate governmental interest – the government has no authority to license the press and declare what "journalistic ethics" are nor does it have the Orwellian power to claim

that its version of events is "information" while other interpretations are "misinformation."

Even if this were a legitimate interest, the government stands on a liquefied ground of shifting justifications, from "there is not enough space" (despite there being no evidence even offered that more than 50 journalists sought access) to "TGP's publications have repeatedly prompted calls for violence" (despite showing nothing to support this). In fact, the thrust of the County's brief seems to be a tale that Appellants should be excluded because County officials received "threats."

When the County denied access to the Appellants, there was only one reason offered – that they do not like the Appellants' journalism. The District Court accepted double hearsay innuendo and misapplied the law in order to favor the County. This Court wisely granted an injunction on appeal. It should not deviate from its order, except to expand upon it, and to give clear instructions to the District Court on remand.

# ARGUMENT

## I. Appellants Demonstrated a Likelihood of Success

This Court has already found that Appellants have a likelihood of success on their First Amendment claim and, relatedly, their due process and equal protection claims. *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, *14 (9th Cir. 2022). Appellees barely address this Court's findings or attempt to distinguish them.

### A. The First Amendment Broadly Protects Newsgathering Activities

Appellees claim that newsgathering is afforded a lesser degree of protection than speech under the First Amendment. While this can be true, it does not mean that viewpoint discrimination is more permissible. Access to government sources cannot be denied arbitrarily or for less than compelling reasons. "If a government agency restricts public access, the media's only recourse is the court system. The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press. Thus, courts have a duty to conduct a thorough and searching review of any attempt to restrict public access." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

Restrictions on newsgathering should be no more arduous than necessary and individual newsmen should not be arbitrarily excluded from sources of information. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491-92 (1975); *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (stating that "right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection") (L. Hand, J.). Appellees' attempt to frame the relevant constitutional issue here as one of lesser importance because it is "only" newsgathering is unavailing. The government must remain as neutral when dealing with different newsgatherers as it must remain neutral when dealing with different speakers or priests.

## B. Maricopa's Press Pass Standards are Facially Invalid

Whether Appellees' conferences are called limited or non-public fora, the government cannot exclude individuals or entities on the basis of viewpoint. The "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all

points of view an equal opportunity to be heard." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). As this Court has previously found, "[t]he danger inherent in government editorial oversight, even in the interests of 'balance,' is well established." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 510 (9th Cir. 1988); *see also Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("it has yet to be demonstrated how government regulation of [the editorial] process can be exercised consistent with the First Amendment.")

Appellees justify themselves as "grant[ing] press passes to those reporters and news outlets who are most likely to accurately report the news to the public, regardless of whether that coverage is favorable." Dkt. 39 at 34. This itself is an admission of viewpoint discrimination because it places the government in the position of determining whether a reporter's stories are "accurate." Often times, there is competing evidence. *See, e.g., Flemming v. Warden, Salinas Valley State Prison,* No. 1:12-CV-00383 AWI GSA HC, 2012 U.S. Dist. LEXIS 120889, at *5-6 (E.D. Cal. Aug. 24, 2012) (characterizing eleven eyewitness versions of the same event as akin to the Kurosawa film *Rashomon* – "honest[], but in mutually contradictory ways.")

Further, why should we trust the government to decide what is "accurate?" The staff of THE MIAMI HERALD won a Pulitzer in 1999 for a series of articles exposing election fraud.[1] That series of articles is replete with government wrongdoers contradicting the accusations, claiming they are telling the truth. In the early articles in that series, the official position was "We run it as straight as anyone can run it." Joseph Tanfani and Karen Branch, "$10 Buys One Vote: Dozens Cast Votes in Miami Mayoral Race – For $10 Each," THE MIAMI HERALD (Jan. 11, 1998). The Herald declined to take the government's word for it, and its persistent reporting led to the Miami mayoral election being overturned. How convenient it would have been for Mayor Suarez to have been able to simply impede the Miami Herald reporters in the practices of their craft by calling them "inaccurate" reporters.

Would Mayor Suarez have called the Miami Herald reporting "accurate" if he wielded the policy in this case and the lower-court's decision? Most certainly not, and the presses at the Miami Herald would have run without this story.

---

[1] *See* "The 1999 Pulitzer Prize Winner in Investigative Reporting," Pulitzer Prizes, available at: https://www.pulitzer.org/winners/staff-44.

Appellants are not so egotistical as to claim they should be given a Pulitzer. They even have the humility to know that this story may lead somewhere else. But, they also know that the government has abused its power in excluding them from newsgathering.

Particularly where the media is reporting on the government's own conduct, it is chilling to imagine giving the government the power to decide which reporting is "accurate" in its sole opinion.

> It cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the truth from the false for us.

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J. concurring).

Regulations that "disapprove materials that criticize and approve those that accept the prevailing state of affairs on a given topic" are not viewpoint neutral. *Bullfrog Films*, 847 at 509 n.11. The County's policy is simply another way of discriminating based on viewpoint.[2]

---

[2]   As Amicus *This is Reno* points out in its brief, allowing courts and governments to judge who is and who is not a journalist creates a murky environment where viewpoint-based judgments can be covered up with

May the government stake out a government-approved viewpoint on "the truth" and then claim that any journalist who challenges them is "inaccurate" and thus lock them out of newsgathering? The public would be blindfolded if the government got to choose their own investigators.

In 1994, the Providence Journal-Bulletin was honored for reporting on corruption in the Rhode Island court system. The government position was that the Chief Justice was "guilty of no intentional wrongdoing." *See* "Top Rhode Island Justice Quits Amid Accusations," THE NEW YORK TIMES (Oct. 9, 1993). Why should the Providence Journal-Bulletin have taken the court system's word for it? It did not, and later proved that the government version of "the truth" was a lie.

Consider the "kids for cash" scandal, in which Pennsylvania judges accepted kickbacks for harsh sentences to for-profit detention centers. In that case, the government's statement of what is the "truth" was only contradicted by journalists who refused to uncritically take the government's position as being immune from challenge. Ian Urbina, "Despite Red Flags About Judges, a Kickback Scheme Flourished," New

seemingly-neutral post-hoc justification and thus should be avoided. *See* Brief, Dkt. No. 25, at 5-8.

York Times (Mar. 27, 2009);[3] *see also United States v. Ciavarella*, 716 F.3d 705, 713 (3d Cir. 2013).

Of course, a journalist does not need to be a Pulitzer Prize winner, nor even be *right* to support the underlying principle. The Atlanta Journal-Constitution famously got it dead wrong with the story of the Olympic bombing, blaming the actual hero of the event. *See Bryant v. Cox Enters.*, 311 Ga. App. 230, 230-31 (2011). Despite being wrong, the AJC should not be relegated to a second-class of journalists by any government entity as some kind of punishment for its errors.

It is so powerful that the First Amendment even protects journalists who lie *on purpose*. Brian Williams famously claimed that he was in a chopper in Iraq that had been "forced down after being hit by an RPG." He lied.[4] Nevertheless, he returned to being a news anchor. And while MSNBC was under no obligation to hire him back, no government official would be justified in limiting his access to a press conference because of his prior fabrications. Even an egregious example of

---

[3] Available at: https://www.nytimes.com/2009/03/28/us/28judges.html (last accessed Dec. 23, 2022).

[4] Joshua Barajas, "NBC's Brian Williams apologizes for false Iraq war story," PBS (Feb. 4, 2015).

journalistic fabrication – Rolling Stone's "A Rape on Campus"[5] should not mean that Rolling Stone can not have a press pass in Maricopa County.

In the case of Mayor Suarez, or the Rhode Island and Pennsylvania courts mentioned above, stifling critical reporters under the guise of "inaccuracy" would have been so tempting. But, doing so would be akin to using Tolkien's "Ring of Power" – unbalancing our Constitutional system and turning journalism into an informational Mordor.

As this Court previously observed, "a predominant reason for the County denying Conradson a press pass was the viewpoint expressed in his writings. It is the County's politically-tinged assessment of Conradson's prior reporting that appears to have led it to deny him a press pass." *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 U.S. App. LEXIS 33641, *14 (9th Cir. 2022). Notably, the record lacks evidence that Appellants' reporting is "false" or otherwise inaccurate,[6] but it is full of evidence of Appellees' animus against Appellants. *See, e.g.,* 2-ER-22;

---

[5]  *See Eramo v. Rolling Stone*, 209 F. Supp. 3d 862 (W.D. Va. 2016).

[6]  As discussed above, that shouldn't matter. The Appellants should have the right to be the worst journalists on Earth, without the government playing "media critic" and wading into that issue.

Dist. Ct. Dkt. No. 25-1. This Court already got it right in granting the injunction on appeal. It should not deviate from its prior wisdom.

"Conflict of interest" and "problematic associations," are the only grounds on which the County denied Appellants access. The County argues that these terms are clear because they have well-understood meanings in the legal and journalistic contexts. But, they fail to acknowledge that *their own definitions* of these terms are wildly different from the SPJ code of ethics (on which they purportedly relied).[7] 1-ER-9; 2-ER-93:7-23. Their definitions are so broad, in fact, that if applied even-handedly, they would exclude any reporter who has ever supported (or voted for) a political candidate or appeared at a political event.[8] We know

---

[7] Journalism is not a regulated profession like the practice of law. The SPJ's rules have no force of law—they are recommendations from a private club, nothing more. In fact, they have less force than even a private organization's bylaws, because the SPJ themselves reject any notion that they should be a "code" or used the way the County tries to use them. 2-ER-34:15—35:4.

[8] Appellees cite to Appellants' expert testimony that "conflicts" exist when "your true purpose is to get a law passed as a lobbyist of an advocate of some type, they don't want you to masquerade as a journalist when you've got that conflict of interest." 2-ER-39:2-5. But those facts are found nowhere here. As an example of what Leslie was talking about, *see* David Folkenflik, et al, "In the Southeast, power company money flows to news sites that attack their critics," NATIONAL PUBLIC RADIO (Dec. 19, 2022), available at: https://www.npr.org/2022/12/19/1143753129/power-

this because that is the only evidence Appellees provided of Conradson having conflicts of interest and compromising associations. 2-ER-146; 2-ER-205-210. This Court has already observed that "[r]elying on a reporter's attendance at political party events is weak grounds – and a poor measuring stick – for determining a journalistic conflict of interest." *Sellers*, 2022 U.S. App. LEXIS 33641 at *11. The District Court, having the benefit of knowing Appellees' bizarre definitions for these terms, erred in finding that the press pass regulations are constitutional. This was a clearly erroneous conclusion of law and an abuse of discretion.[9]

## C. Appellees Used the Press Pass Standards to Engage in Viewpoint Discrimination

An open admission of viewpoint-based discrimination from the government is not necessary to show its existence, and the County denying it (while admitting facts that show it) is of no persuasive value.

---

companies-florida-alabama-media-investigation-consulting-firm (last accessed Dec. 21, 2022) (reporting on utility companies secretly dictating the contents of stories published by newspapers).

[9] As addressed in the brief of Amicus We The People – Hartford, the use of these flexible standards incentivizes media to self-censor their coverage of County government in order to avoid banishment from future press conferences. *See* Brief, Dkt. 35, at 2-3. As its Brief further points out, the District Court's flawed analysis on these points may warrant reassignment upon remand. *See id.* at 3-4.

"[T]he government rarely flatly admits it is engaging in viewpoint discrimination." *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004); *Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (citing *Ridley* with approval); *Chaker v. Crogan*, 428 F.3d 1215, 1227 (9th Cir. 2005) (same) Courts thus use various factors to determine if the government's justification for a restriction on speech is pretextual, including consideration of statements made by government officials concerning the reasons for an action; disparate treatment towards people or things sharing the characteristic that was the nominal justification for the action; a "loose or nonexistent" "fit between means and ends;" the historical background of the decision; the specific sequence of events leading up to the decision; departures from normal procedures or substance; and post hoc rationalization. *Id.*

The County attempts to absolve itself of viewpoint discrimination by claiming that it "granted press passes to several other organizations with a similar viewpoint, such as Newsmax, the Western Journal, and the Epoch times." The only valid portion of this statement is the use of the Oxford Comma. What are these other publications' viewpoints? The record is void of any finding in that regard. Are their viewpoints the same

as *one another*? Are their viewpoints even internally consistent amongst even their own journalists and editors? They certainly are not the same viewpoints as the Appellants. The County seems to argue that everyone to the right of MSNBC must share the same viewpoint. The news world is not so binary that it could be divided into two distinct viewpoints. If it were, then why provide 50 seats at its press conferences at all? Why not simply have one seat for a single "conservative" outlet and another for a "liberal" outlet, and tell everyone else that their viewpoint is now represented?

Viewpoints in media transcend the left-right divide.[10] Every media outlet carries their own biases and brings their own agenda in deciding which stories to cover, from what frame they will cover them, or how they will set their agenda. Simplifying Appellants as solely "conservative" reporters to try and justify excluding them is both inaccurate and

---

[10] As discussed in the Brief of Amicus St. Michael's Media, religious media can be unapologetically biased and still produce valuable journalism. *See* Brief, Dkt. 20. It has been a cornerstone of American journalism since before our nation's founding. *See id.* at 2. It still provides a check on government infringements on religious liberty and in investigating wrongs perpetrated by both religious institutions and the government. *See id.* at 3-5.

insulting to both the Appellants and the entire public. Viewpoint discrimination can not be solved with perceived tokenism.

### 1. So-Called "Security Concerns" are a Red-Herring

Appellees lean hard into the argument that this is all about "safety." "Legitimate security concerns also animated the County's decision to deny Mr. Conradson's application." Dkt. 39 at 34.[11] This not true, though, as is obvious from a cursory review of the record. It is *post hoc* argument by counsel to attempt to justify the County's unconstitutional acts and was no part of the denial of access. 3-ER-438 (no mention of "security" concerns in pass denial). Appellees only claimed that Conradson had failed to "avoid real or perceived conflicts of interest" and be "free of associations that would compromise journalistic integrity or damage credibility." *Id*.

The claim that Conradson's or TGP's reporting incited threats of violence to County employees was not deposited on the barn floor until after Appellants sued them. Indeed, three of the four articles Appellees

---

[11] They make this argument despite their press pass regulations making no mention of County employee safety. Even their articulation of the relevant government interest justifying the regulations makes no mention of employee safety. This alleged concern is completely unmoored from the regulations, and has no bearing on them or their enforcement.

cite for this outlandish claim were not published until *over a month after* Appellants were denied a press pass, and thus could not have played any role in Appellees' decision. 2-ER-219-278. As for the single article that was published prior to then, there is no record evidence that Appellees were even aware of the article's existence when they denied Appellants a press pass. This is strong evidence of Appellees' decision being motivated by viewpoint discrimination.

Once litigation began, the County pivoted its *argument* to claims that there have been "threats." Where are these threats? There is not a single one in the record. The County did a deep enough dive into Conradson's social media history to find photos of him volunteering[12] years ago and at social events with people they do not like. 2-ER-146; 2-ER-205-210. With all of this opposition research, the County couldn't find a *single* copy of a *single* "threat" made against a Maricopa County official to put in the record? All it could find is another competing journalist claiming they happened at some time in the past?

---

[12] It is worth noting that Conradson's volunteering was clearly during the 2020 election, and he testified that he has been a journalist for 1.5 years. 2-ER-58:7-11. Even if it had been last month, this would not be a legitimate reason to exclude him. But, to exclude him for something he did prior to being a journalist is even more constitutionally bankrupt.

Either these "threats" do not really exist or they do not support the County's position. Even if they existed, how could anyone know the sender's motivation or if the sender actually truly *read* TGP? Did they merely read an article *about* TGP? Was it sent by someone trying to discredit TGP? We have nothing but post-hoc stories by a competitor.

## 2. Appellees Cannot Retaliate Against Appellants for the Speech of Others

Assuming, *arguendo*, that Appellees actually had security concerns in mind when denying access, their claim is unavailing. Appellees attempt to hold Appellants responsible for something third parties did. Meanwhile, there is not a shred of evidence that shows that anyone who engaged in such conduct ever even read Conradson's reporting, much less relied upon it for their motivation for their conduct.

Now for the first time,[13] the County seems to pivot to claiming that threats were not sent *to them*, but appeared in the comments section of an article. They have no copy of it, nor can TGP find it, despite a diligent

---

[13] As this is a brand new argument raised in on appeal, it should not be credited. Nevertheless, for the sake of completeness, and for the sake of instruction to the District Court on remand, the Court would not be out of line in addressing it.

search. Further, what does this have to do with Conradson? He most certainly does not have a "comments section," TGP does.

Let us presume that despite these factual voids, the County made this claim in good faith anyway. This would simply be yet another reason to rule for Appellants. The County is treating TGP as the publisher of third party comments, in derogation of 47 U.S.C. § 230. Further, this constitutes a form of a viewpoint-based heckler's veto in violation of the First Amendment.

### a) Section 230

Section 230 says "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Appellants comments section is an interactive computer service. The County can not hold Appellants responsible for what happens in their comments section. *See Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008); *Jones v. Dirty World*, 755 F.3d 398, 412 (6th Cir. 2014). Nor can they be held responsible for actions committed elsewhere, by others, absent a finding of "incitement" under *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

### b) Lack of Any Nexus

The County surely can not be arguing that it is excluding the Appellants as *punishment* for things other people did, in the past. Or, perhaps it is, the County's arguments are unclear. But, this would be grossly improper. The government does not get to banish a media outlet from reporting as a punishment, and if it does, it certainly requires real due process and some legitimate basis.

So let us be charitable and say that Maricopa's real argument is that they are doing this to try and avoid future nastiness from unnamed third parties. If *this* is their justification, then it fails for two reasons – first, it makes no sense. Second, fear of a hostile audience is an admission of viewpoint discrimination, and constitutionally infirm.

If this is a remedial effort, the remediation has no rational connection to the problem. Appellees do not assert, much less provide evidence, that Conradson or any other TGP reporter could compromise anyone's safety if they attend press conferences. They simply claim that they think that people say mean things to the County because TGP exists. How would that change if a TGP journalist is in the press room?

The County's witness stated, about Conradson, "*Mr. Conradson doesn't present as an ethical journalist who practices with integrity or professionalism. He doesn't contact us to seek the truth or to seek our response to what an accusation might be.*" 2-ER-93:3-6. In addition to being perjurious (*see* 2-ER-90:6-7) it erodes the County's position. If a purported problem with Appellants is they do not contact the County for comments, how does excluding Conradson from the ability *to do precisely that* thing help the problem? If there were any logical nexus between government claims of "inaccuracy" and "security," then how can the County claim it is bolstering security by denying Appellants access to the best possible way to be more accurate? This is like trying to remediate mold by spraying water on it.

This purported justification is nothing other than an attempt to cover up retaliation for Appellants' prior reporting, rather than an attempt to protect County employees. This "loose or nonexistent" "fit between means and ends," shows that this is a mere cover for viewpoint discrimination. *Chaker*, 428 F.3d at 1227.

### c) The Heckler's Veto

Even if there were the slightest rationality to this remediation argument, it would fail as it would be an admission of viewpoint discrimination. The heckler's veto is "odious viewpoint discrimination." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015). "A claimed fear of hostile audience reaction could be used as a mere pretext for suppressing expression because public officials oppose the speaker's point of view. That might be the case, for example, where the asserted fears of a hostile audience reaction are speculative and lack substance, or where speech on only one side of a contentious debate is suppressed." *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 502-03 (9th Cir. 2015).

The concept of the heckler's veto is usually invoked where the alleged threat of violence comes from a hostile audience against the speaker. Here, there is a claimed presumption that people *might* read TGP and then say bad things, themselves. *Dirty World* recognized that failing to apply Section 230 would result in this style of "'heckler's veto' that would chill free speech." 755 F.3d at 407.

Here, the government is trying to effect this kind of a heckler's veto, by taking action against Appellants for third party responses to articles they publish online. The analysis might be different if Appellants directly called for imminent lawless action, but there is not even the allegation that Appellants sought out, or even wish for, such a response. In fact, they actively discourage such conduct.[14]

In a similar heckler's veto case, the District of Maryland (affirmed by the Fourth Circuit) held:

> Applying these principles to the facts before the Court, plaintiff is likely to succeed on its claim that the City's conduct was not viewpoint-neutral. Without question, the City reacted to a perceived safety concern arising from past use of inflammatory remarks by some of the rally speakers. In thwarting the rally, the City essentially invoked or relied on the heckler's veto. And, in doing so, it exercised complete, unfettered discretion; it acted on an ad hoc basis, without any standards. Further, it has presented somewhat shifting justifications for its actions, with little evidence to show that the decision was premised on these justifications.

---

[14] *See* Joe Hoft, "Friendly Reminder: The Gateway Pundit Is a 'Zero Tolerance for Threats' Zone," THE GATEWAY PUNDIT (Dec. 6, 2022), available at: https://www.thegatewaypundit.com/2022/12/friendly-reminder-gateway-pundit-zero-tolerance-threats-zone/ (last accessed Dec. 23, 2022).

*St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F. Supp. 3d 327, 370 (D. Md. 2021), *aff'd* No. 21-2158, 2021 U.S. App. LEXIS 39004 (4th Cir. Nov. 3, 2021).

This is what happened here. The County (if its *post-hoc* rationale is credited) reacted to a "perceived safety concern." However, in this case, it is unclear if there was even a real "safety concern" on the County's part, since it never raised that until after being sued. However, even if we credit their claim, this "concern" arises from not-even-inflammatory-statements by Appellants. For example, the Appellees lamented that Conradson compared the County's conduct to Orwell's "Ministry of Truth." 2-ER-145; 2-ER-118:2–119:7. A government in a free country should be expected to take a playful jab like without feeling the uncontrollable urge to retaliate. Well, they can *feel* any way they like, but the First Amendment will not let them act on it. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and … it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (making no exception for insulted County officials).

The County now, *post hoc*, relies on claimed concerns that if Appellants are permitted to be in a press conference, they might later write stories that the County speculates could motivate others to want to write mean emails. The layers upon layers of speculation in this should receive no credit.

Presumably, if even a single relevant threat, properly attributable to the Appellants was received, Appellees would have placed a copy of at least one of them, even unauthenticated, in its voluminous filings below. They did not. The County then acted on an ad hoc basis, applying its "standards" to one news source, and one news source only, and then just like in *St. Michael's Media*, presented the same flavor of "shifting justifications."

If the County's arguments are credited, then they must also bar POLITICO. After all, they reported on the leaked draft of the *Dobbs v. Jackson Women's Health Org.* decision, and thereafter Supreme Court justices received actual corroborated death threats. *See* Josh Gerstein and Alexander Ward, "Supreme Court has voted to overturn abortion

rights, draft opinion shows," POLITICO (May 2, 2022);[15] Pete Williams, *et al.*, "Man with gun, knife arrested near Justice Kavanaugh's house," NBC NEWS (Jun. 8, 2022).[16] But, just like POLITICO, Appellants' exercise of First Amendment rights cannot then be used as a basis to deprive them of those rights, just because third parties acted badly.

### 3. Appellees Targeted Appellants

Appellees singled out Appellants for disparate treatment. Their extremely broad definitions of "conflict of interest" and compromising associations would encompass every single reporter and news outlet that ever, at any point, advocated for a political candidate.[17] 1-ER-9; 2-ER-

---

[15] Available at: https://www.politico.com/news/2022/05/02/supreme-court-abortion-draft-opinion-00029473 (last accessed Dec. 22, 2022).

[16] Available at: https://www.nbcnews.com/politics/supreme-court/man-gun-arrested-justice-kavanaughs-residence-rcna32535 (last accessed Dec. 23, 2022).

[17] Appellees characterize this point as hypothetical in nature, but that is not so considering that there is no record evidence of Conradson violating the press pass regulations other than such associations. If these concerns are "hypothetical," this is only because Appellees have so obviously chosen to single out Appellants for exclusion that *of course* they would not bar a journalist they deem "legitimate" on these grounds. It is highly doubtful, for example, they would bar Dukakis & Clinton campaign member turned ABC News host George Stephanopoulos. The door between reporting and political advocacy is a revolving one. *See The Revolving Door,* Observer (Feb. 25, 2008) available at https://observer.com/2008/02/the-revolving-door/.

93:7-23. Indeed, the *only* evidence of such conflicts or associations that Appellees provided was Conradson supporting a political candidate in a *prior election* and being involved in *prior* political events. 2-ER-146; 2-ER-206-210. Despite these press regulations having such a broad scope, there is no evidence that Appellees have denied *anyone* other than Appellants a press pass on these grounds.[18] The only difference between Appellants and the media outlets that Appellees allow into their press conferences is viewpoint.

The specific sequence of events leading up to Appellees' decision also strongly suggests viewpoint discrimination. One of the Appellees, on the day Appellants applied for a pass, retweeted (with mocking approval) a post undeniably claiming that TGP was not a "legitimate" news outlet. 2-ER-22; Dist. Ct. Dkt. No. 25-1. But this is not evidence of animus?

This followed Appellants breaking the story in 2021 that a Maricopa County election official was an election denier, leading to his resignation. 3-ER-303; 3-ER-309; 3-ER-314; 3-ER-320; 3-ER-325; 2-ER-

---

[18] The brief by Amici Foundation for Individual Rights and Expression and the Marion B. Brechner First Amendment Project illustrates this point – that vague, subjective government standards intended to promote "truth" allow officials to bend those standards to engage in viewpoint-based discrimination. *See* Brief, Dkt. 29, at 9-10.

59:2-25. After this reporting, TGP's relationship with the County became contentious. 2-ER-59:25-60:2. It is true that the District Court found that this timeline did not *definitively prove* animus against Appellants, but (1) this is an abuse of discretion in light of the court making such a conclusion while also crediting double-hearsay Reuters articles for the position that Appellants' reporting caused death threats; and (2) this sequence of events, when considered alongside all other indicia of viewpoint discrimination, leads to the inescapable conclusion that Appellees possessed such animus.

As for departure from normal procedures, Appellees created an entirely new set of standards. Despite the fact that their own definitions of the terms in these regulations would disqualify essentially every reporter in Arizona, Appellees only excluded the Appellants. Coming up with an entirely new set of rules and then immediately saying that *one* news outlet, and *no one else*, violates them is a significant departure from the norm and suggests the rules were crafted specifically to disqualify TGP based on its political viewpoint

**D.    Appellants are Likely to Prevail on Their Due Process and Equal Protection Claims**

Appellees admit that they cannot exclude Appellants from their press conferences without due process. Dkt. 39 at 38. They claim that they afforded it, but they fail to address any of the deficiencies. "Constitutional due process requires that a party affected by government action be given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *State of Cal. ex rel. Lockyer v. FERC*, 329 F.3d 700, 708 n.6 (9th Cir. 2003) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Appellants were given no meaningful time or manner to be heard. There is no appeals process, no standards used in deciding an appeal, or indication of how long an appeal may take. Appellees' denial letter to Conradson only cites the constitutionally improper provisions of the Policy, with no explanation of what conduct allegedly violated them. Furthermore, if we take Appellees' briefing at face value, they *also* denied him a press pass because they claim, with no support, that his reporting allegedly led to threats. Yet, this is mentioned nowhere in the denial email. 3-ER-438. In fact, the policy does not even have a requirement that "the response to the applicant's prior reporting must have always been polite" nor anything of the sort. The County admits to denying him for

apparently violating an unwritten rule, not telling him that this is why, and then claims it afforded him the opportunity to appeal it? Conradson didn't even have notice that the County claimed this "security" rationale until the County dropped it in the District Court.

Appellants did not even have notice of this (convenient-for-litigation) *post-hoc* justification, so how could they have confronted it? "Notice and [a meaningful] opportunity to be heard are the hallmarks of procedural due process." *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012) (*quoting Guenther v. C.I.R.*, 889 F.2d 882, 884 (9th Cir. 1989)) (alteration in original). Without notice of the "security" issue, were Appellants expected to guess that the County would invent this argument out of thin air?

It was reversible error for the District Court to find that this lack of information about the grounds for denial of a press pass, complete lack of information about the appeals process, and undisclosed reasons for denying a press pass satisfied due process.

## II.    TGP Will Suffer Irreparable Harm in the Absence of the Requested Injunction

Appellees claim that restricting newsgathering does not constitute an irreparable injury because it does not burden "speech." As this Court

already found, such a contention lacks merit, and "[v]iewpoint discrimination as to in-person access to such conferences is not a de minimis injury." *Sellers*, 2022 U.S. App. LEXIS 33641 at *16. By Appellees' reasoning, a government restriction on believing in God or joining a political party would not constitute irreparable harm because, technically, the restricted activities do not involve speech.

Appellees cite *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1135 (D. Alaska 2021) for the proposition that "[t]he law recognizes that alleged harm to First Amendment rights from the denial of a press pass are *de minimis* where the same press conference is available by livestream." Dkt. 39 at 40. This misrepresents the holding in *Alaska Landmine*. After acknowledging that *any* restriction of First Amendment rights constitutes irreparable harm, it noted that such harm was *de minimis* at that time because, due to the COVID-19 pandemic, *all press conferences were being held remotely* and livestreamed. *Alaska Landmine*, 514 F. Supp. 3d at 1135. That is not the case here, as Appellants were denied their right to attend a press conference in person while the County was holding them in person. If the County wishes to move *all* press conferences to an online format, it might be able to do that.

But, it can not simply tell selected media it dislikes to "watch it on YouTube" while favored media come to participate, live. Moreover, in *Alaska Landmine*, the press conferences were held by "Zoom or general videoconference." *Id.* at 1127. Those platforms are interactive. YouTube is not. *Alaska Landmine* is, therefore, inapposite in this regard.

Appellees also forget that they admitted that there is no possibility for online viewers to present questions. 2-ER-91:20-23. They further simply ignore the fact that that not all press conferences were livestreamed. 2-ER-69:4-20; 2-ER-77:3-8.[19]

Appellees also repeat their argument, which this Court already rejected, that Appellants' alleged delay undercuts any assertion of irreparable harm. However, the County is not being sincere when trying to claim that Appellants simply sat on their hands for 41 days. Conradson tried, unsuccessfully, to convince the County to change its mind. 2-ER-

---

[19] Appellees further argue that any constitutional harm was *de minimis* because Appellants have no greater right to newsgathering than the public. Dkt. 39 at 40-41. But the average member of the public does not satisfy the content and viewpoint-neutral portions of the press pass regulations, unless the government now wants to raffle off press conference tickets to the general public. This argument makes no sense.

74:3-6; 3-ER-440–441 (discussing Conradson's increasing attempts to resolve the matter without litigation).

In doing so, they apparently contend that Appellants should have known beforehand that there would be such deeply newsworthy irregularities in Maricopa's 2022 election. The cynicism in this contention is shocking. The election was not hot news until November 8, and once it became so, Appellants immediately sought to vindicate their rights. Even if Appellants *had* meaningfully delayed seeking relief, this Court has already found that such delay is not so substantial as to justify denying injunctive relief. *Sellers*, 2022 U.S. App. LEXIS 33641, *16-17 (citing *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985); *Arc of California v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014)). Appellees have made no effort to address this finding, and their argument fails.

## III.  The Remaining Factors Favor Appellants

Appellees argue that the balance of equities tips in their favor because Appellants were barely harmed by not being allowed into press conferences, repeating the false dichotomy that it was their newsgathering activities, not protected speech, that was restricted. But

just as any deprivation of one's First Amendment rights constitutes irreparable harm, such a deprivation also tips the balance of equities in Appellants' favor.

Appellees claim that they would be harmed by the requested relief, but fail to explain how. Appellees' claim that they would not be able to control the size of the crowd attending press conferences. But, this lacks credibility. Appellants do not seek to invalidate *all* restrictions – only two. Removing these particular regulations does not remove the County's ability to prevent a crowd from storming the press room. There is not even argument, much less evidence, that more than 50 *people* wanted to attend, much less 50 different news publications. The cited policy does not actually have a 50-reporter cap. 3-ER-426-427. And, it takes little imagination to conceive of a way to manage 51 or more journalists wanting to attend. The 50 largest readerships could attend. Or, all qualified journalists would draw lots. The County can not decide that it will exclude a single news outlet because it has taken on the role of a media critic, and it decided that it does not like Appellants' news product. Moreover, there is a difference between denying a press-pass altogether

and denying entry to a single press conference if there so-happens to then be a capacity concern.

For these reason, Appellees' arguments regarding the public interest also fail. The public will not be harmed by Appellants being allowed to attend press conferences. The public has a significant interest, however, in not being governed by unconstitutional regulations, and by having a powerful fourth estate that can gather and report the news effectively. In fact, the public would be harmed deeply if all the government needs to do in order to control the narrative of any story is by excluding journalists it finds to be hostile.

## CONCLUSION

The press is supposed to be a watchdog on government. The government does not get to walk through the pound, picking docile watchdogs. Those watchdogs may snarl and bark. They may be uncontrollable. When they are, they do the greatest service to the public. But, if the government expects its watchdog to simply lay its head in the government's lap, the government greatly exceeds the expectations of the First Amendment.

The Court should reverse the District Court's order denying Appellants' motion for a temporary restraining order and remand with instructions to grant the motion in its entirety, including to invalidate the suspect regulations as unconstitutionally vague.

Date: December 23, 2022.          RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

John C. Burns
BURNS LAW FIRM

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32-1(b) because this brief contains 6,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Century Schoolbook 14-point font.

Date: December 23, 2022.
RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

John C. Burns
BURNS LAW FIRM

*Attorneys for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: December 23, 2022.     RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza
Jay M. Wolman

David S. Gingras
GINGRAS LAW OFFICE, PLLC

John C. Burns
BURNS LAW FIRM

*Attorneys for Appellants*